**FENNEMORE LLP**
 James P. Hill, SBN 90478
 Gary B. Rudolph, SBN 101921
 Kathleen A. Cashman-Kramer, SBN 128861
600 B Street, 17th Floor
San Diego, California 92101
Telephone:        (619) 233-4100
Fax Number:      (619) 231-4372
grudolph@fennemorelaw.com

**STEPHEN NEW & ASSOCIATES**
Stephen P. New, West Virginia SBN 7756, Pro Hac Vice
430 Harper Park Dr
Beckley, WV 25801
Telephone: (304) 250-6017
steve@newlawoffice.com

Attorneys for Creditor Arcadian Vanguard, LLC

## UNITED STATES BANKRUPTCY COURT
## CENTRAL DISTRICT OF CALIFORNIA,
## SAN FERNANDO VALLEY DIVISION

| | |
|---|---|
| In re | CASE NO.: 1:24-bk-10396MB |
| Kast Media, Inc., fka Kast Media LLC, aka Sight Reading Academy, aka Kast, | Chapter 11 |
| Debtor. | **OBJECTIONS BY ARCADIAN VANGUARD, LLC TO THE DEBTOR'S SUBCHAPTER V PLAN (ECF # 71) FILED JUNE 11, 2024** |
| | Date:        October 22, 2024 |
| | Time:        1:30 p.m. |
| | Judge:        Hon. Martin R. Barash |
| | Dept.: Suite 342/Courtroom 303 |
| | United States Bankruptcy Court |
| | (Via Zoom.gov) |
| | Video/audio web address: |
| | https://cacb.zoomgov.com/j/1614174604 |
| | ZoomGov meeting number: 161 417 4604 |
| | Password: 392703 Telephone conference lines: 1 (669) 254 5252 or 1 (646) 828 7666 |

50283154.4

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

TABLE OF AUTHORITIES .................................................................................................... iii

SUMMARY OF THE OBJECTIONS ....................................................................................... 1

SUMMARY OF THE ARGUMENT ......................................................................................... 2

ADDRESSING THE INCOMPETENCE OF COLIN THOMSON .................................................. 4

ADDRESSING THE CLAIMS FILED ....................................................................................... 13

ARGUMENT .......................................................................................................................... 16

THE DEBTOR'S PLAN CANNOT BE CONFIRMED ................................................................. 16

A.    STANDARD FOR CONFIRMATION ............................................................................ 16

B.    BURDEN OF PROOF ................................................................................................. 17

C.    THE PLAN SHOULD NOT BE CONFIRMED BECAUSE IT DOES NOT
      SATISFY THE REQUIREMENTS OF SECTIONS 1129 and 1191 OF THE OF THE
      BANKRUPTCY CODE. ............................................................................................... 18

    1.    The Plan Does Not Meet the Requirements of Section 1129(a) Applicable
            Here Under Section 1191(b) ............................................................................ 19

        a.    Section 1129(a)(1) (Plan Compliance with Title 11).................................... 19

        b.    Section 1123(a)(1) (Designation of Classes of Claims and Interests) ........... 20

        c.    Section 1123(a)(3) (Specification of Treatment of Impaired Classes) .......... 20

        d.    Section 1123(a)(5) (Adequate Means for Implementation of the Plan) ........ 21

        e.    Section 1123(a)(6) (Prohibition on the Issuance of Nonvoting Equity
            Securities).................................................................................................. 21

        f.    Section 1123(a)(7) (Selection of Officers and Directors)............................. 21

        g.    Section 1123(b)(2) (Assumption or Rejection of Executory Contracts) ....... 22

        h.    Section 1129(a)(2) (Proponent Compliance with Title 11) .......................... 23

        i.    Section 1129(a)(3) (Good Faith)................................................................. 24

        j.    Section 1129(a)(4) (Disclosure of Payments)............................................... 25

        k.    Section 1129(a)(7) (Best Interests of Creditors Test)................................... 25

        l.    Section 1129(a)(9) (Administrative and Priority Claims) ............................. 26

        m.    Section 1129(a)(11) (Feasibility)................................................................ 27

        n.    Section 1129(a)(16) (Transfers Under Plan)................................................ 28

    2.    The Plan Does Not Comply with Section 1191 ............................................... 28

        a.    Section 1191(b)........................................................................................... 28

        b.    Section 1191(c)–Fair and Equitable............................................................. 29

        c.    The Plan Unfairly Discriminates ................................................................. 30

d.      Section 1191 (c)(3)(B) ..................................................................... 31

3.      Section 1129(d) (Avoidance of Taxes) ............................................... 31

CONCLUSION ........................................................................................................... 31

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

50283154.4

# <u>TABLE OF AUTHORITIES</u>

<u>**Page**</u>

**Cases**

<u>Bank of Am. Nat'l. Tr. & Savings Assoc. v. 203 N. LaSalle St. P'ship</u>,
    526 U.S. 434 (1999) ................................................................................................ 25

<u>In re Acequia, Inc.</u>,
    787 F.2d 1352 (9th Cir. 1986) .......................................................................... 17, 27

<u>In re Acequia, Inc.</u>, 787 F.2d 1352, 1364 (9th Cir. 1986) ...................................... 30

<u>In re Ambanc La Mesa Ltd. Ptshp</u>, 115 F.3d 650, 656 (9th Cir. 1997) ............... 30

<u>In re Ambanc</u>,
    115 F.3d 650 (9th Cir. 1997) ............................................................................ 17, 25

<u>In re Art & Architecture Books of the 21st Century</u>,
    No. 2:13-bk-141135-RK, 2016 Bankr. LEXIS 859 (Bankr. C.D. Cal. Mar. 18,
    2016) ......................................................................................................................... 28

<u>In re Brotby</u>,
    303 B.R. 177 (9th Cir. BAP 2003) ....................................................................... 27

<u>In re Chapel Gate Apartments, Ltd.</u>,
    64 B.R. 569 (Bankr. N.D. Tex. 1986) .................................................................. 25

<u>In re Corey</u>,
    892 F.2d 829 (9th Cir. 1989) ................................................................................. 24

<u>In re Curiel</u>,
    651 B.R. 548 (9th Cir. BAP 2023) ....................................................................... 29

<u>In re Downtown Inv. Club III, LLP</u>,
    89 B.R. 59 (9th Cir. BAP 1988) ........................................................................... 23

<u>In re Future Energy Corp.</u>,
    83 B.R. 470 (Bankr. S.D. Ohio 1988) .................................................................. 17

<u>In re Hobble-Diamond Cattle Co.</u>,
    89 B.R. 856 (Bankr. D. Mont. 1988) .................................................................... 29

<u>In re Jartran, Inc.</u>,
    44 B.R. 331,  (Bankr. N.D. Ill. 1984)
    (superseded by statute re: Rule 3018(a) ......................................................... 25, 26

<u>In re Johns-Manville Corp.</u>,
    68 B.R. 618, (Bankr. S.D. N.Y. 1986),
    aff'd 78 B.R. 407 (July 15, 1987) ..................................................................... 19, 20

<u>In re Johns-Manville Corp.</u>,
    843 F.2d 628 (2nd Cir. 1988) ............................................................................ 19, 27

<u>In re Johns-Manville Corp.</u>, 843 F.2d at 648–649 ................................................. 19

<u>In re Kowalzyk</u>,
    2006 WL 3032145 (Bankr. D. Minn. 2006) ........................................................ 29

In re Madison Hotel Associates,
        749 F.2d 410 (7th Cir. 1994) ................................................................................. 24

In re Patrician St. Joseph Partners Ltd.,
        169 B.R. 669 (D. Ariz. 1994) ................................................................................. 30

In re Perdido Motel Group, Inc.,
        101 B.R. 289 (Bankr. N.D. Ala. 1989) ................................................................... 26

In re Pizza of Hawaii, Inc.,
        761 F.2d 1374 (9th Cir. 1985) ............................................................................... 30

In re Prudential Energy Co.,
        58 B.R. 857 (Bankr. S.D. N.Y. 1986) .............................................................. 17, 27

In re PWS Holding Corporation,
        228 F.3d 224 (3d Cir. 2000) ................................................................................... 19

In re Samurai Martial Sports, Inc.,
        644 B.R. 667 (Bankr. S.D. Tex. 2022) .................................................................. 29

In re Stolrow's, Inc.,
        84 B.R. 167 (9th Cir. BAP 1988) .......................................................................... 24

In re Sylmar Plaza, L.P.,
        314 F.3d 1070 (9th Cir. 2002),
        cert. denied, 2003 US LEXIS 3748 (S.Ct. May 19, 2003) ................................... 24

In re Texaco, Inc.,
        84 B.R. 893 (Bankr. S.D. N.Y. 1988) .............................................................. 16, 19

In re Toy & Sports Warehouse, Inc.,
        37 B.R. 141 (Bankr.S.D.N.Y.1984) ....................................................................... 30

In re Tucson Self-Storage, Inc.,
        166 B.R. 892 (B.A.P. 9th Cir. 1994) ..................................................................... 30

In re Two Wheels Properties, LLC,
        625 B.R. 869 (B.Ct. S.D. Tex, 2020) .................................................................... 19

In re VDG Chicken, LLC,
        2011 WL 3299089 (9th Cir. BAP 2011) ............................................................... 18

In re W. Asbestos Co.,
        313 B.R. 832 (N.D. Cal. 2003) .............................................................................. 20

In re WCI Cable, Inc.,
        282 B.R. 457 (Bankr. D. Or. 2002) ....................................................................... 16

Jorgensen v. Federal Land Bank of Spokane (In re Jorgensen),
        66 B.R. 104 (B.A.P. 9th Cir. 1986) ....................................................................... 24

United States of America v. Arnold & Baker Farms (In re Arnold & Baker Farms),
        177 B.R. 648 (9th Cir. BAP 1994) ........................................................................ 18

United States v. Energy Resources Co., Inc.,
        495 U.S. 545 (1990) ............................................................................................... 27

iv

**Statutes**

11 U.S.C. § 101 et seq. ........................................................................................... 2

11 U.S.C. § 109 ..................................................................................................... 19

11 U.S.C. § 507(a)(2) ...................................................................................... 20, 26

11 U.S.C. § 507(a)(3) ...................................................................................... 20, 26

11 U.S.C. § 507(a)(8) .................................................................................. 20, 26, 27

11 U.S.C. § 1122 ......................................................................................... 16, 19, 20

11 U.S.C. § 1123 ......................................................................................... 16, 19, 20

11 U.S.C. § 1123(a)(1) .......................................................................................... 20

11 U.S.C. § 1123(a)(3) .......................................................................................... 20

11 U.S.C. § 1123(a)(5) .......................................................................................... 21

11 U.S.C. § 1123(a)(6) .......................................................................................... 21

11 U.S.C. § 1123(a)(7) .......................................................................................... 22

11 U.S.C. § 1123(b)(2) .......................................................................................... 22

11 U.S.C. § 1124 ................................................................................................... 16

11 U.S.C. § 1124(a)(1) .......................................................................................... 20

11 U.S.C. § 1126 ................................................................................................... 16

11 U.S.C. § 1127(b) ............................................................................................... 23

11 U.S.C. § 1129 ............................................................................................... 2, 18

11 U.S.C. § 1129(a) ............................................................................................... 16

11 U.S.C. § 1129(a)(1) .......................................................................................... 19

11 U.S.C. § 1129(a)(11) ......................................................................................... 27

11 U.S.C. § 1129(a)(15) ......................................................................................... 16

11 U.S.C. § 1129(a)(16) ......................................................................................... 28

11 U.S.C. § 1129(a)(2) ..................................................................................... 23, 24

11 U.S.C. § 1129(a)(3) .......................................................................................... 24

11 U.S.C. § 1129(a)(4) .......................................................................................... 25

11 U.S.C. § 1129(a)(7) ..................................................................................... 25, 26

11 U.S.C. § 1129(a)(8) .......................................................................................... 16

11 U.S.C. § 1129(a)(9) ..................................................................................... 26, 28

11 U.S.C. § 1129(a)(9)(C) ....................................................................................... 27

11 U.S.C. § 1129(d) ............................................................................................... 31

11 U.S.C. § 1182(1) ............................................................................................... 19

11 U.S.C. § 1191 ........................................................................................... 2, 16, 31

v

11 U.S.C. § 1191(a) ................................................................................................................ 16

11 U.S.C. § 1191(b) ........................................................................................................... passim

11 U.S.C. § 1191(c) ......................................................................................................... 17, 29

11 U.S.C. § 1191(c)(2) ........................................................................................................... 18

11 U.S.C. § 1191(c)(3) ........................................................................................................... 18

11 U.S.C. § 1191(c)(3)(A) ..................................................................................................... 30

11 U.S.C. § 1191(c)(3)(B) ..................................................................................................... 31

**Other Authorities**

H.R. Rep. No. 5-595, 95th Cong., 1st Sess. 412 (1977) ................................................... 19, 20

S. Rep. No. 95-989, 95th Cong., 2d Sess. 126 (1978) ..................................................... 19, 20

**Treatises**

5 Collier on Bankruptcy ¶ 1129.02[11], (15th ed. 1984) ....................................................... 30

50283154.4

**TO THE HONORABLE MARTIN R. BARASH, UNITED STATES BANKRUPTCY COURT JUDGE, THE DEBTOR, DEBTOR'S COUNSEL, AND OTHER INTERESTED PARTIES:**

Creditor and party in interest Arcadian Vanguard, LLC ("Arcadian"), by its attorneys of record, hereby objects to the confirmation of the Subchapter V Chapter 11 Plan [ECF #71] ("Plan") filed by the debtor Kast Media, Inc. ("debtor") on June 11, 2024.

## SUMMARY OF THE OBJECTIONS

As a preliminary matter, the debtor may not be eligible to propose a plan, never mind confirm one, since it is currently not in good standing in the state of Delaware, where it is incorporated. See Exhibits "1" and "2" attached to the Declaration of Gary Rudolph in support of this opposition ("Rudolph Declaration").  In addition, as revealed in the deposition of Colin Thomson conducted on August 1, 2024, there is at least $3 million or more in general unsecured claims against the debtor that were not included in the debtor's schedules. See the transcript of the Colin Thomson deposition attached as Exhibit "3" to the Rudolph Declaration. When added to the scheduled undisputed unsecured claims totaling $6,568,295.80 (see ECF #13, p. 34)[1], the debtor would have more than $9,500,000 in unsecured claims and, as a result, would not qualify for subchapter V relief, as the debt limit at the time the debtor filed this case was $7,500,000.

As to the plan itself, the plan proposed by the debtor is not feasible, and the debtor's principal is not competent to run the company in any event. The "projections" on which the plan is based are unsupported, as demonstrated by the operating reports and other documents filed in this case to date. The debtor seriously underestimated the claims in this case, and it has misrepresented or omitted crucial facts to this Court and to its creditors.  Its liquidation analysis is faulty because, among other things, it fails to account for and report possible avoidance powers actions, especially those existing against Colin Thomson, the Debtor's president, CEO, sole officer and director, and alleged 99% shareholder. Consequently, the plan is not proposed in good faith.  In short, the debtor has not and cannot propose a subchapter V plan that can be confirmed in this case.  As a result, confirmation should be denied.

---

[1] The schedule shows total claims of $6,912,619.38 for more than 60 creditors; of this amount 6 claims totaling $344,323.58 are listed as disputed, resulting in scheduled undisputed general unsecured claims of $6,568,295.80.

## SUMMARY OF THE ARGUMENT

The Plan (ECF #71) provides the following:

(i) Class 1 administrative claims (one wage claim totaling $1,077.22) will be paid in full on confirmation;

(ii) there are no Class 2 secured claims;

(iii) there are approximately 60 Class 3 general unsecured claims totaling $6,154,218.05, which will be treated as follows: either (a) they will each received a pro rata share of $230,000 OR (b) each one can elect to convert their claim pro rata to equity and share pro rata in the shares which Colin Thomson will be contributing to the plan; and

(iv) Class 4 equity interests will retain their interests.

See ECF #71, pp. 2-3.

The plan further describes total administrative claims of $60,000, an IRS priority claim in the amount of $212,370.11[2] which will not be paid on confirmation but which instead will be paid over 48 months; this suggests that the claim is impaired and thus should be entitled to vote or to consent to the treatment proposed by the debtor (but it was not given the opportunity to do so and there is no evidence that the IRS consented to the treatment proposed in the Plan); and an FTB claim for $2,550.86 which it proposes to pay on confirmation.

For the reasons set forth herein, the Plan should not be confirmed as it fails to satisfy all applicable elements of sections 1129 of the Bankruptcy Code (11 U.S.C. § 101 et seq.) and 1191, and is not in the best interest of the Debtor's creditor body as a whole.

## STATEMENT OF FACTS

The debtor was Arcadian's advertising agent from 2018 until the Summer of 2023, selling advertising inventory in exchange for the debtor receiving 20% of the revenues their sales team produced, and the other 80% was to be paid to Arcadian. From late 2021 until 2023, the parties were not able to agree on terms for a new contract and agreed to continue working under an implied contract

---

[2] As will be discussed further below, the debtor's estimated amount of the administrative and priority tax claims which the Debtor owes is substantially incorrect – by $474,859.80 ($110,854.52 + $364,859.80). See pp. 12-13 below.

with the same terms as the previous one; no agreement was ever reached. See the Declaration of Brian Last in support of this opposition ("Last Decl."), ¶¶2-4.

The debtor constantly had issues making payments on time, as well as with supplying detailed accounting to correspond with the payments. Last Decl., ¶5. Throughout 2022, transparency vanished and money stopped being sent regularly to Arcadian. Kast's decisions to send or not send payments were made by Colin Thomson, Kast's CEO. From Mr. Thomson's deposition taken on August 1, 2024, that the debtor lost its line of credit in 2022, yet during this period of time, Mr. Thomson made multiple luxury purchases, from a custom home to multiple luxury vacations – while podcasts like Arcadian's were not being paid. Last Decl., ¶¶6-8. Arcadian also learned at the Colin Thomson deposition that Arcadian's money was being factored – and Arcadian never granted permission for its revenue to be factored. Last Decl., ¶10.

Beginning in late 2022 and continuing until the relationship ended in May 2023, the debtor stopped sending regular income reports to Arcadian, and months would go by without any payments being made to Arcadian. Arcadian was told that no money could be paid without Colin's personal involvement, and that his in-house accountants were not supplied with source materials, only documents generated by Colin Thomson. See Last Decl., ¶¶11-22, and Exhibits A-C thereto.

During this period of time, the debtor never informed Arcadian of its significant financial problems, or that there was a chance that the money that was coming in would never be sent out; Arcadian asked if the debtor was in trouble. Colin finally, in May 2023, informed Arcadian that Kast was being purchased by PodcastOne. Among other things, this required Arcadian to enter into a new agreement with PodcastOne at payment terms that were considerably worse that the terms Arcadian had with the debtor. In addition, Arcadian could only expect to get paid a small portion of what it was owed, and would have to agree to take stock in the debtor. That was soundly rejected by Arcadian. Last Decl., ¶¶23-28 and Exhibits D-F.

The Debtor's Schedule G (ECF #13, p. 35) only lists one unexpired executory contract – an "option" agreement. It lists no contracts with any of the podcasters responsible for generating the advertising income on which the debtor so strongly relies. Yet, Mr. Thomson testified that there are numerous other unscheduled agreements, including, significantly, an agreement Kast entered into with

1   PodcastOne in September 2023.  See paragraphs 3, 32, 33, 34, 41, 43, and 46 of the Declaration of

2   Stephen New in support of this opposition ("New Declaration").

3        The Debtor did not schedule the state of Delaware as a creditor.  It is undisputed that the Debtor

4   is a Delaware domestic corporation. Yet, according to the records from the state of Delaware, Kast is

5   not in good standing in Delaware; has not filed required documents; and  owes approximately

6   $184,531.82 in unpaid taxes to Delaware. See paragraphs 2 and 3  and Exhibits "1" and "2" attached

7   to the Rudolph Declaration. Testimony by Mr. Elyashar, the accountant who prepared the debtor's tax

8   returns, and who was deposed on August 30, 2024, elicited that he knew Kast was a Delaware

9   corporation, and he had been preparing its tax returns since 2020.  See paragraph 39 and Exhibit 13,

10  attached to the New Declaration.

11  <u>**ADDRESSING THE INCOMPETENCE OF COLIN THOMSON**</u>

12       In its memorandum in support of confirmation, the debtor makes certain arguments.   For

13  example, at page 9, the Debtor addresses post-confirmation management, specifically, identifying that

14  Colin Thomson – the 99% shareholder and CEO pre- and post-petition, will continue to be leading the

15  Debtor.

16       Former Kast employee and VP Dustin Knouse is the owner of HoK Productions, and a

17  screenwriting professor at Southern New Hampshire University.  He was employed by the debtor for

18  6 years from 2017 until 2023.  Declaration of Dustin Knouse in support of this opposition ("Knouse

19  Decl."), ¶1.  In the beginning Colin Thomson was basically just a guy with a laptop editing other

20  people's podcasts.  Mr. Knouse used to cohost a pretty successful podcast on PodcastOne back in the

21  day (Penn's Sunday School with Penn Jillette) and discuss with Colin how a network works, and

22  everything PodcastOne did wrong.  Together they developed a method of doing business that was the

23  opposite of PodcastOne, focused on being supportive of creators. Colin always referred to Dustin as

24  his business partner and promised him equity in Kast.  Knouse Decl., ¶¶3-4.

25       Colin never let Dustin see the Debtor's financials, making it hard for him to set up goals and

26  budgets.  Colin always had an excuse as to why he could not show them.  Knouse Decl., ¶5.  Over

27  time, Colin changed from promised equity to stock options.  Dustin knew that payments were being

28  made late and he told Colin that he could not ignore paying people.  Colin kept bringing on more

4

shows, but not more staff to handle it until everyone was overworked, underpaid, and burned out. Knouse Decl., ¶6.

Colin refused to pay overtime and make proper schedules while Dustin held the title "VP". Dustin told Colin he needed to pay his producers overtime and that Colin could not run the debtor the way he was.  Knouse Decl., ¶¶7, 8.

In 2021, as Dustin was preparing to launch the Howie Mandel podcast show, he and his wife had a premature baby and the launch of Howie's show was delayed.  Colin said he wanted to redo the pilot, even though everything was already set up for launch.  Even though he was a VP, Dustin's hours were all logged in a time tracker.  It was still COVID and Dustin spent much time in the hospital, which Colin knew.  Colin blamed Dustin for the delay of Howie's launch, and advised that he was at risk for being let go in 30 days.   Knouse Decl., ¶¶9-11.

Despite a grueling schedule, Colin told Dustin that things were better and he saw improvements with Dustin's performance such that he paid Dustin another performance bonus.  However, three days before Dustin was to take paternity leave, Colin called and let him go.  Knouse Decl., ¶¶12-14.

The press release for the debtor's deal with PodcastOne said there was an all-stock buyout. Dustin and others who had stock options (which were supposed to be converted to stock in the debtor) were never permitted to exercise those options and have never heard anything from Colin regarding conversion, despite Colin's promises to the contrary.  Knouse Decl., ¶16.

Despite his testimony under oath, the debtor continues to ignore just how incompetent a leader Mr. Thomson is.  Mr. Thomson's testimony was taken on August 1, 2024, by stipulation of the parties. Twenty-three exhibits were marked during that time.  See Exhibit "3" attached to the Rudolph Declaration. As of the date of this opposition, Arcadian has not received any notice that Mr. Thomson has made any changes to his deposition transcript.

Among other things, in answer to questions about the debtor's business and finances, Mr. Thomson testified approximately 120 times  "I don't know," as follows:

| Deposition page and line | Summary of what Colin Thomson didn't know |
| --- | --- |
| 28:12-13 | Did Kast CFO Erik Wissig have access to Kast's Quickbooks? |

| Deposition page and line | Summary of what Colin Thomson didn't know |
|---|---|
| 42:10 | Was Vine St. (that Kast rented) a commercial property? |
| 47:24 -25 | When was the last time Kast filed an annual report in Delaware? |
| 48:12 | When was the last time Kast filed a Delaware tax return? |
| 49:14 | Is Delaware Kast's 11th largest creditor (but not listed)? |
| 53:14 | Was Kast behind in the rent for the Hayvenhurst property? |
| 56:17 | Which of Kast's accountants handled the PPP loan in 2020? |
| 57:25 | If Kast LLC ceased to exist after April 7, 2020,  how could it apply for a PPP loan? |
| 60:25 | What percent of Kast's revenue comes from Netflix and HBO? |
| 74:14  and line 23 | What is $136,537.32 in accumulated depreciation? |
| 75:02  and line 15 | Can you run a depreciation report in Quickbooks? |
| 75:24 -76-:07 | What is the computer listed? |
| 76:13 | What are the fixed assets valued at $72,489.31? |
| 76:15 | What is the furniture valued at $29,385.81 |
| 77:14 -78:16 | If furniture went to Howie Mandel in 2023 in settlement, why is it still listed as an asset in 2024? |
| 79:08 -80:12 | If studio equipment went to Howie Mandel in 2023 in settlement, why is it still listed as an asset in 2024? |
| 80:15 -81:04 | Why did Kast have a TD Ameritrade account? |
| 81:08 | Who is the best person to answer about that? |
| 83:23 | Why not keep business and personal expenses separate? |
| 87:06 - line 13 | What does customer credit accrual mean? |
| 87:21 | What does programmatic mean? ($8,323.59) |
| 88:03 | What does spot by spot accrual mean? ($471,855.44) |
| 88:21 | Why didn't he ask his accountants? |
| 89:13 | What is deferred salary of $34,615.67? |
| 89:25 | What does California PIT/SDI and SUI/ETT mean? |
| 96:11 -line 16 | How far back does the $5.857 million loss go? |
| 96:19 | Same re: net income |
| 97:25 | When was PodcastOne contract signed? |
| 98:06 | What is Kast's share of revenues under the PodcastOne contract? |

50283154.4

| Deposition page and line | Summary of what Colin Thomson didn't know |
|---|---|
| 103:19 | Why did he keep the money he got from the sale of the Mercedes G Wagon and not turn it over to Kast (since Kast owned the vehicle)? |
| 111:07 -line 24 | How much did Mr. Elyashar get paid for preparing returns? |
| 113:02 | Who was classified as a subcontractor? |
| 114:12 | What is vendor interest? |
| 115:02 | Was sponsorship money in an interest bearing account? |
| 115:18 -line 21 | What is account payable less $209,682.15 on the cash flow statement? |
| 115:25 | What is the Amex Delta Skymiles card ($8,391.66)? |
| 116:03 | What is deferred salary of $49,997.85? |
| 116:15 | Q Now, the four people that gave you the $2million in 2022, are they creditors of Kast Media?<br> A Yeah, I believe they would be defined as such.<br> Q All right. So let's start on page 11 of 24.<br> Are they secured creditors or unsecured creditors?<br> A I don't know. They're convertible<br> noteholders. |
| 117:21 | Why isn't Lyrical Media, who is owed $1.15 million, not on the creditor list? |
| 118:01 -118:22 | Why aren't Chuck Huebner and Larry Shulman and Clare Vista (lent $500,000) listed? |
| 125:03 | Did he operate Kast business out of the Vine St. home? |
| 127:07 | Why did Kast spend $539,864.50 for travel in 2022? |
| 141:20 | How to tell the difference between FastPay deposits and sponsor deposits? |
| 149:11 | StudioOne? |
| 153:01 | What are payment terms between Kast and Arcadian? |
| 153:19 | Can't tell which open bill payments get applied to which periods |
| 154:02 | Arcadian can't tell what it is owed from Kast's documents, can he? |
| 157:03 | Who in Kast would know? |
| 158:18 | Can't tell if Arcadian was ever paid current |
| 160:07 | Did Kast owe Arcadian money on December 31, 2022? |
| 166:20 | Did PodcastOne pay Kast's debt to Capchase? |
| 173:24 | Why was stock valued at $278,400 omitted as an asset in Kast's schedules? |
| 180:16 | Who represented him as a sophisticated investor? |

50283154.4

| Deposition page and line | Summary of what Colin Thomson didn't know |
|---|---|
| 185:14 | How was his $326,633 in non-employee compensation calculated? |
| 189:19 | How many hours a week did he work in 2021? |
| 190:25 -191:25 | How many employees did he have in 2020 when he took out the PPP loan? |
| 205:14 | What was rent of $88,278 for? |
| 207:12 | Why was Kast address on tax return same as his residence address? |
| 212:09 -line 23 | Why discrepancy between gross income and receipts? |
| 214:06 -line 18 | What was his total compensation? |
| 214:21 | What was $12,002 in repairs and maintenance for? |
| 214:24 -215:06 | What was rent of $266,855 for? |
| 215:15 | What was depreciation of $86,649 for? |
| 215:18 | What was advertising of $82,206 for? |
| 218:01 | How many employees in 2021? |
| 218:04 | What was his income in 2021? |
| 218:23 | Why bank charges of $10,477? |
| 219:06 | What is the number of computers in 2021? |
| 219:13 | Who got paid consulting fees of $384,368? |
| 220:25 | What was $185,482 in office expenses for? |
| 223:08 | What is $749,135 costs of goods sold comprised of? |
| 223:23 | Is his $346,959 in misc. income included in the total salary figure? |
| 224:04 | When was Hayvenhurst rented ? |
| 225:21 | What is depreciating item for $24,748? |
| 226:14 | Who was paid $346,000 for consulting? |
| 226:20 | What insurance policies did Kast have? |
| 231:25 | What was Kast going to do with the $2.5 million in additional capital it was trying to raise? |
| 238:25 | Why discrepancies in amounts owed to Arcadian? |
| 239:13 | Mike or Michael had best knowledge of Arcadian's account? |
| 240:15 | The payments on March 30 and March 17 |
| 241:16 -line 23 | Q So was Brian Last and Jim Cornette, were their payments in the summer of 2023 being conditioned on entering into this nondisclosure agreement with PodcastOne? A I don't know. Q Who would be the best person in Kast Media, Inc. to ask that question? A I don't know. Q You're the CEO. If one of your podcast |

| Deposition page and line | Summary of what Colin Thomson didn't know |
|---|---|
| | partners' payments are being conditioned on entering into a mutual nondisclosure agreement at the behest of a third party, like PodcastOne, shouldn't you know that? |
| 242:14 | Did Kast's relationship with Arcadian end in May 2023 per email received? |
| 243:03 | After May 28, 2023, was there no relationship with Arcadian except owing them money? |
| 247:08 | Did the Debtor owe Arcadian $166,000 at the time of the email dated May 27, 2023? |
| 250:03 | What was the current stock price at that time? |
| 251:16 -line 24 | What was the accounting process for Colin's 1099 misc income purposes? |
| 259:02 -line 5 | Was a corporate resolution required/done before Kast could pay large sums of money to Colin or his wife? |

Mr. Thomson also testified under oath, in response to questions, 23 times, that only his accountants could answer certain questions and that he "relied" on them to do certain things:

| Deposition page/line | 23 times Colin "relied on" or deferred to his "accountants" to respond to the questions about Kast's books and records |
|---|---|
| 55:19 | Accountants (not him) handled the PPP loan during Covid in 2020 |
| 56:19 | Emily Pender was one of many of his accountants |
| 64:20 | His accountants also handle all of Kast's post-petition accounts |
| 72:13 | The accountant at the time would know which accounts Kast used when it tried to use a separate bank account for sponsorship payments (but then discontinued it) |
| 74:15 | Ask accountants |
| 74:19 | Ask accountants |
| 81:13 | TD Ameritrade account - not listed as an asset - ask accountants. |
| 83:07 | Accountants classified business expenses. |
| 87:09 | Only accountants knew. |
| 87:25 | Only accountants knew. |
| 88:03 | Relied on accountants. |
| 88:11 | Relied on accountants. |
| 89:16 | Relied on accountants. |
| 90:22 | Relied on accountants. |
| 96:21 | Relied on accountants. |
| 112:17 | Relied on accountants. |
| 116:08 | Relied on accountants to prepare bankruptcy schedules. |
| 124:10 | Relied on accountants to prepare bankruptcy schedules. |
| 124:12 | Relied on accountants to prepare bankruptcy schedules. |
| 129:10 | Relied on accountants to prepare bankruptcy schedules. |

| Deposition page/line | 23 times Colin "relied on" or deferred to his "accountants" to respond to the questions about Kast's books and records |
|---|---|
| 156:22 | Analina was one accountant. |
| 157:18 | Current accountant Analina has Quickbooks access. |

There were also 25 times when Mr. Thomson's answers were "I don't recall":

| Deposition page/line: | "I don't recall" |
|---|---|
| 26:25 | When first started using Quickbooks. |
| 33:11 -line 15 | Whether or not he conducted significant Kast Media business with his personal Gmail account. |
| 41:10 | Details of leased space that Kast had in 2022 and 2023. |
| 54:03 | Length of lease. |
| 56:12 | PPP loan amounts that Kast took out. |
| 72:07 -line 9 | Anything about the separate account Kast tried to use solely for sponsorship payments, but then it stopped. |
| 103:03 | He sold the Mercedes G wagon (owned by Kast) for more than what was owed on it but does not know the details |
| 107:22 | Who were Kast employees in January/February 2024. |
| 112:11 | Who were Kast lawyers in January/February 2024. |
| 113:22 | Whether Kast paid his personal cell phone expenses. |
| 120:18 | Value of Kast stock in 2023 when he last had it valued. |
| 121:02 | How many stock options Dustin Knouse has. |
| 140:04 | How much of East West Bank's secured line of credit of $2 million was available to Kast. |
| 142:07 | Details of the Bondit $500,000 line of credit. |
| 153:02 | Payment terms with Arcadian. |
| 172:08 | PodcastOne deal/shares. |
| 197:08 -line 9 | Schaub - how much did Kast owe him and when? |
| 198:21 | Did Kast owe Schaub more than $1 million? And why is he not listed as a creditor in the case? |
| 201:20 | When did Rod Thomson and M. Yu obtain their stock that they got from Colin? |
| 202:05 | What insurance policies did Kast have in the last 5 years? |
| 252:20 | How did Kast pay Arcadian? |

Finally, Mr. Thomson answered 37 times that he "did not remember":

50283154.4

| Page/Line | Things Colin did not remember |
|---|---|
| 42:05 | Nothing about space leased for Kast. |
| 104:10 | Whether Kast paid Mercedes G wagon payments. |
| 106:11 - line 14 | Were vehicles insured? |
| 112:08 | Was Kast paying lawyers in January and February 2024? |
| 113:10 | Was Kast paying subcontractors in January and February 2024 ? |
| 119:19 | What is the exact number of shares he owns? |
| 122:06 | Attorney Neile Sacker owns stock options but he doesn't remember how many. |
| 125:11 - line 19 | What is the name of owner/landlord of Vine St. property? |
| 140:24 | How much money Fast Pay advanced to Kast? |
| 142:14 | Did CapChase put $4 million into Kast Media in the first quarter of 2022? |
| 145:25 | Details of Capchase agreement that it would loan Kast $1.4 million |
| 147:21 -line 25 | How much Kast money he used when he bought his home |
| 148:09 | What did house sell for (in June 2024!)? |
| 167:13 | What is the amount he settled with Capchase for in September 2023 |
| 198:02 | Which amounts owed over what periods of time to Schaub |
| 202:11 | What types of insurance policies did the Debtor have? |
| 204:13 | When Kast moved into Vine St. property? |
| 205:24 | Why Kast rented other property for $88,278? |
| 226:25 | Why Kast needed "special insurance" in 2022? |
| 227:07 -line 12 | What the $25,000 and $1,595.561 loans were used for? |
| 237:25 | Who prepared the original agreement with Arcadian? |
| 240:07 | Why Kast promised to make payments to Arcadian in an email then never made the payments? |
| 243:18 | Why Kast did not make the June-August 2023 payments to Arcadian? |
| 250:11 -line 23 | What are expenses for Stitchfix, Printify, etc. (personal or business)? |
| 253:20 | What is the process to differentiate between Colin's business and personal expenses? |

11

50283154.4

| Page/Line | Things Colin did not remember |
|---|---|
| 254:07 -line 10 | What credit cards he used 2021-24? |
| 257:23 | What his wife earned when she was a Kast employee between 2020-2022? |
| 258:10 | What is North Mill Capital? |

If he is telling the truth about what he does not recall, doesn't know, and doesn't remember, then Mr. Thomson is not competent to run a company like Kast, because he knows virtually nothing about the finances or operation of the business.  If he is being evasive with these answers, then he likewise should not be allowed to move forward to confirmation because he – the 99% shareholder and CEO of the debtor – is not acting in good faith.  Either way, he does not appear to be a manager that can make the business of Kast successful.

At page 11 of the debtor's memorandum (ECF #150), it discusses that all administrative claims will be paid in full on the Effective Date.  As demonstrated herein, however, the amounts estimated by the debtor's principal, Colin Thomson, are incorrect. Through Mr. Thomson the debtor ignores other administrative and priority claims which further demonstrate the infeasibility of the plan.  This includes but is not limited to the fact that Leslie Cohen's first fee application in this case seeks payment of $91,579.00 in fees (see ECF #129 filed September 4, 2024 and order entered September 26, 2024, ECF #160) – which is $41,579 more than estimated at Plan (ECF #71) page 4, and that the Subchapter V Trustee's fees are higher than the Debtor estimated ($13,192.00 versus estimated of $10,000.00) (see Order entered September 26, 2024, ECF #159).  It also ignores the proof of claim filed by the City of Los Angeles for unpaid municipal business taxes of $179,473.46 (priority) and $6,083.54 administrative).  Finally, it ignores priority tax claims owed to the state of Delaware by the Debtor in the amount of $184,531.82. See Exhibit 1"attached to the Rudolph Declaration.

| Administrative Claims | |
|---|---|
| Leslie Cohen's First Fee Application | $91,579.00 |
| Subchapter V Trustee's Fees | $13,192.00 |
| City of Los Angeles | $6,083.54 |
| | $110,854.54 |

| Priority Tax Claims | |
|---|---|
| City of Los Angeles Business Taxes | $179,473.46 |

12

| | |
|---|---|
| Delaware Taxes | $184,531.82 |
| TOTALS | $364,005.28 |

The administrative claims total $110,854.54 and the priority claims - again, ignored - total $364,005.28. See pages 13-14, infra.

Finally, at page 12, the debtor asserts, without support, that the Plan is feasible. As will be demonstrated herein, the undisputed facts show that the Plan is not feasible, is doomed to failure, and Colin Thomson, who is not competent to operate the debtor post confirmation, will be the only person to benefit from the debtor's continued operations by virtue of his healthy salary and continued reimbursements.

The debtor offers nothing of substance to supports its projections and assumptions – not even a declaration of Colin Thomson, the person who ran the company into the ground and who will continue to run it in the future (if the Debtor were to prevail). All else is speculation and smoke and mirrors.

## ADDRESSING THE CLAIMS FILED

The priority and administrative claims that claims that have been filed in the case also demonstrate why the plan is not feasible, and why Colin Thomson is unfit to operate this debtor. The claims register shows the following, which directly contradict debtor's "estimates:"

| Claim no. | Creditor | Amount | Classification | Comments |
|---|---|---|---|---|
| 1 | IRS (as amended 9/24/24) | $212,170.11 | Asserted as priority status | Claim also shows that the debtor has not filed certain tax returns |
| 2 | Franchise Tax Board | $3,042.42 | $2,550.86 asserted as priority status | Debtor did not pay the annual $800 fee for years 2020, 2022, 2023 and 2024 |
| 21 | Employment Development Department | $61,309.64 | All asserted as administrative/post-petition | |
| 22 | City of Los Angeles | $185,557.00 | $179,473.46 asserted as priority for unpaid municipal business taxes | For years 2022, 2023 and 2024 |
| Total | | $462,079.17 | | |

13

These claims and their impact on feasibility were also raised by Mr. Flahaut, the Subchapter V trustee, in his limited response filed September 6, 2024 (ECF #139).

In addition to the foregoing, the State of Delaware – where the Debtor is incorporated - states that the debtor owes it $184,531.82 for unpaid franchise taxes.  See Exhibit "1" attached to the Rudolph Declaration.  Exhibit "2" to the Rudolph Declaration also demonstrates that Delaware states that the Debtor has failed to file required reports and pay required taxes.  As a result, the total unpaid asserted priority tax claims are $646,610.99[3].

Without even addressing other non-governmental claims, the above shows that the Debtor's plan is not feasible since the projections do not come close to being able to pay the administrative and priority amounts.  These claims also show that the Debtor's principal cannot be trusted to properly run the debtor's business: Mr. Thomson is either unaware of his obligations to governmental agencies (state and federal), or he chooses to ignore them, since he does not file the necessary returns nor does he pay what is owed for the privilege of doing business.   Finally, the fact that these failures have continued post-petition further support a finding that he is incapable and should not be allowed to confirm a plan and operate the debtor's business post confirmation.

## ADDRESSING THE DEBTOR'S MONTHLY REPORTS

Debtor's operating reports (ECF #s 37, 62, 75, 91, 119 and 155) all demonstrate a similar pattern:  most months the debtor's post-petition expenses surpass its income:

| Item | March | April | May | June | July | August | Totals |
|---|---|---|---|---|---|---|---|
| Cash Receipts | $46,572.50 | $20,937.71 | $23,861.79 | $76,351.44 | $33,594.20 | $26,319.40 | $227,637.04 |
| Cash Disbursements | -$125.00 | -$16,064.82 | -$43,622.82 | -$33,518.88 | -$44,058.82 | -$45,061.26 | -$182,451.60 |
| Net Cashflow | $46,447.50 | $4,872.89 | -$19,761.03 | $42,832.56 | -$10,464.62 | -$18,741.86 | $45,185.44 |

In other words, Debtor's projections are very different than what the Debtor has experienced to date in this case.

Other issues raised by these monthly reports include:

---

[3] This figure includes all priority tax claims on the claims register with the addition of the unpaid taxes listed as owed in Delaware.  See Exhibit 1 to the Rudolph Declaration.

1. A significant amount of each month's "disbursements" goes to pay Mr. Thompson, freelance production costs, and contractor costs. The debtor purports to have no employees (other than Mr. Thomson). For example, for the month of August, the total disbursements made by the debtor were $45,061.26. ECF #155, p. 2, l. 21. Of the disbursements, $41,700.61 went to pay Mr. Thomson ($15,816.84), freelance production costs ($18,137), and contractor costs ($6,746.77). Yet nowhere is there any explanation of what the freelancers and contractors do for the debtor. Given that these costs are a significant percent of the debtor's monthly expenses, the debtor should be put to the task of justifying them. Otherwise, it appears that the sole purpose of the debtor continuing to operate is to make payments to Mr. Thomson and his friends and relatives.

2. Part of the payments to Mr. Thomson each month since may have included "reimbursement" of expenses; some months, these amounts are significant. See, e.g., the reports for May, July and August (ECF #s 75, 119 and 155, respectively). Yet nowhere does he identify what expenses are being reimbursed. There must be additional disclosure on this issue.

3. Of the six (6) months for which pre-petition reports have been filed, three of them (half) show that disbursements exceed income, often by substantial amounts. See e.g., the reports for May, July and August (ECF #s 75, 119 and 155). It appears that debtor's ability to earn, bill, and collect is extremely inconsistent and, hence, unreliable.

4. A review of all six filed monthly reports shows that the debtor has paid nothing to either the IRS, or to the states of California or Delaware, or to the City of Los Angeles, in taxes or fees that would be owed.

5. The Debtor started the case with cash of $173,442.95. ECF #13, p. 8. According to the most recent (i.e., 6th) monthly operating report, the debtor has on hand cash totaling $230,506.80 at August 31, 2024. This equates to an approximate net per-month increase, each month (for the 6 months covered by the 6 reports filed) of approximately $9,500.00. At this rate, the debtor's proposed plan is impossible.

6.  The cash on hand has to be reduced by $93,351.49, the amount of fees and costs awarded to debtor's counsel (ECF #160); $13,192, the amount of fees awarded to the Subchapter V trustee (ECF #159); plus any amount of fees and costs the debtor has to pay its accountant.

7.  Lastly, and disturbingly, the Debtor's most recent post-petition accounts receivable summary (see ECF # 155, p. 20) shows post-petition uncollected accounts receivable of $65,668.68.  Of that amount, $39,262.90 - almost 60% of the total outstanding receivables – have remained uncollected from more than 90 days.  That is half the time that the debtor has been in chapter 11.  The balance of uncollected receivables are-- $10,378.35 - 61-90 days old, $7,557.28 -31-60 days old, and $11,877.92 - 1-30 days old.  Again, this raises the question – how can this debtor perform going forward when it is unable to collect its own pre- and post-petition receivables?

These reports and the data summarized further support the proposed plan's lack of feasibility.

## ARGUMENT

## THE DEBTOR'S PLAN CANNOT BE CONFIRMED

### A.    STANDARD FOR CONFIRMATION

Pursuant to § 1191(a), all of the requirements set forth in § 1129(a) apply to Subchapter V cases with the exception of section 1129(a)(15). With only minor exceptions, all of the provisions of §§ 1122, 1123, 1124, and 1126 regarding contents of the plan, classification, impairment, and voting are fully applicable to a Subchapter V plan.  If all of the requirements of § 1129(a) are met with respect to a debtor's proposed Subchapter V plan–including the § 1129(a)(8) requirement that all impaired classes have voted to accept the plan–§ 1191(a) directs the court to confirm such plan.

For the Court to confirm the Plan, it must be established that the Plan complies with the requirements set forth in 11 U.S.C. § 1129(a) and 11 U.S.C. § 1191, which contains certain conditions precedent to confirmation. See In re WCI Cable, Inc., 282 B.R. 457, 466 (Bankr. D. Or. 2002); In re Texaco, Inc., 84 B.R. 893, 905 (Bankr. S.D.N.Y. 1988).

In addition, 11 U.S.C. § 1191(b) provides that "[n]otwithstanding section 510(a) of this title, if all of the applicable requirements of section 1129(a) of this title, other than paragraphs (8), (10), and (15) of that section, are met with respect to a plan, the court, on request of the debtor, shall confirm

the plan notwithstanding the requirements of such paragraphs if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan."  As described herein, the Plan is not "fair and equitable" as explained in Section 1191(c). which provides that a plan is fair and equitable if:

> (2) As of the effective date of the plan–
> (A) the plan provides that all of the projected disposable income of the debtor to be received in the 3-year period, or such longer period not to exceed 5 years as the court may fix, beginning on the date that the first payment is due under the plan will be applied to make payments under the plan; or
> (B) the value of the property to be distributed under the plan in the 3-year period, or such longer period not to exceed 5 years as the court may fix, beginning on the date on which the first distribution is due under the plan is not less than the projected disposable income of the debtor; and
>
> (3)    (A)(i) The debtor will be able to make all payments under the plan; or (ii) there is a reasonable likelihood that the debtor will be able to make all payments under the plan; and
> (B) the plan provides appropriate remedies, which may include the liquidation of nonexempt assets, to protect the holders of claims or interests in the event that the payments are not made.

## B.    <u>BURDEN OF PROOF</u>

As stated by the Ninth Circuit in <u>Ambanc</u>, "(t)he bankruptcy court must confirm a Chapter 11 (plan proponent's) plan of reorganization if the (plan proponent) proves by a preponderance of the evidence" that the plan satisfies section 1129. In re <u>Ambanc</u>, 115 F.3d 650, 653 (9th Cir. 1997). The Court has an independent duty to determine whether the plan has met all of the requirements necessary for confirmation. <u>See</u> <u>In re Acequia, Inc.</u>, 787 F.2d 1352, 1358 (9th Cir. 1986). The proponent of a plan has the burden of proof on each element of section 1129(a). <u>In re Prudential Energy Co.</u>, 58 B.R. 857, 862 (Bankr. S.D. N.Y. 1986) (later superseded by Texas statute). However, for those creditors who object, it is up to that objecting party to "produce evidence to establish the validity of the objection before the ultimate burden of proving that all the requirements of section 1129(a) have been met is shifted to the plan proponent." <u>In re Future Energy Corp.</u>, 83 B.R. 470 (Bankr. S.D. Ohio 1988). Arcadian submits that the same standard should be applicable to plans filed, as this plan was, under Subchapter V of Title 11.

The requirements for confirmation are identified in 11 U.S.C. § 1129.  "The debtor carries the burden of proving that a Chapter 11 plan complies with the statutory requirements for confirmation under § 1129[.]"  United States of America v. Arnold & Baker Farms (In re Arnold & Baker Farms), 177 B.R. 648, 654 (9th Cir. BAP 1994).)  Debtor must make this showing by a preponderance of the evidence.  (Ibid.)  Here, as with all other elements listed in § 1129, Debtor bears the dual burdens of proof and persuasion.  Arnold & Baker Farms, supra.  "Bankruptcy courts consider several factors when evaluating the feasibility of a plan, including: (1) the adequacy of the capital structure; (2) the earning power of the business; (3) economic conditions; (4) the ability of management; (5) the probability of the continuation of the same management; and (6) any other related matters which determine the prospects of a sufficiently successful operation to enable performance of the provisions of the plan."  (In re VDG Chicken, LLC, 2011 WL 3299089, at *6 (9th Cir. BAP 2011).)

In this case, as we will see below, debtor has not met its burden.  The evidence offered is entirely insufficient to overcome the troubling questions raised by what information was provided.

**C.    THE PLAN SHOULD NOT BE CONFIRMED BECAUSE IT DOES NOT SATISFY THE REQUIREMENTS OF SECTIONS 1129 and 1191 OF THE OF THE BANKRUPTCY CODE**

As set forth herein, the Plan fails to satisfy all requirements of section 1129(a) except for subsections (8), (10) and (15)–each of which is not applicable here under section 1191(b). The Plan is also not fair and equitable within the meaning of section 1191(c)(2) and (3). Accordingly, section 1191(b) is also not satisfied and the Plan cannot be confirmed.

In the debtor's status report filed September 17, 2024 (ECF #147), at para. 5.4, the Debtor asserts that it has timely filed all required tax returns and governmental filings, and paid all taxes due. This is not true.  As mentioned above, at this time the State of Delaware – in which the debtor is incorporated – shows that the debtor is not in good standing because it has failed to file annual franchise tax reports and pay the franchise taxes due.  See Exhibits "1" and "2" to the Rudolph Declaration.  Those records also show that the last annual report filed was for 2022, that the debtor is delinquent, that annual tax assessment is $106,415, and that as of September 30, 2024, the total tax due is $184,531.82.  See Exhibit "1" to the Rudolph Declaration.  However, the debtor did not schedule

1  the state of Delaware as a creditor and, as a consequence, Delaware was not given notice of these

2  proceedings or an opportunity to file a proof of claim.

3      In addition, a review of the debtor's six monthly operating reports filed in the case to date (ECF

4  #s 37, 62, 75, 91, 119 and 155), shows no taxes of any kind paid by the debtor while this case has been

5  pending.

6      There is case law that supports the proposition that when a corporation has not complied with

7  state law for tax reasons, then the corporation should not be considered to be "engaged in commercial

8  or business activities" such as is required to remain in a subchapter V case and propose a plan.  See In

9  re Two Wheels Properties, LLC, 625 B.R. 869 (B.Ct. S.D. Tex, 2020) [debtor not eligible for chapter

10  11 but could file a chapter 7 case].  The court analyzed the case under both Section 109 and 1182(1)

11  of the Bankruptcy Code, noting that state law is also determinative of a corporations eligibility.  Id.,

12  at 872-73. And in this case, the state of Delaware has already spoken.  See Exhibit "1" attached to the

13  Rudolph Declaration.

14    **1.**    **The Plan Does Not Meet the Requirements of Section 1129(a) Applicable Here**

15        **Under Section 1191(b)**

16      The Plan fails to comply with all provisions of sections 1129(a) and 1191(b) of the Bankruptcy

17  Code as established below.

18    **a.**    **Section 1129(a)(1) (Plan Compliance with Title 11)**

19      Section 1129(a)(1) requires a finding that the plan complies with the applicable provisions of

20  the Bankruptcy Code. 11 U.S.C. § 1129(a)(1); In re PWS Holding Corporation, 228 F.3d 224, 230 (3d

21  Cir. 2000); In re Johns-Manville Corp., 843 F.2d at 648–649; In re Texaco Inc., 84 B.R. at 905.  This

22  provision encompasses the requirements of sections 1122 and 1123 of the Bankruptcy Code, which

23  are the substantive provisions most relevant in satisfying section 1129(a)(1). See H.R. Rep. No. 5-595,

24  95th Cong., 1st Sess. 412 (1977); S. Rep. No. 95-989, 95th Cong., 2d Sess. 126 (1978); In re Johns-

25  Manville Corp., 68 B.R. 618, 629 (Bankr. S.D. N.Y. 1986), aff'd 78 B.R. 407 (July 15, 1987). In re

26  Johns-Manville Corp., 843 F.2d 628, 648–649 (2nd Cir. 1988); In re Texaco Inc., 84 B.R. at 905.  This

27  provision encompasses the requirements of sections 1122 and 1123 of the Bankruptcy Code, which

28  are the substantive provisions most relevant in satisfying section 1129(a)(1). See H.R. Rep. No. 5-595,

19

1    95th Cong., 1st Sess. 412 (1977); S. Rep. No. 95-989, 95th Cong., 2d Sess. 126 (1978); In re Johns-

2    Manville Corp., 68 B.R. 618, 629 (Bankr. S.D. N.Y. 1986), aff'd 78 B.R. 407 (July 15, 1987). Section

3    1122 governs classification of claims and interests and section 1123 sets forth the provisions that are

4    required to be included, and those that may be included, in a plan of reorganization. 11 U.S.C. §§ 1122

5    and 1123.  And as explained herein, since the debtor has failed to list and classify all classes, there is

6    no compliance with these sections.

7                    **b.**      **Section 1123(a)(1) (Designation of Classes of Claims and Interests)**

8              Subject to section 1122 of the Code, a plan must designate classes of claims, other than claims

9    of kind specified in sections 507(a)(2) (administrative expenses), 507(a)(3) (involuntary case gap

10   claims), or 507(a)(8) (unsecured priority tax claims) and classes of interests. 11 U.S.C. § 1123(a)(1).

11   See In re W. Asbestos Co., 313 B.R. 832, 841, n.11 (N.D. Cal. 2003) (claims arising from Bankruptcy

12   Code sections 507(a)(1), (a)(2), and (a)(8) are not classified because these claims may not be impaired

13   and their treatment in a plan may deviate from that specified in the Bankruptcy Code only if the

14   claimant affirmatively agrees to less favorable treatment).

15             As set forth herein, the debtor has completely ignored and omitted a significant number of

16   administrative and priority claims, including significant tax claims.  See the chart above at page 13.

17   The failure to designate such claims under the Plan fails to satisfy the requirement of 11 U.S.C. §

18   1123(a)(1).

19                   **c.**      **Section 1123(a)(3) (Specification of Treatment of Impaired Classes)**

20             A plan must "specify the treatment of any class of claims or interests that is impaired under

21   the plan." 11 U.S.C. § 1123(a)(3). The Plan specifies that Classes 3 and 4 are impaired because the

22   legal, equitable or contractual rights of holders of claims or interests in those Classes are altered under

23   the Plan. See 11 U.S.C. § 1124(a)(1). The Plan further specifies the treatment of such classes. Plan p.

24   3.  However, and as set forth herein, because the Debtor has failed to account for significant

25   administrative and priority claims, and omitted at least $3 million in general unsecured claim, its

26   proposed treatment of Classes 3 and 4 is both infeasible and nonsensical, as well as in bad faith (as to

27   Class 3).

28   / / /

d. **Section 1123(a)(5) (Adequate Means for Implementation of the Plan)**

A plan must "provide adequate means for the plan's implementation" and section 1123(a)(5) (A)–(J) lists several examples of what may constitute "adequate means." The examples of adequate means for implementation of a plan provided in section 1123(a)(5) are illustrative and the section does not exclude or limit any other means.

The Plan only provides that payments under the Plan will be made from cash on hand as of the confirmation date, and from the "Debtor's net disposable income over 5 years from the effective date," which the Debtor then estimates will only add up to $139,000, and it is based upon the debtor's projections. Plan, ECF #71, Para. C., p. 2.

Even if the debtor's post-petition operating reports today would support that figure (which they do not), it is clear that the plan is not feasible because the debtor significantly under reported (or concealed) significant administrative and priority claims, many of which are in the nature of unpaid taxes. As such, the debtor's "offer" to generate net disposable income, coupled with the cash on hand presently, will not pay all necessary claims in full as required.

e. **Section 1123(a)(6) (Prohibition on the Issuance of Nonvoting Equity Securities)**

A plan must provide for the inclusion in the charter of the debtor, if the debtor is a corporation, a provision prohibiting the issuance of nonvoting equity securities, and providing, as to the several classes of securities possessing voting power, an appropriate distribution of such power among such classes, including, in the case of any class of equity securities having a preference over another class of equity securities with respect to dividends, adequate provisions for the election of directors representing such preferred class in the event of default and the payment of such dividends. 11 U.S.C. § 1123(a)(6).

At a minimum, the debtor's intention here is vague and ambiguous, because it proposed that Class 3 creditors may elect to choose shares in the debtor. However, there is no discussion at all of voting rights or classification of equity interests.

f. **Section 1123(a)(7) (Selection of Officers and Directors)**

A plan shall "contain only provisions that are consistent with the interests of creditors and equity security holders and with public policy with respect to the manner of selection of any officer,

1    director, or trustee under the plan and any successor to such officer, director, or trustee." 11 U.S.C. §

2    1123(a)(7).  The plan here merely provides that Colin Thomson will continue to operate the Debtor

3    post-confirmation.  As set forth in detail above, and as evidenced by his deposition testimony, Colin

4    Thomson is not fit to run the debtor, and Arcadian submits this would be a great mistake to allow him

5    to do so.

6    **g.      Section 1123(b)(2) (Assumption or Rejection of Executory Contracts)**

7            A plan may "provide for the assumption, rejection, or assignment of any executory contract or

8    unexpired lease of the debtor . . . ." 11 U.S.C. § 1123(b)(2). The Plan presumes only one executory

9    contract, which claim has already been assumed.  See Plan ECF #71, p. 5, ¶6.01.  However, nowhere

10   does the Plan address the Debtor's contracts with PodcastOne.  Specifically, Arcadian recently, on

11   September 19, 2024, conducted the deposition of PodcastOne, with whom the debtor entered into three

12   contractual arrangements in late 2023; these are believed to be executory contracts but were not listed

13   on the debtor's schedule G.  New Decl., ¶3.  Specifically, in approximately August of 2023, the debtor

14   entered into a finder's fee agreement and two other revenue sharing agreements with PodcastOne /Live

15   One.  New Decl., ¶32 and see pg. 159 of Exhibit "1"; see, also, Exhibit "4" (attached to the New

16   Decl.).  According to Colin Thomson, the three shows which are owned and operated podcasts, and

17   are the subject of the finder's fee agreements, generate between $20,000 and $70,000 per month in

18   revenue for the debtor.  New Decl., ¶33 and (pg. 61, lines 18-19 of Exhibit "1" thereto).

19           Interestingly, because the debtor was "upside down", PodcastOne, a division of Live One,

20   opted not to move forward with its acquisition of the debtor.  See, deposition testimony PodcastOne,

21   attached to the New Decl. as Exhibit "7", see, also, Exhibit "7a". New Decl., ¶34.

22   The debtor did not list in its petition the revenues nor stock the debtor obtained in PodcastOne under

23   the finder's fee agreement and other related agreements.  Moreover, PodcastOne purportedly paid the

24   debtor's  line of credit Cap Chase 1.7 million dollars, with 1.392 million dollars' worth of Live

25   One/Podcast One stock.  (pgs. 160-163 of Exhibit "1")  New Decl., ¶¶41-42:

26           Q. Show me where in your bankruptcy petition.... shares...as an asset of Kast Media

27           A. I didn't see the shares listed on this form; I believe that they're not there.

28   (Pgs. 168-170 of Exhibit "1" to the New Decl.)

1    Mr. Thomson has represented himself as a "sophisticated investor and has such knowledge and

2    experience in financial and business matters that it is capable of evaluating merits and risk of – on

3    investment in the shares and is able to bear the economic risk of such investment in the shares for an

4    indefinite period of time and has the capacity to protect his, her, or its own interests as a result of the

5    undersigned's status." (pg. 175 of Exhibit "1" to the New Decl.)  However, the debtor's schedules do

6    not speak to the finder's fee agreement or other related agreements with PodcastOne, either in terms

7    of disclosing the asset nor what will occur after the lockdown expires in September 2025.  New Decl.,

8    ¶43.

9    The debtor benefited from its deals with PodcastOne by virtue of PodcastOne paying selected

10    podcast partners to the tune of 2.5 million dollars (pgs. 188-190 of Exhibit "1").  Despite a line of

11    credit of 4 million dollars in 2022, a loan of 2 million dollars in 2022, and PodcastOne paying off the

12    line of credit with CapChase at 1.7 million dollars, and PodcastOne paying Brandon Schaub 1.6

13    million dollars, the debtor nevertheless filed this bankruptcy case.  So poorly run was the debtor that

14    despite over 10 million dollars worth of investments by outside entities during the one-year pre-

15    petition, the Debtor filed this bankruptcy. The debtor's records do not accurately reflect where this

16    money went in 2022 and 2023.  New Decl., ¶46.  All that is known for certain is that none of this

17    money went to podcast creditors like Arcadian.

18    As such, the Plan cannot be evaluated under this section until the debtor's relationship with

19    PodcastOne and the impact of the three unscheduled pre-petition executory contracts  is addressed.

20    **h.    <u>Section 1129(a)(2) (Proponent Compliance with Title 11)</u>**

21    Section 1129(a)(2) requires that the proponent of a plan comply "with the applicable provisions

22    of this title." 11 U.S.C. § 1129(a)(2). Whereas section 1129(a)(1) focuses on the form and content of

23    a plan itself, section 1129(a)(2) is concerned with the applicable activities of a plan proponent under

24    the Bankruptcy Code. See <u>In re Downtown Inv. Club III, LLP</u>, 89 B.R. 59, 65 (9th Cir. BAP 1988)

25    ("Bankruptcy Code § 1127(b) requires that a modified plan must comply with Bankruptcy Code §

26    1129. Section 1129(a)(2) in turn requires that the proponent of the plan complies with the applicable

27    provisions of Title 11.").

28    While the debtor has assumed it had no duty to disclosure certain things to the Court because

1    it has filed this case as a Subchapter V case, the facts as they have developed in this case so far

2    demonstrate otherwise: between Colin Thompson's use of the debtor to pay his expenses and a rich

3    salary without having to produce results, being completely ignorant of the operations of the debtor

4    (see pages 5-12 above), and ignoring corporate formalities such as filing governmental documents and

5    paying taxes, such an arrangement suggests abuse.

6    Based upon the foregoing, the requirements of section 1129(a)(2) of the Bankruptcy Code are

7    not satisfied.

8    **i.    Section 1129(a)(3) (Good Faith)**

9    Section 1129(a)(3) of the Bankruptcy Code requires that a plan be "proposed in good faith and

10    not by any means forbidden by law." 11 U.S.C. § 1129(a)(3). The Ninth Circuit has held that, although

11    the Bankruptcy Code does not define "good faith," "(a) plan is proposed in good faith where it achieves

12    a result consistent with the objectives and purposes of the Code." In re Sylmar Plaza, L.P., 314 F.3d

13    1070, 1074 (9th Cir. 2002), cert. denied, 2003 US LEXIS 3748 (S.Ct. May 19, 2003). (citing In re

14    Corey, 892 F.2d 829, 835 (9th Cir. 1989)). "(F)or purposes of determining good faith under section

15    1129(a)(3) . . . the important point of inquiry is the plan itself and whether such plan will fairly achieve

16    a result consistent with the objectives and purposes of the Bankruptcy Code." In re Sylmar Plaza, L.P.,

17    314 F.3d at 1074 (quoting In re Madison Hotel Associates, 749 F.2d 410, 425 (7th Cir. 1994)).

18    As noted by the court in In re Stolrow's, Inc., 84 B.R. 167 (9th Cir. BAP 1988), good faith in

19    proposing a plan of reorganization is assessed by the Bankruptcy Judge and viewed under the totality

20    of the circumstances. Jorgensen v. Federal Land Bank of Spokane (In re Jorgensen), 66 B.R. 104, 108–

21    09 (B.A.P. 9th Cir. 1986). Good faith requires . . . a fundamental fairness in dealing with one's

22    creditors. Id., at 109. The Bankruptcy Judge is in the best position to assess the good faith of the parties.

23    In re Stolrow's, at 172.

24    In this case, Colin's lack of practical knowledge of the affairs of the debtor, the pattern of lack

25    of disclosures (agreement, claims, and self-dealing), and the clear pattern and history of not paying

26    taxes and governmental fees and filing required governmental documents, support denial of

27    confirmation and negates any claim of good faith.

28    Accordingly, the Plan is not proposed in good faith and the provisions of section 1129(a)(3)

24

1  have not been met.

2       **j.       Section 1129(a)(4) (Disclosure of Payments)**

3       Section 1129(a)(4) of the Bankruptcy Code requires that any and all fees promised or received

4  in connection with or in contemplation of a Chapter 11 case by professionals in their representation of

5  the estate of a debtor must be disclosed and subject to the court's review. See In re Chapel Gate

6  Apartments, Ltd., 64 B.R. 569, 573 (Bankr. N.D. Tex. 1986) (stating that before a plan may be

7  confirmed, "there must be a provision for review by the Court of any professional compensation").

8       In the instant case, any payments made by the debtor to estate professionals for services or for

9  costs and expenses in, or in connection with, this Chapter 11 case, have not been fully disclosed in the

10 Plan: the fees of Debtor's counsel are higher than projected, and the fees of the debtor's accountant

11 have been ignored. Accordingly, the Plan cannot comply with the requirements of section 1129(a)(4)

12 of the Bankruptcy Code.

13      **k.       Section 1129(a)(7) (Best Interests of Creditors Test)**

14      The "best interests of creditors" test set forth in section 1129(a)(7) of the Bankruptcy Code

15 requires that each holder of a claim or equity interest in an impaired class to either (a) accept the plan,

16 or (b) receive or retain property that is not worth less, as of the effective date of the plan, than the

17 amount that the holder of the claim or interest would receive or retain if the debtor were liquidated

18 under Chapter 7 of the Bankruptcy Code. See Ambanc, 115 F.3d at 656. The "best interests of

19 creditors" test is generally satisfied through a liquidation/recovery analysis. See, e.g., In re Jartran,

20 Inc., 44 B.R. 331, 389–93 (Bankr. N.D. Ill. 1984) (superseded by statute re: Rule 3018(a)); see also

21 Bank of Am. Nat'l. Tr. & Savings Assoc. v. 203 N. LaSalle St. P'ship, 526 U.S. 434, 442 (1999).

22      Under the best interest of creditors test, with respect to classes impaired under the Plan,

23 creditors and equity security holders who do not accept the Plan are to receive at least as much under

24 the Plan as they would receive under a Chapter 7 liquidation. The Debtors' Chapter 7 liquidation

25 analysis is set forth on Exhibit C to the Plan (ECF #71, at pp. 15-17).  Arcadian submits that this

26 analysis is faulty on many levels, including: it completely fails to even address a chapter 7 trustee's

27 avoiding powers claims against Mr. Thomson, which could have significant value in the hundreds of

28 thousands of dollars. These potential claims include but are not limited to: (1) recovery of the money

50283154.4

Colin took from Kast to buy his house; (2) recovery of the money Colin received when he sold the house post-petition; (3) hundreds of thousands of dollars in miscellaneous compensation that Colin received which is not salary and which cannot be substantiated; (4) the value of the benefit he received when Kast was paying his personal rent and/or mortgage for his and his wife's homes; and (5) the value and cost of thousands of dollars in travel and vacation expenses that benefitted Colin and his wife.  See paragraphs 9, 22, 23, 24, 35, 36, 45 and 50 of the New Declaration.

It also ignores that, despite listing accounts receivable with alleged value, the debtor has done nothing to collect any of the pre-petition accounts receivable, and in fact carries significant uncollected receivables post-petition that it either cannot or will not collect.  See the discussion at pages 14-16 above regarding the Debtor's monthly operating reports, and, as such, the debtor's liquidation analysis completely misstates (and understates) the administrative and priority tax claims the debtor owes.  The only thing that this liquidation analysis demonstrates is a guarantee to Colin Thompson of his salary for the next five years, at the expense of the pre-petition creditors from whom he deprived of their contractual share of advertising revenue paid to the debtor.  Finally, the debtor provides no support for the numbers contained in this so-called "analysis."

As such, the liquidation analysis – such that it is – is meaningless and, as a result, the Plan does not satisfy the "best interests of creditors" test under section 1129(a)(7) of the Bankruptcy Code. See Jartran, 44 B.R. at 389–93.

**l.    Section 1129(a)(9) (Administrative and Priority Claims)**

Section 1129(a)(9) of the Bankruptcy Code states the rules applicable to payment of those unsecured claims entitled to priority in distribution in Chapter 11 cases. 11 U.S.C. § 1129(a)(9). With respect to priority claims of the kind specified in Bankruptcy Code sections 507(a)(2), (3), or (8), section 1129(a)(9) constitutes the only essential confirmation requirement, since there is no reason to create a class or classes for sections 507(a)(2), (3), and (8) claims in light of the fact that a majority of such classes cannot bind a minority to less favorable payment terms than those provided under section 1129(a)(9). See In re Perdido Motel Group, Inc., 101 B.R. 289, 293 (Bankr. N.D. Ala. 1989);

The Plan provides for no treatment of more than $751,381.99 in administrative and priority tax claims against the debtor, and as such, there has been no opportunity to determine whether those

1    claimants consent to a "less favorable treatment." The Plan provided that all administrative claims

2    will be paid in full on the effective date of the Plan, in cash. However, the numbers don't lie: the

3    amount of administrative and priority claims - $751,381.99- far exceed the funds the debtor projects

4    to need on the effective date, but the Debtor has to pay them.

5        The Plan therefore does not satisfy section 1129(a)(9)(C) of the Bankruptcy Code. See 11

6    U.S.C. § 1129(a)(9)(C) (requiring payment in full of claims under § 507(a)(8) through "regular

7    installment payments in cash over a period ending not later than 5 years after the date of the order for

8    relief . . . .").

9                              **m.    Section 1129(a)(11) (Feasibility)**

10        The feasibility requirement in section 1129(a)(11) of the Bankruptcy Code requires that, as a

11    condition precedent to confirmation, the court determines that the plan is feasible. Specifically, the

12    court must determine that "(c)onfirmation of the plan is not likely to be followed by the liquidation,

13    or the need for further financial reorganization, of the debtor or any successor to the debtor under the

14    plan, unless such liquidation or reorganization is proposed in the plan." 11 U.S.C. § 1129(a)(11). The

15    feasibility test in section 1129(a)(11) requires the court to determine whether the plan is workable and

16    has a reasonable likelihood of success. United States v. Energy Resources Co., Inc., 495 U.S. 545, 549

17    (1990); In re Acequia, Inc., 787 F.2d at 1364 (finding that plan met feasibility requirement under

18    section 1129(a)(11) where the debtor presented evidence demonstrating that the plan had a reasonable

19    probability of success).

20        The feasibility standard is whether the Plan offers a "reasonable assurance" of success, under

21    which "a debtor need not prove that success is inevitable, and a relatively low threshold of proof will

22    satisfy § 1129(a)(11), so long as adequate evidence supports a finding of feasibility." In re Brotby, 303

23    B.R. 177, 191–192 (9th Cir. BAP 2003) (citations omitted). It is well established that success need not

24    be guaranteed and the court is not required to determine that the future success of the reorganized

25    debtor is inevitable in order to find that the Plan is feasible. In re Johns-Manville Corp., 843 F.2d at

26    649 (2d Cir. 1987); In re Prudential Energy Co., 58 B.R. at 862 ("guaranteed success in the stiff winds

27    of commerce without the protection of the Code is not the standard under section 1129(a)(11). Most

28    Debtors emerge from reorganization with a significant handicap. But a plan based on impractical or

27

1    visionary expectations cannot be confirmed.") (citations omitted).

2        In essence, feasibility generally requires a "reasonable probability" that (1) there will be

3    enough cash on hand on the effective date of the plan to pay all the claims and expenses which are

4    entitled to be paid on that date; and (2) there will be enough cash over the term of the plan to make the

5    required payments thereunder such that the plan is not likely to be followed by liquidation. See, e.g.,

6    In re Art & Architecture Books of the 21st Century, No. 2:13-bk-141135-RK, 2016 Bankr. LEXIS 859,

7    at *58 (Bankr. C.D. Cal. Mar. 18, 2016). The Plan comes nowhere near accomplishing this.

8        The projections set forth on Exhibit A to the Plan (see ECF #71 at p. 10) – if believed -

9    demonstrate that the debtor will not have adequate cash flow to make all required Plan payments and,

10   as a result, has no reasonable likelihood of success.

11       The second aspect of feasibility – namely, the need to show "a 'reasonable probability' of

12   satisfying (the proponent's) obligations under a plan so that '(c)onfirmation of the plan is not likely to

13   be followed by liquidation, or need for further reorganization, of the debtor . . .'" – has also not been

14   demonstrated by the debtor. The debtor has agreed to contribute all of its projected disposable income,

15   for a period of five years, as required under 1191(b).  And it is nowhere near enough.  Accordingly,

16   the Plan does not satisfy the feasibility standard of section 1129(a)(9) of the Bankruptcy Code.

17                **n.    Section 1129(a)(16) (Transfers Under Plan)**

18       Section 1129(a)(16) of the Bankruptcy Code requires that any transfers of property under a

19   plan be made in accordance with applicable non-bankruptcy law that governs the transfer of property

20   by a corporation or trust that is not a moneyed, business or commercial corporation or trust. The Plan

21   completely fails to address its agreements with PodcastOne.  See the detailed discussion regarding

22   these at pages 22-24, infra.

23       **2.    The Plan Does Not Comply with Section 1191**

24           **a.    Section 1191(b)**

25       Section 1191(b) provides that "[n]otwithstanding section 510(a) of this title, if all of the

26   applicable requirements of section 1129(a) of this title, other than paragraphs (8), (10), and (15) of

27   that section, are met with respect to a plan, the court, on request of the debtor, shall confirm the plan

28   notwithstanding the requirements of such paragraphs if the plan does not discriminate unfairly, and is

fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan." As set forth above, the Plan (ECF #71) does not comply with most of the provisions of Section 1129(a) and, as a result, the Plan does not satisfy the requirements of Section 1191(b).

### b.   Section 1191(c)–Fair and Equitable

Section 1191(c) provides that plan is fair and equitable if:

(2) As of the effective date of the plan—

(A) the plan provides that all of the projected disposable income of the debtor to be received in the 3-year period, or such longer period not to exceed 5 years as the court may fix, beginning on the date that the first payment is due under the plan will be applied to make payments under the plan; or

(B) the value of the property to be distributed under the plan in the 3-year period, or such longer period not to exceed 5 years as the court may fix, beginning on the date on which the first distribution is due under the plan is not less than the projected disposable income of the debtor.

In addition, Debtor must establish that its Plan is feasible and it will be able to make the plan payments it proposes. 11 U.S.C. § 1191(c). This standard is a harder and tougher standard than traditional feasibility. In re Curiel, 651 B.R. 548, 561 (9th Cir. BAP 2023) ("This third requirement requires a harder look at feasibility than otherwise conducted under § 1129(a)(11) alone."); In re Samurai Martial Sports, Inc., 644 B.R. 667, 698 (Bankr. S.D. Tex. 2022) (feasibility under § 1191(c)(3) differs from "the more relaxed feasibility test that § 1129(a)(11) contains."). As the plan proponent, the Debtor bears the burden of establishing "concrete evidence" that it has sufficient cash flow to make the payments required under the Plan. Curiel, 651 B.R. at 562-63. Accordingly, "[f]actual support must be shown for the Debtor's projections." In re Hobble-Diamond Cattle Co., 89 B.R. 856, 858 (Bankr. D. Mont. 1988). "The mere fact that the bare numbers in the income and expense projections provided in the plan demonstrate an apparent surplus to adequately fund the plan is not enough to meet the burden on feasibility." In re Kowalzyk, 2006 WL 3032145, at *5 (Bankr. D. Minn. 2006); Curiel, 651 B.R. at 563.

Feasibility requires the court to make a finding that the plan is "not likely" to fail. The purpose

of section 1129(a)(11) is to prevent "confirmation of visionary schemes which promise creditors and equity security holders more under a proposed plan than the Debtor can possibly attain after confirmation." In re Pizza of Hawaii, Inc., 761 F.2d 1374, 1382 (9th Cir. 1985) (quoting 5 Collier on Bankruptcy ¶ 1129.02[11], at 1129–34 (15th ed. 1984)); In re Patrician St. Joseph Partners Ltd., 169 B.R. 669, 674 (D. Ariz. 1994) (while proponent need not guarantee success, it must prove a "reasonable prospect of success.") Generally, whether a plan is "feasible" relates to whether the reorganized Debtor is likely to be able to satisfy its obligations under the Plan. Plans proposing to pay creditors over time are feasible if they are likely to accomplish their required distributions. See, e.g., In re Acequia, Inc., 787 F.2d 1352, 1364 (9th Cir. 1986).

In the Subchapter V context, the Court must find either that the "debtor will be able to make all payments under the Plan" or that "there is a reasonable likelihood that the debtor will be able to make all payments under the plan." Section 1191(c)(3)(A). Here, debtor has provided no evidence of its ability to make any plan payments other than unsupported projections. The debtor must provide more than mere numbers on a page to show its ability to perform under the Plan. Arcadian submits that the undisputed facts set forth herein, and the discussion above, demonstrate that the Plan is in fact not fair and equitable and, for the most part, primarily benefits only Colin Thomson.

### c.    The Plan Unfairly Discriminates

The Plan unfairly discriminates against those 60+ creditors who, pre-petition, generated all of the income the debtor received, and who were not paid their  share of advertising and other revenues that the debtor had agreed to pay them. The term "unfair discrimination" is not defined in the Bankruptcy Code. Courts in the Ninth Circuit, with respect to unfair discrimination, have stated that a plan discriminates unfairly if it singles out the holder of a claim for particular treatment. See In re Toy & Sports Warehouse, Inc., 37 B.R. 141, 151–52 (Bankr.S.D.N.Y.1984); In re Tucson Self-Storage, Inc., 166 B.R. 892, 898 (B.A.P. 9th Cir. 1994). Under Ninth Circuit law, disparate treatment of similarly situated creditors is unfair unless the treatment has a reasonable basis, is necessary to any successful plan, is proposed in good faith, and is reasonable in light of the rationale. In re Ambanc La Mesa Ltd. Ptshp, 115 F.3d 650, 656 (9th Cir. 1997).

And now the debtor plans to continue in largely the same business, using the same business

1   model, all the while predicting it will generate a pittance ($139,000 in net income over five years).

2   And it will operate under the auspices of its 99% shareholder and CEO who testified under oath

3   many times at his deposition that he does not know or understand the financials and working of the

4   Debtor.  This is not a debtor with a good chance of becoming a success story, and foreshadows

5   additional podcast customers who will likely suffer the same fate as the pre-petition creditor have

6   already suffered – not getting paid despite generating significant income (that went into the Debtor's

7   pocket).

8       Further the debtor has not scheduled all the claims of employees or taxing agencies, such that

9   their omission discriminates against them by failing to allow them to participate in the confirmation

10   process.  As a result, this requirement of section 1191 has not been met.

11       **d.    Section 1191 (c)(3)(B)**

12       Finally, Section 1191(c)(3)(B) requires a plan to provide remedies in the event that payments

13   are not made. This Plan fails to do so, and only provides that the Court retains jurisdiction over the

14   enforcement and interpretation of the Plan.

15       **3.    Section 1129(d) (Avoidance of Taxes)**

16       Section 1129(d) of the Bankruptcy Code provides that "on request of a party in interest that is

17   a governmental unit, the court may not confirm a plan if the principal purpose of the plan is the

18   avoidance of taxes or the avoidance of . . . Section 5 of the Securities Act of 1933." 11 U.S.C. §

19   1129(d).  Query whether the Debtor's choice to not  schedule the state of Delaware, or the City of Los

20   Angeles, or to understate the IRS claims, was done intentionally or not.  The Plan as it stands now

21   violates section 1129(d).

22       **CONCLUSION**

23       The debtor's Plan barely scratches the surface of demonstrating a fair and reasonable way of

24   paying creditors of all kinds in this case.  The debtor cannot even "clean its own house:" It fails to file

25   required returns and statements with governmental entities, and fails to pay taxes and fees required of

26   it for the privilege of doing business.  And the debtor will continue to be led by the person who drove

27   the Debtor into bankruptcy, and who under oath appears to know little about how the Debtor operates.

28

50283154.4

1   If it won't pay those claims, what faith can anyone have that the Debtor will pay these significant and

2   overdue claims?

3       Arcadian submits that the proposed Plan be denied confirmation, that the Debtor cannot

4   propose any confirmable plan at this time, that this case should be immediately converted to Chapter 7,

5   and for other such relief as the Court deems just and proper.

6

7   Dated: October 2, 2024              FENNEMORE LLP

8                                       By:    /s/Gary B. Rudolph
9                                              Gary B. Rudolph
                                               Kathleen A. Cashman-Kramer
10                                             Attorneys for Creditor and Party in Interest Arcadian
                                               Vanguard LLC
11
                                        STEPHEN NEW & ASSOCIATES
12

13  Dated: October 2, 2024
                                        By:
14                                             Stephen P. New, Esq.
                                               Attorneys for Arcadian Vanguard LLC
15

16

17

18

19

20

21

22

23

24

25

26

27

28

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:

600 B Street, Suite 1700 San Diego, CA 92101

A true and correct copy of the foregoing document entitled (*specify*):

**OBJECTIONS BY ARCADIAN VANGUARD, LLC TO THE DEBTOR'S SUBCHAPTER V PLAN (ECF # 71) FILED JUNE 11, 2024**

will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) 10/02/2024, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- **Kathleen A Cashman-Kramer**    kcashman-kramer@fennemorelaw.com, theresam@psdslaw.com
- **Russell Clementson**    russell.clementson@usdoj.gov
- **Leslie A Cohen**    leslie@lesliecohenlaw.com, jaime@lesliecohenlaw.com;clare@lesliecohenlaw.com
- **Asha Dhillon**    asha.dhillon@turnerdhillon.com
- **Moriah Douglas Flahaut (TR)**    douglas.flahaut@arentfox.com, C194@ecfcbis.com
- **Samuel R Maizel**    samuel.maizel@dentons.com,
  alicia.aguilar@dentons.com;docket.general.lit.LOS@dentons.com;tania.moyron@dentons.com;kathryn.howard@dentons.com;joan.mack@dentons.com;derry.kalve@dentons.com
- **Gary B Rudolph**    grudolph@fennemorelaw.com,
  bkstaff@sullivanhill.com;vidovich@ecf.inforuptcy.com;rudolph@ecf.courtdrive.com;kcashman-kramer@fennemorelaw.com;ejames@fennemorelaw.com;james@ecf.courtdrive.com
- **United States Trustee (SV)**    ustpregion16.wh.ecf@usdoj.gov

☐ Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:
On (*date*) , I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) _____, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| | | |
|---|---|---|
| 10/02/2024 | Laurel Dinkins | /s/ Laurel Dinkins |
| *Date* | *Printed Name* | *Signature* |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                                    **F 9013-3.1.PROOF.SERVICE**