1  **FENNEMORE LLP**
Gary B. Rudolph, Bar No. 101921
2  Kathleen A. Cashman-Kramer, Bar No. 128861
600 B Street, Suite 1700
3  San Diego, CA 92101
Tel: (619) 233-4100 /
4  Fax: (619) 231-4372
grudolph@fennemorelaw.com
5
**STEPHEN NEW & ASSOCIATES**
6  Stephen P. New, West Virginia Bar No. 7756 -
*Pro Hac Vice*
7  430 Harper Park Dr
Beckley, WV 25801
8  Telephone: (304) 250-6017
steve@newlawoffice.com
9
Attorneys for Creditor, Arcadian Vanguard
10  LLC

11              **UNITED STATES BANKRUPTCY COURT**
                **CENTRAL DISTRICT OF CALIFORNIA**
12              **SAN FERNANDO VALLEY DIVISION**

13  In Re:                              Case No. 1:24-bk-10396-MB

14  KAST MEDIA, INC., fka Kast Media LLC,   Chapter 11
    aka Sight Reading Academy, aka Kast,
15                                      **DECLARATION OF GARY B.**
                                        **RUDOLPH IN SUPPORT OF**
16          Debtor.                     **OBJECTIONS BY ARCADIAN**
                                        **VANGUARD LLC TO THE DEBTOR'S**
17                                      **SUBCHAPTER V PLAN (ECF # 71)**
                                        **FILED JUNE 11, 2024**
18
                                        Date:        October 22, 2024
19                                      Time:        1:30 p.m.
                                        Judge:       Hon. Martin R. Barash
20                                      Dept.: Suite 342/Courtroom 303
                                        United States Bankruptcy Court
21                                      (Via Zoom.gov)
                                        Video/audio web address:
22                                                   https://cacb.zoomgov.com/j/1614
                                                   174604 ZoomGov meeting
23                                                   number: 161 417 4604 Password:
                                                   392703 Telephone conference
24                                                   lines: 1 (669) 254 5252 or 1
                                                   (646) 828 7666
25

26
    I, Gary B. Rudolph, herby declare under penalty of perjury:
27
        1.      I am an individual over the age of majority, I have personal knowledge of the matters
28

1   contained herein, and I am competent to testify as to the facts set forth in this declaration.   If called

2   upon to testify, I could and would testify to the facts set forth in this declaration.

3       2.    I am an attorney at law, duly admitted to practice before this Court.  I am a Director

4   of Fennemore Craig PC, and practice in California as an employee of Fennemore LLP

5   ("Fennemore").   Fennemore is counsel of record for creditor and party in interest Arcadian

6   Vanguard LLC ("Arcadian Vanguard") and I am authorized to make this declaration on its behalf.

7   I have personal knowledge of the matters contained herein.

8       3.    I submit this declaration in support of the Objections by Arcadian Vanguard

9   ("Arcadian") To The Debtor's Subchapter V Plan (ECF # 71) Filed June 11, 2024 by the debtor

10   Kast Media, Inc. ("Debtor").

11       4.    Attached hereto as Exhibits 1 and 2 are two documents that were obtained from the

12   Secretary of State's office for the State of Delaware.  At my instruction my office searched the

13   Debtor's name and located its "entity details" on August 15, 2024.  Thereafter, on September 30,

14   2024 my office performed the same search to update the results obtained on August 15, 2024.  The

15   result is attached hereto as Exhibit 1.  This document shows that the last document was filed by the

16   Debtor on August 24, 2023.  It also shows that the Debtor's status is listed as "EAR Delinquent,

17   Tax Due."  It further shows that the Debtor has not filed an annual report since 2022, and that

18   currently the tax that the Debtor owes to the State of Delaware is $184,531.82.  See Exhibit 1.

19       5.    Attached hereto as Exhibit 2 is a document signed by Delaware Secretary of State

20   Jeffrey W. Bullock and dated August 15, 2024, which states that the Debtor "has failed to file the

21   annual Franchise Tax Report and pay the Franchise Taxes currently due."  See Exhibit 2.

22       6.    Attached hereto as Exhibit 3 is a true copy of the transcript of the deposition of Colin

23   Thompson taken in this case on August 1, 2024 (without exhibits), which I attended.

24       Executed this 2nd day of October, 2024, under penalty of perjury pursuant to the laws of the

25   United States of America at San Diego, California.

26                                         */s/ Gary B. Rudolph*
Gary B. Rudolph, Esq.

27

28

FENNEMORE LLP
ATTORNEYS AT LAW
SAN DIEGO

- 2 -

49953456.1/068327.0001

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:

600 B Street, Suite 1700 San Diego, CA 92101

A true and correct copy of the foregoing document entitled (*specify*):

**DECLARATION OF GARY B. RUDOLPH IN SUPPORT OF OBJECTIONS BY CREDITOR ARCADIAN VANGUARD, LLC TO THE DEBTOR'S  SUBCHAPTER V PLAN  (ECF # 71) FILED JUNE 11, 2024**

will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) 10/02/2024, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- **Kathleen A Cashman-Kramer**    kcashman-kramer@fennemorelaw.com, theresam@psdslaw.com
- **Russell Clementson**    russell.clementson@usdoj.gov
- **Leslie A Cohen**    leslie@lesliecohenlaw.com, jaime@lesliecohenlaw.com;clare@lesliecohenlaw.com
- **Asha Dhillon**    asha.dhillon@turnerdhillon.com
- **Moriah Douglas Flahaut (TR)**    douglas.flahaut@arentfox.com, C194@ecfcbis.com
- **Samuel R Maizel**    samuel.maizel@dentons.com, alicia.aguilar@dentons.com;docket.general.lit.LOS@dentons.com;tania.moyron@dentons.com;kathryn.howard@dentons.com;joan.mack@dentons.com;derry.kalve@dentons.com
- **Gary B Rudolph**    grudolph@fennemorelaw.com, bkstaff@sullivanhill.com;vidovich@ecf.inforuptcy.com;rudolph@ecf.courtdrive.com;kcashman-kramer@fennemorelaw.com;ejames@fennemorelaw.com;james@ecf.courtdrive.com
- **United States Trustee (SV)**    ustpregion16.wh.ecf@usdoj.gov

☐ Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:
On (*date*) , I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) _____ , I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| 10/02/2024 | Laurel Dinkins | /s/ Laurel Dinkins |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

# Exhibit 1

# Exhibit 1

Delaware.gov Governor | General Assembly | Courts | Elected Officials | State Agencies

---

**Department of State: Division of Corporations**

Allowable Characters

---

HOME

View Search Results

Entity Details

| | | | |
|---|---|---|---|
| File Number: | 7927176 | Incorporation Date / Formation Date: | 4/7/2020 (mm/dd/yyyy) |
| Entity Name: | KAST MEDIA, INC. | | |
| Entity Kind: | Corporation | Entity Type: | General |
| Residency: | Domestic | State: | State: |
| Status: | AR Delinquent, Tax Due | Status Date: | 3/2/2024 |

**TAX INFORMATION**

| | | | |
|---|---|---|---|
| Last Annual Report Filed: | 2022 | Tax Due: $ | 184531.82 |
| Annual Tax Assessment: | $ 106415 | Total Authorized Shares: | 12500000 |

**REGISTERED AGENT INFORMATION**

| | | | |
|---|---|---|---|
| Name: | TELOS LEGAL CORP. | | |
| Address: | 13 WEST MAIN STREET P.O. BOX 953 | | |
| City: | FELTON | County: | Kent |
| State: | DE | Postal Code: | 19943 |
| Phone: | 302-483-7293 | | |

**FILING HISTORY (Last 5 Filings)**

| Seq | Description | No. of pages | Filing Date (mm/dd/yyyy) | Filing Time | Effective Date (mm/dd/yyyy) |
|---|---|---|---|---|---|
| 1 | Blnkt Address – Corp | 1 | 8/24/2023 | 9:43 AM | 8/28/2023 |
| 2 | Restated Stock | 10 | 2/9/2021 | 4:18 PM | 2/9/2021 |
| 3 | Conversion | 2 | 4/7/2020 | 10:39 AM | 4/7/2020 |
| 4 | Formation | 4 | 4/7/2020 | 10:39 AM | 4/7/2020 |

Back to Entity Search     Email Status

---

For help on a particular field click on the Field Tag to take you to the help area.

site map | privacy | about this site | contact us | translate | delaware.gov

# Exhibit 2

# Exhibit 2

# Delaware

Page 1

### The First State

I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY THAT THE CERTIFICATE OF INCORPORATION OF "KAST MEDIA, INC.", WAS RECEIVED AND FILED IN THIS OFFICE THE SEVENTH DAY OF APRIL, A.D. 2020.

AND I DO HEREBY FURTHER CERTIFY THAT THE AFORESAID CORPORATION REMAINS A DOMESTIC CORPORATION ON OUR RECORDS BUT HAS FAILED TO FILE THE ANNUAL FRANCHISE TAX REPORT AND PAY THE FRANCHISE TAXES CURRENTLY DUE.

AND I DO HEREBY FURTHER CERTIFY THAT THE SAID "KAST MEDIA, INC." WAS INCORPORATED ON THE SEVENTH DAY OF APRIL, A.D. 2020.

Jeffrey W. Bullock, Secretary of State

7927176  8300U

SR# 20243432195

You may verify this certificate online at corp.delaware.gov/authver.shtml

Authentication: 204175386

Date: 08-15-24

# Exhibit 3

# Exhibit 3

1          UNITED STATES BANKRUPTCY COURT

2     CENTRAL DISTRICT OF CALIFORNIA - SAN FERNANDO VALLEY

3                    DIVISION

4     _____

5     In Re: KAST MEDIA, INC.,          Case No.

6            Debtor.                    1:24-bk-10396-MB

7

8     _____

9

10

11    VIDEOTAPED DEPOSITION OF F.R.B.P. RULE 2004 CORPORATE

12    REPRESENTATIVE FOR KAST MEDIA, INC. - COLIN THOMSON

13

14    DATE:          Thursday, August 1, 2024

15    TIME:          10:19 a.m.

16    LOCATION:      Leslie Cohen Law Office, PC

17                   1615-A Montana Avenue

18                   Santa Monica, CA 90403

19

20

21    OFFICIATED BY:

22    Natalie Rivas

23    JOB NO.: 6834033

24

25    PAGES 1 - 269

                                        Page 1

```
 1              A P P E A R A N C E S

 2    ON BEHALF OF DEBTOR KAST MEDIA, INC.:

 3          LESLIE A. COHEN, ESQUIRE

 4          Leslie Cohen Law

 5          1615-A Montana Avenue

 6          Santa Monica, CA 90403

 7          leslie@lesliecohenlaw.com

 8          (310) 394-5900

 9

10    ON BEHALF OF CREDITORS ARCADIAN VANGUARD LLC AND JIM

11    CORNETTE:

12          GARY B. RUDOLPH, ESQUIRE (by videoconference)

13          Fennemore LLP

14          600 B Street, Suite 1700

15          San Diego, CA 92101

16          grudolph@fennemorelaw.com

17          (619) 233-4100

18

19          STEPHEN NEW, ESQUIRE

20          Stephen New & Associates

21          430 Harper Park Drive

22          Beckley, WV 25801

23          steve@newlawoffice.com

24          (304) 250-6017

25
```

Page 2

```
 1              A P P E A R A N C E S (Cont'd)

 2    ALSO PRESENT:

 3          Brian Last, CEO of Arcadian Vanguard LLC (by

 4          videoconference)

 5          Erin Lewis, Employee of Counsel Mr. New (by

 6          videoconference)

 7          Vincent Mazza, Videographer

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                          Page  3
```

```
 1                    I N D E X

 2   EXAMINATION:                                      PAGE

 3        By Mr. New                                      8

 4

 5                  E X H I B I T S

 6   NO.            DESCRIPTION                         PAGE

 7   Exhibit 1      Notice and Stipulation               36

 8   Exhibit 2      Voluntary Petition for

 9                  Non-Individuals                       38

10   Exhibit 3      Certificate of Conversion            40

11   Exhibit 4      Business Search                      45

12   Exhibit 4-A    Entity Details                       46

13   Exhibit 5      Email, 05/11/2022                   138

14   Exhibit 6      Limited Liability Company

15                  Articles of Organization            146

16   Exhibit 7      Vendor Balance Detail               151

17   Exhibit 8      A/P Aging Detail, 03/15/2024        151

18   Exhibit 9      Finder's Fee Agreement              165

19   Exhibit 10     LiveOne to Acquire Certain

20                  Assets of Kast Media                181

21   Exhibit 11     2021 Form 1099-NEC                  184

22   Exhibit 12     Kast Media PPP Borrower Search      190

23   Exhibit 13     One Sentence, KAST000004            192

24   Exhibit 14     One Sentence, KAST000003            192

25   Exhibit 15     A/P Aging Summary, 03/13/2024       193
```

Page 4

```
 1              E X H I B I T S (Cont'd)

 2    NO.             DESCRIPTION                    PAGE

 3    Exhibit 16      Email, 09/29/2023              196

 4    Exhibit 17      Tax Returns, 2018-2023         203

 5    Exhibit 18      Expenses, 2017-2022            229

 6    Exhibit 19      Kast Investor Memo, March 2023 229

 7    Exhibit 20      Podcast Agreement              237

 8    Exhibit 21      Email, 05/30/2023, 11:52 a.m.  238

 9    Exhibit 22      Email, 05/30/2023, 11:53 a.m.  241

10    Exhibit 23      Email, 05/30/2023, 9:01 p.m.   242

11

12          D O C U M E N T S   R E Q U E S T E D

13    NO.             DESCRIPTION                    PAGE

14    1               Investor Contracts             92

15

16        QUESTIONS INSTRUCTED NOT TO ANSWER

17                    PAGE       LINE

18                     32          2

19

20

21

22

23

24

25

                                        Page 5
```

```
 1                    P R O C E E D I N G S
 2              THE OFFICER:  Good morning, everyone.  My
 3    name is Natalie Rivas; I am the deposition officer
 4    assigned by Veritext to take the record of this
 5    proceeding.  We are now on the record at 10:19 a.m.
 6              This is the deposition of Colin Thomson
 7    taken in regards to Kast Media, Inc., on Thursday,
 8    August 1, 2024, at Leslie Cohen Law Office, located at
 9    1615-A Montana Avenue, Santa Monica, California 90403.
10              I am a notary authorized to take
11    acknowledgment and administer oaths in California.
12              Additionally, absent an objection on the
13    record before the witness is sworn, all parties and the
14    witness understand and agree that any certified
15    transcript produced from the recording of this
16    proceeding:
17                   - is intended for all uses permitted
18                      under applicable procedural and
19                      evidentiary rules and laws in the same
20                      manner as a deposition recorded by
21                      stenographic means; and
22                   - shall constitute written stipulation
23                      of such.
24              This proceeding will be recorded via
25    video technology by Vincent Mazza.
```

Page 6

```
 1                    At this time will I please have everyone
 2      in attendance identify yourself for the record,
 3      beginning with our noticing attorney.
 4                    MR. NEW:  Yes.  Stephen New and Gary
 5      Rudolph on behalf of creditors Arcadian Vanguard, LLC,
 6      and Jim Cornette.
 7                    THE OFFICER:  Thank you.
 8                    MS. COHEN:  Leslie Cohen representing the
 9      debtor.
10                    THE OFFICER:  Thank you.
11                    Just your name.
12                    MR. THOMSON:  Colin Thomson.
13                    THE OFFICER:  Thank you.
14                    And our participants on Zoom, if you can
15      please introduce yourself.
16                    MR. RUDOLPH:  Gary Rudolph appearing
17      on -- with Stephen New.
18                    MR. LAST:  Brian Last, president of
19      Arcadian Vanguard.
20                    THE OFFICER:  There's one more person
21      still.
22                    MR. NEW:  That's my office.  She doesn't
23      have a microphone with her computer.  That's Erin Lewis
24      with my office.
25                    THE OFFICER:  Thank you so much.
```

Page 7

1          MR. NEW:  And she is the host of the

2    Zoom.

3          THE OFFICER:  Thank you.  Hearing no

4    objections, I will swear in our witness.

5          Please raise your right hand.

6    WHEREUPON,

7                    COLIN THOMSON,

8    called as a witness and having been first duly sworn to

9    tell the truth, the whole truth, and nothing but the

10   truth, was examined and testified as follows:

11          THE OFFICER:  Thank you.

12          You now may begin.

13                    EXAMINATION

14   BY MR. NEW:

15      Q    Sir, please state and spell your full name for

16   the record.

17      A    Colin Thomson, C-O-L-I-N T-H-O-M-S-O-N.

18      Q    Okay, sir.  My name is Stephen New.  I

19   represent Arcadian Vanguard and Jim Cornette in your

20   bankruptcy filed here in California, and we're here

21   today to take the deposition not of you, but of the

22   deposition of Kast Media, Inc.  Do you understand that?

23      A    Yes.

24      Q    Do you understand that you have been

25   designated as the person pursuant to Rule 30(b) to -- of

Page 8

1   the Federal Rules of Civil Procedure to testify as the

2   corporate representative of that corporation?

3                   MS. COHEN:  I do want to note for the

4   record I don't think all that 30(b) stuff was in our

5   stipulation.  But he is testifying --

6                   MR. NEW:  Yes.  Yes, it was.

7                   MS. COHEN:  Okay.

8                   MR. NEW:  This is a 30(b) deposition.

9   BY MR. NEW:

10      Q    You understand that you are here to be a

11   corporate representative of Kast Media, Inc., today,

12   sir?

13      A    Yes.

14      Q    And you understand that your sworn testimony

15   here today binds the corporation?

16      A    Yes.

17      Q    Have you ever given sworn testimony before?

18      A    Only in the -- the -- that initial --

19                   MS. COHEN:  Meeting of creditors.

20                   THE WITNESS:  The meeting of the

21   creditors.  That would've been the first time.

22   BY MR. NEW:

23      Q    Okay.  Other than that meeting of creditors in

24   which you gave sworn testimony, have you ever given

25   sworn testimony in any other areas?

                                        Page 9

1       A      No, I don't believe so.

2       Q      All right.  So because you've never given

3    sworn testimony before, I'm going to go through some

4    ground rules of the deposition; okay?

5            This is a formal process in an informal

6    setting; okay?  And what I mean by that is this is an

7    under-oath question and answer session, and the oath

8    that you took to tell the truth is the same one as if

9    you were testifying live in a courtroom in front of a

10   judge and a jury; you understand that?

11      A      Yes.

12      Q      And you understand that the penalty for

13   testifying falsely under oath is perjury.  You

14   understand that; correct?

15      A      Yes.

16      Q      All right.

17            MS. COHEN:  Mr. New, before you get

18   rolling, I'm fine with all those answers, and I don't

19   think we need to change anything.  But I do note I have

20   the 2004 stipulation in front of me, and I don't see

21   anything in there about Rule 30.

22            I mean, he is testifying as a corporate

23   representative, but I'm not seeing it in the

24   stipulation.  So perhaps I missed something.

25            MR. NEW:  It's a Rule 30 deposition.

Page 10

1            MS. COHEN:  And where is that?  The

2    stipulation says it's a Rule 2004 examination, so --

3            MR. NEW:  It's taken pursuant to Rule

4    30(b).  We -- see, and here's the reason why it is a

5    30(b), and I'm not arguing with you about this, or we

6    can get the bankruptcy judge on the phone.  We gave you

7    areas of inquiry.  You knew that this was a corporate

8    representative deposition of Kast.

9            MS. COHEN:  I'm not disputing that.  I'm

10   not disputing that.

11           MR. NEW:  Then why the issue?

12           MS. COHEN:  Because you've asked him to

13   testify under oath that his understanding, this is a

14   Rule 30(b) deposition, and the stipulation for 2004 does

15   not talk about Rule 30 --

16           MR. NEW:  It is a Rule 30(b) -- so I tell

17   you what.  There are obligations under Rule 30(b) for a

18   corporate representative deposition to be prepared to

19   testify.

20           MS. COHEN:  He's prepared to testify.

21           MR. NEW:  Okay.  No.  No, no, no.

22           MS. COHEN:  The stipulation doesn't say

23   Rule 30(b).

24           MR. NEW:  I'm talking about preparation

25   in advance of the deposition.  There are obligations

                                            Page 11

1   under Rule 30(b) of the Federal Rules of Civil Procedure

2   that obligate a corporate representative to prepare in

3   advance.

4           MS. COHEN:  I don't believe that was part

5   of our stipulation here.  I think he'll be fine for this

6   examination, but I don't see anything about Rule 30(b)

7   in this stipulation.  I just don't see it, and that

8   wasn't our understanding.  I think he's prepared.  I

9   think he'll do fine.  But it's just not in there.

10          MR. NEW:  Well, there are areas of

11  inquiry.  So to the extent that the areas of inquiry

12  dovetail with the documents produced, yes, it's clear

13  that this is a 30(b) deposition and not the deposition

14  of Colin Thomson personally.

15          MS. COHEN:  We agree that it is the

16  deposition of -- that it is the 2004 examination of Kast

17  Media.  Mr. Thomson is here as the representative.  This

18  whole 30(b) thing was not part of the inquiry, and it's

19  not part of the stipulation.

20          So if you want to call the judge or

21  anything you want to do, it's okay with me.  I don't

22  think it's necessary.

23          MR. NEW:  Gary, you want to get the judge

24  on the phone right now?  Because there's certain

25  obligations that a corporate representative 30(b)

Page 12

1    witness has.

2              Or I tell you what, Leslie.  I tell you

3    what.  I'll depose him as Colin Thomson today and not

4    the corporate representative of Kast Media, Inc., and

5    I'll come back out next week and I'll depose -- we'll

6    notice up Kast Media, Inc.

7              If you want to say that 30(b) doesn't

8    apply to this because the language of that isn't in that

9    stipulation, that's fine.  I'll depose Colin Thomson

10   personally today for seven hours, and then I'll come

11   back out next week or two weeks from now and I'll depose

12   Kast Media, Inc., for seven hours.

13             So just let me and Gary know right now

14   what it is that you want to do.

15             MS. COHEN:  I'm just looking at the

16   stipulation that your office prepared.

17             MR. NEW:  I didn't prepare it.

18             MS. COHEN:  Well, Mr. Rudolph did.  It

19   was negotiated by me, him, and you.  We had many phone

20   calls.

21             MR. NEW:  Yes.  And in that, it was

22   clear --

23             MS. COHEN:  May I ask you respectfully to

24   please lower your voice?

25             MR. NEW:  Mm-hmm.

                                        Page 13

1          MS. COHEN:  You're talking too loud.

2     Thank you.

3          MR. NEW:  Okay.

4          MS. COHEN:  Just dial it down a little

5     bit.

6          MR. NEW:  Okay.  It was clear in the nine

7     meet and confers that we had with you that this was

8     going to be a corporate rep deposition governed by Rule

9     30(b).  Now, if you want to start -- like I said, seven

10    hours.  I'm happy.  I'm more than happy to be here seven

11    hours today with Mr. Thomson.

12          I've got a lot that I need to talk to Mr.

13    Thomson about.  So you go ahead and tell us right here

14    at 10:27 Pacific Time whether this deposition is going

15    to be conducted pursuant to Rule 30(b) of the Federal

16    Rules of Civil Procedure.

17          If you say it's not, then I'm going to

18    depose him in his individual capacity for seven hours

19    today, and we're going to come back out in a week or two

20    and I'm going to depose Kast Media, Inc.  So Ms. Cohen,

21    please state on the record which deposition it is that

22    you want today.

23          MS. COHEN:  I'm reading from the

24    stipulation.

25          MR. NEW:  Okay.  That's --

                                                  Page 14

1          MS. COHEN:  The stipulation discusses the

2     Rule 2004 examination of the debtor.  Mr. Thomson is

3     here, testifying --

4          MR. NEW:  Mr. Thomson isn't the debtor.

5          MS. COHEN:  Please let me finish my

6     sentence.  Thank you.  Mr. Thomson is here as the

7     representative of the debtor.

8          MR. NEW:  Mm-hmm.

9          MS. COHEN:  What I have an issue with is

10    that you are asking him to testify under oath that he

11    understands he's here under Rule 30(b), and --

12          MR. NEW:  Yeah, there are certain

13    obligations under Rule --

14          MS. COHEN:  You've told me that ten times

15    now.

16          MR. NEW:  Yep.

17          MS. COHEN:  And please lower your voice.

18    But in any event, the stipulation just doesn't say Rule

19    30(b).

20          MR. NEW:  Okay.

21          MS. COHEN:  It's not in there.  So that

22    doesn't give you the right to examine him as an

23    individual.  It's the 2004 examination of the debtor.

24          MR. NEW:  All right.

25          MS. COHEN:  If you wanted some 30(b)

Page 15

1    thing, then you could've told us that, and we could've

2    dealt with it.

3              MR. NEW:  Yep.  It is, because it says

4    he's the representative of a corporation.

5              MS. COHEN:  Right.

6              MR. RUDOLPH:  Steve, Steve, will you call

7    me on my cell?  Get off the record for a moment.  Please

8    call me on my cell.

9              MR. NEW:  All right.

10             THE VIDEOGRAPHER:  Off the record?

11             MR. NEW:  Yep.

12             THE VIDEOGRAPHER:  We're now going off

13   the record.  The time is 10:29 a.m.

14             (Off the record.)

15             THE VIDEOGRAPHER:  We're now going back

16   on the record.  The time is 10:31 a.m.

17             MR. NEW:  All right.  We're not going to

18   argue about whether Rule 30(b) governs this or not.

19   That's a matter we'll take up with the judge.

20   BY MR. NEW:

21        Q    Are you prepared to testify on behalf of Kast

22   Media, Inc. today, Mr. Thomson?

23        A    Yes.

24        Q    All right.  So getting back to the ground

25   rules of this deposition, this is a question and answer

                                          Page 16

1    session.  I'll ask you a question, and you're expected

2    to give me truthful, complete, and honest answers to my

3    questions; you understand that?

4        A    Yes.

5        Q    Okay.  If at any time today for any reason you

6    don't understand a question that I ask you or anything

7    else, feel free to have me restate it, rephrase it, or

8    break it down until you are comfortable answering the

9    questions that I ask you; okay?

10        A    Sure.

11        Q    It's going to be understood by anyone that

12    reads the transcript that's being typed up here today

13    and anybody that watches these videos that you

14    understood me unless you tell me you didn't understand

15    one of the questions that I asked you; okay?

16        A    Okay.

17        Q    All right.  Now, from time to time today, your

18    lawyer here may put good, proper, nonspeaking objections

19    on the record as required by the Federal Rules of Civil

20    Procedure.

21            Unless she tells you specifically not to

22    answer a question on the basis of something like

23    attorney-client privilege, you go ahead and answer my

24    question just the same as if the objection hasn't been

25    lodged; okay?

Page 17

1          A     Yeah, that's --

2                     THE WITNESS:  That's what we talked

3      about; right?

4                     Yeah.

5      BY MR. NEW:

6          Q     Okay.  So she may put a good nonspeaking

7      objection on the record, and what I mean by that is

8      she's allowed to say in this deposition, "Object to

9      form"; okay?

10         A     Okay.

11         Q     If you hear her say, "Object to form," then

12     you go ahead.  She's doing her job, trying to protect

13     the debtor's interests.  You go ahead and answer my

14     questions.

15         A     Got you.

16         Q     Okay?  This is going to be a long day.  I'll

17     go ahead -- I've told you, and I'm going to go ahead and

18     reiterate to you.  But if you need to take a break, let

19     me know, and we can take a break at any time.  The only

20     time we can't break is if I have asked you a question

21     that you haven't answered yet; okay?

22         A     Yep.

23         Q     All right.  Let's go ahead and get started.

24     Tell me everything -- now, you're looking over at your

25     counsel's computer screen.

                                                    Page 18

1             MS. COHEN:  I'm taking notes.

2             MR. NEW:  Okay.  I just ask that you keep

3     those -- you're not allowed to coach the witness in any

4     manner.

5             MS. COHEN:  Of course.  I understand.

6             MR. NEW:  So I'd ask that you keep your

7     computer screen -- I mean, this is an intimate setting,

8     but I'd ask that you keep your computer screen out of

9     Mr. Thomson's view, please.

10            MS. COHEN:  I'll do my best to do so.

11    I'm simply taking notes about the deposition.

12    BY MR. NEW:

13        Q    She's not allowed to tell you what to answer.

14            MS. COHEN:  He knows.

15            THE WITNESS:  I understand.

16    BY MR. NEW:

17        Q    She's not allowed to type anything for you to

18    look over and cheat off of like it's fifth grade or

19    something; okay?

20            MS. COHEN:  He knows.

21            THE WITNESS:  I understand.

22            MS. COHEN:  He knows, and he most likely

23    didn't cheat in the fifth grade.

24            MR. NEW:  Been about 12 times now in 13

25    minutes that he's looked over at your screen as I've

                                                    Page 19

1    asked just preliminary questions.  So I just -- I'm

2    putting that on the record.  All right.

3                   MS. COHEN:  And I'll add to the record,

4    as I said, I've shown you the screen.  I'm taking notes

5    on the examination.

6                   MR. NEW:  Right, and I can't see it, but

7    he can, because he's looking over at your screen

8    nonstop.

9                   MS. COHEN:  I understand.

10   BY MR. NEW:

11       Q    Okay.  Let's go ahead and get started.  Tell

12   me everything that you did to prepare for today's

13   deposition, and what I'm not asking for is conversations

14   with your lawyer or her staff.

15                   MS. COHEN:  And I'm going to instruct him

16   that he may answer the question, but he may not divulge

17   any conversations with us or emails with us.

18                   MR. NEW:  I just said that.

19                   MS. COHEN:  You said conversations.  I'm

20   adding --

21                   MR. NEW:  Communications.

22   BY MR. NEW:

23       Q    I don't want to know anything about

24   communications you've had with your counsel, but other

25   than communications with Counsel or her office, tell me

                                             Page 20

1    every single thing that you've done to prepare for

2    today.

3        A    In order to prepare for today, I reviewed the

4    records, and that's about what I did to prepare for

5    today.

6        Q    Okay.  Which records did you review to enable

7    you to come here and give sworn testimony on behalf of

8    Kast Media, Inc.?

9        A    The ones we provided you.

10        Q    And you're talking about the documents that

11    were provided, I believe, on July the 15th or 19th,

12    somewhere around there.

13        A    I think that's right.

14        Q    Approximately 2,700 pages?

15        A    Mm-hmm.  I think so.

16        Q    Is that yes?

17        A    I think so.  I don't know the total page

18    count.

19        Q    Okay.  Okay.  Amex records; right?

20        A    Yes.

21        Q    Wells Fargo records; correct?

22        A    Yep.

23        Q    East West Bank records; correct?

24        A    Yep.

25        Q    Tax returns from 2018 to 2023 for Kast Media,

Page 21

1    Inc.; correct?

2        A    Yep.

3        Q    There were not payroll records, but, like, an

4    Excel spreadsheet of employee compensation in that;

5    correct?

6        A    Yep.

7        Q    Okay.  And do you understand sitting here

8    today that there are still some areas of inquiry and

9    documents that have yet to be produced to us?

10       A    I understand that there -- yeah, there's

11    dialogue around additional documents.

12       Q    Okay.  Let's talk now about Kast's computer

13    system, servers, software, and things like that.  I have

14    seen some email communication from Kast Media, Inc.;

15    correct?

16       A    Correct that you have seen some communication?

17            MS. COHEN:  Wait.  You can't testify as

18    to what he's seen.

19            MR. NEW:  I don't -- if you object to my

20    question, just say, "Object to form."  We're -- I

21    promise y'all we're going to get through this today.

22    BY MR. NEW:

23       Q    You've sent Brian Last of Arcadian Vanguard

24    emails from your Kast Media email account; correct?

25       A    Yes.

                                          Page 22

1      Q     Tell me your email address for Kast Media.

2      A     colin@kast with a K, kastmedia.com.

3      Q     Okay.  How did Kast Media maintain its email

4    system?

5      A     That is a Google Business account that we use

6    for email.

7      Q     Did all Kast Media employees have a Google

8    Kast Media business account?

9      A     I believe so.

10     Q     Have all of those emails been preserved?

11     A     Yeah, we haven't deleted anything.

12     Q     I have seen emails from accounting@kastmedia

13   to Brian Last.  Was there an email account called

14   accounting@kastmedia.com?

15     A     So Google Business accounts have what's called

16   a group, and that is designated by an email address that

17   a few different account -- you know, individuals that

18   have accounts with the business account on Google would

19   have access to.  And that's what

20   accounting@kastmedia.com is.  It's a group.

21     Q     Who had access to the accounting@kastmedia.com

22   email address?

23     A     That would vary depending on when and who

24   was -- you know, who was a part of the accounting team

25   at the time.

Page 23

1       Q    Are --

2       A    But people on the accounting team would have

3    access to it.

4       Q    Either starting today and going backwards or

5    starting backwards and going up to today, tell me

6    everybody who would have had access to that account or

7    been a part of that group, please.

8       A    Okay.  So to the best of my memory, that would

9    be myself, Analina Acosta, Michael Calabretta, Emily

10   Pender.  We used an outside accounting firm called NOW

11   CFO for a few months.  That's who William Langworthy, or

12   I believe his last name's Langworthy, worked with.  So I

13   believe he had access to it.

14          Krimzee Maenlee, and I think that that's

15   all -- that's all of the individuals that I can think of

16   off the top of my head.

17      Q    And so your testimony --

18          MR. RUDOLPH:  Stephen, I don't want to

19   interrupt, but the video is off, and we can't see

20   anything.

21          MR. NEW:  Mine?

22          MR. RUDOLPH:  Yeah.

23          MR. NEW:  All right.  One moment.  All

24   right.

25          MR. RUDOLPH:  That works.

                                        Page 24

1           MR. NEW:  Okay.  Can you read my last

2    question back to me, Madam Court Reporter?

3           THE OFFICER:  Yes.

4           (The officer repeated the record as

5           requested.)

6    BY MR. NEW:

7       Q   Okay.  So your testimony under oath is that

8    those were the people with access to that

9    accounting@kastmedia.com account; correct?

10      A   Yes.  Those are the ones I can remember.

11      Q   And your testimony is that those emails that

12   would have been sent to and from that email account in

13   particular and all of Kast's email accounts have been

14   preserved through today; correct?

15      A   Of course.

16      Q   Okay.  What other groups did Kast have that

17   would have had multi-level or multi-member people

18   accessing the same email account, in other words?

19      A   Oh, yeah.  I mean, groups are a handy piece of

20   the Google platform.  We have one for

21   info@kastmedia.com.  That goes to generally a -- you

22   know, a lot of times, that would be on various podcasts

23   or things like that so that the general public could

24   reach out with questions or whatever the case may be.

25           I believe we had a staff one,

                                              Page 25

1   staff@kastmedia.com, although that one didn't get used

2   as frequently.  We had a -- I think we had sales or

3   maybe salesteam -- I'm not sure -- at kastmedia.com.

4   All of the sales folks would've had access to that.

5           And we had studio@kastmedia.com.  That was

6   used for the studio team to have access to for booking

7   and scheduling and all the studio communications.  Those

8   are -- those are the ones that I can recall us using

9   regularly.

10      Q   Okay.  That's your emails for Kast Media.

11   Tell me about other business management softwares that

12   Kast would have used.

13      A   What other business management softwares?

14      Q   Yes.

15      A   For -- for what?  You mean like project

16   management?  For --

17      Q   For whatever.  Let me give you an example.

18   Did Kast Media use QuickBooks?

19      A   QuickBooks was our accounting software.  Yes,

20   and continues to be our accounting software.

21      Q   Okay.  And --

22      A   QuickBooks Online.

23      Q   For what period of time did Kast Media use

24   QuickBooks?

25      A   I don't recall exactly when it would've

Page 26

1    started.  You know, probably before 2018.

2        Q    And has Kast used QuickBooks consistently as

3    its accounting and bookkeeping software through present?

4        A    Yes.

5        Q    And you indicated and I appreciate you

6    volunteering that it's QuickBooks Online; correct?

7        A    Yeah, that's the -- the type.

8        Q    That is as opposed to some software being

9    installed onto the hardware of Kast's servers or

10   computers; correct?

11       A    So QuickBooks is owned by Intuit, and they

12   sell a variety of different platform types.  And I'm not

13   very familiar with the types other than QuickBooks

14   Online.  It's what we've always used, and I've never

15   used any other type of QuickBooks.

16       Q    Would I assume correctly that the people who

17   were the in-house accountants for Kast used Kast's

18   QuickBooks?

19       A    Yes.

20       Q    And it sounds to me that you may be much like

21   I am and that you don't use QuickBooks yourself for

22   Kast; is that correct?

23       A    That's right.  I mean, I -- I have -- you

24   know, I get reports from there and things like that.

25       Q    Same as me.

Page 27

1        A    Yep.

2        Q    Now, you mentioned an outsourced accounting,

3    NOW CFO or something like that.  Did NOW CFO have access

4    to Kast's QuickBooks?

5        A    Yes.

6        Q    Was there anyone else from outside the Kast

7    organization that had access to Kast's QuickBooks?

8        A    Yeah.  That would've been -- we have a CPA

9    that has prepared our returns, Howard Elyashar.  I'm not

10   sure exactly how to pronounce his last name.  So he and

11   his team have had access.  I had a contracted CFO called

12   Erik Wissig.  I believe he had access.  I -- I don't

13   know that for positive off the top of my head.

14        That's -- that's what I can think of.

15        Q    Other than your CPA, NOW CFO, or -- NOW CFO,

16   not that your CPA is now your CFO.  CPA, NOW CFO, or

17   Mr. -- did you say Wissig?

18        A    Wissig, W-I-S-S-I-G.

19        Q    Okay.  Anybody else that you can think of who

20   may have had access from the outside to Kast's

21   QuickBooks?

22        A    No, I don't -- I can't think of anyone else.

23        Q    Any other business management, office

24   management, or any other kind of software platforms that

25   Kast would have used?

                                          Page 28

1       A     We used, like I said, Google, and we used all

2   of Google's -- beyond email, we used Google Drive,

3   Google Documents, Google Spreadsheets.  We used

4   Microsoft and their ecosystem.  We used Slack for

5   internal communications among the team.

6           You know, I mean, there were different

7   platforms that we experimented with and that sort of

8   fell off, you know, and those were the ones that were

9   the most consistently used over the years.

10      Q     And those were the ones that representing who

11  I represent, I was the most interested in, because I

12  understand that in addition to doing the type of work

13  that Kast did for Arcadian Vanguard and Jim Cornette

14  that Kast also had what you call -- what I have seen in

15  the media referred to as O&O programming; correct?

16      A     I think that's actually my term.  I think I

17  came up with that.

18      Q     You need to trademark that.

19      A     Yeah, yeah.  I do.

20      Q     But your O&O programming, do I assume

21  correctly that Kast would have creative softwares and

22  things that it would use to produce those programs, for

23  instance?

24      A     Sure.  Yeah.  We use -- Adobe Creative Cloud

25  would've been the platform that we use for editing audio

                                                Page 29

1   and video.  Audio is through Adobe Audition.  Video is

2   through Adobe Premiere.  So, you know, that's -- that's

3   what we use for editing, and we edited a lot more than

4   just our O&O shows.

5        Q   Okay.  I understand that.  Let's continue on

6   now with a little bit of background about you.  You

7   don't have to give me a specific address, necessarily.

8   Where do you currently live, city and state?

9        A   Staying with family in St. Louis, Missouri.

10       Q   How long have you lived in St. Louis,

11   Missouri?

12       A   The last couple months.

13       Q   When did you move from California?

14       A   Within the last couple of months.

15       Q   So, like, around late May, early June?

16       A   Yeah, somewhere in that time -- timeframe.

17       Q   Are you employed?

18       A   I am Kast's CEO, and I'm paid as a contractor

19   by Kast.

20       Q   Have you always been a 1099 contractor with

21   Kast Media, Inc.?

22       A   In the past, I was both.  I would be paid both

23   as a W-2 and as a 1099.  When we -- when we went into

24   the bankruptcy in order to save the company money, we

25   transitioned to just contracted work.

Page 30

1     Q     So from the bankruptcy filing forward, you

2  have been a 1099 contractor serving in the role as

3  Kast's CEO; correct?

4     A     Yes.

5     Q     Prior to the filing for bankruptcy, you would

6  have received both W-2 wages and compensation as a 1099;

7  correct?

8     A     Yes.

9     Q     Do you have any other sources of income other

10  than being a paid contractor as Kast's CEO?

11               MS. COHEN:  I'm going to make relevance

12  objection.

13               You can answer.

14               THE WITNESS:  Nothing significant.

15  BY MR. NEW:

16     Q     Do you hold any positions with any

17  organizations other than Kast Media, Inc.?

18               MS. COHEN:  Same objection.

19               You can answer.

20               THE WITNESS:  No.

21  BY MR. NEW:

22     Q     All right.  Your date of birth is 6/10/89;

23  correct?

24     A     Yes.

25     Q     Your last four of your Social is 8719;

                                        Page 31

1    correct?

2                    MS. COHEN:  Don't answer that.

3                    MR. NEW:  I don't --

4                    MS. COHEN:  He's testifying for the

5    corporation.  He doesn't need to give his Social.

6                    MR. NEW:  I didn't ask him for his

7    Social.  I asked him for his last four.

8                    MS. COHEN:  I've instructed him not to

9    answer.

10                    MR. NEW:  Okay.  That's fine, as long as

11    you're verifying that he is the Colin Thomson.

12                    MS. COHEN:  He's Colin.  He's the Colin

13    Thomson who's the head of the company.

14                    MR. NEW:  Okay.

15    BY MR. NEW:

16        Q    Now, let's go through some phone numbers for

17    you.  I have a mobile of (941) 323-6811.  Is that your

18    mobile number?

19        A    Yes.

20        Q    What number is (323) 471-2163?

21        A    I don't know off the top of my head.  I don't

22    really memorize phone numbers.

23        Q    colinpthomson@gmail.com.  Do you have that

24    email address?

25                    MS. COHEN:  Same objection.

                                        Page 32

```
 1                        You can answer.

 2                        THE WITNESS:  Yeah.

 3           BY MR. NEW:

 4                Q     Did you ever conduct any Kast business from

 5           colinpthomson@gmail.com?

 6                A     I've always been very careful to conduct

 7           business through my -- my Kast Media email.

 8                Q     And so your answer is you did not conduct any

 9           Kast Media business through colinpthomson@gmail.com;

10           correct?

11                A     I don't recall anything significant.

12                Q     All right.  sightreadingacademy@gmail.com.

13           Same question.  Did you ever conduct any Kast Media

14           business using sightreadingacademy@gmail.com?

15                A     I don't recall anything significant.

16                Q     evan, E-V-A-N, 34240@gmail.com.  Same

17           question.  Did you ever conduct any Kast Media business

18           using that email address?

19                A     No.

20                Q     All right.  When did Kast Media, LLC, cease to

21           exist?

22                A     We converted the company from an LLC to a C

23           corp in the year 2020.

24                Q     Was Kast Media, LLC, a California LLC?

25                A     I think so.  I would assume so.
```

                                                    Page 33

1      Q    And Kast Media, Inc. is a Delaware corporation

2   authorized to do business in the state of California;

3   correct?

4      A    Yes.

5      Q    Are you still married to Christine Thomson?

6      A    Yes.

7      Q    All right.  And did you and Christine Thomson

8   last live together at 24350 Sterling Ranch Road, Canoga

9   Park, California, here in Los Angeles County when you

10   lived in California?

11             MS. COHEN:  I'm going to object to the

12   question.

13             You can answer.

14             But, you know, Mr. New, you were the one

15   who had said that it was a corporate deposition, not an

16   individual.

17             MR. NEW:  It is.  We'll get there.

18             MS. COHEN:  So hold off on the personal

19   questions after this, please.

20             MR. NEW:  No.  I'll ask -- you put good

21   nonspeaking objections on the record, and I swear to God

22   we'll get through this.  But you're not going to eat my

23   time today putting improper speaking objections on the

24   record.

25   //

Page 34

1    BY MR. NEW:

2         Q    Is that address, Canoga Park, California,

3    where you last lived when you lived in California?

4                   MS. COHEN:   You can answer.

5                   THE WITNESS:   Yes.

6    BY MR. NEW:

7         Q    Who is Margaret Schaefer?

8         A    A friend.

9         Q    Did she live with you at that address?

10        A    I mean, I don't -- she -- she rented a room

11   from us for a short amount of time.

12        Q    Okay.  And that property was sold to the A.

13   Iofi [ph] and P. Curbanof [ph] Living Trust on May the

14   29th, 2024.  Is there any relation between you and that

15   living trust?

16        A    No.

17        Q    All right.  So it was an arm's length

18   transaction; correct?

19        A    Correct.

20        Q    All right.  I assume you're living with

21   Matthew Yu in St. Louis?

22        A    I am, yes, living with family in St. Louis.

23        Q    And that being Matthew Yu?

24        A    With family, yeah.

25        Q    Was Kast ever operated from 4421 Mary Ellen

                                        Page 35

1    Avenue, Sherman Oaks, California?

2        A    No.

3        Q    So Kast would've never have listed 4421 Mary

4    Ellen Avenue, Sherman Oaks, California, as an address?

5        A    Not -- not on purpose as a corporate address,

6    no.

7                    MR. NEW:  We will attach these as Exhibit

8    1, these two documents.

9                    (Exhibit 1 was marked for

10                    identification.)

11   BY MR. NEW:

12       Q    All right, sir.  I've handed you Exhibit 1 to

13   this deposition.  It's the notice of deposition and the

14   stipulation for Debtor's Rule 2004 production of

15   documents and conduct of a Rule 2004 examination.

16           The debtor is Kast Media, Inc., formerly known

17   as Kast Media, LLC, a.k.a. Sight Reading Academy, a.k.a.

18   Kast; correct?

19       A    You're asking me if the debtor is Kast Media,

20   Inc.?

21       Q    Yes.  Kast Media, Inc. is the debtor in this

22   case; correct?

23       A    Yes.

24       Q    You have not filed for bankruptcy yourself

25   personally; correct?

                                        Page 36

1      A      Correct.

2      Q      All right.  Turn over to page 2 of the

3    stipulation, if you could.

4                MS. COHEN:  Excuse me for interrupting.

5    Is -- both documents collectively is Exhibit 1?

6                MR. NEW:  Collectively 1, yes.

7                MS. COHEN:  Okay.

8    BY MR. NEW:

9      Q      Sir, take a look at the Areas of Inquiry 1

10   through 14.  Have you ever seen this document before?

11     A      I believe so.

12     Q      All right.  And are there any of those areas

13   of inquiry, 1 through 14, that you don't feel

14   comfortable testifying to, unprepared to testify to, or

15   anything else?

16                MS. COHEN:  So before he answers, it

17   doesn't say "areas of inquiry."  It says what he was

18   supposed to produce, so I just want to clarify that for

19   the record.

20                MR. NEW:  All right.

21                MS. COHEN:  You may answer.

22                MR. NEW:  It also says the parties met

23   and conferred numerous times.

24                MS. COHEN:  It does.

25                MR. NEW:  As well as the conduct of the

                                                    Page 37

1    Rule 2004 examination.  I know we're going to be back in

2    front of the judge.  So, again, the document speaks for

3    itself.

4              MS. COHEN:  I've authorized him to answer

5    the question.  I'm just noting that it doesn't say

6    "areas of inquiry," and you said it did.  That's all.

7              But you may answer the question.

8              THE WITNESS:  Okay.  I'm going to read

9    through them.

10   BY MR. NEW:

11       Q    Yeah, the conduct of the 2004 examination.

12   Areas 1 through 14 on there, sir.  Are you prepared to

13   speak to those today?

14       A    Yes.

15       Q    Do you know of any reason why you can't speak

16   to those on behalf of Kast Media, Inc.?

17       A    No.

18       Q    Do you recognize that document, sir?

19       A    Yes.

20       Q    All right.  Exhibit 2 is your voluntary

21   petition for nonindividuals filing for bankruptcy for

22   Kast Media, Inc., which was filed on March the 13th,

23   2024.

24              (Exhibit 2 was marked for

25              identification.)

                                        Page 38

1              MS. COHEN:  Mr. New, do you mean that

2      it's Kast's materials, rather than his?

3              MR. NEW:  Yeah, Kast --

4              MS. COHEN:  Because you said "your," but

5      I think you meant Kast's.

6              MR. NEW:  "Your" is the debtor today.

7              MS. COHEN:  Well, it wasn't when you were

8      asking him about his address and so on.  So let's just

9      be clear.  You're asking if this is Kast's petition?

10             MR. NEW:  Yeah, he's already told me that

11     he hasn't filed for bankruptcy, so --

12             MS. COHEN:  Right.  So it couldn't be

13     his, so just --

14             MR. NEW:  So --

15             MS. COHEN:  So let's just keep it clear

16     for the record.

17             MR. NEW:  Let's just put good nonspeaking

18     objections on the record.

19     BY MR. NEW:

20        Q    When I say "your," you understood you haven't

21     filed for bankruptcy, so the only "you" to which I could

22     be referring is Kast Media, Inc.; correct?  Exhibit 2 is

23     Kast Media, Inc.'s petition for bankruptcy; correct?

24             MS. COHEN:  You may answer.

25             THE WITNESS:  Yes.

1    BY MR. NEW:

2        Q    So we're -- I've got a bunch of exhibits for

3    you here today, but keep that one handy if you could,

4    Mr. Thomson; okay?  Because that is the subject of what

5    it is that we're here to talk about today, we'll be

6    coming back to it a lot; okay?  Let me know when you've

7    reviewed that.

8        A    Yep.

9        Q    And what is that document, sir, Exhibit 3?

10                (Exhibit 3 was marked for

11                 identification.)

12       A    This looks to be the conversion -- a document

13   related to the conversion from an LLC to a C corp.

14       Q    Is that your signature on it?

15       A    Yes, I believe so.

16       Q    And it's dated February 21, 2020; correct?

17       A    Yep.

18       Q    And so Kast Media, LLC converted to Kast

19   Media, Inc. on or about February 21, 2020; correct?

20       A    Yes.

21       Q    And was the principal place of business for

22   Kast Media, Inc. at that time 1480 Vine Street, Suite or

23   whatever it is 1801?

24       A    Yes.

25       Q    Describe 1480 Vine Street, 1801 for me.

Page 40

1       A     This was our headquarters and studio.   We

2   would operate the business out of here, and we would

3   record and film podcasts out of there.

4       Q     How many rooms?

5       A     One -- one main area and then two rooms.

6       Q     How many people worked out of that location?

7       A     Probably 10 to 20, on average.

8       Q     How much square footage were those three rooms

9   where 10 to 20 people worked?

10      A     I don't recall.

11      Q     Five thousand, two thousand, one thousand?

12            MS. COHEN:   I'm going to instruct the

13   witness not to guess.

14            THE WITNESS:   Yeah, I -- I couldn't say.

15            MR. NEW:   Just put a good nonspeaking

16   objection on the record, Ms. Cohen.

17            MS. COHEN:   That was an instruction.

18            MR. NEW:   You don't get to instruct your

19   client to do anything other than protect attorney-client

20   or some other kind of privilege, Ms. Cohen.

21   BY MR. NEW:

22      Q     You can answer.  Do you have an estimate

23   between zero square feet and 10,000 square feet, Mr.

24   Thomson?

25      A     I don't have an estimate.

Page 41

1    Q    All right.  What was the name of this complex?

2    A    I mean, what, the business name or something?

3  Like the landlord's business name?

4    Q    Yeah.  Yes.

5    A    I don't remember off the top of my head.

6    Q    All right.  I'll jog it for a few minutes.

7  That's fine.

8         Was this a commercial place, Unit 1801 of 1480

9  Vine Street?

10    A    I don't know.  I don't know the distinction.

11    Q    Now, at the time, you had a personal residence

12  at Unit 1102 of the same location; correct?

13    A    Yes.  Yeah, for a period of time, I personally

14  rented another unit in the same building.

15    Q    I assume your unit, Unit 1102, was

16  residential; correct?

17    A    I would also assume that.

18    Q    For what period of time did you rent, you

19  personally rent 1102 in the same complex that Kast was

20  operating at Unit 1801?

21    A    Can you -- can you say the question again?

22    Q    Yes.  For what period of time did you live at

23  Unit 1102 while Kast operated at Unit 1801?

24    A    So -- so the overlap, the overlap period

25  specifically.

                                        Page 42

1       Q    Can you give me a month and year of when you

2   started living at 1102 and stopped living at 1102?

3       A    That's a different question.

4       Q    No.

5       A    Yeah, it is.

6       Q    No, it's not.  So -- well, then I'll ask it

7   the way that you'd like it asked.  What's the period of

8   time that you lived at Unit 1102 in the same complex

9   that you were operating Kast out of?

10      A    Wait.  You're still asking for the overlap

11  time.

12      Q   I don't care.

13      A    I lived there personally before Kast lived

14  there, or before Kast was operated out of there.

15      Q    Okay.  That's fine.

16      A    So the overlap period, I would have to guess,

17  would be, you know, a year, a year or two of overlap.

18      Q    All right.  Now I'm not asking about any

19  overlap.  For what period of time did you live at 1102?

20      A    Probably from 2019 through 2021, or it may

21  have been '18 to 2020, two years in there.

22      Q    When you lived at Unit 1102, did Kast ever pay

23  your rent there?

24      A    No, I don't believe so.

25      Q    Pardon me?

Page 43

```
 1        A     No, I don't believe so.

 2        Q     What are your qualifications to be the CEO of

 3    Kast Media, Inc.?

 4        A     I founded the company.

 5        Q     Anything else?

 6        A     Any other qualifications?

 7        Q     Yes.

 8        A     No.

 9        Q     Your degree from Wheaton College is in music

10    theory and composition; correct?

11        A     Yes.

12        Q     What year did you obtain your bachelor's

13    degree in music theory and composition from Wheaton

14    College?

15        A     2013.

16        Q     And tell me what you did for work from 2013 to

17    2018.

18        A     From 2013 to 2018, I -- I started a company, a

19    music education company called Sight Reading Academy,

20    which was then the -- the corporation that was converted

21    into Kast that -- that I used for that when I started

22    Kast.  I was a piano teacher during that time, and I was

23    a -- I worked at a restaurant.

24        Q     When did you found Kast Media?

25        A     I believe it would've been in 2016.
```

Page 44

1      Q     And do I understand your testimony correctly

2    that you converted Sight Reading Academy into Kast

3    Media, LLC?

4      A     Yeah.  I had formed an LLC for a music

5    education startup that I was working on, and so when I

6    started Kast, it really started as a very small

7    operation, just myself, you know, essentially working as

8    a contractor to do some production for people.

9           And so I ran the business through my existing

10    Sight Reading Academy, LLC.

11      Q     So you ran Kast's operations through Sight

12    Reading Academy -- your Sight Reading Academy, LLC for a

13    period of time; correct?

14      A     And then I -- yeah.  Correct.  I mean,

15    that -- it's the same corporation.  I just changed the

16    name.

17      Q     Let me know when you have reviewed Exhibit 4.

18                 (Exhibit 4 was marked for

19                 identification.)

20      A     I've reviewed it.

21      Q     Okay.  This shows Kast Media, LLC inactive

22    with the Secretary of State of California on -- or as of

23    April 7, 2020; correct?

24      A     It shows it active?  What's the question?

25      Q     Yes.  It shows it -- the inactive date for

                                              Page 45

1    Kast Media, LLC as 4/7 of '20; correct?

2         A    Oh, here it says "Inactive Date, 4/7/2020"?

3         Q    Yes.

4         A    Yes.

5         Q    All right.  Kast Media, LLC would not have

6    existed for any legitimate business purpose after April

7    7, 2020; correct?

8         A    No.

9         Q    Is what I said correct?  It would not have

10   existed?

11        A    Yeah.  Correct.  Not -- not that I know of.

12        Q    We're going to call this Exhibit 4-A so I

13   don't get my numbers off.  And that's from the

14   Delaware -- 4-A is from the Delaware Secretary of State

15   showing Kast Media, Inc. incorporating on the same day

16   that Kast Media, LLC ceased to exist and became inactive

17   in the state of California; correct?

18                  (Exhibit 4-A was marked for

19                  identification.)

20                  MS. COHEN:  Before the witness answers,

21   I'm just going to object to the use of the document to

22   say it's unauthenticated.

23                  You may answer.

24                  THE WITNESS:  So this document says

25   "Incorporation Date/Formation Date, 4/7/2020."  Is that

                                                    Page 46

1    what you're looking for?

2    BY MR. NEW:

3        Q    Yes.  Yes.  Now, look under Tax Information on

4    4-A, if you can.  This says "Last annual report filed,

5    2022."  And this is as of about a week ago from the

6    Delaware Secretary of State's office.  Is that accurate,

7    Mr. Thomson?

8                    MS. COHEN:  Before the witness answers,

9    I'm going to have the same objection as to the

10   document's hearsay, that it's not authenticated.

11                   You may answer.

12                   MR. NEW:  It's not hearsay.  I'll go

13   ahead and teach you the Federal Rules of Evidence today,

14   too.  Government documents are non-hearsay, and it's a

15   self-authenticating document, Ms. Cohen.

16                   You just put good nonspeaking objections

17   like "Object to form" on the record, and I promise you

18   we'll get through this.  But you ain't going to eat up

19   my seven hours today with improper speaking objections.

20   BY MR. NEW:

21       Q    My question to you, sir, is did -- is that

22   portion of this document that the last annual report was

23   filed 2022, is that accurate?

24       A    I don't know if it's accurate, and -- I don't

25   know.

                                           Page 47

1        Q     Who would be the best person to ask that

2    question?

3        A     Well, we are working with -- this is for the

4    State of California; correct?

5        Q     No, State of Delaware.

6        A     The State of Delaware.  We're working to get

7    clarity on what the tax liability is with the company

8    currently.

9        Q     Not my question.  My question was what was the

10   last year that Kast Media, Inc. filed a Delaware tax

11   return?

12       A     I don't know.  I don't know off the top of my

13   head.

14       Q     Now, this document also says "Tax due,

15   $158,454.13."  Do you see that?

16       A     Yes.

17       Q     All right.  Go back to Exhibit 2, which is

18   your petition, your, Kast's, petition.  Can you find for

19   me anywhere in Kast's petition that the $158,454.13

20   that's owed to the State of Delaware is listed as a

21   debt?

22       A     Would you like me to go through the document?

23       Q     Yeah, go through the document.

24       A     I don't see the -- I don't see this number in

25   there.

Page 48

1      Q      Okay.  Go to page 12 of Exhibit 2, please.

2                  MS. COHEN:  That's page 12 at the top?

3                  MR. NEW:  Yes, page 12 of 24.

4                  MS. COHEN:  Twelve of twenty-four.

5                  THE WITNESS:  Oh.  I see.  Mm-hmm.

6      BY MR. NEW:

7      Q      Assuming that Kast owes $158,454.13 to the

8      State of Delaware for unpaid taxes, that would make the

9      State of Delaware the 11th largest creditor in Kast's

10     bankruptcy; wouldn't it?

11                 MS. COHEN:  Object to the form of the

12     question, calls for speculation.

13                 You may answer, if you can.

14                 THE WITNESS:  I -- I don't know.  I don't

15     have it in -- oh, is this listed in order?

16     BY MR. NEW:

17     Q      Yes.  Your Mom and Dad LLC out of Beverly

18     Hills, California, you say it has an unsecured claim of

19     $203,713.  SupportingCast has a claim of 139,466.  I

20     understand you're not a bankruptcy lawyer, so tax liens

21     aren't usually unsecured credit for claims; are they?

22     A      I don't know.

23     Q      I mean, government's going to get his; isn't

24     it?

25                 MS. COHEN:  Objection.  The question

Page 49

1   calls for speculation.

2   BY MR. NEW:

3       Q    Government's going to get theirs probably

4   before any of these other unsecured creditors, so --

5               MS. COHEN:  Object to the question, calls

6   for a legal conclusion.

7   BY MR. NEW:

8       Q    All right.  Why didn't you disclose the

9   $158,454.13 on Kast's petition, Mr. Thomson?

10      A    Well, what I can tell you is that we are

11  working to get clarity around what the tax liability is

12  for the company, and we believe it's overstated.  But we

13  haven't come to a final conclusion.

14      Q    Who is the "we" that's working to get clarity

15  on this overstated tax amount to the State of Delaware?

16      A    Kast and my legal counsel.

17      Q    All right.  Who's your lawyer to help you work

18  out this tax issue?

19      A    My legal counsel.

20              MS. COHEN:  Do you mean Kast's attorney?

21              MR. NEW:  Yeah.

22              THE WITNESS:  Yeah, it's Leslie.

23  BY MR. NEW:

24      Q    Okay.  All right.  But you agree with me that

25  that figure, 158,454 and 13 cents, isn't in Kast's

Page 50

1   petition for bankruptcy; is it?

2              MS. COHEN:  You mean it's not in the list

3   of 20 largest; right?

4              MR. NEW:  No.  He read the entirety of

5   the document.

6   BY MR. NEW:

7      Q   You read the entirety of that document, and

8   that amount is not in Kast's petition; is it?

9      A   I scanned this document, and I did not see

10   that number.

11      Q   All right.  Is Kast in good standing in the

12   state of Delaware?

13      A   I -- I would believe so.  Yeah.

14      Q   Does Kast file tax returns in the state of

15   Delaware?

16      A   I believe so.

17      Q   Does Kast file tax returns in the state of

18   California?

19      A   I believe so.

20      Q   The state of California would still be

21   considered Kast's principal place of business; would it

22   not?

23      A   Yes.

24      Q   And does Kast have, like, an actual office

25   here in California somewhere?

Page 51

1     A     Our -- our operations are based out of the

2     address on file on our documents, the Hayvenhurst.

3     Q     All right.  7111 Hayvenhurst Avenue, Van Nuys,

4     California 91406?

5     A     Yep.

6     Q     Describe that location for me.

7     A     That is a warehouse studio location.

8     Q     How large?

9     A     The building is very large.  I have no idea

10    how large.

11    Q     Does Kast have business offices and studios at

12    7111 Hayvenhurst Avenue?

13    A     We have a -- an office space and an

14    arrangement to be able to access the studio for our

15    needs, for our recording needs.

16    Q     Does Kast rent space at 7111 Hayvenhurst

17    Avenue, Van Nuys?

18    A     No.

19    Q     Is that space provided gratis?

20    A     That was part of a settlement where we agreed

21    that Kast would continue to have access to it,

22    reasonable access to it for a period of time after our

23    lease was up with them.

24    Q     And when was that settlement reached?

25    A     I think it would've been early -- early 2023.

Page 52

1       Q       What was the nature of the dispute such that a

2    settlement had to be reached?

3       A       We were not making as significant usage of the

4    space as we were expected to.  We had a few months left

5    on the lease, and so thereby we had a liability there

6    for the remainder of the months left on the lease.  So

7    we did a settlement that gave us -- so -- so -- you

8    know.

9            So we got -- we needed a settlement that gave

10   us usage of it, like I described.

11      Q       Do I take it that you were behind in rent at

12   the 7111 Hayvenhurst Avenue, Van Nuys, in the first

13   quarter or so 2023?

14      A       I don't know if we were behind in rent or not.

15      Q       Then explain why the settlement was needed.

16      A       Because we still had several months left on

17   the lease where we would have to continue to make

18   monthly payments.

19      Q       And so you wanted some relief from having to

20   pay those remaining months on the lease; correct?

21      A       Mm-hmm.

22      Q       Is that yes?

23      A       Yes.

24      Q       And what was the rent amount?

25      A       I believe it was around 11,000 a month.

1    Q    And how many months remained that Kast needed

2    relief from when the settlement was reached?

3    A    I don't recall.  I don't recall exactly.  I'm

4    going to have to look at the document.

5    Q    Six months?

6    A    May have been.  I'm not sure.

7    Q    What document would tell you how many months

8    remained on the lease that Kast needed relief from the

9    $11,000 a month rent payment in the first quarter or

10   thereabouts 2023?

11   A    There is the lease contract that would show

12   when the lease was up, and then there would be the

13   settlement, which would show at what point we decided to

14   move forward with the settlement deal.

15   Q    And so the terms of the settlement were that

16   you didn't have to pay however many remaining months

17   there were on the lease, and you got to stay in the

18   location gratis; correct?

19   A    Those were some of the terms.

20   Q    And I take it that that settlement agreement

21   relative to the 7111 Hayvenhurst Avenue, Van Nuys,

22   California, provided Kast with some financial relief,

23   took some pressure off; right?

24   A    We would have saved money on the remainder of

25   the lease.

Page 54

1      Q      Took some pressure off of Kast from a

2   financial standpoint; correct?

3                  MS. COHEN:  Asked and answered.

4                  You may answer one more time.

5                  THE WITNESS:  Yeah, we saved some money

6   on the -- the ongoing lease payment.

7   BY MR. NEW:

8      Q      Not only did you save money, you didn't have

9   to put out any rent money from roughly first quarter

10  2023 up through the present; correct?

11     A      Yeah.  From -- from when we signed the

12  settlement up to present.

13     Q      Right.  So it's not just the rent that you're

14  saving.  You're not paying rent anywhere to operate

15  Kast.  Is that a fair statement, Mr. Thomson?

16     A      Yeah.  Correct.

17     Q      Let's talk about PPP.  When the pandemic hit

18  in 2020, did Kast apply for PPP?

19     A      I think we did, but my accountants handled it.

20     Q      Now, I don't want to use these terms

21  interchangeably, despite what the cover of the voluntary

22  petition says.  Which entity filed for and received PPP

23  benefits from the federal government during or around

24  the time of the pandemic?

25     A      Which entity filed --

                                              Page 55

1    Q    Yes.

2    A    The -- that -- well, either Kast, LLC or

3    Kast -- Kast, Inc.; right?  Depending on when the

4    conversion was, if the conversion was right in that same

5    timeframe, although the PPP rolled out a little bit

6    later, so it probably would've been converted at that

7    time.

8         But I don't have the PPP, you know,

9    application in front of me.

10   Q    Do you know how much one of those entities got

11   in PPP relief?

12   A    I don't recall off the top of my head.

13   Q    And you said your accountants handled that?

14   A    Yes.

15   Q    Which accountants handled the PPP at some

16   point in 2020?

17   A    I -- I don't know for sure, but I would guess

18   it would've been Emily Pender, would've been the

19   accountant at that time.

20   Q    And was she in-house?

21   A    Yes.

22   Q    As we've seen in the documents from California

23   and Delaware, there would've been no legitimate reason

24   for Kast Media, LLC after April the 7th to receive PPP;

25   correct?

                                                   Page 56

1              MS. COHEN:  Objection, calls for a legal

2      conclusion.

3                   Answer if you know.

4                   THE WITNESS:  What's the question?

5                   MR. NEW:  Just put a good nonspeaking

6      objection on the --

7                   MS. COHEN:  That is a nonspeaking

8      objection.

9                   MR. NEW:  It is not.  When you say "if

10     you know," it suggests that he doesn't.

11     BY MR. NEW:

12         Q    So I'm going to ask my question again with a

13     good nonspeaking objection placed on the record if she

14     has one.  We saw the documents from California -- you're

15     welcome to look at them again, Mr. Thomson -- that said

16     that Kast Media, LLC ceased to exist as of April the 7th

17     of 2020.

18              So I'm asking you whether you agree with me

19     that there would've been no legitimate reason for Kast

20     Media, LLC to have sought PPP relief after that date.

21                   MS. COHEN:  And my objection is that it

22     calls for a legal conclusion.

23     BY MR. NEW:

24         Q    You can answer.

25         A    I -- I don't know.

                                              Page 57

1      Q      All right.  Did Sight Reading Academy receive

2   PPP relief?

3      A      Sight Reading Academy was the corporation that

4   was renamed Kast Media, LLC.

5      Q      That's not my question.  My question is did

6   Sight Reading Academy apply for or receive any PPP?

7      A      I believe all of the PPP activity would have

8   taken place after the renaming of Sight Reading Academy

9   to Kast Media, LLC.

10      Q      Was Sight Reading Academy doing any business

11   as of, say, April 2020?

12      A      Sight Reading Academy is the corporation that

13   was converted into Kast Media -- or not converted,

14   renamed Kast Media, LLC.

15      Q      So the answer to my question is no, Sight

16   Reading Academy was not operating or doing any business

17   as of April 2020; correct?

18      A      That's right.  Then the corporation was Kast

19   Media, LLC, and Sight Reading Academy was renamed Kast

20   Media, LLC.

21      Q      I mean, from a business standpoint, regardless

22   of business structure, you could operate Sight Reading

23   Academy as a sole proprietorship; right?

24           MS. COHEN:  Objection, calls for a legal

25   conclusion.  Objection, calls for speculation.

                                              Page 58

```
 1    BY MR. NEW:

 2         Q    Do you understand that?

 3         A    I don't know.

 4         Q    Okay.  You said that you are the CEO of Kast

 5    Media, Inc.; correct?

 6         A    Yes.

 7         Q    Who are the other officers of Kast Media,

 8    Inc.?

 9         A    I am the only officer.

10         Q    So you are the president, vice president,

11    secretary, and treasurer of Kast Media, Inc.; correct?

12         A    No, I'm the only officer.

13         Q    Is Kast Media, Inc. an S corp or a C corp?

14         A    I believe it's a C corp.

15         Q    Did Kast Media at some point have a deal with

16    Netflix or HBO or HBO Max?

17         A    Yeah, we -- we did production work for both of

18    those companies.

19         Q    Both Netflix and HBO?

20         A    Yep.

21         Q    When was that production work done for Netflix

22    and HBO?

23         A    Let's see.  We did Season 2 of Batman, which

24    was pretty cool.  Batman: The Audio Adventures, that is.

25    That was for HBO.  I mean, I assume the actual entity we
```

Page 59

1    contracted with was probably WarnerMedia.

2        Q    I'm sorry.  When was that?

3        A    I think -- I believe that probably would've

4    been during 2021 or 2022.

5        Q    Okay.  I'm sorry.  I interrupted you by asking

6    when Season 2 of Batman: The Audio Adventures was done

7    with HBO or Warner Brothers, whomever it was.  What

8    other production work did you do for Netflix, HBO,

9    whomever?

10       A    And then we did -- we did -- so that's the

11   only one we did with WarnerMedia, and then for Netflix,

12   we produced a podcast called We Have the Receipts.  And

13   I think that that one would've been a little bit later

14   than Batman, so probably during the year 2022.

15       Q    I won't ask you the dollars, necessarily, but

16   in terms of percentage of revenue for Kast Media, Inc.,

17   what do the Netflix and HBO deals constitute?

18       A    In terms of percentage?  Let's see.  You're

19   asking me to do some quick math here.

20       Q    Or you can tell me the amounts.  I just wasn't

21   going to ask about the amounts, but if you want to tell

22   me the amounts as opposed to percentage.

23       A    Well, you know the revenue, so -- the revenue

24   for the company, 'cause you have the tax returns.  I

25   don't know.  They were a couple hundred thousand dollars

Page 60

1   per production, I believe.

2       Q   Why did those productions stop?  Was it just a

3   definitive contract, or were those nonrenewed by the

4   entities?  What happened there?

5       A   Batman was a definitive contract.  It was one

6   season.  No, they both were.  Yeah, the -- it was one

7   season of We Have the Receipts also.  So we finished out

8   the contract.

9       Q   You said that Batman was the Audio Adventures?

10      A   Yeah, I think so.

11      Q   And so is that a situation where you could

12  listen to that podcast from HBO on the podcast streaming

13  platforms?

14      A   Warner discussed a unique distribution model

15  where they put it on HBO Max, which I think has been

16  renamed to HBO now.  I don't know if they put it up on

17  regular podcast apps or not.  They distributed it at

18  least initially on HBO Max.

19      Q   Same question with respect to Netflix.  Was

20  that audio and video or just audio?

21      A   That was audio and video.  Yeah.

22      Q   So in other words, you could stream that

23  podcast on Netflix and watch the podcast being done?

24      A   No.  Netflix -- Netflix's distribution model

25  for that -- and -- and that's different.  Batman was

                                        Page 61

1    audio only, but it was an audio-only production on HBO

2    Max.

3              And then the Netflix one was video.  However,

4    they didn't put the video on the Netflix platform that

5    I'm aware of.  They were rolling out a -- they were

6    rolling out a new platform called Tudum, T-U-D-U-M, at

7    the time.  And their plan was to have that be the

8    primary distribution place for the video.

9              I think they ended up maybe putting it out on

10    YouTube as well.

11        Q    Tudum?

12        A    Exactly.

13        Q    Like the little "tudum"?

14        A    You know, it comes from House of Cards,

15    pounding the table.  Tudum.  Cute; right?

16              MS. COHEN:  How come I don't know this?

17              THE WITNESS:  The platform -- the

18    platform didn't last.

19    BY MR. NEW:

20        Q    That's the sound that it makes when the N

21    comes on before Stranger Things or whatever.  Tudum.

22        A    No, I know.  I know.  Yeah, and it comes from

23    House of Cards originally.  It's the sound of that main

24    character pounding his desk.  They called -- that's why

25    they called Tudum Tudum.  Oh, sorry.  My mic dropped.  I

Page 62

1    got excited.

2        Q    So Kast Media, Inc. is still in operation at

3    7111 Hayvenhurst Avenue, Van Nuys; correct?

4        A    Yes.

5        Q    Is all of your professional time spent working

6    as the CEO of Kast Media, Inc.?

7        A    The majority of my time is spent on Kast, Inc.

8        Q    Does Kast Media, Inc. have a chief financial

9    officer?

10       A    Not currently, no.

11       Q    Has Kast Media, Inc. ever had a chief

12   financial officer?

13       A    We worked with NOW CFO, which of course is an

14   outsourced chief financial officer.  That's NOW CFO.

15   And we contracted Erik Wissig as a -- as a part-time CFO

16   for us.  Those are the two people that would've -- or

17   entities that would've held that title.

18       Q    Are all of Kast's business records or computer

19   systems located at 7111 Hayvenhurst Avenue, Van Nuys?

20       A    Everything is pretty much in the cloud,

21   including Google and -- everything is in the cloud.

22       Q    So I take it that Kast Media, Inc. doesn't

23   maintain any paper records?

24       A    Pretty much everything is in the cloud.

25       Q    And I'm trying to get to pretty much

Page 63

1    everything, if there are paper business records that

2    Kast maintains in its regular course of business.

3         A    No.   No.   We keep everything in the cloud.

4         Q    Let's turn to the petition now, Exhibit 2.

5    And according to the petition, in addition to the

6    physical location, Kast has a post office box in Van

7    Nuys; correct?

8         A    Yes.

9         Q    From the point of the filing of the petition,

10   March 13th of 2024, how many employees does Kast Media,

11   Inc. have?

12        A    We don't have any employees.   We contract

13   with -- we contract out all of our work currently.

14        Q    And how many contractors does Kast Media, Inc.

15   have from the date of the filing of the petition to

16   present?

17        A    Probably around ten.

18        Q    Can you tell me what their positions are,

19   please?

20        A    Yeah.   I have an accountant.   I have somebody

21   who was working as sort of administrative assistance.   I

22   have a director of development who's -- who's overseeing

23   the stories that we're producing and what we're -- what

24   we're putting out in episodes.   We have writers,

25   producers, and hosts and audio editors.

Page 64

1        Q        What projects are the writers, producers, and

2    hosts working on?

3        A        We have a few owned and operated podcasts that

4    we are continuing to put out episodes on.  We are

5    developing new series and -- yeah, that's what they're

6    working on.

7        Q        All right.  Let's break those down.  One of

8    those is the Vigilante; correct?

9        A        Vigilante is, yes, an owned and operated

10   podcast.

11       Q        And my understanding from the documentation

12   with PodcastOne is that Kast Media, Inc. owns a 70

13   percent share of the Vigilante; correct?

14       A        I believe it's 50 percent.

15       Q        All right.  We'll take a look at those

16   documents.

17       A        Yeah.

18       Q        Same question relative to The Opportunist.  Is

19   that a 70 percent share?

20       A        Yes, 70 percent on that.

21       Q        And is it Lost in Paradise?  Is that the other

22   O&O?

23       A        Panama.

24       Q        Lost in Panama.  Sorry.  Can't read my own

25   writing.  Same question.  What's the percentage of Lost

                                                  Page 65

1   in Panama?

2      A    Seventy.

3      Q    So it is a 70, 70, and a 50 percent ownership,

4   along with PodcastOne; correct?

5      A    Correct.

6      Q    Are those shows generating income currently?

7      A    Yes.

8      Q    How much income are those three shows

9   generating whereby Kast Media, Inc. gets either a 70 or

10  a 70 or a 50 percent cut?

11     A    It varies, you know, between 20 and 70

12  thousand dollars a month.  It might be lower on the low

13  range.  It varies.

14     Q    And how does Kast generate that income for the

15  Vigilante, The Opportunist, and Lost in Panama?

16     A    Through advertising and subscriptions.

17     Q    Where would one subscribe to one of those

18  three podcasts?

19     A    On Apple Podcasts.

20     Q    Spotify?

21     A    No.  Not that I'm aware of.

22     Q    And do I take it that you or someone sells

23  advertising on those three podcasts to generate this

24  somewhere in the neighborhood of 20,000 to 70,000

25  dollars per month?

Page 66

1       A    Yes.  Advertising is sold on those podcasts.

2       Q    And under the terms of the agreement with

3    PodcastOne, is Kast paying to PodcastOne its either 30

4    or 30 or 50 percent share of those three shows?

5       A    PodcastOne is distributing and selling the

6    advertising on those three shows.  They collect revenue,

7    and then they pay us our cut.

8       Q    Kind of like what you were doing with Last and

9    Cornette; right?

10      A    Correct.

11      Q    So PodcastOne distributes these three

12   podcasts.  They generate the advertising dollars, and

13   then PodcastOne pays to Kast its 70 or 70 or 50 percent;

14   do I understand that correctly?

15      A    Can you say that again?

16      Q    Yes.  Just -- I want to make sure that I

17   understand your testimony.  PodcastOne distributes these

18   three podcasts; correct?

19      A    Yes.

20      Q    PodcastOne then collects that advertising

21   money for the advertising done on these three podcasts;

22   correct?

23      A    Yes.

24      Q    And then PodcastOne distributes to Kast its

25   share, whatever that share may be, for the income

Page 67

1    generated from the advertising for those three shows;

2    correct?

3        A    Yes.

4        Q    Now, I noticed in the PodcastOne agreements

5    that there was an escrow agreement.  The money that

6    PodcastOne sells for advertising, is that money

7    currently being given to Kast Media, Inc., this 20 to 70

8    thousand dollars per month?

9        A    Our split of revenue is being paid to Kast in

10    cash and not held in -- in escrow.

11        Q    And by "cash," I assume that you just mean by

12    bank transfer or a check, as opposed to --

13        A    Yes.  Correct.  ACH or whatever wire --

14        Q    Okay.  And into what account does that money

15    go?

16        A    The operating East West account.

17        Q    And that operating East West Bank account, is

18    that the same operating account that Kast Media has had

19    for a number of years?

20        A    No.

21        Q    All right.  When did that East West Bank

22    account into which PodcastOne deposits podcasting money

23    into, when did that account come about?

24        A    As part of the bankruptcy petition, you're

25    required to close all your old accounts and open up new

Page 68

1   debtor in possession accounts.  So that's when that one

2   was opened, around about that time.

3        Q    So do I understand correctly that the accounts

4   from which you would have paid Arcadian Vanguard and

5   Cornette are no longer active?  They've been closed;

6   correct?

7        A    Correct.

8        Q    Who is your primary contact at PodcastOne?

9   Who do you deal with at PodcastOne primarily?

10        A    I deal with their operations person over

11   there, Stacy.  I deal with Kit, their president; Eli,

12   their head of content; and Rob Ellin, who owns

13   the -- their parent company.

14        Q    All right.  Turn over to page 5 of the

15   petition, please, page 5 of 24.  All right.  This

16   document is called Kast Media Balance Sheet as of

17   January 31, 2024, and it's part of Kast's bankruptcy

18   petition in this case; correct?

19        A    Yes.

20        Q    All right.  Let's go through assets here.

21   Chase Personal Checking.  Tell me what that is.

22        A    I think that would've been a -- a personal

23   account that was inactive at this time.

24        Q    Why would there be a personal checking account

25   listed as an asset of Kast Media?

Page 69

1       A    Because the company would regularly pay my

2   credit card payments.  We would separate out

3   what -- what was an appropriate business expense and

4   what would be taken as 1099 income.

5       Q    Okay.  We'll get into that more later.  East

6   West Bank Batman Production 2653.  Tell me what that is.

7       A    That was an account that Warner -- that we set

8   up for the Warner production.  They wanted us to handle

9   payment to their talent, and they wanted us to set up a

10  separate bank account for that contract.  So that's what

11  that was set up for.

12      Q    Why would you have to pay Warner's talent?

13      A    Well, pass-through; right?  So they would pay

14  us, but we would handle actually processing payment out

15  to their talent.

16      Q    Like a voice actor or something like that?

17      A    Correct.

18      Q    And as of January 31, 2024, had that account

19  shut down?

20      A    No, I think it was still active up until we

21  closed it down with the filing of the bankruptcy.  But

22  it was empty, obviously.

23      Q    East West Bank Deposit Checking Account 5084.

24  Tell me what that is.

25      A    So --

Page 70

1    Q    Or I'm sorry.  5085.

2    A    5085.  So this has nothing in it; right?

3    Q    Yes.

4    A    In the past, we had a line of credit facility

5    with East West, and I believe that this account was used

6    as what they would call a lockbox account for that

7    credit facility, where they would collect payments, and

8    then they would move them into our main operating

9    account after they collected payments.

10    Q    Who is "they" collecting payments, East West

11    Bank?

12    A    Yep.

13    Q    All right.  The East West Bank Main Checking

14    4038, tell me what that is.

15    A    I believe that was our main operating account.

16    Q    Kast Media Payroll, zero balance.  Tell me

17    what that is.

18    A    I think we experimented at some point with

19    using a separate checking account to handle payroll, but

20    we didn't continue that practice.

21    Q    "PayPal account."  I know what PayPal is.

22    Tell me why that's listed as an asset here.

23    A    That is a PayPal account that the company had.

24    Q    "Sponsorship payouts, zero."  Tell me what

25    that is.

Page 71

1      A     Again, at one point, we experimented with

2  using a separate checking account for our sponsor

3  payouts, but we didn't continue that practice.

4      Q     For what period of time did you use some bank

5  account -- you said experimented -- for sponsorship

6  payouts?

7      A     I don't recall.

8      Q     Where was the bank account?

9      A     I don't recall.  Yeah, I don't remember.

10      Q     Who would be the best person to ask

11  where -- the bank that the sponsorship payouts were paid

12  out of?

13      A     Probably one of the accountants who would've

14  had access to the QuickBooks at that time.

15      Q     If it wasn't this account that you

16  experimented with paying out sponsorship payouts, where

17  else would those have been paid out of?

18      A     The main operating account, 4038.

19      Q     "Stripe."  Tell me what that is.

20      A     That is a payment processing platform, very

21  similar to PayPal.  Same thing.

22      Q     "Wells Business Checking, $20,448.19."  Tell

23  me what that is.

24      A     That's a separate business checking account.

25      Q     This has "Accounts receivable, $500,536.65."

Page 72

1    Tell me what accounts were receivable as of January 31,

2    2024.

3        A    What accounts were receivable?

4        Q    Yes.

5        A    $500,000 worth of them.

6        Q    No, what -- I can see the amount.  Where was

7    that derived?

8        A    From customers that owed us money.

9        Q    Which customers would have owed Kast money

10   totaling $500,536.65 as of January 31, 2024?

11       A    I would have to look at a receivables report.

12       Q    And could you run a receivables report as of

13   that date to tell you who owed you that specific amount?

14       A    Yes.

15       Q    All right.  Tell me who the customers would've

16   been.  And I'm not asking about that would've added up

17   to the roughly half a million bucks, but who would some

18   of those customers have been that would have owed Kast

19   that money?

20       A    Advertisers.

21       Q    Such as?

22       A    You want examples of advertisers?

23       Q    Yep.

24       A    Well, actually, it probably would've been

25   mostly agencies.  Veritone, Oxford Road, Ad Results

Page 73

1   Media.  Those were the main customers in the form of

2   advertising agencies that would regularly purchase

3   advertising on our podcasts.

4       Q    Is it -- you believe that those agencies would

5   have made up the lion's share of this roughly half a

6   million dollars?

7       A    It would've been a significant amount of it.

8       Q    All right.  All right.  You have here

9   "Accumulated depreciation of $136,537.32."  Do you see

10  that?

11      A    "Accumulated depreciation, a hundred" -- yes,

12  I see it.

13      Q    All right.  Tell me what that is.

14      A    I don't know.  You would have to ask the

15  accountants.

16      Q    Who are the accountants?

17      A    The people that I listed before, Mike

18  Calabretta, Emily Pender, Analina Acosta.  People

19  that -- the accountants that we'd worked with in the

20  past.

21      Q    And what are they depreciating at the amount

22  of $136,537.32?

23      A    I don't know.  I'd have to look at the report.

24      Q    How easy is it for you to get the depreciation

25  report?  That's an easy report to run on your

Page 74

1   QuickBooks; is it not?

2        A    I don't know.  I haven't run a -- a

3   depreciation report on QuickBooks.

4        Q    You said that you could answer my question if

5   you had access to the depreciation report; correct?

6        A    I believe so.

7        Q    All right.  So it would be fairly easy, would

8   it not, for you to ask one of the accountants to run the

9   depreciation reports to tell you what it is that Kast

10  Media, Inc. is depreciating to come up with $136,537.32;

11  correct?

12       A    You're asking if it would be easy to run the

13  report?

14       Q    Yes.

15       A    I don't know.  I haven't run a depreciation

16  report before.

17       Q    All right.  If you run the depreciation report

18  and you have someone run it for you, Kast, you can tell

19  us then where the 136,537 and 32 cents comes from for

20  accumulated depreciation; correct?

21       A    I would guess so.

22       Q    All right.  "Computer, $9,913.94."  Which

23  computers are those?

24       A    I don't know.  I would have to look at the

25  detail.

                                            Page 75

1        Q      And what detail would that be?

2        A      The detail of this line item, what makes up

3     this $9,913.

4        Q      But Kast has that, though; right?

5        A      I don't know.

6        Q      Sir, you're the CEO.  You should.

7        A      I don't know.  I would have to run the report

8     and see.

9        Q      All right.  "Fixed asset, other tools,

10    equipment, $72,489.31."  What's that?  What are the

11    fixed assets, other tools, equipment of Kast Media, Inc.

12    as of January 31, 2024?

13       A      I don't know.

14       Q      "Office furniture, $29,385.81."  What's that?

15       A      I don't know.

16       Q      Where is that?  Since you don't know what that

17    is on the balance sheet, where is the office furniture

18    that's valued at $29,385.81, Mr. Thomson?

19       A      I would assume that that would've been part of

20    the settlement agreement with -- that we already

21    discussed with the -- the lease, the place that we were

22    renting.

23       Q      What's a settlement agreement with Howie

24    Mandel have to do with $29,385.81 worth of furniture

25    that you list as an asset of Kast Media as of January

                                                Page 76

1    31, 2024?

2        A    I made a deal.  Part of the settlement deal

3    for the remainder of what we owed for the remainder of

4    that lease was that we would do essentially a trade of

5    equal value that would be the equipment for the

6    remainder of what -- what we owed the lease.

7             So they got the use of the equipment.  We

8    didn't have to pay the remainder of the lease.  We

9    continued to have access to the office and the studio,

10   you know, thereafter for a specified period of time.

11       Q    Why are you still listing office furniture

12   that went to Howie Mandel or his company or whomever in

13   2023 as an asset of Kast Media, Inc. in January of 2024?

14       A    I don't know.

15       Q    Shouldn't be on there; should it?

16       A    I don't know.

17       Q    You should know.  You're the CEO.

18            MS. COHEN:  Okay.  We're going to stop

19   this now.  You're badgering the witness.  You're telling

20   him what he should and shouldn't know.  He's answered

21   the question already.  For you to scold him and tell him

22   what he should and shouldn't know is not productive.

23            MR. NEW:  Put a good nonspeaking

24   objection on the record, Ms. Cohen.

25            MS. COHEN:  My objection is you're

                                            Page 77

1   badgering the witness.

2                   MR. NEW:  I'm not badgering.  I'm not

3   "wolverining."  I'm not any other "rodenting" Mr.

4   Thomson.  Put a good nonspeaking objection on the

5   record.

6                   MS. COHEN:  Objection, badgering.

7                   MR. NEW:  Badgering isn't even an

8   objection.  I promise this'll be like a CLE.  We'll get

9   through the Federal Rules of Evidence, Federal Rules of

10  Civil Procedure, and everything else today.

11  BY MR. NEW:

12      Q    Mr. Thomson, if you made a deal whereby Howie

13  Mandel or his company or whomever got this $29,385 worth

14  of furniture in 2023, it shouldn't be listed as an asset

15  in a bankruptcy petition as of January 2024; correct?

16      A    I don't know.  We would have to investigate

17  that.

18      Q    All right.  We will.  "Studio equipment."

19      A    Mm-hmm.

20      Q    "$24,748.26."  Tell me about that.

21      A    That is a -- under our fixed asset -- assets.

22      Q    The total current assets?

23      A    Oh, yeah.  Yeah, but fixed assets under total

24  current assets.  No, it's not under --

25      Q    No, it's not under total fixed assets.  Was

                                                    Page 78

1    the studio equipment part of the deal with Howie Mandel?

2         A    It is under fixed assets.  Was the studio

3    equipment part of the deal with Howie Mandel?  We -- we

4    gave our landlord equipment and furniture in that

5    settlement agreement.

6         Q    So this $24,748.26 was part of the 2023 deal

7    with Howie Mandel or his company; correct?

8         A    I don't know.  I would have to go back and

9    investigate.

10        Q    All right.  And if I ask you the same question

11   about why equipment that was a part of a 2023 settlement

12   is still listed as a Kast Media asset, you can't answer

13   that question; can you?

14             MS. COHEN:  Objection, miscasts the

15   witness's prior testimony.

16   BY MR. NEW:

17        Q    You said, "I don't know.  I'll have to check.

18   I'll have to get back to you," that kind of thing with

19   respect to office furniture.  I'm asking is your

20   question the same relative to studio equipment at

21   $24,748.26?

22        A    Is my question the same?

23        Q    Is your answer the same?

24        A    Correct.  I would have to look at the detail

25   and investigate.

                                              Page 79

1     Q    All right.  So let's make sure.  Kast Media

2    doesn't own office furniture or studio equipment

3    totaling those amounts as of January 2024; does it?

4     A    I'm not aware of that.  I'm not aware that we

5    own equipment outside of what we provided as part of

6    that settlement agreement.

7     Q    So why's it listed as an asset?

8     A    I don't know, but it's possible that it wasn't

9    updated in the accounting software.

10     Q    All right.  Anything else on this page that

11    hasn't been updated?

12     A    I don't know.

13     Q    TD Ameritrade.  Why did Kast Media have a TD

14    Ameritrade account?

15     A    I don't know.

16         MS. COHEN:  Where are you, Mr. New?

17         MR. NEW:  Under "Total Fixed Assets,

18    Other Assets, TD Ameritrade."

19         MS. COHEN:  Thank you.

20    BY MR. NEW:

21     Q    Did Kast Media, Inc. trade in stocks?

22     A    No, not that I'm aware of.

23     Q    Why would a TD Ameritrade account be listed in

24    assets belonging to Kast Media, Inc.?

25     A    I don't know.

Page 80

1    Q    Shouldn't you know as the CEO of that

2    corporation?

3                MS. COHEN:  Objection, argumentative.

4    A    I don't know.

5    Q    Who's the best person from Kast Media, Inc.

6    when we do Part 2 or Part 3 of this deposition to ask,

7    Mr. Thomson?

8    A    I don't know.

9    Q    You don't even know who within your

10   corporation would be the best person to answer the

11   question why is there a TD Ameritrade account listed as

12   an asset of your corporation?

13   A    One of the accountants.

14   Q    Give me their names again.

15   A    I think you have them.  Michael Calabretta.

16   Analina Acosta.  Emily Pender.  Krimzee Maenlee.  NOW

17   CFO.  Erik Wissig.

18   Q    Anybody else?

19   A    I think that's the list of people.

20   Q    All right.  Let's keep going.

21   A    And entities.

22   Q    Liabilities, accounts payable, $4,803,985.44.

23   You see that?

24   A    Yes.

25   Q    You going to be able to tell me where that

                                        Page 81

1    $4,803,985.44 comes from?

2         A     That was owed to our vendors.

3         Q     People like Brian Last and Jim Cornette, among

4    others; correct?

5         A     Correct.

6         Q     All right.  So under "Credit Cards," there's

7    $24,090.90 owed as of January 31, 2024; correct?

8         A     Yes.

9         Q     And the only one that that's on is Amex Delta

10   SkyMiles Reserve Card 31001; correct?

11        A     Yes.

12        Q     Is that a business credit card or a personal

13   credit card?

14        A     That is a personal credit card.

15        Q     Why is there a personal credit card with a

16   balance of $24,090.90 listed on the balance sheet of

17   Kast Media, Inc. as a liability?

18        A     The company would pay my personal credit card.

19   It would be separated into appropriate business

20   expenses, and any personal expenses would be taken by

21   myself as income.

22        Q     Okay.  Let's break that down then.  So as I

23   understand your testimony, anything that you charge on

24   this Amex Delta SkyMiles Reserve card ending 31001, Kast

25   Media, Inc. would pay; correct?

Page 82

1        A     I believe so.

2        Q     And if there was a business charge on that for

3    something legitimate, that would be taken as a

4    legitimate business expense by your accountants;

5    correct?

6        A     The business expenses would be classified

7    appropriately as business expenses by the accountants.

8        Q     All right.  And then anything that was charged

9    of a personal nature was deemed income to you; correct?

10       A     Correct.

11       Q     Placed on either a W-2 or a 1099; correct?

12       A     Would've been the -- would've gone to the

13   1099.

14       Q     There's an Amex business card, 42003.  If Kast

15   has legitimate business expenses that it needs to put on

16   a business card and you have legitimate personal

17   expenses, why not keep the two separate?

18             MS. COHEN:  Objection, calls for

19   speculation.

20   BY MR. NEW:

21       Q     Why not keep the two separate, Mr. Thomson?

22             MS. COHEN:  Same objection.

23       A     I don't know.

24       Q     That's not the way you've ever run Kast Media,

25   Inc.; is it?

                                        Page 83

1      A    What do you mean --

2      Q    With a separate business credit card and you

3  just taking draws and then paying your own credit card

4  payments.  That's not how you've ever run Kast; is it?

5      A    I don't understand the question.

6      Q    All right.  You've always had Kast Media, Inc.

7  pay your personal credit card bills and then divvy it up

8  in the manner in which you just described; correct?

9      A    Our process was that the company would

10  regularly pay my personal credit card bills.  The

11  transactions that were appropriate business transactions

12  would be classified as such, and the personal expenses

13  would be classified as income, would be taken as income

14  on the 1099.

15      Q    And my question is from the time that Kast

16  Media, Inc. came into existence in April of 2020, that's

17  how you've done it; isn't it?

18      A    Yeah.

19      Q    And that continues through today; correct?

20      A    No.  Since -- currently, right now, we're

21  paying me exclusively through payments.  As I -- as I

22  said, I'm a -- I'm a contractor at this point, and so

23  I'm being paid as a contractor on a biweekly basis.  And

24  then any expenses that I incur on behalf of the business

25  are reimbursed separately.

Page 84

1      Q    Any reason why you couldn't have done that

2    from April of 2020 up to the point of Kast filing

3    bankruptcy?

4           MS. COHEN:  Objection, calls for

5    speculation.

6      A    We transitioned to that process.

7      Q    That's not my question.  The process that

8    you're currently doing, you could've done from April of

9    2020 up to the point of March 2024, filing bankruptcy;

10    correct?

11           MS. COHEN:  Objection, calls for

12    speculation.

13    BY MR. NEW:

14      Q    You can answer.

15      A    I can't speculate about that.

16      Q    That's funny.  Every time she says

17    "speculation," are you going to say "speculate" today,

18    Mr. Thomson?  Is that how it's going to work?

19           MS. COHEN:  Objection.  You're harassing

20    the witness.

21           MR. NEW:  It's going to be a long day.

22           MS. COHEN:  You're going to get your

23    seven hours.

24           THE WITNESS:  Can we take a break?

25           MS. COHEN:  Let's take a break.

Page 85

```
 1                    MR. NEW:  Sure.

 2                    THE VIDEOGRAPHER:  We're now going off

 3      the record.  The time is 12:15 p.m.

 4                    (Off the record.)

 5                    THE VIDEOGRAPHER:  We're now going back

 6      on the record.  The time is 1:02 p.m.

 7      BY MR. NEW:

 8          Q    Okay.  Mr. Thomson, when we left off, the

 9      question that I was asking you was is the process that

10      Kast is following now relative to you paying for

11      business expenses and then being reimbursed, was there

12      any reason why that process could not have been followed

13      from April of 2020 up to the point in time of filing the

14      bankruptcy?

15                    MS. COHEN:  Objection, asked and

16      answered.

17      BY MR. NEW:

18          Q    You can answer.

19          A    I can speculate about that.

20          Q    So you don't know whether that process

21      could've been followed?

22                    MS. COHEN:  Objection, asked and

23      answered.

24      BY MR. NEW:

25          Q    Is that your testimony?
```

                                                    Page 86

1          A     My testimony is already -- I already said my

2     testimony.

3          Q     All right.  Take a look at the petition again.

4     "Balance sheet.  Customer credit accrual."  Tell me what

5     that is.

6          A     I -- I don't know off the top of my head.

7          Q     What's the best way that a creditor in this

8     bankruptcy can find that out?

9          A     The accountants would know or would have

10    access to that information.

11         Q     But what is customer credit accrual?  I mean,

12    what does that mean?

13         A     I don't know.  I don't want to speculate.

14    I -- you know, just based off of the name of the

15    account.

16         Q     "Programmatic, $8,323.59."  What does that

17    mean?

18         A     This looks to be a subcategory of -- of

19    customer credit accrual.  It's indented a little bit.

20         Q     And what does that mean?

21         A     I don't know.  It's in the same category as

22    customer credit accrual.

23         Q     Who's the best person with Kast Media, Inc. to

24    ask that question?

25         A     The accountants.

                                        Page 87

1    Q    "Spot-by-spot accrual, minus $471,855.44."

2    What does that mean?

3    A    I don't know.  The accountants would have that

4    information.

5    Q    Let me ask you a question, Mr. Thomson.  Did

6    you consult -- knowing that this bankruptcy petition was

7    going to be covered today as one of the areas, did you

8    consult with the accountants in preparation for the

9    deposition?

10    A    No.  I didn't go over this balance sheet with

11    the accountants.

12    Q    Okay.  Any reason why you couldn't have?  Is

13    there anything that would've prohibited you from

14    consulting with the accountants about what -- these

15    entries in Kast Media's balance sheet attached to the

16    petition?

17              MS. COHEN:  Objection, relevance,

18    badgering.

19    A    Is there anything that would've prohibited me?

20    Q    Yes.

21    A    I -- I don't know.  I'm not going to speculate

22    about that.  Do you like that?

23              MS. COHEN:  Let the record reflect the

24    attorney is laughing at the witness.

25    //

BY MR. NEW:

Q    So as you sit here today as the representative

of and CEO of Kast Media, Inc., you can't say what

"spot-by-spot accrual" means, nor how $471,855.44 was

arrived at as of January 31, 2024; correct?

MS. COHEN:  Objection, asked and

answered.

BY MR. NEW:

Q    Correct?

A    Yeah, I already said.

Q    Okay.  "Deferred salary, $34,615.67."  What is

that?

A    I don't know.

Q    You put it in the bankruptcy petition.  Why

don't you know?

A    I relied on my accountants to prepare these

schedules.

Q    So the accountants would be the best people on

behalf of Kast Media, Inc. to ask these questions;

correct?

A    I believe so.

Q    We'll get into the loans payable and the lines

of credit later.  Turn over to page 7 of 24.  What is

California PIT/SDI and SUI/ETT?

A    I don't know, but they're categorized under

Page 89

1    payroll liabilities, so that's what I would expect them

2    to be.

3        Q    "Payroll Taxes 941 and 944."  I assume as the

4    CEO of a corporation, you know what federal taxes 941s

5    and 944s are; don't you?

6             MS. COHEN:  Objection, argumentative.

7             MR. NEW:  I'm just asking.

8    BY MR. NEW:

9        Q    Do you know what 941s and 944s are?

10       A    I'm not going to -- I'm not going to offer a

11   definition off the top of my head.

12       Q    You don't know what those are; do you?

13            MS. COHEN:  Objection, asked and

14   answered.

15   BY MR. NEW:

16       Q    You don't know what 941s and 944s are; do you?

17       A    Not going to define them off the top of my

18   head.

19       Q    All right.  Nor can you as you sit here today

20   tell me where $16,437.99 came from as of January 31,

21   2024; correct?

22       A    No.  I relied on my accountants to prepare

23   these schedules.

24       Q    All right.  Now, "Investor note payable, $2

25   million."  What is that?

                                        Page 90

1          A     This is a convertible note that was invested

2     into the company by -- by our investors.

3          Q     Who are the investors?

4          A     There's four entities.  Lyrical Media.  Chuck

5     Huebner.

6          Q     Spell the last name, please.

7          A     H -- it's either U-E or E-U, B-N-E-R.  I'm not

8     exactly sure what order on the E and the U.  Huebner.

9     Larry Shuman and Clara Vista.

10         Q     And what?

11         A     Clara Vista.

12         Q     When did those investors invest $2 million

13    into Kast Media, Inc.?

14         A     Clara Vista put in 500 I believe around

15    January of 2022, and the remainder was all put in toward

16    the middle or second half of 2022.

17         Q     Into what account did this $2 million go?

18         A     Into the operating account.

19         Q     And what did these investors get in exchange

20    for their $2 million gross investment?

21         A     They got a convertible note.

22         Q     What does that mean?

23         A     It is a -- an equity or debt facility

24    that -- a debt facility that converts to equity upon

25    some event.

Page 91

1    Q    And what's the event that theirs would

2    convert?

3    A    I would have to go to the -- the SAFE

4    contracts, the convertible note contracts to look up,

5    you know, exactly what all qualifies.

6    Q    Do you have those?

7    A    They are in Kast's possession, yes.

8              MR. NEW:  Counsel, I'd ask for those, and

9    we've asked for them before.

10             MS. COHEN:  Do you want to talk about

11   that now or later?

12             MR. NEW:  Whatever you want.  They've

13   been asked for.  They should've been produced prior to

14   today.

15             MS. COHEN:  So let's look at the 2004

16   stipulation, Exhibit 1, and if you can show us where in

17   that those are requested.

18             MR. NEW:  Item Number 1 covers it, I

19   believe.  "Information used to prepare Debtor's petition

20   and schedules."  There was information used to put this

21   $2 million amount in there.

22             MS. COHEN:  Well, you can ask him if he

23   used that note and --

24             MR. NEW:  Information -- okay.  No,

25   I'm -- you can ask him whatever you'd like,

                                                Page 92

1    but -- that's fine.  I believe 1 covers it.

2              All right.  We can go back on.

3    BY MR. NEW:

4         Q    So Kast owes Lyrical Media, Chuck Huebner,

5    Larry Shuman, and Clara Vista a total of $2 million;

6    correct?

7         A    Yes.  Those convertible notes have not

8    converted into equity.

9         Q    Under your bankruptcy plan, what happens to

10   that $2 million, Mr. Thomson?

11        A    They have the opportunity to convert to equity

12   or take their pro rata share of the amounts paid out

13   under the plan.

14        Q    Have you spoken with any of the four of them

15   about under your proposed plan right now, which they're

16   going to do?

17        A    No.  I haven't spoke with them since -- since

18   we proposed the plan.

19        Q    Is it 500,000 equal for the four investors

20   that totals $2 million?

21        A    No.

22        Q    You told me Clara Vista was 500.  How much is

23   Larry Shuman?

24        A    I believe he was 100.

25        Q    And how much is Chuck Huebner?

                                            Page 93

1        A    I believe he was 250.  You're going to be able

2    to check and make sure this all adds up at the end of

3    the day.

4        Q    And Lyrical Media then would be about

5    1,150,000?

6        A    Yep.

7        Q    And as you sit here today, you can't recall

8    what it is, the event that triggers the conversion;

9    correct?

10        A    I don't have the contract in front of me.  I

11    believe that there are a few different events that could

12    trigger that.  Normally, it would be something like

13    a -- a priced investment round.

14        Q    Like a what?

15        A    A priced investment round.

16        Q    Tell me what "retained earnings" is.

17        A    That is an equity account, and I don't have a

18    more detailed definition than that.

19        Q    Whose is it?

20        A    Whose is it?

21        Q    Yes.

22        A    Kast's.

23        Q    Where did it earn $5,857,107.60?

24        A    Oh, there's a negative in front of that

25    number.

                                              Page 94

1      Q     Okay.  So it lost $5,857,107.60 in retained

2   earnings?

3      A     That's what it looks like to me.

4      Q     So explain that term to me as you understand

5   it, where that comes from.

6      A     That would be the operations of the company

7   over -- you know, over the time of the company

8   operating.

9      Q     So from April 2020 to the time of the filing

10  of the bankruptcy, March 13, 2024, Kast lost

11  $5,857,107.60; correct?

12     A     I don't know if that starts with the

13  conversion to C corp or not.

14     Q     So the 5.8 roughly that you've lost may have

15  predated the formation of the corporation; correct?

16     A     The formation of the corporation?

17     Q     Yes.  Yes.

18     A     You mean the conversion?

19     Q     You call it a conversion.  An -- a California

20  LLC is not a Delaware corporation, but I don't want to

21  get into the weeds about that.  You operated --

22     A     This document calls it a conversion.

23     Q     Pardon me?

24     A     This document you gave me calls it a

25  conversion.  "Certificate of Conversion."

Page 95

1       Q      From Kast Media -- and -- let me see that.

2   Yeah, that's the LLC to the Inc.

3       A      Correct.

4       Q      But it wasn't a California corporation, so

5   regardless of whether you're calling it a conversion or

6   a whatever, you don't know if the 5.857 million in

7   losses predates the conversion; correct?

8       A      Correct.

9       Q      So this could've been losses going back to

10  2018; right?

11      A      Not going to speculate.  I don't know.

12      Q      Well, we won't.  We've got documents to show

13  us.  So we should be able to add up the corporate losses

14  on your tax returns to come up with that amount; should

15  we not?

16      A      I don't know.

17      Q      "Net income, $161,413.50."  Where does that

18  come from?

19      A      Net income, 161?  I don't know.

20      Q      Why don't you know?

21      A      'Cause I relied on my accountants to prepare

22  these schedules.

23      Q      All right.  Turn over to the next page, 8 of

24  24.  I want to make sure that I understand the time

25  period that we're talking about here.  Is this two

                                                    Page 96

1    months or one month?

2        A    This looks to me like it would be two months.

3        Q    February and January of 2024; correct?

4        A    Yes, that's what it says at the top of this.

5        Q    What would be the sources of the advertising

6    revenue?

7        A    Agencies, brands.

8        Q    What is derivative revenue?

9        A    That would've been revenue from intellectual

10   property that we owned.

11       Q    Such as?

12       A    Our podcasts.

13       Q    The O&Os?

14       A    Yeah, the owned and operateds.

15       Q    And so this is PodcastOne paying Kast's

16   percentages of the O&Os?

17       A    No.  No.  This $35,000 would've been a rights

18   fee for the development of one of our podcasts into a

19   scripted series.

20       Q    Which one?

21       A    Vigilante.

22       Q    Well, that's one that as of January and

23   February of 2024, PodcastOne has a percentage of;

24   correct?

25       A    Yeah, I don't know when the contract was

Page 97

1    signed with PodcastOne, but yeah, they have --

2         Q    September of 2023.

3         A    They have 50 percent of it.

4         Q    Okay.  So it -- does 35,000 represent Kast's

5    half?

6         A    I don't know.  I think that they paid us that

7    directly because that was a deal.  That was a renewal of

8    an option.  The way that an option contract works is

9    that you -- they have a certain period of time to

10   develop a scripted derivative based off of a piece of

11   IP.  We signed that.  It would've been in 2022.

12        And they have -- I think it was 18 months to

13   either greenlight it for production or not or to extend

14   their option to continue developing it without

15   officially greenlighting it for production.  They opted

16   to extend their contract.

17        So, you know, I'm not going to give a legal

18   opinion, but my -- but I believe that that is Kast's --

19        Q    I'm not asking you for any legal opinions

20   today.

21        A    I believe that that should be Kast's, because

22   it -- and, you know, only Kast's, without a split

23   attached to it, probably, because it -- it originated

24   from a contract that predates the contract with

25   PodcastOne.

Page 98

1    Q    Any others like that where Kast might enjoy

2    revenue by virtue of extensions of agreements that

3    preexisted the bankruptcy filing?

4    A    What's the question?

5    Q    My question -- I understand everything that

6    you just said about the Vigilante and this $35,000.  Are

7    there any others like that that Kast has?

8    A    So you are asking are there other series in

9    development?

10    Q    Mm-hmm.

11    A    We do have other series in development.  I

12    wouldn't say that they match all the criteria of what's

13    going on with Vigilante.

14    Q    That's fine.  Tell me the other series in

15    development.

16    A    We're working towards a -- a documentary

17    derivative based on Lost in Panama.  We're working

18    towards a scripted series based on one of the seasons

19    from Opportunist.  I mean, those are the priorities

20    right now.

21    Q    I'm not asking about priorities.  What are any

22    others that are in development?

23    A    I think that those are -- those are the two

24    that we're focusing on right now.  I think that those

25    are --

Page 99

1        Q     What's Lost in Panama about?

2        A     It's a story about two Dutch women who go on a

3    vacation in Panama, and they're -- they get lost and

4    tragically die.  And there's a lot of speculation as to

5    whether there may have been foul play or not, so we tell

6    the story about what happened, and we investigate

7    whether -- you know, what may have happened.

8        Q     All right.  What's The Opportunist about?

9        A     The Opportunist tells stories about regular

10   people who turn sinister by following an opportunistic

11   character streak.

12       Q     What is premium revenue?

13       A     Okay.  Let's see.  Premium revenue -- I don't

14   off the top of my head know why premium and subscription

15   would be separate line items.

16       Q     Tell me what they are.

17       A     They are both revenue that is directly from

18   listeners subscribing to a podcast, paying a monthly fee

19   for, you know, ad-free, bonus content, and stuff like

20   that.

21       Q     And the gross profit for those two months is

22   $66,307.41; correct?

23       A     Yeah, that's what it says here.

24       Q     All right.  Let's look at expenses.  "Auto

25   expense, $1,328.32."  Tell me what that is.

Page 100

1        A        That is a vehicle.

2        Q        Which vehicle?

3        A        Which vehicle?  That is a -- I believe that

4    was a Mercedes G Series.

5        Q        Is it titled in Kast's name?

6        A        No, that vehicle is in -- is not in Kast's

7    name.

8        Q        In whose name is the vehicle that this auto

9    expense is paid for titled?

10        A        I believe it's my name.

11        Q        Is this the only auto expense Kast Media, Inc.

12    has paid for you?

13        A        No.

14        Q        What other auto expenses has Kast paid for

15    you?

16        A        There's a different Mercedes, and there's a

17    Tesla.  And those are the two that I can directly

18    recall.

19        Q        Is -- does Kast continue to pay your Mercedes

20    G Wagon payment?

21        A        No.

22        Q        When did Kast last pay your Mercedes G Wagon

23    payment?

24        A        I think probably before the -- the petition

25    date.

Page 101

1      Q    Do you still own the Mercedes G Wagon?

2      A    No.

3      Q    Did you let it go back?

4      A    What does that mean?

5      Q    Did you let Mercedes or a lending company

6    repossess the G Wagon?

7      A    No.

8      Q    Where is the G Wagon now?

9      A    I sold it.

10     Q    You sold it?

11     A    Yep.

12     Q    When did you sell it?

13     A    I think towards the beginning of this year.

14     Q    Early 2024?

15     A    Yeah, sometime in probably Q1 of 2024.

16     Q    Was it financed at the time that Kast was

17   paying the $1,328.32 auto expense?

18     A    I believe so.

19     Q    Where was it financed through?

20     A    I'd have to look, but probably -- I think it

21   was Bank of America, but I'm not sure.

22     Q    All right.  Did you get more out of it than

23   was owed on it when you sold it Q1 '24?

24     A    Did I get more out of it than was owed on it?

25     Q    Yes.

Page 102

1       A    Yes.

2       Q    By how much?

3       A    I don't recall the -- the exact number.

4       Q    Regardless of how much you got when you sold

5    the Mercedes G Wagon, did you reimburse Kast for its

6    payments of your Mercedes G Wagon expense?

7       A    No.

8       Q    You pocketed that money from the sale of the

9    Mercedes G Wagon; correct?

10            MS. COHEN:  Objection, argumentative.

11      A    Do you have a question?

12      Q    Yeah, I -- yeah, I have a question.  You kept

13   the money from the sale of the Mercedes G Wagon?  You

14   didn't -- in other words, you didn't reimburse Kast?

15      A    So I already said that I didn't reimburse

16   Kast.

17      Q    All right.  And you kept it, though; right?

18   As opposed to doing something else with it?

19      A    I don't know what you mean.  I didn't

20   reimburse --

21      Q    Like pay a debt, pay somebody that you might

22   owe money?

23      A    I didn't reimburse Kast.

24      Q    Nor did you pay any other debt that Kast

25   might've had; correct?

Page 103

1        A     That would've been reimbursing Kast.

2        Q     Indirectly; right?  To pay one of Kast's

3    debts?

4        A     That would've been reimbursing Kast.

5        Q     Well, no.  If you think that's what it was,

6    I'll accept that answer.  Let's talk about the other

7    vehicles that Kast paid for for you.  Oh, no.  Before we

8    get off of the G Wagon, how long did Kast make your G

9    Wagon payment?

10       A     I -- I don't -- I don't remember exactly when.

11   Probably since sometime in 2021.

12       Q     Okay.  Now, the different Mercedes, what kind

13   of Mercedes was that?

14       A     The different -- I believe that was a C

15   Series.

16       Q     And in whose name was the C Series Mercedes?

17       A     I think it was in my name.

18       Q     And for what period of time did Kast make the

19   payment on the C Series?

20       A     I think it would've been probably from maybe

21   2020 through 2023 or something like that.

22       Q     And what was the disposition of that?

23       A     What was the disposition of that?

24       Q     Yes.

25       A     That was a lease, so the lease ran out.

                                            Page 104

1      Q      Was that a lease directly through

2  Mercedes-Benz?

3      A      I think so.

4      Q      And the Tesla?  In whose name was the Tesla

5  titled?

6      A      I think it was in my name.

7      Q      And how long did Kast make the Tesla payment

8  on your behalf?

9      A      Probably about a year.

10     Q      When?

11     A      From the end of -- the beginning of 2023 to

12  the end of 2023.

13     Q      Was that a lease or purchase?

14     A      That was a purchase.

15     Q      And what was the disposition of the Tesla?

16     A      Oh, I still have the Tesla.

17     Q      Is that what you drive in St. Louis?

18     A      Yeah, I drive the Tesla.

19     Q      I take it Kast no longer makes the payment on

20  the Tesla?

21     A      That's correct.

22     Q      Now, with respect to titling, insurance,

23  maintenance, fuel, things like that, did Kast pay any

24  ancillary expenses like that for any of these three

25  vehicles?

Page 105

1      A     Like gas and stuff like that?  Yeah, Kast

2   would pay --

3      Q     Gas is fuel, so that's one.

4      A     Yeah, Kast would pay some -- some -- there

5   were some gas -- Kast would definitely pay for some gas.

6      Q     Okay.  Other than for the Tesla?  It runs on a

7   battery; right?

8      A     Good point.

9      Q     Insurance?  Did Kast pay insurance on these

10  vehicles?

11     A     I -- I don't -- I don't remember.  I would

12  have to look through.

13     Q     All right.  What about maintenance?

14     A     I don't remember.  I'd have to look through.

15     Q     Mercedes aren't cheap to maintain; are they?

16           MS. COHEN:  Objection, irrelevant.

17           MR. NEW:  No.  No, it's very relevant if

18  Kast was paying it.

19  BY MR. NEW:

20     Q     Mercedes are expensive to maintain; aren't

21  they?

22     A     Relative to what?

23     Q     Relative to a General Motors or a Ford or a

24  Chrysler.

25     A     Depends.

Page 106

1        Q     Okay.  "Dues and subscriptions, $2,515.62."

2    What is that?

3        A     These would've been expenses like -- I would

4    have to look through all -- what all got included in

5    here, but things like the Adobe software or, you know,

6    the Adobe Cloud or the Google Drive or different things

7    like that.

8        Q     Microsoft, QuickBooks, things like that?

9        A     Yeah.  Yeah.

10       Q     All right.  "Email hosting expense."  Tell me

11   what that is.

12       A     Email hosting would've been the -- the Google

13   Business account.

14       Q     Coming on down just a little bit to wages,

15   "Wages, $55,767.80."  Break that down for me.

16       A     I don't have the breakdown in front of me.

17       Q     Who was working for Kast in January and

18   February of 2024?

19       A     I believe that that would have been myself,

20   and Hannah Smith, host of Opportunist at the time,

21   would've been getting paid during this time.  I don't

22   recall if we would necessarily have had anyone else at

23   that time.  There was a -- yeah, I believe that those

24   would've -- those would be the two people.

25            But of course, you have the payroll details.

Page 107

1      Q      I have a spreadsheet that tells me what the

2    payroll --

3      A      Yeah.  So it would've added up to this.  Did

4    it?

5      Q      Like I said, I have a spreadsheet.

6      A      Yeah.  I mean, like, you -- you have the

7    numbers behind this.

8      Q      Now, when you pay or when Kast pays you, how

9    does it pay you?

10     A      I was paid through W-2 payroll and through

11   payments either for my personal credit cards, like we

12   talked about before.  They would be split up between

13   appropriate business expenses, or any personal expenses

14   would be taken as 1099 income.

15     Q      So do I understand then that you did not get,

16   like, an every two weeks or every month direct deposit

17   of a certain amount into a personal account that you

18   might have?

19     A      No, I did.  I was -- that was -- I was paid

20   biweekly, and that's my W-2 portion.

21     Q      And how much was your W-2 portion?

22              MS. COHEN:  For what period?

23              MR. NEW:  Pre-bankruptcy period.

24              THE WITNESS:  I don't have the totals in

25   front of me, and you have the numbers.

                                        Page 108

1    BY MR. NEW:

2        Q    All right.  We'll go through.  The

3    spreadsheet, you've given me, but it's not your W-2s.

4        A    Oh, okay.  I did submit my W-2s with something

5    for --

6               MS. COHEN:  With the --

7               THE WITNESS:  Oh, for the consultation.

8               MS. COHEN:  Inside a --

9               THE WITNESS:  Mm-hmm.

10              MS. COHEN:  But it wasn't requested in

11   the production.

12              MR. NEW:  Yeah, it was.

13              MS. COHEN:  Should we have that

14   discussion again?

15              MR. NEW:  Sure.  Yeah.  A W-2 is a tax

16   record; ain't it?  And you specifically refused to

17   provide payroll information for anybody beside Mr.

18   Thomson and --

19              MS. COHEN:  We gave you all the payroll

20   information.

21              MR. NEW:  But you didn't give me his

22   W-2s.

23              MS. COHEN:  Well, it was not requested.

24              MR. NEW:  Yeah, it is.

25              MS. COHEN:  The tax -- if it's in the tax

                                        Page 109

1    return --

2                    MR. NEW:  It's a tax record.

3                    MS. COHEN:  If it's in -- if it was

4    included in the tax return, it would be in there.

5                    MR. NEW:  I'm not arguing with you.

6    We're going to be back in front of the judge, anyway.

7    There'll be plenty to argue about at a later date.

8    BY MR. NEW:

9        Q    The accounting services and fees, is that Mr.

10   Elyashar or whatever his name is in Beverly Hills?

11                   MS. COHEN:  Do you want to repeat that

12   question in a less inflammatory manner?

13                   MR. NEW:  That wasn't inflammatory.

14                   MS. COHEN:  "Mr. Elyashar or whatever his

15   name is"?  That's prejudicial.

16                   MR. NEW:  It is not prejudicial.

17                   MS. COHEN:  It's not okay.  You haven't

18   done the "whatever his name is" on any other name in

19   this deposition.

20                   MR. NEW:  I couldn't -- he couldn't

21   remember his name earlier.  He mispronounced it, and you

22   didn't scold him.  He couldn't remember his own

23   accountant's name earlier.

24                   MS. COHEN:  I stand by my comment.

25                   MR. NEW:  I stand by the comment --

                                        Page 110

1    BY MR. NEW:

2        Q    What's your accountant's name in Beverly

3    Hills, Mr. Thomson?

4        A    Howard Elyashar.

5        Q    Elyashar.  So is this $17,040 for Mr. Elyashar

6    in Beverly Hills?

7        A    I don't know.  I would have to go into the

8    detail of this specific line item.

9        Q    Was there any other accounting firm other than

10   Mr. Elyashar's in Beverly Hills in January and February

11   of 2024?

12       A    I don't think so.  He was the CPA that -- that

13   Kast was working with at the time.

14       Q    All right.  And the -- so that's $17,040 spent

15   on accounting.  Now, my question is was that for that

16   two-month span of time, or if we asked the accountants

17   or got some more specific information from the

18   QuickBooks, would that perhaps have covered a larger

19   period of time than two months?

20       A    I don't know.  January, February.  It's tax

21   season.

22       Q    So that could've been an annual accounting

23   bill, or it could've been for two months.  You just

24   don't know as you sit here today; correct?

25       A    Correct.

Page 111

1     Q    All right.  "Legal services."  Whose legal

2    services constituted $73,767.65?

3     A   I would have to go into the detail of these

4    transactions.

5     Q    All right.  Tell me who all lawyers that Kast

6    Media had in January and February of 2024.

7     A   At that date, I think that we were working

8    with Leslie's law firm, and I -- I don't remember if we

9    had anybody else on at that time or not.  We've worked

10    with other lawyers over time, of course.  I just don't

11    recall if they would've been part of this time or not.

12     Q    And if I ask you the same question relative to

13    the period of time that those legal services would have

14    been rendered, is your answer the same, that you can't

15    tell me if that's a monthly bill, a two-month bill, a

16    six-month bill, or a one-year bill?

17     A   Correct.  My -- I relied on my accountants to

18    prepare these schedules.

19     Q    All right.  "Subcontractors, $4,763.07."

20    What's that?

21     A   Subcontractors?

22     Q    Yes.

23     A   I would have to look at the detail to see what

24    is contained in there.

25     Q    What are the kinds of subcontractors that Kast

Page 112

1   would have been using in January and February of 2024?

2       A   I don't know if we classified them as

3   subcontractors or something else.  That's why I'm

4   looking, to see if there's anything else.  But, you

5   know, contractors would do editing work for us or

6   writing work for us, things just -- just like they do

7   currently.

8       Q   Who would some of those subcontractors have

9   been?

10      A   I -- I don't remember exactly who we would've

11  had at this time.

12      Q   "Telephone expense, $150."  What's that?

13      A   Kast has a -- a phone.

14      Q   A landline phone?

15      A   Yeah, it's a cell phone.

16      Q   A cell phone?

17      A   Mm-hmm.

18      Q   And is that Kast cell phone different from

19  your personal cell phone?

20      A   Yes.

21      Q   Has Kast ever paid your cell phone bills?

22      A   Not that I recall.

23      Q   "Net operating income, minus $94,020.10";

24  correct?

25      A   Yes, that's what it says.

Page 113

1        Q       "Total other income under termination and

2    release agreements, talent, $182,613.06."  Tell me what

3    that entry is.

4        A       These would've been releases signed with

5    talent that we owed a certain balance to, and so that

6    release then, as far as I understand it -- again, this

7    is more of an accounting thing -- would flow onto the

8    P&L.

9        Q       All right.  Turn over to the next page,

10    please, page 9 of 24.  "Vendor interest."  Tell me what

11    that is.

12        A       I don't know what that is off the top of my

13    head.

14        Q       On the operating account that Kast had where

15    monies for podcasts would go into, was that an

16    interest-bearing account?

17        A       I don't think so.

18        Q       That was East West Bank; right?

19        A       What's the question?

20        Q       The question is whether the account into which

21    podcasters' money that you would owe them that money,

22    whether that was an interest-bearing account.

23        A       So if advertising revenue, which I've already

24    told you flowed into our operating account, if that

25    operating account was an interest-bearing account?

                                                Page 114

1      Q      Yes.

2      A      I don't know.  I don't -- I don't think so.

3      Q      All right.  And you can't tell me what vendor

4   interest that totals up to $4,311.07 is; correct?

5      A      Correct.

6      Q      Turn over to page 10 of 24, please.  "Net

7   income, $75,532.20.  Accounts receivable."  What is

8   United Capital Factoring Reserve, minus $20,836.78?

9      A      I'm not super familiar with a cash -- with the

10   cashflow statement and exactly how all of it works.

11         I can tell you that United Capital Factoring

12   [sic] is a factoring facility that we worked with to

13   advance our receivables, and they would hold a certain

14   amount in reserve to protect the amount that they were

15   advancing to us.  But that's -- that's what I know.

16      Q      "Accounts payable, minus $209,682.15."  What's

17   that?

18      A      "Accounts payable, minus" -- I don't know.

19   This is a cashflow statement, so that would've been the

20   change -- I assume that would've been the change in

21   accounts payable, but I don't know exactly how this

22   cashflow statement works.

23      Q      The Amex Delta SkyMiles Reserve card,

24   $8,391.66.  Tell me what that is.

25      A      I don't know.

Page 115

1      Q      "Deferred salary, $49,997.85."  Tell me what

2  that is.

3      A      I don't know.

4      Q      Do you know anything about any of these

5  numbers that are listed on this statement of cashflows,

6  January, February 2024, attached to the bankruptcy

7  petition?

8      A      No, I relied on my accountants to help me

9  prepare these schedules.

10      Q      Now, the four people that gave you the $2

11  million in 2022, are they creditors of Kast Media?

12      A      Yeah, I believe they would be defined as such.

13      Q      All right.  So let's start on page 11 of 24.

14  Are they secured creditors or unsecured creditors?

15      A      I don't know.  They're convertible

16  noteholders.

17      Q      And you told me Lyrical Media was $1,150,000.

18  They're not listed in the unsecured creditors; correct?

19            MS. COHEN:  Wait.  Do you mean on the

20  list of 20 largest?

21            MR. NEW:  Yeah, and at 1.15 million, that

22  would exceed Chatty Broads at 478,184; right?

23            MS. COHEN:  So just --

24  BY MR. NEW:

25      Q      So my question is Lyrical Media with its 1.15

Page 116

1    million owed as part of the $2 million convertible note,

2    Lyrical Media isn't listed in one of the 20th largest

3    unsecured creditors?

4                    MS. COHEN:  You're referring to Official

5    Form 204?

6                    MR. NEW:  Yep.

7                    MS. COHEN:  Page 11 of 24, the petition.

8    Are they in that or not?

9                    MR. NEW:  Yeah.

10                    THE WITNESS:  No, I don't believe they're

11    in here.

12    BY MR. NEW:

13        Q    Now, go on over to page 13 of 24.  That is a

14    listing of all creditors of Kast Media, Inc.; correct?

15        A    I believe this would be a listing of all

16    creditors.

17        Q    Is Lyrical Media with its 1.15 million owed in

18    that list of creditors?

19        A    I don't see it in the list.

20        Q    Okay.  Should it be?

21        A    I don't know.

22        Q    Is Chuck Huebner with his $250,000 investment

23    in Kast Media, Inc. listed?

24        A    I don't think so.

25        Q    Should he be?

Page 117

1        A     I don't know.

2        Q     Same question for Larry Shuman and his hundred

3    grand.  Is Larry Shuman and the hundred grand that he

4    invested in Kast Media, Inc. listed in your listing of

5    creditors, Mr. Thomson?

6                  MS. COHEN:  Hold on.  You're referring to

7    Official Form 201, the voluntary petition, and following

8    the list of 20 largest, there's just a bunch of pages

9    that just have names and addresses.

10                  MR. NEW:  Yeah.

11                  MS. COHEN:  And that's the list you're

12   referring to, and you're asking if he's on that; is that

13   the question?

14                  MR. NEW:  Yes.  Between --

15                  MS. COHEN:  Page 13 --

16                  MR. NEW:  -- pages 13 and 20.

17                  MS. COHEN:  Okay.

18                  THE WITNESS:  Yeah.  I don't think so.  I

19   don't think he's on that list.

20   BY MR. NEW:

21        Q     All right.  Should he be?

22        A     I don't know.

23        Q     And Clara Vista, 500 grand?

24        A     I don't think so.

25        Q     All right.  Well, let's go ahead and turn over

                                              Page 118

1    then.  "Equity Security Holders List."  I see Clara

2    Vista Investment Partners, William Hapworth, 450

3    Lexington Avenue, 4th Floor, New York, New York.  What

4    are equity security holders in Kast Media?

5         A    People who hold equity in Kast.

6         Q    Clara Vista's is 500,000?

7         A    That's the amount of their SAFE.

8         Q    And how much is Cary Granat's?

9         A    Cary was an advisor, so I believe he holds

10   options.  I forget the exact amount.

11        Q    There's -- I assume Charles is Chuck.  I

12   don't -- it's Palos Verdes Estates.  I don't know if

13   that's a town in California or an address.  There he is

14   with his quarter million.  Now, what's yours?  "Colin

15   Thomson, care of Rose, Snyder & Jacobs."  What's your

16   equity position in Kast?

17        A    I own the majority of the common stock.

18        Q    How much?

19        A    I don't remember the exact number.

20        Q    Ninety-nine percent?

21        A    Yeah, somewhere in that range.

22        Q    Who owns the other 1?

23        A    Of common stock?  That is Matthew Yu and Rod

24   Thomson.

25        Q    Matthew Yu's your brother-in-law; right?

                                        Page 119

1        A    No.

2        Q    Is he related to you?

3        A    Yes.

4        Q    What's his relation?

5        A    He's my father-in-law.

6        Q    Father-in-law.  And Rod Thomson?  Who's he?

7        A    That's my father.

8        Q    And together, they own the other 1 percent of

9   Kast Media, Inc.?

10       A    I don't think it's exactly 1, but yeah.

11       Q    What's the value of common stock for Kast

12  Media, Inc.?

13       A    We haven't done a -- a valuation recently.

14       Q    When was the last time a valuation was done?

15       A    Probably towards the beginning of 2023, I

16  think we probably did a 409A.

17       Q    And what was the value of the stock then?

18       A    I don't recall exactly the value then.

19       Q    Do you have documents that would show me the

20  value of the common stock of Kast Media in Q1 of '23,

21  Mr. Thomson?

22       A    Yes.

23       Q    Dustin Knouse.  What's his equity position in

24  Kast Media?

25       A    He owns stock options.

Page 120

1       Q    How many?

2       A    I don't recall the exact number.

3       Q    Turn over and see -- yeah, there's Larry

4   Shuman, Chino Hills, California.  And there's Lyrical

5   Media, 241-5 Center Street, 3rd Floor, New York, New

6   York.  Let's talk about some more of these people.

7   There's Matthew Yu, your father-in-law; correct?

8                   MS. COHEN:  Asked and answered.

9                   MR. NEW:  No, I'm asking if he is on page

10  23 of 24 for the equity-secured holders -- security

11  holders.

12                  THE WITNESS:  Okay.  So do you want to

13  ask the question?

14  BY MR. NEW:

15      Q    Yes.  On page 23 of 24, it has your

16  father-in-law, Matthew Yu, listed as an equity security

17  holder; correct?

18      A    Yes.

19      Q    Who is Michael Jensen?

20      A    Michael Jensen was an employee of Kast.

21      Q    What's his equity position in Kast Media?

22      A    He owned stock options.

23      Q    Neil Sacker.  Who's Neil Sacker?

24      A    Neil Sacker was an attorney that we worked

25  with for a period of time.

Page 121

1    Q    He have, I guess, an equity security position
2    in Kast?
3    A    I believe he owned stock options as well.
4    Q    Did he do that while he was performing legal
5    services for Kast?
6    A    I don't remember the -- how the timeline
7    worked out exactly.
8    Q    Did you pay him in stock options in cash -- or
9    in Kast Media as opposed to paying his bills?
10   A    No.
11   Q    All right.  So under Kast's plan, how's Kast
12   going to pay the equity security holders?
13   A    We already talked about the options that they
14   have as creditors.
15   Q    So they can either -- want to make sure that I
16   understand this.  They can ride it out with Kast and get
17   their investments back if that's possible, or they take
18   so many cents on the dollar, like the unsecured
19   creditors; correct?
20   A    I think everybody's getting that option.
21   Q    Yeah, everybody gets that option.
22   A    Including the unsecured -- including the
23   unsecured creditors.
24   Q    Right.  But the equity-secured creditors could
25   actually stick around if Kast does better and get the

Page 122

1    full amount of their investments back; correct?

2         A    And so could the unsecured creditors.

3         Q    Is Kast in the black for the first half of

4    '24?

5         A    What's the question?

6         Q    Is Kast in the black for the first half of

7    2024?  January 1 of 2024 through June 30 of 2024, is

8    Kast negative or positive on the balance sheet?

9         A    On the balance sheet?  Since the petition?

10         Q    Well, we'll take -- we'll -- I tell you --

11         A    The books have been separated out; right?  So

12    there's not a way to run an aggregate.  There's -- they

13    stop at the petition date.

14         Q    Okay.  Fair enough.  From March the 13th of

15    '24 through August the 1st of '24, is Kast profitable?

16         A    I believe that we -- I believe that we will

17    be.  We're doing pretty well.

18         Q    Will be when?

19         A    When will we be profitable?

20         Q    Yes.

21         A    When we've reconciled that time period, I

22    believe that we will -- that we will show a profit.

23         Q    All right.  Because, as we saw from the

24    petition, for whatever period of time it was, whether it

25    was '20 up to March 13th of '24 or '18 through March the

                                        Page 123

1    13th of '24, Kast lost $5,857,107.60; correct?

2        A    What's the question?

3              MS. COHEN:  Wait.  Can you read back that

4    question?  I couldn't understand it.

5              MR. NEW:  Sure.  Yeah.

6    BY MR. NEW:

7        Q    So whether the time period is from April of

8    '20 to March of '24 or pre-conversion, 2018, to March of

9    2024, Kast had lost $5,857,107.60; correct?

10       A    I relied on the accountants to prepare those

11   schedules.  That is the retained earnings line item.

12   But again, I -- I -- the accountants prepared those

13   schedules.

14       Q    Do you think Kast had done better in that

15   period of time than losing $5.8 million?

16       A    I don't know.

17       Q    We'll look at the tax returns.  We'll find out

18   what you told the federal government Kast did in terms

19   of making money or not making money.

20             So we'll move right on.  Did you ever disclose

21   Sunset Vine Tower Apartments, 1480 Vine Street, Los

22   Angeles, California, Unit 1102, as a business address of

23   Kast Media, Inc.?

24       A    1102?  I don't believe so.

25       Q    All right.  Sunset Vine Tower Apartments.  Are

                                          Page 124

1    those authorized to operate a business entity or

2    commercial enterprise out of?

3        A    I don't know.

4        Q    Did you ever get permission from the landlord

5    to operate a business entity from Unit 1801 of Sunset

6    Vine Tower Apartments?

7        A    Yes.

8        Q    And who was the landlord or the representative

9    of Sunsight -- Sunset Vine Tower Apartments that

10   authorized Kast to operate out of Unit 1801?

11       A    I don't remember their name.  I don't remember

12   the name of the person who was running it at the time.

13       Q    And so if we subpoena --

14              MS. COHEN:  Hang on.  You cut off his

15   answer.

16              Finish your answer, please.

17              MR. NEW:  Sorry.  I was looking down.  My

18   apologies.

19              THE WITNESS:  I don't remember the name

20   of the individual that was running the -- that company

21   at that time.

22   BY MR. NEW:

23       Q    Okay.  If we subpoena the Sunset Vine Tower

24   Apartments' corporate records, those will not show Kast

25   Media, Inc. paying your rent at 1102; correct?

                                        Page 125

1      A    I don't believe that Kast paid my rent at

2    1102.

3      Q    Okay.  Let's talk about travel expenses.  Kast

4    ever pay your travel expenses?

5      A    Yeah, sometimes.

6      Q    Tell me what legitimate business travel you

7    would have taken for which Kast would have paid the

8    cost.

9      A    A -- a variety of different -- variety of

10    different --

11      Q    Give me some examples.  For instance, lawyers

12    go to these things called continuing legal education.

13    So they could be here in LA.  They could be in Las

14    Vegas, could be in New Orleans, Miami, Nashville.  And

15    that's a legitimate business expense if we go to one of

16    those.

17          That's just an example.  Can you give me some

18    examples of legitimate business trips that Kast Media,

19    Inc. would've paid on your behalf?

20      A    Sure.  Some examples would include meeting

21    with clients, meeting with talent, meeting with

22    managers, conferences, things like that.

23      Q    Do you know why Kast would've had or would've

24    paid $539,864.50 in travel in 2022?

25      A    So -- well, where's that number coming from?

Page 126

1      Q    I'm asking.  Do you know why Kast would've

2   been paying over a half a million dollars for your

3   travel?

4                MS. COHEN:  He's -- and he's asking you

5   where you got the number, because he doesn't know that

6   number.

7                THE WITNESS:  I don't know the number.

8                MR. NEW:  Just put a good nonspeaking

9   objection on the record.

10  BY MR. NEW:

11     Q    I'll ask you do you believe that Kast would

12  have paid upwards of over a half a million dollars for

13  your travel in 2022?

14     A    In total travel expenses?

15     Q    Mm-hmm.

16     A    Absolutely.

17     Q    All right.  So -- and what I'm asking for is

18  give me some examples of the trips you would've taken in

19  2022 that would've necessitated --

20     A    Kast paid a lot more than just my trips, too.

21     Q    And that's why I'm asking you.

22     A    There was a lot of travel throughout the

23  company.  Different employees' production of different

24  shows necessitated travel that Kast was required to pay

25  for at times.  All of these things contributed to the

                                        Page 127

1  line item.

2        Q    Give me everything that you can think of, if

3  you went to a conference or you sent somebody here.

4  Just give me some examples of that.

5        A    I just did.

6        Q    Specific examples.

7        A    No, I just did.

8        Q    That Colin Thomson went to this location at

9  approximately this date for a legitimate business

10  purpose that Kast Media would've paid for.  Can you do

11  that?

12        A    You're asking for what my specific

13  travel -- my own person -- my -- my own specific travel,

14  not other employees in 2022?

15        Q    Yes.  I can tell you that Stephen P. New, LC

16  sent Stephen New to Miami the second week of February of

17  2007 for an American Association for Justice conference.

18        A    Good.  That's pretty good.

19        Q    Yeah, it is.  But you can't tell me for 2022

20  where Kast sent you for any specific business-related

21  travel?

22        A    We always had at least one Podcast Movement

23  conference that we would go to.  2022 was the year that

24  we produced Lost in Panama, so we had to fly people down

25  to Panama to produce that show.  And so there -- there's

                                              Page 128

```
 1    plenty.
 2         Q    So your bank records should bear out all of
 3    this legitimate business travel; correct?
 4         A    Yes.
 5         Q    All right.  We'll look at them.
 6         A    Great.
 7         Q    Now, with respect to your personal trips, like
 8    to Hawaii, Fiji, Bali, Wynn's Resort in Las Vegas, did
 9    Kast pay that?
10         A    My understanding of how the accountants would
11    run everything is that any non-business-related travel
12    would've been taken as income.
13         Q    Okay.  So the answer to my question is Kast
14    paid for your trips to Bali, Hawaii, Fiji, Las Vegas, or
15    wherever else, and your in-house accountants took that
16    as income to you on a 1099; correct?
17         A    Yes.  Any personal expenses would've
18    been -- would've contributed to my 1099 overall income
19    for a given year.
20         Q    Like a $10,000 per night suite in the Wynn's?
21    You remember that trip?
22              THE OFFICER:  Mr. New, it's hard to hear
23    you when you have your hand --
24              MR. NEW:  Sorry.
25              MS. COHEN:  Go ahead and repeat that.
```

Page 129

1    You go ahead and repeat that.

2    BY MR. NEW:

3       Q    Yes.  Your $10,000 per night suite at the

4    Wynn's Resort in Las Vegas; do you recall that trip that

5    Kast paid for?

6       A    No.

7       Q    All right.  At a certain point, Kast Media had

8    a contract with Arcadian Vanguard and Jim Cornette;

9    correct?

10      A    Yes.

11      Q    And at a certain point, that contract expired;

12   correct?

13      A    Yes.

14      Q    And then my understanding is that Kast Media,

15   Inc. continued to do business with Arcadian Vanguard and

16   Jim Cornette without a formal contract being in place;

17   correct?

18      A    Yes.

19      Q    My understanding is further that essentially,

20   the terms of the expired written contract were

21   maintained after the contract expired and basically on a

22   loose, implied contract; is my understanding correct?

23      A    Yeah.  Generally, that was my understanding of

24   the arrangement.

25      Q    And essentially, the contract was an 80/20

Page 130

1    split of advertising revenue that Kast Media earned for

2    Arcadian Vanguard and Cornette; correct?

3        A    My understanding of the contract was that it

4    was an 80 -- 80 percent of advertising revenue would be

5    due to those shows when the average audience was greater

6    than 100,000, and 75 percent would be due when the

7    audience was less than 100,000.

8        Q    When was the money owed to Arcadian Vanguard

9    and Cornette?  Was it, like, a net 30 or a net 60 or

10   what?

11       A    I would have to go back to our contract with

12   them.

13       Q    All right.  We'll do that in a little bit.

14   Now, you mentioned a moment ago when we were looking at

15   the petition -- I'm going to find the name of the

16   company.  What was the name of the factoring company

17   that you told me about?

18       A    Probably UC Funding.

19       Q    UC Funding?

20       A    Or United Capital.

21       Q    United Capital Funding.  Tell me how United

22   Capital Funding worked for Kast Media, Inc.

23       A    Sure.  United Capital was a factoring provider

24   for us, which is sort of an alternative debt solution

25   where they would look at the amount that was owed us,

Page 131

1    our receivables, and they would advance us a certain

2    amount of our receivables upfront.

3           And then they would collect our receivables on

4    our behalf and pay them out to us, minus whatever their

5    fee was.

6        Q    All right.  So I want to make sure that I

7    understand this arrangement with United Capital Funding.

8    For a show like one of Arcadian Vanguard's or Jim

9    Cornette's -- and let's assume that the show is greater

10   than 100,000, so it's on the 80/20 split, for instance.

11          Were you getting factoring for advances only

12   on Kast's 20 percent?

13       A    We would factor our entire receivables based

14   on what was approved by the factoring partners.

15       Q    Not my question.

16       A    Actually, it was.

17       Q    No.  No, it wasn't.  My question is -- okay.

18   Let's go ahead and break it down then.  Let's say, for

19   example, that advertisers owe $50,000 for an Arcadian

20   Vanguard, Jim Cornette show; all right?  You'd take

21   loans against the entire 50 that included what was owed

22   to Brian and Jim; correct?

23       A    We would advance the full amount of our

24   receivables that was approved by UC.

25       Q    Was it approved by the people that you were

Page 132

1    working with?

2        A    What's the question?

3        Q    Yeah.  My question is --

4        A    We were working with UC.

5        Q    Huh?

6        A    We were working with UC.  Like, what's

7    the -- rephrase the question.

8        Q    My question is you're -- you would take an

9    advance on money, 80 percent of which might be owed to a

10   podcast like Arcadian Vanguard and Jim Cornette;

11   correct?

12       A    Yes.  Of course.

13       Q    So in addition, you wouldn't just take an

14   advance on the 20 percent that you'd be owed, like

15   10,000.  You'd take it on the 80 percent that Arcadian

16   Vanguard and Jim Cornette would be owed as well;

17   correct?

18       A    We advanced our full receivables, whatever

19   was -- whatever was approved by the factoring company.

20       Q    But you weren't owed the entire hundred

21   percent, Mr. Thomson.  You were only owed in the case of

22   Arcadian Vanguard and Jim Cornette 20 percent.

23           You'd advance the entirety of the amount owed

24   to the podcaster, including the 80, and then you

25   wouldn't give their percentage to them when you got the

Page 133

```
 1    money from United Capital Funds.  Do I understand that
 2    correct?
 3         A    What's the question?
 4         Q    My -- I just asked it.
 5              MS. COHEN:  I didn't understand it,
 6    either.  So maybe she can read it back.
 7              MR. NEW:  You don't have to understand
 8    it, Ms. Cohen.
 9              MS. COHEN:  Yes, I do.
10              Go ahead and read it back.
11              MR. NEW:  No.  No, you don't.  So --
12              MS. COHEN:  Have her read it back.
13              MR. NEW:  All right.  Okay.  Let's go
14    through my example again.  Let's -- no, she's
15    not -- you're not running this.  You can ask him
16    questions when I'm done, Ms. Cohen.  I'm going to ask my
17    question again.
18    BY MR. NEW:
19         Q    You've got a $50,000 advance, or you know that
20    50,000 is coming in a receivable.  You would advance all
21    of that from United Capital Funds; correct?
22              MS. COHEN:  His testimony isn't that he
23    advanced anything.
24              MR. NEW:  Just put a good nonspeaking
25    objection.
```

Page 134

1          MS. COHEN:  Oh, okay.

2          MR. NEW:  You'd say, "Object to form."

3   Speaking objections are improper, and I'm not going to

4   allow you to do it today.

5   BY MR. NEW:

6      Q    You'd get 50,000 or have 50,000 in a

7   receivable coming to Kast; correct?

8      A    I would have 50,000 in a receivable coming to

9   Kast?

10     Q    Yes, for a show like Brian and Jim's shows.

11     A    What's the question?

12     Q    Yes.  I'm giving you a hypothetical example.

13  You'd have a receivable coming for their show of, say,

14  $50,000.  You would get money from United Capital

15  Funding not only for Kast's 20 percent part, but also

16  for their 80 percent part; correct?

17     A    We would advance the full amount of our

18  receivables that would be approved by our advancing

19  partners -- debt facility to Kast.  We always did.

20     Q    Okay.  And you didn't --

21     A    Through East West, and we --

22     Q    And you didn't pay when you got the advance

23  the podcast that you took the factoring on; correct?

24          MS. COHEN:  Objection, vague as to time.

25          MR. NEW:  Nope.  Put a good nonspeaking

                                        Page 135

 1  objection on the record.  We'll be just fine.

 2            MS. COHEN:  Objection, vague as to time.

 3  That's a legitimate objection.

 4  BY MR. NEW:

 5       Q    Go ahead.  You wouldn't give the podcast their

 6  money when you factored it; would you?

 7       A    We paid our podcasters as long as we could

 8  until the business wouldn't allow us to anymore.

 9       Q    Did you ever pay Brian Last or Jim Cornette

10  out of anything that you factored with United Capital

11  Funding; yes or no?

12       A    Did I ever pay them out of --

13       Q    Did you ever pay them --

14       A    We had always factored our receivables.  Did

15  they get paid?

16       Q    That's what I'm asking you.  When you factored

17  with United Capital Funding, did you pay Last and

18  Cornette out of the money that you'd get?

19       A    Yes, until we couldn't.

20       Q    When was it that you couldn't anymore?

21       A    When the business had -- you know, the

22  business dynamics had degraded to the point where we

23  couldn't afford it.

24       Q    Did you ever take loans or do factoring with

25  United Capital Funding for ad inventory that had not yet

                                        Page 136

1   sold?

2        A    So you're talking about factoring receivables

3   that don't exist?

4        Q    Yeah.

5        A    No.

6        Q    And if somebody said that under oath in this

7   case, they'd be lying?

8        A    Yeah.

9             MS. COHEN:  Mr. New, I'm going to ask you

10   to please take it down a notch.  You're badgering the

11   witness.  You're hostile.  You need to tone it down.

12             MR. NEW:  I'm not.

13             MS. COHEN:  The video will show it.  I

14   know your face isn't on, but your voice is.

15             MR. NEW:  Okay.

16             MS. COHEN:  It's just not fair to the

17   witness.

18             MR. NEW:  Okay.

19   BY MR. NEW:

20        Q    Revenue per download on average went down 5.3

21   cents per download to 2 point -- cents per download in

22   February 2023.  Do you know why?

23        A    So I think you're referencing probably

24   something that I said to business publications.  Is that

25   where that's coming from?

                                        Page 137

1      Q    Yes.

2      A    Yeah, so if you look at the market dynamics

3  during this time, look at the various articles that were

4  being written during the time, you'll see a lot of -- a

5  lot of other companies dealing with the same situation.

6  And so --

7      Q    So the podcast industry took a turn for the

8  worse Q1 of '23?

9      A    Correct.  Not Q1 of '23.  The -- the decrease

10 occurred particularly from February.  The -- the thing

11 that you're citing that I told Bloomberg or Berger,

12 whoever I told, that was an analysis of revenue per

13 download, if I recall correctly, from February of 2022

14 to January of 2023.

15     Q    Okay.  Take a look at Exhibit Number 5,

16 please, Mr. Thomson.  You recognize these emails?

17              (Exhibit 5 was marked for

18               identification.)

19     A    Yeah.  And -- well, at least the first page.

20 I haven't gone through the whole thing.  I do recognize

21 the first page.

22     Q    Okay.  You recall this series of emails coming

23 about?

24     A    Oh, yeah.

25     Q    How?  Tell me how these emails came about.

Page 138

1        A    How did these emails come about?

2        Q    Yes.

3        A    So I guess if you -- like, do you want me to

4    tell you who Capchase is?

5        Q    Yeah.

6        A    Okay.  Capchase was a debt partner that

7    provided us with a line of credit at a certain period,

8    and they chose to withdraw that line of credit in or

9    around May of 2022, which caused a lot of, you know,

10   financial struggle for the company.  And these are the

11   emails around that time with them.

12       Q    Did Kast Media have any lines of credit prior

13   to 2022 with anyone?

14       A    Yeah.

15       Q    Who?

16       A    East West, FastPay.  I think Bluevine would've

17   been one.  BondIt would've been one.

18       Q    Do you happen to recall prior to January of

19   2022 how much in terms of a line of credit Kast would've

20   taken with East West Bank?

21       A    Prior to 2022, how much of a line of credit

22   East West Bank gave us?

23       Q    Yes.

24       A    If I recall correctly, their maximum was $2

25   million, but the amount that we actually had access to

Page 139

1    was a -- a more -- was a -- was a calculation that left

2    us with significantly less than that available.

3          Q    How much?

4          A    I don't recall exactly, and it would vary

5    depending on the metrics of the business.

6          Q    And I guess your bank records will show us

7    that?

8          A    The -- yeah, I mean, that was prior to 2022,

9    but yeah.

10         Q    And whatever you were taking from East West

11   Bank in terms of a line of credit advanced, was that

12   going into Kast's regular operating account?

13         A    Yes.

14         Q    The same question with respect to FastPay.

15   Can you tell me prior to January 2022 how much FastPay

16   extended to Kast Media in terms of an advance on a line

17   of credit?

18         A    Yeah, FastPay was our line of credit provider

19   after East West, before CapChase, and they -- they were

20   a more traditional factoring structure, very similar to

21   United Capital Funding.  And so they would advance us

22   our receivables.  Yeah, so that was FastPay.

23         Q    And how much did FastPay advance?

24         A    I don't remember how much they advanced

25   exactly.  When -- the -- the balance would vary

                                                  Page 140

1   depending on what our receivables balance was.

2       Q    So if we look at Kast's bank accounts and we

3   see a deposit from FastPay, that is an advance on a line

4   of credit; correct?

5       A    I -- I believe so.  Well, it might not always

6   be, because the way they operate is with

7   a -- a -- they -- they are essentially our accounts

8   receivable.  They collect, and then they send it to us.

9   So in order to do that there, the funds need to flow

10  through their bank account and then to us.

11          So we would instruct advertisers to pay them.

12  They would pay us the next day as part of our deal.  So

13  I couldn't say that it was all an advance on -- on a

14  line of credit.

15      Q    Looking at your -- looking at Kast's bank

16  records, how would we know the difference between

17  FastPay collecting money that Kast and its podcast

18  partners were owed as opposed to an advance on a line of

19  credit?

20      A    I don't know.

21      Q    Same question for Bluevine.  How much did you

22  get from them in terms of an advance on a line of

23  credit?

24      A    I think it was quite small, and it was

25  potentially -- I don't even know.  Maybe 2018 or

                                        Page 141

1    something.  It was quite a while ago.  But it -- it

2    was -- it was a relatively small amount.

3         Q    And BondIt?  How much did you get from BondIt

4    for Kast Media?

5         A    BondIt was, I believe, a $500,000 line.

6         Q    When was that?

7         A    I don't recall all the exact dates, but each

8    line of -- you know, each provider that we worked with,

9    we would obviously have to -- we only worked with one

10   provider at a time.  So BondIt would've been prior to

11   East West Bank.

12        Q    CapChase put $4 million into Kast Media, Inc.

13   first quarter of 2022; didn't it?

14        A    I don't remember exactly.  I think that

15   we -- at the -- I think our highest balance with

16   CapChase was somewhere in the $4 million range.

17        Q    What was Kast Media doing in first and second

18   quarter of 2022 that it needed access to that much cash?

19        A    Well, we were working to get everybody paid.

20   We were working to invest in the growth of the company,

21   and, you know, we had general business uses for the line

22   of credit.

23        Q    Okay.  So there's business growth and paying

24   your podcast partners.  Those were the primary reasons

25   why you needed -- Kast needed $4 million from CapChase

Page 142

1    in early 2022 and was seeking more by mid-2022; correct?

2         A    By mid -- oh, you're talking about this email

3    exchange?

4         Q    Yes.

5         A    No, they had frozen our line here, and they

6    were requiring repayment.

7         Q    Okay.  So by May of 2022, Mr. Singh and others

8    were asking Kast to repay some of the 4 million or

9    whatever it is that had come into Kast in the first one

10   or two quarters of '22; correct?

11        A    We always had to make payments.  Our agreement

12   with them if I remember it correctly was that we would

13   always make payments against our balance, and then this

14   is the email exchange around their decision not to

15   advance us more.

16        Q    -- before we move off of that.  I want to make

17   sure that I understand the names in -- I assume that

18   Ishwar Singh is your contact that you're working with at

19   CapChase; correct?

20        A    He's one of the contacts we worked with at

21   CapChase.  Yes.

22        Q    Erik Wissig is who?

23        A    Contracted CFO, part-time CFO of Kast.

24        Q    Ben Boyd?  Who is that?

25        A    I believe that was an employee of CapChase.

                                        Page 143

1      Q      I'm going to mispronounce Mr. Gotfryd's first

2    name if I try it, so who is Mr. Gotfryd or Mrs. Gotfryd?

3      A      Yeah, Przemek Gotfryd -- yeah, he is -- I

4    would say he's our primary contact at CapChase.

5      Q      And Alex Zavlaris?

6      A      Yeah, I believe he was an employee of

7    CapChase.

8      Q      By May of 2022, when you're sending this

9    rather detailed email to CapChase, were you looking for

10   more money, not have to pay back?  What were you looking

11   for for accommodation out of CapChase as of May of 2022?

12     A      We were asking for them to keep the line of

13   credit open with us that they had given us.  The line of

14   credit that they provided us had a max of $6.2 million.

15   We had only drawn around $4 million of that.

16     Q      So you felt like you had another 2 to 2.2

17   available on a line of credit; correct?

18     A      That was our expectation prior to this.

19     Q      Did you ever get satisfactory answers from

20   CapChase as to why Kast Media, Inc. could not access

21   that other 2 or 2.2 million in a line of credit advance?

22     A      I was told by CapChase that they had decided

23   to focus on SaaS companies, software as a service

24   companies, moving forward, and they were getting out of

25   the media space.

                                           Page 144

1    Q    Go over to page 2 of these emails, May 5th,

2    from Ishwar Singh to you.

3              MS. COHEN:  Down at the bottom?

4              MR. NEW:  Yes.

5    BY MR. NEW:

6    Q    "CapChase will file an all-asset lien on Kast

7    Media.  Attached is the lien document.  After the lien

8    is ready to go, we will unfreeze capacity for Kast Media

9    for a $1.4 million draw in May on a 12-month term."

10             Next page, 3.  "Subject to meeting guardrails

11   below, we can also commit to a $500,000 draw on a

12   four-month term in June."  Four.  "Beyond June, we would

13   like to transition to a four-month term for any

14   subsequent draws at the price of the 3 percent, but

15   approval would be subject to underwriting."

16             "Guardrails.  One.  Cash balance greater than

17   $1 million at the time of making the draw.  You can make

18   the draw at the high point for the month when payments

19   come through.  Two, year-on growth greater than 25

20   percent."

21             Is that a situation where these guardrails and

22   these terms that Ishwar proposes on May the 5th, was

23   that just a situation where you felt like Kast couldn't

24   do that or you just didn't want Kast to do that?

25   A    I don't remember all the details of the

                                        Page 145

1    decision that we made at this point with them.  I would

2    have to go back through and look.  It was -- I think

3    that it was not very palatable, probably because of the

4    million-dollar balance requirement, so we didn't have a

5    big chunk of that even available to us to access.

6             But again, I'm -- you know, I'm kind of going

7    back through my thought process at this -- at the time

8    of this email.

9         Q    Do you recall what Kast paid to you on a 1099

10   in 2021?

11        A    No.

12        Q    $326,000?

13        A    Uh-huh.

14        Q    Tell me how it was that Kast Media would pay

15   you $326,000.

16        A    Through either transfers or expenses paid on

17   my behalf or the credit card, like we already talked

18   about.

19        Q    Do you have the exhibit -- the limited

20   liability company articles of organization from the

21   state of Wyoming?

22        A    Yeah, I have Exhibit 6 here.

23             (Exhibit 6 was marked for

24             identification.)

25        Q    There was a $352,000 down payment made.  If

Page 146

1    you'll turn over to the second to the next to the last

2    page, it says "Confidential" on the top, August 18,

3    2023.

4         A    You said second-to-last page?

5         Q    Yes.  Maybe third-to-last page.  According to

6    this document, there was a down payment of $352,051 on

7    or around February 1, 2022, for 24 -- or 350 Sterling

8    Ranch Road, Canoga Park, California.  My first question

9    is did Kast Media, Inc. pay that down payment on your

10   home?

11        A    No.

12        Q    The proceeds that you took for 1099 income for

13   2021, $326,000, were those used to put towards the 352

14   down payment?

15        A    Did I use some of the proceeds from my

16   compensation to put towards the down payment on my

17   house?

18        Q    Yes.

19        A    Yes.

20        Q    How much?

21        A    I don't remember exactly.

22        Q    More than 300,000?  You got paid $326,000 in

23   miscellaneous income in 2021.  How much of that was used

24   to apply to the 352 down payment in February of '22?

25        A    I don't remember exactly how much.

Page 147

1    Q    Now, what bank was used to purchase and

2    finance the home?

3    A    I think it was through Bank of America.

4    Q    And that home was sold recently at a profit;

5    right?

6    A    The home was sold -- yeah, the -- we sold the

7    home recently.

8    Q    Right.  For about 2.1 million?

9    A    I don't remember exactly the purchase price.

10    Q    I can look it up and tell you.

11    A    You should.

12    Q    Oh, I did.

13    A    Good.

14    Q    Same as with the Mercedes G Wagon?  I take it

15    when you sold this home, you didn't take any of that

16    money and put it back into Kast Media; correct?

17    A    I don't know what this has to do with the G

18    Wagon, but when I sold my home, I did not put any of the

19    money associated with that transaction into Kast Media.

20    Q    All right.  Your former home; right?

21    A    Correct.

22    Q    I'll represent to you that you got 64,484 in

23    PPP.  Do you know why it said "educational services" on

24    your PPP?

25    A    I didn't prepare those documents.

Page 148

1      Q      So if an accountant or a lawyer or somebody

2      put "educational services" in 2020 for Kast Media or

3      Kast Media, LLC, resulting in 64,484, you don't know how

4      that came about; right?

5      A      No, and I don't even know any benefit that it

6      would have.

7      Q      Has Sight Reading Academy had any business

8      since 2020?

9      A      No, not that I'm aware of.

10     Q      What is StudioOne?

11     A      StudioOne is -- I don't know.  It's not a

12     thing that exists.

13     Q      So you have never solicited people to

14     interview for jobs for an entity called StudioOne or

15     studiooneip.com?

16     A      No.  I did -- I did set up a domain with the

17     possibility of the idea that there would -- that

18     LiveOne, which is the parent company of PodcastOne, may

19     use that for their IP operations.  That was sort of the

20     idea of setting up the domain, but none of that

21     happened.

22     Q      Were you going to sell the studiooneip.com

23     address to PodcastOne or LiveOne?  Was that the -- kind

24     of the idea behind it?

25     A      No.

Page 149

1       Q       Okay.  What was the idea behind that?

2       A       The idea was that in partnership with Kast, we

3    could create some value out of Kast's partnership with

4    PodcastOne under the brand name of StudioOne.

5                      MR. NEW:  That's a pretty good segue.

6    It's 2:40 Pacific.  Is now another good time for a break

7    before we get into the issues with PodcastOne?

8                      THE WITNESS:  I'm fine with taking a

9    break.

10                      MR. NEW:  Okay --

11                      MS. COHEN:  Five minutes.  Make it five.

12                      THE WITNESS:  Yeah.  Real quick.

13                      MR. NEW:  All right.

14                      THE VIDEOGRAPHER:  We're now going off

15    the record.  The time is 2:40 p.m.

16                      (Off the record.)

17                      THE VIDEOGRAPHER:  We're now going back

18    on the record.  The time is 2:50 p.m.

19                      MR. NEW:  Before we get into this segment

20    of -- what's the amount that we've been on the video

21    record, the amount of time?

22                      THE VIDEOGRAPHER:  2:55.

23                      MR. NEW:  Good.  All right.  Great.

24                      THE VIDEOGRAPHER:  No, I'm sorry.  3:55.

25                      MR. NEW:  3:50.  That's fine, too.

                                        Page 150

1                      THE OFFICER:  This one is going to be 8?

2      Is that --

3                      MR. NEW:  Let's do 8.  Let's do --

4                      THE WITNESS:  It has the 7 on it already.

5                      MS. COHEN:  This is 7.

6                      MR. NEW:  Okay.  The one that says

7      "Vendor Balance Detail" is 7, and the one that says

8      "Kast Media A/P Aging Detail as of March 15, 2024,"

9      that's 8.

10                      (Exhibit 7 and Exhibit 8 were marked for

11                      identification.)

12     BY MR. NEW:

13          Q    All right.  Ready to start back, Mr. Thomson?

14          A    Oh, yeah.

15          Q    Okay.  All right.  Do you recognize Exhibits 7

16     and 8?

17          A    Yes.

18          Q    And what do you recognize these to be?

19          A    What we -- the documents that we sent to you.

20          Q    What specifically documents that you sent to

21     me?

22          A    Eight is an A/P aging detail, and 7 is a

23     vendor balance detail.

24          Q    For Arcadian Vanguard, parentheses Brian Last;

25     correct?

                                        Page 151

1    A    Correct.

2    Q    All right.  Now, when I see this, it looks to

3    me like if you start -- let's just start in 2018, on the

4    vendor balance detail.

5    A    That is 7?

6    Q    Yes.  Bill.  What kind of bill is that?

7    A    I believe that that is a bill due to the

8    vendor.

9    Q    And the vendor being whom?

10    A    Arcadian Vanguard.

11    Q    Okay.  And so that's something saying that

12    Kast owes Arcadian Vanguard $4,480 due on September 30,

13    2018; correct?

14    A    Are you talking about -- so the top one?

15    Q    Yes.  First one, just as an example.

16    A    Bill Number 1113 specifies a due date of

17    9/30/2018.

18    Q    And under that, date 10/30/2018, Bill 1145,

19    due date March 2, 2019, same amount.  Can you explain

20    that?

21    A    Bill Number 1145 appears to have a due date of

22    3/2/2019.

23    Q    Why would there be a bill that would be due

24    some -- November, December, January, February -- some

25    roughly four months later?

Page 152

1      A     I don't know.  I'd have to look at our

2    contract.  I don't recall what our payment terms were

3    precisely with Arcadian Vanguard.

4      Q     And then the third entry on Kast 000963 is a

5    payment for $4,480.  Which of the two bills that precede

6    that is that paying?

7      A     I don't think you can see from the schedule.

8      Q     So you don't think that the $4,480 that was

9    paid November 2, 2018, was paying either the September

10   30, 2018, bill or the October 30, 2018, bill?

11     A     I can't tell what that bill payment is being

12   applied to, which open bill that payment is being

13   applied to.

14     Q     What's the best way for us to figure out when

15   these payments were made what it was paying?

16     A     What's the best way to figure out what it was

17   paying?

18     Q     Yes.

19     A     I don't know.

20     Q     So how are Brian Last and Jim Cornette

21   supposed to look at a vendor balance detail like this

22   and be able to tell that Kast is paying it -- paying

23   them what it owes them?

24     A     How are they -- how are they supposed to look

25   at this?

Page 153

1       Q      Yes.

2       A      I don't know.

3       Q      And you'd agree with me that your vendor can't

4    just look at this vendor balance detail and tell which

5    of its bills are being paid by Kast; is that a fair

6    statement?

7       A      That a vendor can't look at this and tell

8    which one is being -- which one specifically is being

9    paid?

10      Q      Yes.  Yes.

11      A      Probably not, although I don't think it's

12   relevant.

13      Q      You don't think the vendors would want to know

14   whether their bills -- what you call bills, money you

15   promised to pay them via contract, is being paid?  You

16   don't think that's relevant to them, Mr. Thomson?

17      A      Well, this shows -- this is not a document

18   that we generate regularly for our podcasting partners.

19   This is an internal document responsive to your request

20   from our accounting services, and it details all of our

21   bills and all of our payments and how both of them add

22   up to a total amount owed.

23      Q      If a vendor wanted to ask for a report which

24   is essentially an audit or an accounting that you

25   generated a bill saying that their podcast was owed

                                        Page 154

1    $4,480, for instance, and they know for certain that

2    they got that bill paid by Kast Media, what would they

3    need to ask for?

4        A    That's a question for the accounting team.  I

5    mean, you had audit rights.

6        Q    Give me the names -- because you keep saying

7    "accounting team."  I want to know everybody on the

8    accounting team that we need to ask, if it's more than

9    one person.

10        A    You want the list again?

11        Q    Yes.

12        A    How many times do you need the list?

13        Q    I'm going to ask for it every single time.

14    That -- every single time that you as the CEO of this

15    company don't know something and you say the accounting

16    team knows it, I'm going to ask who your accounting team

17    is, because the CEO doesn't know.  So I'm going to ask

18    for your accounting team; okay?

19            You as the CEO don't know, so you tell me who

20    your accounting team is.

21        A    What's the question?

22        Q    Who's your accounting team that could explain

23    to me an audit to know that your vendor, in fact, got

24    paid what it was supposed to?

25        A    So Kast Media had various accountants over the

Page 155

1    years.  They included Michael Calabretta, Analina

2    Acosta.  Erik Wissig was a contract CFO.  NOW CFO.  And

3    Emily Pender and Krimzee Maenlee.

4         Q    Calabretta.  What was the other name?  I'm

5    going to write them down.

6         A    Starting again?  Yeah.  You can reference

7    the -- the ten other times that I told you.

8         Q    Every time you don't know a question, every

9    time you say, "I don't know," I'll reference the list;

10   how's that?

11        A    Nice.  Good -- good call.  Let's see.

12        Q    Calabretta.  What was the other lady's name?

13        A    So Michael Calabretta; Krimzee Maenlee,

14   M-A-E-N-L-E-E; Analina Acosta; Erik Wissig, a

15   contract -- part-time contract CFO; NOW CFO; and Emily

16   Pender.

17        Q    Does Kast Media, Inc. have any either contract

18   or employee accountants employed today?  Does Kast Media

19   have any accountants on its payroll now, either as

20   contractors or employers?

21        A    Yes.  Analina Acosta is our contracted

22   accountant.

23        Q    So if we wanted to depose someone in this case

24   about auditing, what Arcadian Vanguard and Jim Cornette

25   should have been paid at certain points, paying off

Page 156

1    certain bills, Analina Acosta would be the best person

2    to ask that question?

3        A    I don't know.  You're asking me to advise you

4    on your legal approach.

5        Q    No.  No, I'm not.  I'm asking whether there's

6    anybody else within Kast Media that might have knowledge

7    that you don't have here today, sir.

8            I'm asking you -- I asked you to look at a

9    document that you provided to tell me when did Last and

10   Cornette get paid certain bills, and you told me you

11   couldn't do it.  Do you recall that testimony?

12           Using the first three entries on the vendor

13   balance detail, you told me that you couldn't tell me

14   when that $4,480 check was sent, what bill it paid, so

15   what I'm asking you is who within Kast do I need to ask

16   that question of?

17       A    Well, it would probably -- yes, Analina is the

18   current accountant and has access to all of Kast's

19   previous books and records.

20       Q    How long has Analina Acosta been with Kast?

21       A    I think since maybe December or so of -- of

22   2023.

23       Q    So she wouldn't have any knowledge of Brian

24   Last and Jim Cornette, because your deal with them was

25   terminated as of that time; correct?

Page 157

1      A      That's what I said.  She has access to all the

2    books.

3      Q      But she has access to all the books?

4      A      Yeah.

5      Q      All right.  All right.  So do you believe as

6    the CEO of Kast Media that you had paid Brian Last and

7    Jim Cornette everything that Kast owed them through the

8    end of 2022?

9      A      Through the end of 2022?

10     Q      Yes.

11     A      Let me see.  So -- this is what -- this is

12   what our A/P shows; right?

13     Q      Mm-hmm.

14     A      Yes.  I believe this A/P is accurate.

15     Q      Okay.  So you believe that as of December 31,

16   2022, Kast Media was current with Arcadian Vanguard and

17   Jim Cornette; correct?

18     A      I don't -- I don't know that from this A/P.

19     Q      Well, take a look at the vendor balance

20   detail, Kast 000980, and the A/P aging detail.

21     A      What am I looking at?

22     Q      Go -- if you go to the Bates stamp number on

23   the bottom Kast 000980.

24     A      Okay.  Okay.

25     Q      Open balance and balance through December 30,

Page 158

1     2022, is zero.

2          A     Yes.

3          Q     And had been for some time; correct?  Months,

4     if not years, zero balance; correct?

5          A     I don't -- I don't know that.

6          Q     Go to the previous pages, 2021, 2022.

7          A     This is a -- when -- when is this report

8     dated?

9          Q     You provided it to me, sir.

10         A     Yeah, I don't know when this report was run.

11    But as of the date that this report was run, Kast had a

12    balance of zero dollars for those line items.

13         Q     As of December 30, 2022; correct?

14         A     I don't know that.

15         Q     Sir, it's your document.  You produced it to

16    me.

17         A     There isn't a date on it.

18         Q     The last entry --

19         A     It's --

20         Q     -- 10/31 of '23.

21         A     This is a vendor balance -- this is a vendor

22    balance detail that shows that per all dates, these are

23    the bills that have been paid by Kast, and it says when

24    they were paid.  But it doesn't give me a snapshot into

25    a moment in time of what the balance was at any given

Page 159

1    moment in time.

2         Q    Okay, and that's not what I'm asking.  I'm

3    just asking whether or not as of December 30, 2022 --

4         A    That's a snapshot that you're asking for.

5         Q    Okay.  So as of December 30, 2022, Kast

6    could've owed Last and Cornette money; right?

7         A    I don't know.

8         Q    Okay.  Now, let's take a look at the document

9    that you've produced to me in this case.  Go to Bates

10   number Kast 000980, please.

11        A    Mm-hmm.

12        Q    This is where Kast stops paying Arcadian

13   Vanguard; isn't it?

14        A    This page?

15        Q    No, this is the time --

16        A    The time as in the time of 980?

17        Q    When you look at the A/P -- as in the time of

18   January 10, 2023.  As of January 2023 and first quarter

19   2023, Kast stopped paying Arcadian Vanguard; didn't it?

20        A    I don't think that's an accurate statement,

21   and this document doesn't say that, either.  This

22   document shows a payment made on January 24, 2023.

23        Q    Was it the full payment of everything that

24   Kast owed to Arcadian Vanguard?

25        A    No, we show an accrued balance.

Page 160

1        Q     Mm-hmm.  And then it goes on for a couple of

2     more months, and there's a payment on March the 17th of

3     2023.  Was that paid balance in full, Mr. Thomson?

4        A     March 17th appears to zero out the balance,

5     yes.  Oh, no.  I see.  The balance accrues --

6        Q     63,000 --

7        A     The balance continues to accrue.

8        Q     Balance continues to accrue.  Thank you.  And

9     on March 30, 2023, there is another payment that still

10    does not zero out the balance; correct?

11       A     Correct.

12       Q     And there is a payment marked -- or I'm sorry,

13    May the 12th of 2023.  You're into Arcadian Vanguard and

14    Cornette for $166,019.71 by then; correct?

15       A     May the 12th?

16       Q     Yes.  May the 12th, 2023, Kast owes Last and

17    Cornette 166,019 and 71 cents; correct?

18       A     What -- what transaction are you looking at?

19       Q     "Bill payment check, May 12, 2023."

20       A     Is this on 9/8, too?

21       Q     Yes.

22       A     Okay.  May 12th.

23       Q     There was a payment made of $37,275, leaving a

24    balance owed of 166,019.71; correct?

25       A     Correct.

Page 161

1      Q      And then it continues to accrue for the weeks

2      thereafter; correct?

3      A      Yes.

4      Q      And Kast hasn't made a payment to Last and

5      Cornette since May the 12th of 2023; correct?

6      A      Correct.

7      Q      And Kast owes Last and Cornette $250,442.79;

8      correct?

9      A      I believe that to be the upper limit of what

10     we would owe them.  I haven't done an audit of that

11     hundred thousand download metric in the contract, but I

12     do expect that 250 to be the upper limit.

13     Q      That's assuming that those podcasts would've

14     been over the hundred thousand limit; correct?

15     A      Yeah, downloads per episode; right?

16     Q      You mentioned doing an audit.  You have the

17     ability to do an audit?

18     A      Yeah, I intend to do so.

19     Q      Okay.  We intend for you to do so as well.  So

20     we know what you owed Last and Cornette and when you

21     owed Last and Cornette and when you were paying Last and

22     Cornette in 2023; correct?

23     A      With the stipulation of that contractual term.

24     Q      Okay.  Now, 2023 is when you were also looking

25     to enter into some type of an agreement with PodcastOne;

Page 162

1    correct?

2         A    Kast was, yes.

3         Q    On May the 23rd, 2023, LiveOne announced that

4    it had entered into a letter of intent to acquire

5    certain assets of Kast Media.  Did that go through?

6         A    Eventually, the -- the deal with PodcastOne

7    did get signed.

8         Q    And what kind of deal was that?

9         A    It's the finder's fee structure we provided

10   the contract to.

11        Q    What assets of Kast Media did LiveOne obtain?

12        A    Certain shows that made the decision to take a

13   deal with PodcastOne and to move their show over to

14   PodcastOne.

15        Q    Do you recall which shows those were?

16        A    Well, I don't have the list in front of me.

17        Q    As of the date of the filing of bankruptcy,

18   March 13 of 2024, did Kast Media, Inc. owe PodcastOne or

19   LiveOne any money?

20        A    As of the date of the petition, did Kast owe

21   PodcastOne or LiveOne any money?  No, I don't believe

22   so.

23        Q    All right.  Now, the arrangement that you

24   described to me earlier, you said PodcastOne distributes

25   the three O&Os; correct?

Page 163

1        A     Yes.

2        Q     And then you have the 70/30, 70/30, and 50/50

3    splits on the three O&O podcasts; correct?

4        A     Yes.

5        Q     Why is that arrangement with PodcastOne

6    advantageous to Kast Media?

7        A     We went through a pretty rigorous due

8    diligence process with them in regards to being our

9    distribution or monetization partner.  As I'm sure you

10   understand, Kast has spent six or seven years on the

11   other end -- side of that fence, so we -- we know how to

12   kick the tires.  We know how to find a good partnership.

13          And we believed them to be the best option for

14   Kast and the deal that they made with us.

15       Q     You see the finder's fee agreement, Mr.

16   Thomson?

17       A     Yes.

18       Q     Entered into what date?

19       A     It says "Effective as of August 1, 2023."

20             MS. COHEN:  I'm sorry.  What exhibit

21   number is this?

22             THE WITNESS:  Exhibit 9.

23             MS. COHEN:  Thank you.

24             THE WITNESS:  Mm-hmm.

25   //

                                        Page 164

1              (Exhibit 9 was marked for

2              identification.)

3    BY MR. NEW:

4         Q    Effective August 1, 2023.  So one year ago as

5    we sit here today; correct?

6         A    Oh, close to.

7         Q    Today's August 1st.

8         A    Yeah, close to.  363 days; right?

9         Q    Exactly one year ago, this was effective,

10   dated September 8, 2023; correct?

11        A    Dated September 8, 2023.

12        Q    All right.  Who prepared this agreement,

13   PodcastOne or Kast?

14        A    I believe LiveOne's counsel prepared it.

15        Q    All right.  And if you turn over to page 2,

16   "Share price means $8 per share of PC1 common stock";

17   correct?

18        A    Share price, G.  "Share price means $8 per

19   share of PC1 common stock."

20        Q    All right.  "Compensation fees.  Compensation.

21   Company" --

22        A    You on the next page?

23        Q    Yep.  Page 3 of the agreement: "Success fee.

24   Company agrees to pay Kast the adjusted success fee as

25   defined below in shares of the company's restricted

                                        Page 165

1    common stock."  I don't know how much that is, one 10

2    millionth or whatever, one 100 thousandth.  "Par value

3    per share," and it goes on.  You see that?

4        A    Yeah, I see this paragraph.

5        Q    Now, halfway down through that, that talks

6    about $1,392,000 worth of shares, "The upfront shares to

7    be issued by the company to Kast promptly after the

8    effective date as prepayment of the adjusted success

9    fee."  Tell me what that is.

10       A    This looks to do with a settlement agreement

11   that we made with CapChase for the balance of that line

12   of credit that we still owed them.

13       Q    Okay.  So I want to make sure that I'm clear

14   about that.  PodcastOne paid to CapChase $1.392 million

15   on behalf of Kast Media; correct?

16       A    So 1.392 would be worth of shares, so that

17   would be at an $8 stock price, I believe.  But

18   PodcastOne and CapChase have a deal, and it references

19   it in here.  But as to whether PodcastOne has made that

20   payment to CapChase, I don't know.

21       Q    The payment was made on behalf of Kast Media;

22   correct?

23       A    We entered into a settlement agreement with

24   CapChase for the amount that we owed them where they

25   would receive a certain amount from PodcastOne as

                                           Page 166

1   detailed here.  Now, as to whether they received that or

2   not, I don't have knowledge.

3        Q    I understand.  I just want the record to be

4   clear this is evidence of PodcastOne paying a debt that

5   Kast Media owed; correct?

6        A    I don't think that that's an accurate

7   phrasing.

8        Q    Did in September of 2023 Kast Media owe

9   CapChase money on a line of credit?

10       A    Yes.  Prior to our settlement agreement, we

11  owed them a certain amount of money.

12       Q    How much?

13       A    I don't remember exactly.

14       Q    Give me a ballpark.

15       A    Maybe 1.7 or something.

16       Q    Okay.  And you, Kast, settled with CapChase,

17  as evidenced by this agreement on page 3 of it; correct?

18       A    Yes, we settled with CapChase.

19       Q    And so that took a significant amount of

20  financial pressure off of Kast at that point.  Would you

21  agree with that?

22       A    The settlement contract with CapChase was

23  absolutely in Kast's best interests.

24       Q    And by extension, you, you personally, Colin's

25  best interest?

Page 167

1    A    I would say all shareholders of Kast.  All

2    stakeholders, really.

3    Q    But not the podcast partners who were owed

4    money?

5    A    No, all stakeholders.

6    Q    How did you paying off -- Kast paying off a

7    line of credit with CapChase benefit your podcasting

8    partners, like Brian Last and Jim Cornette?

9    A    Well, they were offered -- they were offered a

10    deal from PodcastOne, too.

11    Q    We're going to talk about that deal in just a

12    moment, but you owed Brian Last and Jim Cornette 250

13    grand.

14    A    And they didn't want to take PodcastOne's

15    deal.

16    Q    No, they -- let me finish my question.

17    A    Yeah.  Go ahead.

18    Q    Kast owed Brian Last and Jim Cornette $250,000

19    as of September 2023, and nothing that Kast did

20    vis-a-vis PodcastOne or CapChase put a single red cent

21    in Brian Last's or Jim Cornette's pocket; correct?

22    A    I believe 250 to be the upper limit of the

23    amount that we would owe them based on an audit of the

24    downloads per episode.

25    Q    Not my question.

Page 168

1              MS. COHEN:  Let him finish his answer.

2   BY MR. NEW:

3         Q    Assuming --

4         A    Can you ask the part that you want the answer

5   to?

6         Q    Yeah.  I'm going by the document you gave me.

7   I'm going by your schedule, sir.  So you can waffle it

8   that it may not be 250 all that you want.  You've sworn

9   documents under penalty of perjury that what you owe my

10  clients is $250,442.79, so I'm going to believe you when

11  you signed the bankruptcy document saying that; okay?

12             So I understand your qualifier from earlier,

13  and my question to you is this.

14             Assuming that the 250 and change is accurate,

15  as you've told the bankruptcy court that it is, nothing

16  that you did with CapChase or PodcastOne benefitted my

17  client in any way for the amount that you've told the

18  bankruptcy court you owed them; correct?

19        A    No.  Not correct.

20        Q    How did it benefit -- how did your deal with

21  CapChase and PodcastOne benefit my clients?

22        A    Kast made a deal with PodcastOne, and you're

23  referencing this part that includes CapChase, who had a

24  significant -- that Kast owed a significant amount of

25  money to.

                                              Page 169

1           And therefore, reliving that debt put Kast and

2    all of its stakeholders, including employees, partners,

3    investors, creditors, in a better position to collect on

4    what was owed to them.

5         Q    In such a great position that eight months

6    later, you were in bankruptcy court, seeking protection.

7    Is that your testimony here today, Mr. Thomson, is that

8    this deal was so good for Kast, its podcast partners,

9    and everybody else that eight months later, you ran to

10   bankruptcy court for protection?

11            Is that your testimony, sir?

12               MS. COHEN:  Objection, argumentative.

13   BY MR. NEW:

14        Q    Is that your testimony?

15        A    What's your question?

16        Q    My question -- your testimony was that this

17   September 2023 deal was a great deal for Kast, for you,

18   for your podcasting partners, for everybody --

19        A    My --

20        Q    Let me finish my question.  It was such a

21   great deal --

22               MR. NEW:  Is California a one consent

23   state?  Are you recording me?

24               MS. COHEN:  No, and I don't know what the

25   consent is, but this thing is being recorded.  I don't

                                          Page 170

1     need to record you.

2                    MR. NEW:  All right.  If you're recording

3     me with your phone --

4                    MS. COHEN:  Yeah.

5                    MR. NEW:  If you're recording me with

6     your phone and California's not a one-party consent

7     state --

8                    MS. COHEN:  This meeting is being

9     recorded, so --

10                    MR. NEW:  Okay.  If you're recording me

11    on your phone, I'll sue you, and I'll turn you in to the

12    California State Bar.

13                    MS. COHEN:  Understood.  No problem

14    there.

15                    MR. NEW:  I'll file a bar complaint

16    against you if you're recording me with your phone.

17                    MS. COHEN:  Go right ahead.  Go right

18    ahead.

19                    MR. NEW:  You don't have my consent, nor

20    my authority.

21    BY MR. NEW:

22       Q    So this was such a great deal with CapChase

23    and PodcastOne that eight months later, you filed

24    bankruptcy; right?

25       A    Are you ready for me to answer?

                                          Page 171

1      Q      Yeah.

2      A      Okay.  My testimony is that this deal with

3  PodcastOne and CapChase benefited Kast and all of Kast's

4  stakeholders.

5      Q      Did you pay any podcast partners after this

6  deal with CapChase and PodcastOne monies that were owed

7  to them?

8      A      I don't recall, but if we did, it was only as

9  a, you know, final release payment with them.

10      Q      Okay.  "B, 278,400 of the upfront shares

11  equivalent to 34,800 shares shall be issued in the name

12  of the escrow agent and deposited with the escrow agent

13  pursuant to the terms of the escrow agreement."  You see

14  that?

15                  MS. COHEN:  Are you still on 0007?

16                  MR. NEW:  Yep.

17                  THE WITNESS:  Yeah.  "B,

18  274,000 -- 278,400 of the upfront shares equivalent to

19  34,800 shares shall be issued in the name of the escrow

20  agent and deposited with the escrow agent" --

21  BY MR. NEW:

22      Q      And that's Kast's; right?

23      A      I -- I believe that this is the

24  amount -- yeah, I believe that this would be --

25      Q      That's Kast's?

Page 172

1      A     That this would be Kast's once the

2     escrow -- you know, once it comes out of escrow.

3      Q     Go to your bankruptcy petition, sir.

4            MS. COHEN:  Exhibit 2?

5            MR. NEW:  Yep.

6     BY MR. NEW:

7      Q     Show me where in your bankruptcy petition that

8     you list these 34,800 shares worth $278,400 as an asset

9     of Kast Media, Inc.

10     A     What's the question?

11     Q     Show me where in your bankruptcy petition you

12    list 34,800 shares worth $278,400 as an asset of Kast

13    Media.

14     A     I -- I -- you want me to go through it?

15     Q     Yep.

16     A     Okay.

17     Q     Take all the time that you want, and you tell

18    me the page where that is.

19     A     Well, I believe that they may -- may not be in

20    here.

21     Q     Okay.  I've looked, and I can't find where you

22    listed these shares of stock worth $278,400 as an asset.

23    Do you know why they were omitted?

24     A     I -- I don't know why they were omitted, but

25    obviously, I think probably because the valuation of

                                           Page 173

1  them would be rather tricky to come up with, because

2  they're not liquid, and the stock price is fluid.

3      Q    This deal tells us.  It's 34,800 shares,

4  $278,400; right?

5      A    That would be if the stock were priced at $8 a

6  share.  But of course, as you know, because we provided

7  you with the escrow agreement, they're subject to, I

8  believe, two-year lockup provisions, and nobody has any

9  idea what the price of the stock is going to be two

10 years after that date.

11     Q    We'll get there.  But whatever it is, the

12 liquid nature of the stock, you didn't even list the

13 number of shares; did you?  Regardless of the price of

14 it, you didn't --

15     A    I don't see the shares listed on this form.

16 But I haven't -- I haven't looked for them, but I -- I

17 believe that they're not there.

18     Q    Okay.  And those shares are deposited with an

19 escrow agent; correct?

20     A    I believe that's what the contract states.  I

21 actually -- I never followed up to make sure that they

22 were deposited.

23     Q    And the agreement goes on to say that the max

24 value of those shares -- for the avoidance of doubt, the

25 max value of the shares is $1.7 million; correct?

Page 174

```
 1       A     Where does it say that?

 2       Q     On the last line of page 3, Bates stamped Kast

 3    000007.  Do you see that, sir?

 4       A     "For the avoidance of doubt, the maximum worth

 5    of shares to be issued to CapChase pursuant to which the

 6    company agrees to -- to apply the discount" -- "the

 7    company" being PodcastOne -- "such shares shall be 1.7

 8    million, including the discount."

 9       Q     So the maximum value to Kast at the end of the

10    two-year lockdown period would be $1.7 million; correct?

11       A     I don't think that's accurate.

12       Q     The maximum worth of the shares -- oh, I'm

13    sorry.

14       A     Yeah.

15       Q     To CapChase?

16       A     Yeah.  Correct.

17       Q     Okay.  So the max CapChase can get is 1.7.

18    That's how you knew that you owed CapChase about 1.7;

19    right?

20       A     What's the question?

21       Q     My question is that informs us or refreshes

22    your recollection, you believe, that the line of credit

23    to CapChase was about 1.7 at that time; correct?

24       A     I don't think my recollection needed

25    refreshing on the amount owed to CapChase.
```

                                            Page 175

1      Q    All right.  All right.  Now, if you turn over,

2   Exhibit C, Accredited and Sophisticated Investor

3   Questionnaire.  I think it's Bates number Kast 000024;

4   correct?

5                  MS. COHEN:  One document starts with 32,

6   and the other starts with 5.

7                  MR. NEW:  We were just looking at 5.

8                  THE WITNESS:  Yeah, I have 32, 33, 34.

9                  MR. NEW:  Okay.  All right.

10                 MS. COHEN:  So I'm looking -- I wonder if

11  you intended to, maybe, because this one, Mr. New, is

12  the same as this.  It's like a new document.  It's the

13  partial document that's stapled to your finder's fee

14  agreement.

15                 MR. NEW:  All right.  Let me see.  Yeah,

16  that's the portion that I meant to give you, pages 32,

17  33, and 34.

18                 MS. COHEN:  So we have it --

19                 MR. NEW:  And 35.

20                 MS. COHEN:  We have it twice.  We have it

21  as an attachment to Exhibit 9, and we have it as a

22  separate document.  So which would you prefer to refer

23  to?

24                 MR. NEW:  It can be attached to 9.

25                 MS. COHEN:  Okay.

                                        Page 176

1    BY MR. NEW:

2        Q    Now, I'll show you the first page, because it

3    begins as Exhibit C to the escrow agreement with Kast

4    Media, Inc., 7111 Hayvenhurst Ave, Los Angeles,

5    California.

6        A    Assuming it's this.

7            MS. COHEN:  Is this where you are?

8            MR. NEW:  Yes.

9            MS. COHEN:  And do you have any other

10   pages that go with the finder's fee agreement after page

11   4, or does it end --

12           MR. NEW:  It ends there.  That's all I

13   was going to ask about.

14           MS. COHEN:  No signatures?  Okay.

15   BY MR. NEW:

16       Q    Exhibit C is the Kast Media, Inc. Accredited

17   and Sophisticated Investor Questionnaire.  Kast Media,

18   Inc. an accredited and sophisticated investor?

19       A    Is it the Part C or something else?

20           MS. COHEN:  We're not seeing your page.

21           MR. NEW:  All right.  I'll give you my

22   whole part, my whole exhibit so you can take a look at

23   it.  I have questions about certain portions, but you're

24   welcome to look to -- at the entirety.

25           MS. COHEN:  So the signature block --

                                        Page 177

1                    MR. NEW:  The signature block appears

2      on --

3                    MS. COHEN:  We have the signature block

4      page.

5                    MR. NEW:  Yep.

6                    MS. COHEN:  And then you have pages that

7      come after that.  "Accredited Investor" -- this is what

8      you just handed me.

9                    MR. NEW:  Those pages come before.

10                    MS. COHEN:  Okay.  Well, the way you'd

11      handed me is just like that.

12                    MR. NEW:  This is Bates number 29.

13                    MS. COHEN:  Right.

14                    MR. NEW:  That's the end of CapChase's,

15      signed by Mr. Przemek Gotfryd, and then the page behind

16      that begins Kast Media, Inc.'s sophisticated investor

17      section.

18                    MS. COHEN:  And what's the Bates on that?

19                    MR. NEW:  Thirty, thirty-one, all the way

20      over through thirty-five.  I didn't copy 30 and 31,

21      because I don't have any questions coming from pages 30

22      and 31.  But if you'd like to see them, I can hand them

23      to you.

24                    MS. COHEN:  I just want to make sure we

25      have the document.  We have one that has 5, 6, 7, and

                                                Page 178

1    then 8.

2                    MR. NEW:  Yes.

3                    MS. COHEN:  And then it goes to 32, 33,

4    34, 35.

5                    MR. NEW:  And 35.  Yes, and --

6                    MS. COHEN:  Okay.  So that's the document

7    we're looking at?

8                    MR. NEW:  Yes.

9                    MS. COHEN:  Okay.  What page?  Which

10   Bates page?

11                   MR. NEW:  Bates page 32.

12                   MS. COHEN:  Okay.  We've got it.

13   BY MR. NEW:

14      Q    Okay.  "Sophisticated investor status.  The

15   undersigned recipient represents and warrants to the

16   company as follows and has checked the box or boxes

17   below, which are next to the recipient's truthful and

18   honest answers under which the recipient qualifies as a

19   sophisticated investor and, B, has such knowledge and

20   experience in financial and business matters that it is

21   capable of evaluating merits and risk of -- on

22   investment in the shares and is able to bear the

23   economic risk of such investment in the shares for an

24   indefinite period of time and, C, has the capacity to

25   protect his, her, or its own interests as a result of

Page 179

1    the undersigned's status."

2         "Check the appropriate descriptions below."

3    Did you check these boxes on behalf of Kast Media, Inc.,

4    Mr. Thomson?

5         A    I believe I probably did.

6         Q    Okay.  "The recipient has such knowledge and

7    experience in financial, investment, and business

8    matters that he, she, or it is capable of evaluating the

9    merits and risks of the proposed acquisition of the

10    shares, number one."

11         "Number two, recipient considers himself,

12    herself, or itself to be an experienced and

13    sophisticated investor.  If so, on what basis?

14    Experience running podcast company."  You put that in

15    there; didn't you, Mr. Thomson?

16         A    I don't know if I did or if PodcastOne's

17    counsel did, but yeah, I -- I -- that's -- that's my

18    experience.

19         Q    And is that accurate?

20         A    Yes.  I did run a podcast company.

21         Q    And are running a podcast company; correct?

22         A    Yep.

23         Q    Three, "The recipient understands the nature

24    of the investment and the risks involved with making an

25    investment in a public company."  Four, "The recipient

Page 180

1    has sufficient knowledge of financial and business

2    matters to evaluate the risk association -- associated

3    with an investment in a public company."

4         You checked all four of the boxes on these

5    sophisticated investigator -- or sophisticated investor

6    exhibit to the escrow agreement; correct?

7         A    Yes.

8         Q    And you signed that on behalf of Kast Media,

9    Inc., CEO, dated September 7, 2023; correct?

10        A    Yep.

11        Q    Now, this might refresh your memory.

12             MS. COHEN:  Is this Exhibit 10 or 11?

13             MR. NEW:  Ten.

14             MS. COHEN:  Ten.

15             (Exhibit 10 was marked for

16             identification.)

17   BY MR. NEW:

18        Q    I just want to make sure that I understand,

19   though.  There was never an acquisition of Kast's assets

20   by PodcastOne; correct?

21        A    They ended up labeling the deal a finder's fee

22   deal instead.

23        Q    Not an asset purchase agreement; correct?

24        A    They ended up labeling it a finder's fee deal.

25        Q    Did PodcastOne or LiveOne ever say they didn't

                                            Page 181

1  want your name associated with their companies or that

2  you weren't allowed to tell people that you were

3  associated with LiveOne or PodcastOne?

4      A    No, they didn't say that.

5      Q    And I don't know if I have an extra copy of

6  this.  I'll give you my copy if you want to see it.  We

7  don't have to attach it as an exhibit.

8          The lockup agreement -- I'll show you -- says

9  all of this discussion that we've been having about

10  these shares, their value in PodcastOne, it's locked

11  down until September of 2025; correct?

12      A    Yeah, I believe so.  I believe that's

13  generally what this contract states.

14      Q    What does your -- I'm sorry.  What does your

15  bankruptcy plan say about Kast's intentions with respect

16  to the lockdown and the assets that'll be locked down

17  until September 2025?  Does it speak to it at all?

18      A    No.

19      Q    All right.  Does the name Foley Shechter

20  Ablovatskiy LLP sound familiar to you as the escrow

21  agent of the 34,800 shares of common stock?

22      A    The name sounds familiar to me.

23      Q    All right.  And just so the record is clear,

24  the stock -- we keep kind of using terms interchangeably

25  here, PodcastOne, LiveOne, et cetera, et cetera.  The

Page 182

1    shares of stock are in Courtside Group Inc.; correct?

2        A    Yes.

3        Q    You mentioned earlier that Kast's been on the

4    other side of the deal like the one that you've got with

5    PodcastOne now; right?  Remember your kicking the tires

6    analogy you gave me, "We know how to kick the tires"?

7        A    Yeah.  Kast -- Kast was a distributor and a

8    monetizer of -- with an in-house sales team of podcasts

9    for a number of years.

10        Q    Okay.  When does PodcastOne owe Kast money?

11        A    You have the contracts.  I would have to go

12    back to them to see what our payment terms are.

13        Q    I think it's net 60; isn't it?  I flagged it.

14    Revenue split.  I'll show it to you.  "Podcaster will in

15    aggregate receive 70 percent, podcaster's share, of 100

16    percent of the gross revenue with the remainder to be

17    paid retained by a company," dah-dah-dah-dah-dah.

18            "Company agrees to pay podcaster's share for

19    outstanding receivables 60 days after invoicing the

20    applicable advertising clients and/or sponsors for said

21    receivables."  Since you entered into this agreement on

22    November the 14th of 2023, has PodcastOne failed to pay

23    you, pay Kast?

24        A    Have they failed to pay Kast?

25        Q    Yes.

                                        Page 183

1      A      They haven't failed to pay Kast.

2      Q      Okay.  Like you failed to pay Brian Last and

3   Jim Cornette to the tune of $250,000; right?

4      A      What's the question?

5                 MS. COHEN:  Objection, argumentative.

6   BY MR. NEW:

7      Q      My question is PodcastOne has not done to Kast

8   what Kast did to Arcadian Vanguard and Jim Cornette; is

9   that a fair statement?

10                 MS. COHEN:  Objection.  Objection,

11   relevance, argumentative, badgering.

12      A      So the question is has PodcastOne met its

13   payment obligations with Kast?

14      Q      Yeah.  Yes.

15      A      Yeah, they have.

16      Q      And you acknowledge --

17      A      I believe so.

18      Q      You acknowledge that Kast did not meet its

19   payment obligations to Brian Last, Arcadian Vanguard,

20   and Jim Cornette?

21      A      Correct.

22                 MS. COHEN:  Exhibit number?

23                 THE WITNESS:  It says 11.

24                 (Exhibit 11 was marked for

25                 identification.)

Page 184

```
 1    BY MR. NEW:

 2         Q    All right.  You recognize these documents?

 3         A    Yes.

 4         Q    Okay.  Now, where is 4421 Mary Ellen Avenue,

 5    Sherman Oaks, California 91423, which is the address

 6    where the 2021 Form 1099 NEC, Nonemployee Compensation,

 7    was sent?

 8         A    That is where I lived at the time.

 9         Q    And what's the best way for a creditor in this

10    case to find out how the $326,633 of nonemployee

11    compensation to you came into being?

12              MS. COHEN:  Objection, calls for a legal

13    conclusion.

14         A    I don't know.

15         Q    Now -- and I want to make sure -- and I'll

16    write this down, too.  My understanding was there were

17    three sources of that; correct?  That there could be

18    just money paid to you out of the accounts; correct?

19         A    Yes.

20         Q    Or there could be debts that you owed that

21    were paid that -- debts that you personally owed that

22    Kast paid on your behalf; correct?

23         A    Are you referencing the credit cards?

24         Q    The G Wagon, the credit cards, the trips, the

25    whatever else that you have --
```

Page 185

1      A     Personal expenses could be paid on my behalf.

2      Q     Okay.  And I thought you told me a third thing

3  that could result in Kast sending you a Form 1099

4  nonemployee compensation form.

5      A     I don't think -- I think those are the two.

6      Q     Okay.  And as you sit here today, you can't

7  tell me when, how, or anything this 326,633 came into

8  being; correct?

9      A     The accounting team would go through the

10  transactions and would classify the business ones as

11  business and the personal ones as compensation, and

12  that's where this number comes from.

13      Q     Okay.  If you'll turn over to the second page,

14  Colin Thomson, 4421 Mary Ellen Avenue, Sherman Oaks, in

15  2022, it appears that you were given nonemployee

16  compensation of $346,959; correct?

17      A     Yes.

18      Q     And if you turn over to the third page,

19  $79,000 of nonemployee compensation from Kast Media;

20  correct?

21      A     Yes.

22      Q     And is the difference there what you testified

23  earlier about the downturn in the podcasting business in

24  2023?

25      A     No, I chose to take smaller compensation due

Page 186

1    to the company's distressed financial situation.

2         Q    Kast Media, Inc., was distressed, as we've

3    seen with the emails with Ishwar Singh, as of May of

4    '22; correct?

5         A    Actually, no.  I wouldn't say so.  Our highest

6    revenue month ever was either June or July of 2022.

7         Q    Okay.  So when did Kast Media, Inc. start to

8    become distressed financially?

9         A    The very end of 2022, beginning of 2023.

10        Q    And why was that?

11        A    Because we -- the downturn in the podcast

12    economy.

13        Q    To what do you attribute that?

14        A    I mean, obviously, that's a -- quite a bit of

15    speculating going on about the nature of the industry,

16    but --

17        Q    Well, you just said --

18        A    It's borne out by a lot of different, you

19    know, articles written in the various publications about

20    the industry.

21        Q    So you'd had hard times put on Kast Media as

22    of early 2023; correct?

23        A    What's the question?

24        Q    My question is something, the podcast

25    industry, the downturn, or something had put hard times

                                              Page 187

1    on Kast Media; right?

2         A    I think you would find that -- you

3    would -- you would find that most everyone within the

4    podcast industry in a capacity of selling advertising

5    would -- would say that that was absolutely the case.

6         Q    So everybody was going through hard times?

7         A    Yeah, the industry as a whole went through a

8    distressed time or a downturn.

9         Q    And that was before you'd ever started having

10   any disputes with Brian Last and Jim Cornette; correct?

11        A    What was before?

12        Q    The hard times put on you.  You started having

13   hard times put on you in your business in early 2023,

14   before Brian Last and Jim Cornette refused the

15   PodcastOne deal in the summer of 2023; correct?

16        A    Yes.

17        Q    All right.  Is there any other factors that

18   put hard times on Kast Media in early 2023?

19        A    I believe that the major cause of the

20   distressed financial situation was the revenue per

21   download decrease that we saw.

22        Q    Do you think that the 700, almost 800 thousand

23   dollars that you drew personally might've put hard times

24   on Kast Media, Inc.?

25        A    No.

                                        Page 188

1       Q     Do you think maybe the G Wagon payments and

2    the Tesla payments and the $10,000 a night Wynn's suites

3    in Vegas, that didn't help put hard times on Kast?

4       A     What's the question?

5       Q     My question is did the personal trips, the

6    credit card -- personal credit card payments --

7       A     My compensation?

8       Q     Yes.

9       A     No.

10      Q     All right.  Let's talk about your

11   compensation.  How many hours were you working?

12      A     I --

13              MS. COHEN:  When?

14              THE WITNESS:  Yeah, what time period?

15   BY MR. NEW:

16      Q     In -- well, and let's take 2021.  You drew

17   $326,000 out of Kast Media.  How many hours a week were

18   you averaging in 2021?

19      A     I don't know.  A lot.

20      Q     More than 40?

21      A     Yeah, for sure.

22      Q     More than 50?

23      A     Yeah, for sure.

24      Q     More than 60?

25      A     Might've been in the 60 range.

Page 189

1    Q    Okay.  Same for 2022?

2    A    Yep.

3    Q    Same for 2023?

4    A    Yep.

5    Q    Same for 2024?

6    A    Yep.

7    Q    Before we get with the -- we'll clean up some

8    stuff before we get back around to the tax returns and

9    the credit card and bank statements.

10        So my question for you is this.  The pandemic

11    started in March of 2020.  Kast Media ceased to exist

12    April 7, 2020.  Kast Media, LLC ceased to exist April 7,

13    2020.  Why was Kast Media, LLC receiving $64,484 in PPP

14    loan?

15                (Exhibit 12 was marked for

16                identification.)

17    A    I didn't file the paperwork, but I think you

18    would find a -- a variety of Kast Media, LLC

19    designations still floating around during the time after

20    the conversion.

21    Q    Did Kast Media, LLC have 15 people

22    working -- Kast Media, LLC or Inc. have 15 people

23    working for it at the time that the PPP loan was applied

24    for?

25    A    I don't know for sure.

Page 190

1    Q    If you go to this and you look, it says "Kast

2    Media, LLC," and this is from federal government

3    website.

4    A    Yeah, I didn't prepare the PPC [sic] document,

5    although I think -- I think 15 people working for us,

6    like, yeah, probably we did.  But I don't know for sure.

7    Q    Okay.  And that's all I'm asking, if you think

8    ballpark -- whether it was Wells Fargo Bank or someone

9    reported 15 jobs, if you think that's about right.

10    A    Yeah, I think that's probably about right.

11    Q    Okay.  Now, for industry educational services,

12    that's not right.  Kast Media, LLC was not in the

13    educational services business; was it?

14    A    No, it wasn't, although Sight Reading Academy

15    was.

16    Q    Sight Reading Academy wasn't in business when

17    the pandemic hit?

18    A    Yeah, I'm just thinking about, you

19    know -- never really thought about that might be the

20    reason why something got checked automatically, because

21    that was a music education company that I created.

22    Q    So this was a document that was provided to us

23    in the documents that were provided pursuant to the

24    notice.  Did you prepare this?

25    //

Page 191

1                    (Exhibit 13 was marked for

2                    identification.)

3        A    Yes.

4        Q    "Kast leased space at 7111 Hayvenhurst and

5    1480 Vine Street, 1801."  We've talked about those

6    today.  Kast had/has no relationship with Unit 1102, nor

7    24350 Sterling Ranch property.  Is that also, in

8    addition to being provided in the document, your sworn

9    testimony here today?

10       A    Yes.

11       Q    This is a document Bates stamped Kast 000003.

12   "There is no relationship between Kast and 24350

13   Sterling Ranch, Canoga properties.  Sight Reading

14   Academy was the LLC name used in a previous business

15   prior to 2016 and was converted into Kast Media when

16   Kast started podcasting activities."

17              Is that also correct?

18                    (Exhibit 14 was marked for

19                    identification.)

20       A    Yes.

21       Q    Let me know when you're ready to answer this.

22       A    Yep.

23       Q    What is this document?  It was provided at

24   Kast 000002.

25   //

                                        Page 192

1          (Exhibit 15 was marked for

2          identification.)

3      A    This is an A/P aging summary dated March 13,

4    2024.

5      Q    What does it show us?

6      A    The A/P aging for Kast Media as of March 13,

7    2024.

8      Q    In other words, it's the money that you owe

9    podcasting partners and others as of the day that Kast

10   Media, Inc. filed bankruptcy; right?

11     A    This is our accounts payable summary, yes.

12     Q    Now, go over to page 2, please.  "Termination

13   and release, 2, minus $2,548,274.08."  Do you see that?

14     A    Yes.

15     Q    Where did that number come from?

16     A    I didn't prepare these documents, but I

17   believe that that was the amount owed to various

18   podcasters who ended up taking the PodcastOne deal and

19   releasing Kast of the amount that Kast owed them.

20     Q    Okay.  So that amount of 2,548,274 and 8

21   cents, that is yet another benefit to Kast of the

22   agreement with PodcastOne; correct?

23     A    Yes, to Kast and all of its stakeholders.

24     Q    I will ask you again.  Did Brian Last or Jim

25   Cornette benefit in the least by PodcastOne striking a

                                         Page 193

1    deal for 2 and a half million dollars with your other

2    podcasting partners?

3        A    All Kast stakeholders benefited from the deal

4    because it improved Kast's financial position, and, like

5    I pointed out before, they were offered a very favorable

6    deal from PodcastOne to accept a similar offer.

7        Q    Okay.  Even with PodcastOne buying out some of

8    your other podcast partners to the tune of $2.5 million,

9    you still had to file bankruptcy and put Kast Media,

10   Inc. in bankruptcy; didn't you, Mr. Thomson?

11       A    What's the question?

12       Q    My question is despite PodcastOne paying some

13   of your podcast partners upwards of $2.5 million, you

14   still had to file Kast into bankruptcy; didn't you?

15       A    Kast did file bankruptcy.

16       Q    Yes.  So the benefit that everybody got as a

17   result of this PodcastOne deal didn't prevent Kast from

18   having to file bankruptcy; did it?

19       A    Kast did file bankruptcy.

20       Q    Right.  Despite the deal from PodcastOne?

21       A    Kast did file bankruptcy.

22       Q    All right.  And the 4.759 million is what you

23   owe everybody else who didn't take the 2 and a half

24   million dollar PodcastOne deal; correct?

25       A    This is our accounts payable summary.

Page 194

1      Q     Yeah, and that's what you listed.  If you want

2   to look at your petition, I believe that's what you list

3   as what Kast owed; correct?

4      A     Yeah, that's an -- an accounts payable

5   summary.

6      Q     All right.  And just so that the record is

7   clear, on page 1 of that document, you have Brian Last,

8   $250,442.79; correct?

9                MS. COHEN:  I think it's 248, and --

10               MR. NEW:  No, you're at CBS Interactive

11  Inc.

12               MS. COHEN:  I'm showing --

13  BY MR. NEW:

14     Q     Brian Last, 250,442 and 79 cents; correct?

15     A     Yes, I believe that's right.

16     Q     All right.  What'd you owe Logan Paul?  I was

17  curious.  About 350 grand; right?  Yeah, Impaulsive with

18  Logan Paul; correct?  336,714.

19     A     What's the question?

20     Q     You owed Logan Paul 336,714; correct?

21     A     So Kast's debt to payable balance with

22  Impaulsive with Logan Paul was a total of $336,714.27 as

23  of March 13, 2024.

24     Q     All right.  And this document also tells us

25  that the 250,442.79 had been owed to Brian Last,

Page 195

1    Arcadian Vanguard, and Jim Cornette for 91 days or more

2    at that point; correct?

3        A    Yes.

4        Q    Let me know when you're ready.

5        A    Yeah, I'm ready.

6        Q    "PodcastOne paid Brendan Schaub 1.6 million

7    while other Kast podcasters were asked to accept pay

8    cuts."  That's the headline of the billboard.com

9    article; correct?

10                    (Exhibit 16 was marked for

11                    identification.)

12                    MS. COHEN:  I'm going to object to this

13    document.  It's not authenticated.  It's hearsay.

14                    THE WITNESS:  Yeah, it's a lot of

15    hearsay.

16                    MR. NEW:  Just put a good nonspeaking

17    objection on the record.

18                    MS. COHEN:  That's my objection.

19                    MR. NEW:  And I've got some questions

20    about it, if you want.

21                    MS. COHEN:  That's my -- my objection is

22    that it's not admissible, it's hearsay, and it's not

23    authenticated.

24    BY MR. NEW:

25        Q    All right.  So did PodcastOne pay Brendan

Page 196

1    Schaub $1.6 million?

2         A    I can't speak to PodcastOne's deal with

3    Brendan Schaub.

4         Q    Did Brendan -- or did Kast Media owe Brendan

5    Schaub money?

6         A    Yes.

7         Q    How much and for what period of time?

8         A    I don't recall the exact amount, and I don't

9    recall the exact period of time.

10        Q    So do you think it's just coincidence, Mr.

11   Thomson, that PodcastOne paid Brendan Schaub $1.6

12   million, a podcaster that you owed seven figures plus?

13   Is that a coincidence?

14             MS. COHEN:  Objection, argumentative,

15   assumes facts not in evidence.

16   BY MR. NEW:

17        Q    No, you've said as the CEO you don't know how

18   much you owed Brendan Schaub and for what period of

19   time; remember?  I asked you just about two minutes ago

20   what you owed Brendan Schaub and for what period of

21   time, and you as the CEO of Kast Media said you couldn't

22   tell me; remember that?

23        A    What's your question?

24        Q    Yeah, my question is you can't remember

25   telling me two minutes ago that you don't know how much

                                          Page 197

1    you owed Schaub or for what period of time; correct?

2        A    Yeah, I don't remember the exact amounts.

3        Q    And this article doesn't refresh your

4    recollection about anything; right?

5        A    This article's, like -- this is Billboard.

6        Q    Okay.  I tell you what.  We'll subpoena Mr.

7    Schaub.  We're going to talk to PodcastOne, so I guess

8    we can question them about what PodcastOne paid on Kast

9    Media's behalf; correct?

10        A    You can do whatever you want.

11            MS. COHEN:  Objection, calls for a legal

12    opinion.

13   BY MR. NEW:

14        Q    All right.  Did you owe Brendan Schaub more

15    than a million dollars?

16            MS. COHEN:  By "you," do you mean Kast?

17            MR. NEW:  Yes.

18   BY MR. NEW:

19        Q    Did Kast owe Brendan Schaub more than a

20    million dollars?

21        A    I don't recall the exact amount, but it

22    was -- it -- it was significant.

23        Q    And Brendan Schaub isn't listed as a creditor

24    on your bankruptcy; is he?

25        A    I would say all the podcasters got good

Page 198

1    offers.  Some chose to take them.  Some chose not to

2    take them.

3        Q    Not my question.

4        A    And your clients got really good offers.

5        Q    Not my question.

6        A    Yeah, I know, but --

7        Q    Brendan Schaub --

8        A    Schaub.

9        Q    Not listed as a creditor in your bankruptcy

10    petition; is he?

11        A    No.

12        Q    How was it that Brendan Schaub got paid 1.6 or

13    whatever he was owed by Kast, and the other podcasting

14    partners didn't?  How did Kast Media, Inc. arrive at

15    that decision-making process?

16        A    That wasn't Kast's decision to make.

17        Q    It was Schaub's?  Whose was it?

18        A    Correct.  It was Schaub's decision, because he

19    entered into a contract.

20        Q    With whom?

21        A    PodcastOne or Courtside.

22        Q    And once again, a deal that PodcastOne is

23    making that benefits Kast Media, Inc.; correct?

24        A    And all Kast stakeholders.

25        Q    Brian Last, Arcadian Vanguard, Jim Cornette

Page 199

 1    receive a single penny after PodcastOne's deal with

 2    Brendan Schaub?

 3        A    They're in a better position to receive more

 4    because of the deal.

 5        Q    Under your plan, you keep talking -- we're

 6    going to get to the good deal that was offered to

 7    Arcadian Vanguard with PodcastOne.  We're going to talk

 8    about PodcastOne's stock price.  But under your plan,

 9    how much is Arcadian Vanguard supposed to receive, Mr.

10    Thomson?

11        A    I don't know.

12        Q    It's about 3 and a half cents on the dollar;

13    isn't it?  About $8,700?

14        A    The plan allows for two paths, one, taking the

15    net disposable income calculation; or, two, getting

16    equity.

17        Q    Why in the name of God Almighty would Brian

18    Last and Jim Cornette want a stake in a company that's

19    lost $5.8 million in four to six years?

20             MS. COHEN:  Objection, argumentative.

21    BY MR. NEW:

22        Q    Why in the name of God Almighty would they

23    want a stake in your company, Mr. Thomson?

24             MS. COHEN:  Objection, argumentative,

25    calls for a legal conclusion.

                                            Page 200

1    BY MR. NEW:

2        Q    Why?

3        A    What's your question?

4        Q    My question is why in the name of God

5    Almighty --

6        A    I can't speculate about what their -- what

7    their best interest is, but --

8        Q    Do you believe it's in their best interest to

9    invest in a company that's lost about $6 million over

10   six years?

11       A    I believe that our plan -- I believe that our

12   plan is a -- a fair and generous plan.

13       Q    I didn't ask you whether it's a fair and

14   generous plan.  I asked you whether -- why in the name

15   of God Almighty somebody would want to invest in Kast

16   Media, Inc. when it's lost $6 million almost in either

17   four or six years.

18            When did Rod Thomson and Matthew Yu obtain

19   their ownership interests in Kast Media, Inc.?

20       A    I don't recall the date exactly, but it was

21   probably around 2021.

22       Q    And how did that come about?

23       A    I gave it -- I personally gave them some of my

24   shares as a gift.

25       Q    Has Kast Media had in the last five years any

Page 201

1    commercial general liability or any other types of

2    insurance policies?

3        A    Yeah.

4        Q    Can you tell me what those are?

5        A    I don't recall all the details, but I know we

6    had some E&L, and we had some general liability.  And we

7    currently have the insurance that is required.

8        Q    Who are the insurance companies that you've

9    had CGL and EL with?

10       A    I believe they were with Hiscox, and I don't

11   remember if there was other ones in the past.

12       Q    Can you spell that?

13       A    H-I-S-C-O-X.

14       Q    And did you have an agent for that?

15       A    No, we didn't have a direct representative or

16   a specific individual who was our agent.

17       Q    Who coordinated with Hiscox for these

18   insurance policies?

19       A    Either I did or the accounting team or at

20   other times people related to productions.

21       Q    Whatever this next exhibit is, we'll make this

22   as a collective.

23            MS. COHEN:  This was the W-2 that you

24   told us we hadn't turned over.  I guess it's here.

25   Exhibit what, 17?

Page 202

1              (Exhibit 17 was marked for

2              identification.)

3              MR. NEW:  No, that's for 2014.  I believe

4    the W-2 that I was seeking was another year.

5              MS. COHEN:  We're ready.

6    BY MR. NEW:

7         Q    Okay.  All right.  Let's start going through

8    your tax returns.  2018, Kast Media, LLC, a W-2 for

9    $18,000; correct?

10        A    Where?

11             MS. COHEN:  Right here.

12             THE WITNESS:  Yeah, that says 18,000.

13   BY MR. NEW:

14        Q    So it looks like in 2018, Kast Media, LLC paid

15   you $18,000; correct?

16        A    Yes.

17        Q    In W-2 wages; correct?

18        A    Yes.

19        Q    All right.  Go over to the next page, 1040, US

20   Individual Income Tax Return, Married, Filing Jointly,

21   you and Christine Thomson.  That's the 1480 Vine Street,

22   Apartment Number 1102.

23             I thought you told me when we looked at the

24   2021 nonemployee compensation that at that time, you

25   were living at 4421 Mary Ellen Avenue, Sherman Oaks.

                                        Page 203

1     A     What's the question?

2     Q     My question is this shows your address as 1480

3  Vine Street, 1102.

4     A     Yep.

5     Q     Was that your home address in 2018?

6     A     Yes, I believe so.  I believe so, according to

7  this.

8     Q     I'm asking --

9     A     But this was filed the next year; right?  But

10  still -- yeah.

11     Q     I'm asking where you lived.

12     A     I believe it -- it would've been here, and I

13  don't remember exactly the date that we moved in.

14     Q     When did you live in Sherman Oaks?

15     A     During 2020 and 2021.

16     Q     Okay.  And just so the record's clear, you

17  have -- you didn't have multiple residences in Southern

18  California in between 2018 and 2024; did you?

19     A     No.

20     Q     If you go over to the profit or loss from

21  business, the Schedule C to the 1040.

22     A     Schedule C.  That's 795?

23     Q     Yes.  It has: "Media advertising.  Business

24  name, Sight Reading Academy.  1480 Vine Street, Suite

25  1801.  Gross receipts or sales of $661,356"; correct?

Page 204

1        A     Yep.

2        Q     Now, on expenses, "Car and truck expenses,

3    $5,074."  Was Kast Media, LLC paying car and truck

4    expenses as far back as 2018?

5        A     It looks like we have 5,074 in car and truck

6    expenses in 2018.

7        Q     So the answer to my question is that yes, Kast

8    Media, LLC was paying your car and truck expenses as far

9    back as 2018; correct?

10       A     Yeah, the -- we have car and truck expenses of

11    $5,074 in 2018.

12       Q     The rent or lease under number 20B, 88,278,

13    what is that?

14       A     I don't know.

15       Q     What business property was Kast leasing?

16             MS. COHEN:  I'm sorry.  I'm having

17    trouble finding where you're talking about.

18             THE WITNESS:  I think it's here.

19             MR. NEW:  Box 20B on the Schedule C.

20             MS. COHEN:  Okay.  "Rent or lease," and

21    then "Other business property"?

22             MR. NEW:  Yep.

23             MS. COHEN:  Got it.  Thank you.

24             THE WITNESS:  I don't remember what that

25    was for.

                                        Page 205

1    BY MR. NEW:

2        Q    Was it 1480 Vine Street, Suite 1801?

3        A    It may have been.

4        Q    What was the rent at 1480 Vine Street, Suite

5    1801?

6        A    It was around $11,000 per month.

7        Q    So on 12 months, that'd be what, 121,000 in a

8    year?

9        A    Mm-hmm.

10       Q    Is that yes?

11       A    On 12 month -- 12 -- you want me to do the

12   math?

13       Q    Twelve times eleven.

14       A    Twelve times eleven is $121,000, I think.

15       Q    All right.  And you're showing here a net

16   profit, net profit of $63,643 in 2083 -- in 2018;

17   correct?

18       A    Thirty-one, "Net Profit or Loss, $63,643."

19       Q    All right.  Go to the 2019 return, please.

20            MS. COHEN:  Mr. New, where did you get

21   these?

22            MR. NEW:  From you.

23            MS. COHEN:  Will you produce them

24   when -- oh, I see.  There's a Bates label on them.  I

25   didn't see it.

Page 206

1           MR. NEW:  There's a Bates number at the

2     bottom.

3           MS. COHEN:  I had -- couldn't see the

4     Bates at first.  Thank you.

5     BY MR. NEW:

6     Q     Let me know when you've reviewed it.

7     A     I'm looking at it.

8     Q     Okay.  Do you know why your home address of

9     1480 Vine Street, Apartment 1102 would be listed as Kast

10    Media, LLC's address on your tax form to the federal

11    government, Mr. Thomson?

12    A     Yeah, I don't know why 1102 is on here.

13    Q     Okay.  All right.  Going down, "Total

14    income" -- I'll ask you.  You've still got your 2018

15    return in front of you.  What was total income for 2018,

16    like 661 or something; right?

17    A     661,356.

18    Q     661,356.  So total income, 2019 jumps to

19    $2,693,664; correct?

20    A     Yep.

21    Q     Okay.  How did that happen?  661.  Was it 2.4?

22    That'd be a 400 percent -- so you're talking about a 450

23    percent increase in gross income; correct?

24    A     Yep.

25    Q     Thereabout -- I mean, that's ballpark math;

Page 207

1    right?

2        A    Yep.

3        Q    But it's pretty close; right?  Now, what I

4    don't think I have for the 2019 is a Schedule C.  Can

5    you find for me in the 2019 return a Schedule C?

6        A    I don't see anything that says Schedule C on

7    it.

8            MR. NEW:  All right.  Counsel, I'd ask

9    you to supplement the 2019 return so that we can tell

10   what the business expenses in 2019 were.

11   BY MR. NEW:

12       Q    And we can't tell from this exhibit, can we,

13   Mr. Thomson, what the net profit to Kast Media was for

14   the 2019 tax year; correct?

15       A    I don't know.

16       Q    I mean, if you can look in that form and find

17   for me what the net -- because we knew on 2018 that the

18   net was about 63K.  On gross, it was 661.  So what I'm

19   asking is if you can look at the 2019 and tell me what

20   the net is.

21       A    I don't see a number that would be met on

22   this.

23       Q    Okay.  I don't, either.  All right.  Let's go

24   to the 2020 LLC return of income.  All right.  Gross

25   income of $1,591,874; correct?

Page 208

1        A     Yep.  Yep.

2        Q     And again, I don't see itemizations.  I don't

3    see business expenses.  I don't see losses.  I don't see

4    podcasts or payouts.  None of the stuff that we see from

5    2018 do we see in the 2020 return; correct?

6        A     I don't see -- I don't see -- I haven't gone

7    through it.  I don't see a net income on this.

8        Q     All right.  Let's go to the 2021 tax return,

9    please.

10                 MS. COHEN:  How are we doing on time?

11                 MR. NEW:  How are we doing on time, Mr.

12    Videographer?

13                 I don't think he can hear us.

14                 THE VIDEOGRAPHER:  Yeah, one moment.

15                 MR. NEW:  Okay.

16                 THE VIDEOGRAPHER:  We're at five hours

17    and six minutes.

18                 MR. NEW:  Okay.  Good.

19    BY MR. NEW:

20        Q     All right.  Take a look --

21                 MS. COHEN:  Just for the record, I'm not

22    going to be able to stay until 6:30, so --

23                 MR. NEW:  Want to come back tomorrow

24    morning?

25                 MS. COHEN:  Possibly.

Page 209

1          MR. NEW:  I get seven hours, and you

2     didn't -- I'm here from West Virginia, and you didn't

3     advise me there were any limitations on my deposition.

4     I have a flight out at 7 a.m.

5          MS. COHEN:  Yeah.  Yeah, we were here at

6     ten.  We didn't start at ten.  We asked for a 30-minute

7     break.  You ended up taking quite a bit longer, so --

8          MR. NEW:  No, I didn't.

9          MS. COHEN:  Okay.

10          MR. NEW:  No, you took a break at about

11     12:35, and we were back at 1:00.  I didn't even want to

12     take a lunch break.

13          MS. COHEN:  We were back before you were

14     for -- by, like, 30 minutes.  We were sitting right

15     here.

16          MR. NEW:  No.  All right.  You're making

17     misrepresentations on the record.  I walked in at a

18     couple of minutes after one.  But the video record will

19     bear out when we started back.

20          MS. COHEN:  Yes, it will.

21          MR. NEW:  But I'm not going to let you

22     mispresent this.  Now, I've got seven hours with this

23     deposition, and I intend to take it.  I have a flight

24     out at 7 a.m. tomorrow from LAX, because I didn't plan

25     on being out here an extra day.  So I'm going to finish

Page 210

1    my examination.

2              I have 1 hour and 54 minutes left, not

3    counting improper objections that you've made.  I plan

4    on taking it, so let's just go ahead and get about it.

5    It's 4:27.  I plan to be here for another hour and 54

6    minutes.  Let's get about it.  Okay.

7              MR. VIDEOGRAPHER:  Sorry to interrupt.

8    Could we take, like, a five-second break, and I'm going

9    to change the card?

10             MR. NEW:  Yep.

11             MR. VIDEOGRAPHER:  We're now going off

12   the record.  The time is 4:27 p.m.

13             (Off the record.)

14             THE VIDEOGRAPHER:  We're now going back

15   on the record.  The time is 4:34 p.m.

16   BY MR. NEW:

17       Q    All right.  Mr. Thomson, take a look at page 1

18   of the federal income tax summary.  It is Bates stamped

19   Kast 826 on the bottom, please.  You see that?

20       A    Yep.

21       Q    Now, that has gross receipts at 5,932,196.

22   The California Form 568 that we were given in this case

23   has total income Schedule IW 1,591,874.  Which of those

24   numbers do you believe accurately reflects the gross

25   income of Kast Media for the year 2020?

                                        Page 211

1      A      What's the -- what's the California one that

2      you're referencing, document?

3      Q      2020, 1,591,874.

4      A      In the year 2020?

5      Q      That's what we were provided in this case.

6      Yes.

7      A      And what -- where is that?

8             MS. COHEN:  There it is.

9             THE WITNESS:  Oh, okay.  I don't know.  I

10     didn't prepare these tax returns.

11     BY MR. NEW:

12     Q      So you don't know whether Kast Media, Inc. had

13     $5,932,196 of gross income or $1,591,874 for the tax

14     year 2020?

15     A      No, I don't know what the cause of the

16     discrepancy would be.

17     Q      Now, let's look at the federal income tax

18     return that was filed for 2021.  Do you believe that

19     Kast had gross receipts of 15,132,245 in 2021?

20     A      Yes, that's what it says here.

21     Q      What is the cost of goods sold?  What goods

22     was Kast Media, Inc. selling in 2021?

23     A      I don't know what all would be in that line

24     item.

25     Q      Did you ever ask your CPA what that line item

                                        Page 212

1    is?

2         A    No.

3         Q    "Gross profit, 14,925,338."  Do you see that?

4         A    Gross profit, 14,925,338?  Yeah.

5         Q    Yes.  All right.  "Total income, 14,925,338."

6    So we see here that beginning in 2021, you start paying

7    yourself through Kast $200,200; correct?

8         A    The line item "Compensation of Officers" shows

9    $200,000 -- $200,200.

10        Q    And you were the only officer of Kast Media in

11   2021; correct?

12        A    Yes, I believe so.

13        Q    By the way -- I'll ask your -- I tell

14   you -- I'll ask your accountant when I come out here and

15   depose him.  The tax return is in the name of Kast

16   Media, LLC; correct?

17        A    It shows Kast Media, LLC up here.

18        Q    But Kast Media, LLC didn't operate in 2021;

19   did it?

20        A    Yeah, that's consistent with what I said

21   earlier about, you know, not all documents were updated.

22   The LLC thing floated around.

23        Q    All right.  "Salaries, Wages, Less Employment

24   Credits, $1,554,015."  Do you see that?

25        A    "Salaries, Wages, Less Employment Credits,

Page 213

1    1,554,015."  Yep.

2        Q    All right.  So if I add these together and you

3    have $200,200 and we have your 1099 at 326,633, it

4    appears that your total compensation would've been

5    $526,833; correct?

6        A    I don't know.

7        Q    Well, take the two documents.  I'll hand you

8    mine.  That's the 2021 NEC and the 200,200 listed in the

9    federal tax return, and if you add those numbers

10   together, your income for 2021 would've been $526,833;

11   correct?

12       A    I don't know where Howard put my compensation

13   on this tax return.

14       Q    All right.  We'll take a look.  We'll keep

15   going through it.  So that was going to be my next

16   question.  Is the 326,633 a part of the 1,554,000

17   depicted as salaries, wages, less employment credits?

18       A    I don't know.

19       Q    "Repairs and maintenance, $12,002."  Repairs

20   and maintenance of what?

21       A    I don't know.

22       Q    "Rents, 266,855."  What was Kast Media paying

23   rent on in 2021 at $266,855?

24       A    I don't know, but I do think that we had a

25   larger rent line item here, because we had some

Page 214

1    crossover between, you know, our old lease with -- at

2    1801 and our new lease at 7111 Hayvenhurst.

3        Q    So you might've paid rent or double rent in

4    2021 on more than one place?

5        A    Yeah, for a period of -- of crossover time,

6    potentially.  I don't know exactly.

7        Q    When you had rent at 7111 Hayvenhurst, what

8    was the amount of that rent?

9        A    It was around 11,000.

10        Q    So your rent payment didn't go up in 2021.

11    You just changed locations; correct?

12        A    Yeah, I think that they were similar amounts.

13        Q    Now, depreciation is listed here at $86,649.

14    Depreciation on what, Mr. Thomson?

15        A    I don't know.

16        Q    "Advertising, $82,206."  Where was Kast Media

17    advertising in 2021 to the tune of $82,206?

18        A    I don't know.

19        Q    Did Kast make money or lose money in 2021?

20        A    This document, line 28 shows taxable income of

21    negative 1,378,009.

22        Q    So Kast Media lost $1.378 million in 2021;

23    correct?

24        A    This document shows taxable income, line 28,

25    of negative 1,378,009.

Page 215

1    Q    And so the answer to my question is, "Yes,

2    you're correct.  Kast Media lost $1,378,009 in 2021";

3    correct?

4    A    Yeah, this document shows taxable income, line

5    28, of negative 1,378,009.

6    Q    You have no reason to dispute what the tax

7    document shows; do you?

8    A    No.

9    Q    And if you'll go over to Kast Bates number

10   832, that's the Delaware Division of Revenue.  You told

11   the State of Delaware that you lost $1,374,088; correct?

12   A    This document shows estimate, Delaware taxable

13   income for the year, negative 1,374,088.

14   Q    Just so that the record is clear, you can't as

15   you sit here today explain a single one of these figures

16   in any of these line items on this US corporation income

17   tax return for the year 2021; correct?

18   A    I didn't prepare these tax documents.

19   Q    It's not my question.  I didn't ask if you

20   prepared this document.  My question is you can't

21   explain a single line item, what it is, what it was for,

22   how it was arrived at; correct?

23   A    I don't think that's accurate.  I -- I gave

24   you an answer as to why the rent was larger in

25   that -- in that year.

Page 216

1        Q      "Cost of goods sold."  Can you tell me what

2    that is --

3                    MS. COHEN:  Asked and answered.

4                    MR. NEW:  No.

5                    MS. COHEN:  Objection, asked and

6    answered.  You've asked him cost of goods sold.

7    BY MR. NEW:

8        Q      You can't tell me what that -- other than the

9    rents, can you tell me what any of the others are or how

10   they were arrived at?

11       A      What are you asking?  What -- what -- which

12   one are you asking about?

13       Q      Okay.  He's opened the door now.  "Income,

14   salaries and wages, $1,554,015."  How did that number

15   come about?

16       A      Where is it?

17       Q      I'm looking on the page that's Bates stamp

18   numbered 836 on the bottom.

19       A      All right.  What's the question?

20       Q      Yeah, my question is 1,554,015 in salaries and

21   wages, explain how that came about.

22       A      I believe that's our salaries and wages.

23       Q      How many employees?

24       A      In the year 2021?

25       Q      Mm-hmm.

                                              Page 217

1        A    I don't know.  Probably 20 to 30.

2        Q    What you can't tell me is whether that 1.554

3    included your 326 of miscellaneous income; correct?

4        A    No, I don't know.

5        Q    All right.  Turn over to Bates number 846,

6    please.

7        A    Okay.

8        Q    The deductions, 13,790,839, are you able to

9    explain all of those to me?

10        A    Am I able to explain all of those to you?

11        Q    Yes.

12        A    I didn't prepare this tax return.

13        Q    So the answer is no, you can't explain all of

14    the deductions that are listed on Statement 1 at Bates

15    number 846; correct?

16        A    I probably couldn't tell you what they -- what

17    all of them contain.

18        Q    We know there's 10,300 auto and truck.  That's

19    your Mercedes and Tesla; right?

20        A    Those are auto expenses.

21        Q    "Bank charges, $10,477."  How do you end up

22    with $10,477 of bank charges?

23        A    I don't know.

24        Q    "Computers and software, 57,799."  What's

25    that?

Page 218

1       A    Well, the company had computer expenses.

2   They -- we had computers in our studio that we used, and

3   obviously, we -- like I said, we had to pay for Adobe

4   software and other software.

5       Q    How many computers did Kast have in 2021?

6       A    I don't know.  They were -- I think they were

7   all in the studio.  There must've been six or seven of

8   them, maybe.

9       Q    Macs or PCs?

10      A    We mostly used Macs, I think.

11      Q    "Consulting fees, $384,368."  Who got $384,000

12  of consulting fees from Kast in 2021?

13      A    I don't know what all is contained in that

14  line item.

15      Q    "Hiring, $18,015."  What is hiring?

16      A    That would be LinkedIn and/or ZipRecruiter

17  fees.

18      Q    "Hosting, 75,594."  What's that?

19      A    That's what we had to pay for the various

20  hosting providers that we worked with, whether Libsyn or

21  Art19, Megaphone, et cetera.

22      Q    "Insurance, 218,601."  What's that?

23      A    That would've been the E&O and stuff that we

24  talked about before.

25      Q    Through Hiscox?

Page 219

1      A      Yep.

2      Q      Legal and professional fees of $664,000 that

3   year; correct?

4      A      Yes.

5      Q      Meals.  Are all those -- $18,974 in meals.

6   How does that come about?

7      A      What's the question?

8      Q      How do $18,974 in meals come about?

9      A      What kind of answer are you --

10      Q      An honest one would be preferable.

11      A      Those are meals.

12      Q      All business-related?

13      A      Yes, of course.

14      Q      I mean, don't look at me like I've got two

15   heads.  I mean, you've testified here today that Kast

16   pays personal expenses.

17      A      That's taken as income.

18      Q      All right.  So any meal that you would've

19   eaten would've gone into the 326,633 as miscellaneous

20   income to you for that year; right?  This is all $18,974

21   worth of legitimate business expense; right?

22      A      I believe that all of our meal expenses

23   would've been legitimate business expenses.

24      Q      All right.  What is office expense, 185,482?

25      A      I don't know what all is contained in this,

Page 220

1    but this probably would've been, you know, costs

2    associated with running the studio.

3         Q    Like what?

4         A    You know, paper, printers, various, you know,

5    things that they need to restock on.  Snacks for the

6    studio, you know, all that stuff.

7         Q    "Show marketing and production expenses,

8    1,168,410."  Give me some examples of those.

9         A    Show marketing and production?

10        Q    Mm-hmm.

11        A    This would've been costs associated with

12   marketing podcasts and producing them.

13        Q    Marketing Kast's podcasts or the podcasts of

14   others?

15        A    It's all -- they're all Kast podcasts.

16        Q    Pardon me?

17        A    They're all Kast podcasts.

18        Q    Jim Cornette's Experience and Jim Cornette's

19   Drive-Thru were not, are not Kast's podcasts.

20                MS. COHEN:  Is there a question pending?

21                THE WITNESS:  What's your question?

22   BY MR. NEW:

23        Q    Yeah.  My question -- you said they're all

24   Kast's podcasts.  So my question is were you advertising

25   for your own, your podcast partners, or a combination?

                                        Page 221

1        A     All of -- all of -- for -- for our owned and

2    operated and our partner podcasts.

3        Q     All right.  And you paid out sponsors

4    10,430,000; correct?

5        A     Paid out sponsors?

6        Q     No --

7        A     Sponsor payouts --

8        Q     Sponsor payouts --

9        A     I mean, I think that -- I think that that line

10   item is probably labeled a little bit oddly.  That's

11   probably the payments to podcasters from -- from -- you

12   know, from the sponsor advertising revenue.

13       Q     Sure.  All right.  And so despite

14   doing -- well, how much in business, 15, 132, gross

15   profit of 14,925,000, Kast lost $1,378,009; correct?

16       A     Our taxable income here is negative 1,378,009.

17       Q     All right.  Go to the '22 return.

18             MS. COHEN:  Did you give us that one?

19             MR. NEW:  Yes.  It starts at Bates number

20   874.

21   BY MR. NEW:

22       Q     Let me know when you're ready.

23       A     Yep.

24             MS. COHEN:  I'll share with you.  I can't

25   find it.

Page 222

```
 1                    THE WITNESS:  Oh, okay.

 2      BY MR. NEW:

 3           Q    Gross income, how much?

 4           A    One -- oh, no, "1A, Gross Receipts of Sales,

 5      17,575,881."

 6           Q    "Cost of goods sold, 749,135."  Where does

 7      that come from?

 8           A    I don't know what's contained in the cost of

 9      goods line item.

10           Q    "Total income for 2022, 16,889,408"; correct?

11           A    "Eleven, total income, 16,889,408."

12           Q    "Compensation of officers, 143,231."  The only

13      officer in the company in 2022 is you; correct?

14           A    I believe I was the only officer in the

15      company at that time.

16           Q    "Salaries and wages, 3,485,350."  How many

17      employees or contractors did Kast have in 2022?

18           A    I expect that during this year, we probably

19      got into -- you know, at our -- at our peak, we were

20      around 35 or so, 38.

21           Q    Does that 3,485,000 amount include your

22      346,959 that you took in miscellaneous income that year?

23           A    I don't know.

24           Q    "Rents, 213,278."  What was Kast Media, Inc.

25      renting in 2022?
```

Page 223

1      A    We rented 7111 Hayvenhurst, and there may have

2    been some crossover during this year, too.  I'm not

3    sure.  I forget how long the crossover was, but there

4    was -- there was that period, and I don't know if it was

5    part of this year, too, or not.

6      Q    How are the rents, even if it's 11,000 a month

7    and for -- allowing for a little bit of crossover from

8    1801, $213,000, that's almost 100,000 more in rent than

9    what you're actually paying at 7111 Hayvenhurst.  Got an

10   explanation for that?

11     A    I would have to look at the detail -- detailed

12   transaction report.

13     Q    "Interest, $328,048."  Interest on what?

14     A    I would expect this to be some of the debt

15   facilities we worked with, but I don't have the detail

16   in front of me.

17     Q    All right.  And so in 2022, on a total income

18   of 16,889,408, Kast lost $2,014,647; correct?

19     A    Let's see.  "Twenty-eight, taxable income,

20   minus 2,014,647."

21     Q    And that's despite -- you lost over $2 million

22   despite CapChase pumping 4 million in; correct?

23          MS. COHEN:  Objection, asked and

24   answered, argumentative.

25     A    We had a debt facility with CapChase.

Page 224

1       Q    Of $4 million; right?

2       A    Yeah, the debt facility was actually $6.2

3    million, but I think that the most we drew on it was

4    around 400 -- or 4 million.

5       Q    We'll look at that in a moment.  Turn over to

6    the Form 4562, please.

7       A    What number is that?

8       Q    883.  It's hard to see the Bates.

9       A    Okay.  Here.

10      Q    "Depreciation and amortization."  What is Kast

11   depreciating here?

12      A    Where?

13      Q    On this form, there is depreciation.  What is

14   Kast depreciating?

15      A    Are you saying number 14?

16      Q    I'm just asking.  "Special depreciation

17   allowance and other depreciation."

18      A    Which is number 14; right?

19      Q    Yes, 200 -- or I'm sorry, 24,748.  What is

20   Kast depreciating to the tune of 24,748?

21      A    I don't know within that line item.

22      Q    All right.  Turn over to the next page, 884.

23   The auto and truck charges have gone up to 52,674;

24   correct?

25      A    52,674.  Yes.

                                        Page 225

1    Q    "Commissions, 317,915."  Who earned

2    commissions, $317,000 in 2022?

3    A    The sales team.

4    Q    Who was on the sales team?

5    A    There were probably about ten people on the

6    sales team.

7    Q    Who were they?

8    A    Off the top of my head, in 2022, we would've

9    had Mike Jensen, Maria Hazel, Dave Murcin, Wes -- no.

10   Yeah, Wes O'Dell.  Lila.  I feel bad -- forgetting one.

11   Oh.  Oh, Alex.  I think that that -- I think that

12   would've been everyone on the sales team at that time.

13   Q    Who earned the 346,000 in consulting?

14   A    I don't know who all was in that line item.

15   Q    "Insurance, $365,519."  What is that?

16   A    Those are insurance costs.

17   Q    And the only insurance that Kast had at the

18   time was the E&L policies and the CGL policies through

19   Hiscox?

20   A    I don't know if that's the case.  In 2022, we

21   had to pull out some special insurance for some of the

22   podcast productions that we were doing specific to those

23   productions, so --

24   Q    What kinds were they?

25   A    I don't remember all of the details, but some

Page 226

1    of it was necessary for the productions, and then Warner

2    required us to have some insurance for their

3    productions, too.  So I know that we had to pull out

4    some special stuff.

5         Q    If you go over to the next page, 885, "Loan

6    receivable investment, $25,000."  What's that?

7         A    I don't remember the details of what this was.

8         Q    "FastPay advances" under Statement 6,

9    "1,595,561."  It -- that's the beginning, and then at

10   the end of it, it's zeroed out.  So I take it that

11   FastPay got paid off in the year of 2022?

12        A    Yeah.  If I remember correctly, at the end of

13   2022, we transitioned from working with FastPay to

14   working with CapChase for our line of credit.

15        Q    That was at the end of '21, going into '22;

16   correct?

17        A    Yeah, I --

18        Q    You'd already moved from FastPay to CapChase

19   by '22, when we -- as we saw the emails with Ishwar

20   earlier; correct?

21        A    Yeah, yeah, yeah.  Right.  I think that I had

22   that a year off.  I think we transitioned from FastPay

23   to CapChase probably in December of 2021.

24        Q    All right.  Take a look at the '23 return,

25   please.  And the gross income goes down to what?

Page 227

1      A      Where -- where are we looking at?

2      Q      On Bates number 920.

3      A      920, line item 1A, $7,709,559.

4      Q      All right.  With a total income of 7,492,634;

5   correct?

6      A      "Total income, 7,492,634," in line 11.  Yep.

7      Q      That's a pretty significant drop from the year

8   before; correct?

9      A      Yes.

10      Q      It's about half or more than half, 55 percent;

11   right?

12      A      I would -- it was around -- it's around half;

13   right?

14      Q      Yeah, 16.889 down to 7.492.

15      A      Yeah, right around half.

16      Q      Your compensation's still 136,513; correct?

17      A      "Compensation of officers," line item 12 is

18   136,513.

19      Q      All right.  And you can't tell me whether the

20   79,000 of nonemployee compensation is included in the

21   1,042,173 if I ask you; correct?

22      A      Correct.

23      Q      Rents are down to 40,800; correct?

24      A      Yep.

25      Q      And that's in large part due to the deal that

Page 228

1    you struck with Howie Mandel and his company on the 7111

2    Hayvenhurst; correct?

3         A    Yep.

4              MR. NEW:  Keep the 22 and the 23 returns

5    handy, please.  What exhibit is this?

6              THE OFFICER:  Eighteen.

7              (Exhibit 18 was marked for

8              identification.)

9              MS. COHEN:  Did we provide this?

10             MR. NEW:  No.

11   BY MR. NEW:

12        Q    Let me know when you've reviewed 18 and 19.

13             (Exhibit 19 was marked for

14             identification.)

15        A    Sure.  Yep.

16        Q    Sir, the Kast investor memo dated March 2023,

17   who prepared this?

18        A    This looks to be -- I mean, we didn't provide

19   this memo, but it looks to be a memo that

20   numerous -- multiple members of the Kast team prepared

21   together.

22        Q    And who were those multiple members of the

23   Kast team that contributed to this?

24        A    Myself, Mike Jensen, Harris Lane, Neil Sacker.

25        Q    And what was the purpose of it?

                                        Page 229

 1      A    To communicate with the investors.

 2      Q    Looking to raise money for Kast?

 3      A    Yeah, Kast was looking for additional funding

 4  at the beginning of 2023.

 5      Q    So Kast lost $2,014,647.  Show me in this

 6  where you disclose that to potential investors.

 7      A    I don't think a P&L is provided in this.

 8      Q    I'm not asking about the P&L.  I'm asking

 9  about what you told the federal government and what you

10  told potential investors.  You claimed a $2 million-plus

11  loss in 2022.

12          MS. COHEN:  What was the question?

13  BY MR. NEW:

14      Q    My question is do you disclose $2 million of

15  losses in tax year 2022 to investors in this memo?

16      A    I -- I haven't read back through the whole

17  thing, but it probably wasn't discussed in this specific

18  memo.

19      Q    Okay.  Turn over to page 3, please.  Are those

20  revenue statements on the top chart in page 3 accurate?

21      A    This would have been revenue on an accrual

22  basis, and it's worth noting that the taxes are prepared

23  on cash basis.

24      Q    So that's the reason for the discrepancy?

25      A    If there is one.

Page 230

```
 1        Q    No, I'm asking you.

 2        A    I -- I'm just pointing this fact out.

 3        Q    Is there a discrepancy in what you claimed

 4   with the federal government versus what you're telling

 5   investors?

 6        A    These were absolutely accurate on -- as far as

 7   I understand on an accrual basis.

 8        Q    All right.  Turn over to the next page, page

 9   4.  What are we looking at there in that chart?

10        A    Revenue and COGS.

11        Q    And despite -- again, despite CapChase pumping

12   $4 million into your business the first quarter of 2022,

13   you're losing money; right?

14             MS. COHEN:  Objection, asked and

15   answered, argumentative.

16   BY MR. NEW:

17        Q    Right?

18        A    Oh, I already answered it.

19        Q    Okay.  All right.  How much were you looking

20   to raise with this investor memo?

21        A    I think we say on the front.  "Kast needs to

22   raise 2.5 million of additional capital through equity

23   and/or debt financing."

24        Q    What were you planning to do with that money?

25        A    I don't know.  Do we -- do we specify in here?
```

Page 231

1      Q    I don't know.

2      A    It's been a long time since I -- since I

3  looked at this.

4      Q    I was just asking why you were trying to raise

5  2 and a half million dollars through investors.

6      A    'Cause we were in a tight financial position,

7  as outlined by this, at the time, and we needed it to

8  continue the company.

9      Q    Turn over to page 10.  You say here "Legal and

10 professional fees versus quarter."  Remember when we

11 talked about those?  The reason your legal and

12 professional fees were so high in Q1 '22, fees in

13 association with fighting two lawsuits and NOW CFO;

14 right?

15     A    What's the question?

16     Q    Yeah.  The chart --

17          MS. COHEN:  What is the question?

18 BY MR. NEW:

19     Q    The chart shows that from Q4 of '21 to Q1 of

20 '22, your legal fees went from about 150,000 up to just

21 over 400,000; correct?

22     A    Yeah.  We show a bump in Q1, and we point out

23 in this document fees in association with fighting two

24 lawsuits and NOW CFO.

25     Q    What two lawsuits was Kast fighting in 2022?

                                        Page 232

1        A    We had an employee dispute, and we had a

2    contract dispute.

3        Q    What -- contract dispute with whom?

4        A    A company called X1T, or X-1-T.

5        Q    Which has since been resolved; correct?

6        A    It's -- they're a creditor in the bankruptcy.

7        Q    What's that?

8        A    They're a creditor in the bankruptcy.

9        Q    Were you able to raise the 2.5 million that

10    you were looking for as a result of this investor memo?

11        A    No.

12        Q    Go to Appendix 2 of this, please.

13              MS. COHEN:  Is there a page number?

14              MR. NEW:  Page 23.

15    BY MR. NEW:

16        Q    Minimum guarantees.  That's what MG stands

17    for; right?

18        A    Yes.

19        Q    And so if you turn over to page 24, Kast had

20    8.1 million in minimum guarantees to those podcasters;

21    right?

22        A    Totals at the bottom of this line item

23    document says 8,122,000.

24        Q    Right.  Meaning --

25        A    That's listed as previous MG.

Page 233

1    Q    Right.  Meaning that for some of these, like

2    Chatty Broads; Whitney Cummings; Sarah Silverman;

3    Welcome to the OC, Bitches; Some More News; and so on

4    and so forth, you -- that was a minimum guarantee that

5    Kast said to those podcasters, "We guarantee you'll get

6    at least that much money"; right?

7    A    Yeah, Kast had minimum guarantee obligations

8    with several of its podcasters.

9    Q    As set forth in this appendix; correct?

10   A    Yeah, I believe so.

11   Q    All right.  For $8.122 million.  Now, what

12   you're telling investors here, renegotiated to 2.931

13   million; correct?

14   A    2,931,067.  Yep.

15   Q    Okay.  For a savings of 5,190,333; correct?

16   A    Yep.

17   Q    Now, you didn't have a minimum guarantee with

18   Cornette and Last; correct?

19   A    No.

20   Q    Is what I said correct, that they didn't have

21   a minimum guarantee?

22   A    Arcadian Vanguard did not have a minimum

23   guarantee deal structure with Kast.

24   Q    All right.  So just so that the record is

25   clear, in 2023, you had the benefit of the

Page 234

1     PodcastOne -- I want to make sure that the record is

2     really clear about this.  You have the CapChase

3     PodcastOne deal that benefits Kast; correct?

4          A     What's the question?

5          Q     In 2023, you have the CapChase PodcastOne deal

6     that benefits Kast; correct?

7          A     Yes, we have a deal with PodcastOne that I

8     believe benefits Kast.

9          Q     The deal with Schaub benefits Kast; correct?

10         A     Can't really speak to the deal with Schaub.

11    It's not my deal.

12         Q     All right.  By the way, did you get a finder's

13    fee on the Schaub deal?

14         A     It lays it out in the contract; right?

15         Q     I don't -- I don't have the Schaub contract.

16         A     No, no, no, no.  In the finder's fee contract.

17    If Schaub moved over, then the whole calculation for any

18    finder's fee that goes to Kast is laid out in detail in

19    that finder's fee agreement.

20         Q     Okay.  Was the Schaub deal subject to -- it

21    was subject to the finder's fee agreement; correct?

22         A     Yeah.

23         Q     And can you testify that Kast did, in fact,

24    receive money or whatever it is pursuant to the finder's

25    fee agreement as a result of the Schaub deal?

Page 235

1       A      As of today, we haven't received any value.

2       Q      Sure.  It would go into the escrow agreement?

3       A      It would go into the escrow, and we

4    haven't -- I -- I haven't been notified of, you know,

5    anything going into the escrow, but -- but we're hoping

6    that we can get some -- that Kast will be able to get

7    some value out of the deal.

8       Q      And you also have then these renegotiated

9    minimum guarantees of $5,190,333; correct?

10      A      This line item in this document says

11   "Renegotiated to" -- no, it says "Savings, 5,190,333."

12   Of course, those are moving forward from the date of

13   essentially April 2023.

14      Q      Okay.  So my question for you is despite the

15   CapChase deal with PodcastOne, despite the deal with

16   Schaub, despite renegotiating minimum guarantees in

17   2023, Kast Media still had to go into bankruptcy; didn't

18   it?

19               MS. COHEN:  Objection, argumentative.

20      A      Kast filed bankruptcy.

21      Q      Yeah.  Despite those three things that I just

22   said; right?

23               MS. COHEN:  Objection, argumentative.

24      A      Kast filed bankruptcy.

25      Q      Okay.

                                        Page 236

1              MS. COHEN:  Did we provide this?

2              MR. NEW:  No.

3              This is Exhibit 20; correct?

4              THE OFFICER:  Nineteen.

5              THE WITNESS:  Yeah.

6              MR. NEW:  I'm sorry.  I thought the other

7    one was 19.

8              THE WITNESS:  Oh, yeah.  This one's 19.

9              MR. NEW:  Yeah, the Kast investor memo is

10   19.  This should be 20.

11             THE OFFICER:  Sorry about that.

12             (Exhibit 20 was marked for

13             identification.)

14   BY MR. NEW:

15        Q    What is Exhibit Number 20, Mr. Thomson?

16        A    Looks to be a draft of a podcast agreement.

17        Q    And that podcast agreement was never entered

18   into between Kast and Jim Cornette and Arcadian

19   Vanguard; correct?

20        A    There's no signature on this contract.

21        Q    And you told me earlier that the earlier

22   contract between Kast and Cornette had expired; correct?

23        A    I believe so.

24        Q    Who prepared this document?

25        A    I -- I don't remember exactly.

                                        Page  237

1    Q    Well, between the two parties, Kast and

2    Cornette and Last, who drafted it?

3    A    Probably Kast's counsel made the initial

4    draft.

5    Q    Twenty-one.  Take a look at those emails from

6    May of '23, please, Mr. Thomson.  You recognize those?

7              (Exhibit 21 was marked for

8              identification.)

9    A    Not really, but I see that I'm on them.

10             MS. COHEN:  This is what, 21?

11             THE WITNESS:  Yeah.

12   BY MR. NEW:

13   Q    This is setting up conversation about catching

14   up on payments with Arcadian Vanguard; correct?

15   A    I see subject line, "Financial Update."

16   Q    Yep.  And you see on March 23, 2023, at 8:19

17   a.m., Brian Last saying: "Hey, Mike, this deal doesn't

18   jive with the previous figures we were sent by Michael.

19   We received the first payment listed to the cent, but

20   why the discrepancy in the remaining that is listed?

21             "Jim is pretty livid.  I need to be able to

22   tell him what's going on."  What was the discrepancy

23   between what was being reported to Last for what Kast

24   owed Last and Cornette?

25   A    I don't know.

Page 238

1        Q     You don't know why there would've been

2   discrepancies in payments and what was being paid?

3                MS. COHEN:  Objection, asked and

4   answered.

5   BY MR. NEW:

6        Q     Think it'd be best if we asked Mike Jensen and

7   Michael Calabretta?

8                MS. COHEN:  Objection, argumentative.

9   BY MR. NEW:

10       Q     I'm just asking if they're the -- Mike and

11  Michael are the two best people to ask about what was

12  going on vis-a-vis Arcadian in 2023.

13       A     I don't know.

14       Q     All right.  Turn over to page 4, please.

15  "Hey, Brian.  Got with Colin and Michael on current

16  plan.  Let's talk today.  Please see attached.  In the

17  attachment, you will find the revenue report as of

18  12/31/22.  The dates below are the pay schedule Kast

19  will be using."

20                "Please note the amounts to be paid beyond May

21  are not finalized yet, but this way, you know Kast's pay

22  schedule and when it's -- when exactly you can expect

23  deposits monthly."

24                And so this is Mike Jensen of Kast Media

25  telling Brian Last, "You can expect to get 20,902.33 on

                                                    Page 239

1    March 16th of '23, 30,128 and 15 cents on April the 13th

2    of '23, 22,653 and 68 cents on May 11th of '23, and then

3    pay on June the 8th of '23, July the 6th of '23, and

4    August 3rd of '23."

5        Kast never paid Arcadian Vanguard, Brian Last,

6    and Jim Cornette as set forth in this email; did it?

7        A    I don't remember off the top of my head what

8    the payments were that went out.

9        Q    Well, go back to the previous exhibit that we

10   had.  You're welcome to look at that.  I believe that's

11   it.

12       A    Mm-hmm.

13           THE WITNESS:  So we have 3/30 and 3/17.

14   So it looks like we paid out a little bit ahead of

15   schedule.  I don't know.

16           MS. COHEN:  Yeah.  Okay.  Go ahead.

17           THE WITNESS:  Okay.

18   BY MR. NEW:

19       Q    All right.  Did Kast make a payment on June

20   the 8th of '23?

21       A    On June the 8th?

22       Q    Yep.

23       A    No, I don't think so.

24       Q    Did Kast make a payment on July the 6th of

25   '23?

Page 240

1      A     No, I don't think so.

2      Q     Did Kast make a payment on August 3rd of '23?

3      A     No, I don't think so.

4      Q     Now, in the summer of 2023, you were trying to

5    get Arcadian and Last to enter into a nondisclosure

6    agreement; correct?

7                   (Exhibit 22 was marked for

8                   identification.)

9      A     Yeah, I think that that was a decision

10   dictated by PodcastOne as part of entering into

11   negotiations to do a deal with them.

12     Q     So was Brian Last and Jim Cornette, were their

13   payments in the summer of 2023 being conditioned on

14   entering into this nondisclosure agreement with

15   PodcastOne?

16     A     I don't know.

17     Q     Who would be the best person in Kast Media,

18   Inc. to ask that question?

19     A     I don't know.

20     Q     You're the CEO.  If one of your podcast

21   partners' payments are being conditioned on entering

22   into a mutual nondisclosure agreement at the behest of a

23   third party, like PodcastOne, shouldn't you know that?

24     A     I don't think that -- I don't think that it

25   was, if I recall correctly.  I don't think that the NDA

Page 241

1  held up any payments in any way, but again, I'm working

2  from memory.

3      Q    All right.  So on May the 28th of 2023, Brian

4  Last is telling you in no uncertain terms: "Colin, no.

5  We will not be working with PodcastOne or any of their

6  subsidiaries."  He even puts in bold: "We -- I will put

7  it in bold.  We will not be working with PodcastOne or

8  any of their subsidiaries."  Do you see that?

9                (Exhibit 23 was marked for

10                identification.)

11      A    Yes.

12      Q    That's Last ending the relationship between

13  Kast and Arcadian Vanguard; correct?

14      A    I don't know.

15      Q    Okay.  I'll read it for you.  "Our

16  relationship with Kast is over.  We are free agents."

17  Do you see that?

18      A    No.  Where does it say that?

19      Q    Second paragraph, last sentence, last two

20  sentences.

21      A    "Our relationship with Kast is over.  We are

22  free agents."

23      Q    And after May the 28th of 2023, Kast had no

24  relationship with Arcadian Vanguard despite owing it

25  money; correct?

Page 242

1        A     After April -- after when?

2        Q     The date of this email, May 28, 2023.

3        A     I don't know if that's 100 percent accurate,

4    but I do see that he writes "Our relationship with Kast

5    is over."

6        Q     Why didn't Kast make the payments as Mike

7    Jensen told Brian Last those would be made in

8    June -- May, June, and July of 2023?

9                 MS. COHEN:  Go back to the exhibit.

10                MR. NEW:  If you want.

11                MS. COHEN:  You mean --

12                MR. NEW:  Yep.

13                MS. COHEN:  You mean June, July, and

14    August?

15                MR. NEW:  June, July, and August.

16   BY MR. NEW:

17       Q     Why didn't Kast make those three payments?

18       A     I don't remember the substance of the

19   conversation that's referenced here with -- with Mike,

20   but generally speaking, you know, at this time, Kast

21   was -- you know, had hope to be able to fulfill its

22   payment obligations but at this time was not able to.

23       Q     Go over to page 2 of the email that we're

24   looking at.  What you wanted, what Kast wanted was Brian

25   Last and Jim Cornette to go to PodcastOne so you could

                                        Page 243

1    get that healthy finder's fee; right?

2                    THE WITNESS:  Am I on the wrong one?

3                    MS. COHEN:  Which -- oh, no, I think

4    you're on the right one.

5                    THE WITNESS:  Exhibit 23?

6                    MS. COHEN:  Sorry.  I'm on the wrong

7    exhibit.

8                    THE WITNESS:  This is 23?

9                    MS. COHEN:  Yeah.  Sorry.  Sorry.

10                   MR. NEW:  Yeah.  Page 2 of 23.

11                   MS. COHEN:  Got it.

12   BY MR. NEW:

13       Q     "Hey, Brian.  To answer your question as you

14   referenced about Kast and Jim having an agreed payment

15   plan in place to which both parties agree and Kast has

16   adhered, Kast intends to continue to make the payments

17   you referenced on schedule."  But you didn't; did you?

18       A    I don't believe that the records show Kast

19   making payments in June -- June, July, and August.

20       Q    You didn't make any payments.  We looked at

21   the schedule earlier.  The last payment that you made to

22   Arcadian Vanguard was May the 12th of '23.  Yet you're

23   telling Brian here on May the 28th, "We intend to

24   continue to make the payments you referenced"; correct?

25       A    I see here "Kast intends to continue to make

                                             Page 244

1    the payments you referenced on schedule."

2        Q    All right.  And here, you're telling Brian

3    Last "If you were to cause this deal to unravel, could

4    be substantial, potentially falling within the region of

5    10 to 20 million dollars, and would impact a broad

6    spectrum of parties."

7            Mr. Thomson, what was it -- if Brian Last,

8    Arcadian Vanguard, and Jim Cornette didn't go with

9    PodcastOne, how would that cost you or anybody else 10

10   to 20 million dollars?

11       A    I -- I believe what I said here was if they

12   caused the deal to be -- to be unraveled.

13       Q    Mm-hmm.  How?

14       A    How?

15       Q    What could Jim Cornette and Brian Last do that

16   caused 10 to 20 million dollars?

17            MS. COHEN:  Objection, calls for

18   speculation.

19   BY MR. NEW:

20       Q    You said -- these are your words, Mr. Thomson.

21       A    Right.

22       Q    You said "The ensuing damages if you were to

23   cause this deal to unravel could be substantial,

24   potentially falling within the region of 10 to 20

25   million, and would impact a broad spectrum of parties."

                                        Page 245

1    Those are your words.

2           What could Brian Last and Jim Cornette do to

3    cause 10 to 20 million dollars' worth of damage?

4           MS. COHEN:  Objection, irrelevant, calls

5    for speculation.

6      A    You can probably just read the first email

7    into the record.

8      Q    You don't know what you meant or how anything

9    that Brian and Jim would've done would've caused 10 to

10   20 million dollars worth of damage?

11     A    I think it's -- I think it's in their first

12   email.

13     Q    You thought -- in Brian's?

14     A    Yeah.

15     Q    Oh.  Where Brian says that: "We're going to

16   let -- does Colin Thomson owe you money?  Going to let

17   the listeners know with great detail that Colin Thomson

18   of PodcastOne stole our money, because he doesn't know

19   how to run a business"; right?  But his email is after

20   yours.

21          You wrote "You're going to do 10 to 20 million

22   dollars worth of damage to me" before he wrote what I

23   affectionately like to refer to as the "stick it" email

24   back to you.

25     A    Oh.  I would go to -- then I would go to the

                                        Page 246

1  one that he did write to me first, where he says --

2      Q    On Saturday, May 27?

3      A    -- "My legal team is looking into anything we

4  can do -- we can possibly do to kill your planned sale

5  of Kast."

6      Q    "Until we are paid."  At the time of that

7  email, you owed Arcadian Vanguard $166,000; right?

8      A    I don't know.

9      Q    Okay.  You've got a sheet there in front of

10 you that details it out, so you're more than welcome to

11 look at that if you need your memory refreshed.

12     A    We're going to need to do an audit of the

13 audience.

14     Q    That's fine.  Feel free.  You've told a

15 bankruptcy court now that you owed them 250 and some

16 change.  But again, you wanted, because of the finder's

17 fee, Brian and Jim to go with PodcastOne; right?

18     A    I believed at the time that it was in the best

19 interest of Arcadian Vanguard and all Kasts'

20 stakeholders, that the PodcastOne deal was in everyone's

21 best interest.

22     Q    What was the PodcastOne deal, Mr. Thomson,

23 that this -- this deal that you loved so much and that

24 you think was in the best interest of Brian and Jim and

25 all of your podcast partners?  What was that deal?

Page 247

1          MS. COHEN:  Objection.  You're badgering.

2     You're harassing.  You're saying "the deal that you love

3     so much."  Please ask regular questions in a normal

4     tone.

5          MR. NEW:  Okay.

6          MS. COHEN:  Thank you.

7     BY MR. NEW:

8          Q     What was the deal?

9          A     I would have to look at the offer that we

10    made.

11         Q     Is it not in this email?

12         A     It's probably in this email.

13         Q     Well, take a look at the --

14         A     Yeah, you tell me.

15         Q     Well, I'm asking you.  It was --

16         A     It was your document.

17         Q     It was -- no, these are emails from you to my

18    client.

19              MS. COHEN:  We didn't produce --

20              THE WITNESS:  You gave me this document.

21              MS. COHEN:  We didn't produce these.

22    BY MR. NEW:

23         Q     These are emails from you --

24              MR. NEW:  Just put good nonspeaking

25    objections on the record, Ms. Cohen.

                                        Page 248

1    BY MR. NEW:

2         Q    These are emails from you, Mr. Thomson.

3         A    Where is it?

4         Q    Want to look for it?

5         A    Yeah, let me know.  Where is it?

6         Q    All right.  Go back to page 5.  So you don't

7    remember what the ballpark rough terms of this wonderful

8    deal with PodcastOne were; do you?

9         A    I'm not going to speak from memory.  There's a

10   document that details it.  I don't see it here.

11        Q    And Brian and Jim --

12        A    Oh, there's an attachment.

13        Q    And Brian and Jim told you they weren't

14   interested; right?  In a deal with PodcastOne?

15        A    Yes.

16        Q    And part of that deal was to take stock in

17   LiveOne; correct?  PodcastOne?

18             MS. COHEN:  He already answered the

19   question.  Asked and answered.

20             MR. NEW:  No, he didn't.

21   BY MR. NEW:

22        Q    That's part -- that was part of the deal, was

23   stock in PodcastOne; correct?

24        A    I don't have the attached file in front of me.

25   It's referenced right here, but I don't have it.

Page 249

1      Q     All right.  If they'd taken that deal, that

2   stock has gone down significantly in value; has it not?

3      A     I don't know what the current stock price is.

4      Q     Here are the Amex records that you turned

5   over.  I didn't make copies.  I'm just going to go

6   through some of the charges and ask you some questions.

7   I'm happy to show them to you.  Stitch Fix.  Is that a

8   legitimate business expense, Mr. Thomson?

9      A     Stitch Fix?

10      Q     Mm-hmm.

11      A     I don't remember.  They were an advertiser of

12   ours for a while.  I know that.

13      Q     Okay.  These charges to Printify.com, what

14   would those be?

15      A     That would've been the merchandise operations.

16      Q     Did Kast Media have merch?

17      A     Kast handled merch on behalf of some of its

18   shows.

19      Q     Which shows?

20      A     Off the top of my head, Viall Files,

21   Friendship Onion.  We had some for our O&O shows.  I

22   don't remember.  I think there were probably a couple

23   more, but I don't remember.

24      Q     There's charges here to -- well, Marina Del

25   Rey Hotel, $276.37.  That's just right down the road.

                                              Page 250

1    Do you know why y'all would be charging multiple charges

2    at Marina Del Rey Hotel on July the 9th?

3         A    We hosted a company event down there, brought

4    in some of the team.

5         Q    If we want to go through these credit card

6    statements in detail and question what is a legitimate

7    business expense or what was claimed as a legitimate

8    business expense versus income to you, who's the best

9    person to ask that question?  One of the accountants?

10        A    Yeah, the accounting team.

11        Q    Did the accounting team keep a list or make a

12   spreadsheet or something like that of "This is

13   everything that we're going to call Colin's income for

14   1099 purposes" versus what's charged on the credit cards

15   as business expenses?

16        A    I don't know exactly what their process was,

17   but -- you know.

18        Q    The Home Depot charges?  Know why there would

19   be charges to Home Depot?

20        A    No.

21        Q    Can you think of a legitimate business expense

22   for charges to Home Depot?

23        A    Yeah, I mean, the studio probably would've

24   gotten things from there at certain times, but I don't

25   know if the individual expenses would've been business

Page 251

1   or personal and taken as 1099 income.

2        Q    Who is Libor Janicek?

3        A    That -- he was our head of studio for a couple

4   of years.

5        Q    Okay.  So if Libor Janicek is making charges

6   to Home Depot on the Amex Business Gold Rewards card,

7   you believe those would be legitimate business expenses?

8        A    I would expect so.

9             THE OFFICER:  Sorry, Counsel.  Can you

10  just please spell it for me?

11            MR. NEW:  Libor, L-I-B-O-R, Janicek,

12  J-A-N-I-C-E-K.

13            THE OFFICER:  Thank you.

14  BY MR. NEW:

15       Q    What was Bill.com?

16       A    Bill.com was the payment processor that we

17  worked with to process payments to a lot of our vendors

18  and contractors.

19       Q    How did Kast pay Last and Arcadian Vanguard?

20       A    I don't recall, but probably early on would've

21  been by check, and then later on, we would've moved to

22  Bill.com.

23       Q    There's a $7,665 charge to Cartier in New York

24  on the Kast credit card.  Can you explain that, Mr.

25  Thomson?

                                           Page 252

1        A     That probably would've been a personal expense

2    taken as income and included on the 1099.

3        Q     So a charge like a Cartier boutique, $7,665,

4    you're sure that the accountants at Kast Media would've

5    counted that as personal income to you?

6        A     I would expect that to be a personal expense

7    that was included on the 1099.

8        Q     And if personal credit cards are listed in

9    these business Amex payments -- in other words, I've

10   seen Capital One, Chase, some others -- was that always

11   captured as income to you?

12       A     Any personal -- or any payments made to my

13   personal credit cards would've been appropriately

14   designated.  The transaction side of them would've been

15   designated as either business expenses, or if they were

16   personal, then that would've been taken as 1099 income.

17       Q     Did you give your personal credit card

18   statements to your accounting team to go through to

19   reconcile business charges versus personal charges?

20       A     I don't remember what the -- what the process

21   always was, but -- but we made sure to -- that

22   the -- the accounting team was taking care of that.

23       Q     How would they know what was a business charge

24   and what was a personal charge if you didn't give your

25   accounting team the personal credit card statements?

Page 253

1    A    Sometimes -- they would have access or they

2    would get the statements.

3    Q    All right.  What personal credit cards did you

4    have in 2021, 2022, 2023, and 2024 that your accounting

5    team, the Kast accounting team would be reconciling for

6    business charges versus personal charges?

7    A    I -- I don't remember the whole list of them.

8    Just -- there's a few.

9    Q    Tell me what they were.

10    A    I don't remember.  You have the transactions.

11    Q    All right.  Lots of trips to St. Louis in

12    here.  Those business or personal?

13    A    If they were business, they would be

14    classified as business.  If they were personal, they

15    would be classified as personal.

16    Q    What kind of business you doing in St. Louis?

17    A    There -- you might be surprised.  There are

18    podcasters out there.

19    Q    All right.  So as you sit here --

20    A    -- conferences in St. Louis.

21    Q    I tell you what we'll do.  Since you don't

22    want to tell me who your personal credit cards were,

23    we'll just issue subpoenas to every credit card company

24    that's listed in the documents that you have provided;

25    okay?  You don't want to tell me that it's Capital One

Page 254

1    or Chase or whomever else.

2              MS. COHEN:  Objection, argumentative.

3    There's no question pending.  Don't yell at him.

4              MR. NEW:  Yeah, there is.  I've asked him

5    who the personal --

6    BY MR. NEW:

7        Q    You've told me that Kast's accountants

8    reconciled your personal credit card statements, yet you

9    can't tell me which personal credit cards those were;

10   correct?

11       A    Yeah, I don't have the -- I don't have them in

12   front of me.

13       Q    All right.  Citi?  Did you have a Citi

14   personal credit card?

15       A    Yeah, I believe so.

16       Q    Okay.  Did you have a personal Amex?

17       A    Yeah, I believe so.

18       Q    Did you have a Chase credit card?

19       A    Yes, I believe so.

20       Q    Any others?  Did you have a personal Discover?

21       A    Yeah, I believe so.

22              MS. COHEN:  How are we on time?

23              THE VIDEOGRAPHER:  Six hours and 27

24   minutes.

25              MR. NEW:  And how much?

                                        Page 255

1                    THE VIDEOGRAPHER:  Twenty-seven.

2                    MR. NEW:  All right.  Thirty-three more

3    minutes.

4                    MS. COHEN:  No, I have a proposal, Mr.

5    New.  I do have to be at an event.  We were ready at

6    ten.  You weren't here and weren't ready, so -- we

7    started at 10:19.

8                    I would propose that we split the

9    difference and you take ten -- and we take off ten

10   minutes of what he says you have left, because I really

11   need to be somewhere, and I'm -- I think that we've been

12   very cooperative, and you've gotten a lot of testimony

13   that I question whether it's needed.

14                   But we've really worked very hard to

15   cooperate with you today.

16                   MR. NEW:  All right.

17   BY MR. NEW:

18       Q    Take a look at May 24th of '21, please.  It's

19   14,000-some dollars on a Chase card paid out of the

20   Wells Fargo account; correct?

21       A    What transaction?

22       Q    It was a $14,000 transaction to Chase.

23                   MS. COHEN:  I see an ending balance of

24   14,000, but I don't see the payment of 14.  Maybe it's

25   on the other side.  No.

                                        Page 256

```
 1                    THE WITNESS:  No.

 2                    MS. COHEN:  Can you show us?

 3                    MR. NEW:  Sure.

 4                    MS. COHEN:  Here.  You can highlight it.

 5      BY MR. NEW:

 6          Q    "Chase credit card autopay, $14,643.07."  See

 7      that?

 8          A    The payment is $4.16.

 9                    MS. COHEN:  It's the ending balance

10      you're looking at, Mr. New.

11                    MR. NEW:  Okay.  My apologies.

12      BY MR. NEW:

13          Q    "Withdrawals, debits, $4.16."  Were your

14      credit cards set to automatically deduct from the Wells

15      Fargo account?

16          A    I believe some of them were.

17          Q    Well, let's spend the last 10, 15 minutes

18      talking about your wife.  For what periods of time was

19      Christine Thomson employed by Kast?

20          A    From around 2020 through 2022, the end of

21      2022.

22          Q    And how much did she earn?

23          A    I don't remember exactly.

24          Q    Is it set forth in the payroll summaries that

25      you've provided to us?
```

Page 257

1    A    Yeah.

2    Q    Here's another charge to the Wells Fargo

3    account, $2,765 on your Citi card in March of 2023, Mr.

4    Thomson; correct?

5    A    It says 2,675.04.

6    Q    2,675?

7    A    Yep.

8    Q    All right.  And that's Bates number Kast 2052.

9    What is North Mill Capital?

10   A    It sounds familiar, but I don't remember.

11   Q    Do you know why they would've gotten $983,823

12   in the East West bank statements?

13   A    No.

14   Q    Do you know why there would've been a wire

15   transfer, Christine Thomson, $176,000 in the East West

16   Bank statements?

17   A    That would've been taken as compensation and

18   included in the 1099 amount.

19   Q    To Christine Thomson?

20   A    Yeah.

21   Q    Who is Eurasian Capital?

22   A    Oh, I think they were a service that we worked

23   with at one point to secure the CapChase deal.

24   Q    In taking large sums of money from Kast Media,

25   Inc., was there a corporate document generated that

Page 258

1    authorized those either to yourself or to your wife?

2        A    I -- I don't know.

3        Q    Like a resolution or something like that,

4    corporate resolution, on file?

5        A    I don't know.  You have the books.

6        Q    Who is Robert L. Gold?

7        A    That is an individual associated with Clara

8    Vista.

9        Q    Okay.  So you got a $500,000 wire from Robert

10   L. Gold.  That was part of the Clara Vista investment in

11   Kast Media?

12       A    Yeah, that was the Clara Vista investment.

13       Q    The $2 million investment from Clara Vista and

14   the others, did that go directly into Kast's operating

15   account?

16       A    Yeah.

17       Q    I'll show you the $176,000 wire to Christine

18   Thomson.  What is that, October of '21?

19       A    10/26.

20       Q    All right.  And so there should be a 1099 to

21   her reflecting at least that; correct?

22       A    No.  That was taken as my own income.  The

23   only label that was taken is my own income, my income on

24   my 1099.  It was only labeled Christine Thomson because

25   the -- the transfer went into her bank account, the bank

Page 259

1    account with her name on it.

2        Q    So that's not her income.  That was your

3    income; correct?

4        A    Yes.

5        Q    Did Kast put any more of your income into her

6    bank account other than this 176 grand?

7        A    I don't -- I don't remember specific

8    transactions.

9        Q    Where did she bank?

10       A    I think Bank of America.

11       Q    This is the North Mill Capital, and it says

12   "FastPay."  I'll show you this one was $635,000.  Does

13   that document refresh your memory at all what North Mill

14   Capital is?

15       A    Yeah, it probably would be related to FastPay

16   then.

17       Q    Do you know what relation to FastPay?

18       A    No, but I can tell you about FastPay.

19       Q    Well, FastPay was doing your lines of credit

20   in 2021, before CapChase got involved; correct?

21       A    Yep.

22       Q    And speaking of CapChase, here on January 3rd

23   of 2022, CapChase puts a $3 million wire into your

24   operating account; correct?

25       A    Yep.

Page 260

1     Q     And another million on March 7; correct?

2     A     3/7, 1 million.  Yep.

3                    MR. NEW:  Okay.  Mr. Thomson, I

4     appreciate your patience today.  There are still some

5     outstanding issues in dispute concerning documents that

6     we have not yet received from your counsel, though we

7     will suspend the deposition.  With that, thank you.

8                    THE OFFICER:  Ms. Cohen, did you want to

9     purchase a copy of today's transcript?

10                    MS. COHEN:  No, thank you, but how are we

11    dealing with the transcript?  Do you want to make a

12    stipulation?  That's what we normally do.

13                    MR. NEW:  That's fine.  I just want it

14    expedited.

15                    THE OFFICER:  No worries.

16                    MS. COHEN:  So then you send it to him,

17    and then he has -- you want to -- any time for you?

18    It's going to be very long, so --

19                    MR. NEW:  Is --

20                    THE WITNESS:  Yeah, it is.

21                    MR. NEW:  I want a draft expedited.

22    Regardless of how much time he takes reading, I want a

23    draft expedited for our purposes.  I assume he's reading

24    it; correct?

25                    MS. COHEN:  Yeah.  He's going to read it

                                          Page 261

1    for sure.

2                    MR. NEW:  Okay.  All right.  Well, I

3    mean, it's his choice to read or waive; okay?

4                    THE OFFICER:  All right.

5                    THE VIDEOGRAPHER:  One more thing also.

6    Mr. New, would you like the video synced with the

7    transcript?

8                    MR. NEW:  Please.

9                    THE VIDEOGRAPHER:  Okay.  Mr. Rudolph, if

10   you're still there, would you like a copy of the video?

11                   MR. RUDOLPH:  No, I'm okay.  I'll

12   get -- I'll speak to Mr. New about that.

13                   THE VIDEOGRAPHER:  Okay.

14                   MS. COHEN:  So will you send the

15   transcript to me to forward to Mr. Thomson?

16                   THE OFFICER:  No worries.

17                   MS. COHEN:  Thank you.

18                   THE VIDEOGRAPHER:  And Ms. Cohen, did you

19   want a copy of the video?

20                   MR. RUDOLPH:  So did you set a time --

21                   MS. COHEN:  Give me your card.  I'll let

22   you know.

23                   MR. RUDOLPH:  -- Mr. Thomson to review?

24                   MS. COHEN:  He said he doesn't care how

25   long it takes.  Mr. New said he doesn't care how long it

                                        Page 262

```
 1    takes.  I would say --

 2                    MR. NEW:  No, because I'm going to get a

 3    draft to use in motion --

 4                    MS. COHEN:  Yeah.  He's going to need

 5    three weeks.  It was so long, so he's going to need

 6    three weeks to review it.

 7                    MR. RUDOLPH:  Three weeks?

 8                    MS. COHEN:  Yeah.

 9                    MR. RUDOLPH:  Three weeks from receipt?

10                    MS. COHEN:  Three weeks from receipt.

11                    THE VIDEOGRAPHER:  Okay.  If that's

12    everything, I --

13                    MR. RUDOLPH:  Stephen, is that agreeable

14    to you?

15                    MR. NEW:  Yeah.  Like I said, I'm getting

16    a draft for use in motions practice, so that's fine.

17    Take as long as you want.

18                    MR. RUDOLPH:  Understood, but in terms of

19    getting a signed copy or signed original or copy from

20    Mr. Thomson, is three weeks enough time for him to

21    review and get him to sign it regardless of you getting

22    an expedited draft?

23                    MS. COHEN:  No.  No.  Well, as long as

24    he's going to get the expedited draft, we should give

25    him four weeks, because that's going to be really long.
```

Page 263

```
 1                    MR. NEW:  Yeah.

 2                    MS. COHEN:  I mean, it's a nine-hour day.

 3                    MR. RUDOLPH:  Well, three weeks should be

 4        fine.

 5                    MS. COHEN:  So what did we say, 30 days?

 6        Is that what we said?  Four weeks, 30 days?

 7                    THE WITNESS:  Yeah, 30 days.

 8                    MS. COHEN:  Thirty days.

 9                    THE WITNESS:  I need 30 days to read it.

10                    MS. COHEN:  Okay.  Thirty days to -- from

11        receipt to review and get it back.

12                    MR. RUDOLPH:  -- is that acceptable to

13        you?  I thought you --

14                    MR. NEW:  Yes -- yes.  Thirty days from

15        date of receipt to read and sign his final thing.

16                    MR. RUDOLPH:  All right.  And then

17        Stephen and -- and Leslie, will you sign the stipulation

18        that was sent over last night, since you're both there?

19                    MR. NEW:  I --

20                    MS. COHEN:  I don't have it printed up

21        here, but I can have my office send it to you this

22        evening.

23                    MR. RUDOLPH:  All right, and then see if

24        they'll send it to you when we get Leslie's signature.

25                    MS. COHEN:  Sounds good.
```

Page 264

1          MR. NEW:  Okay.

2          MS. COHEN:  Okay.

3          THE VIDEOGRAPHER:  All right.  This

4    concludes today's deposition of Colin Thomson.  We are

5    off the record at 6:07 p.m.

6                    (Signature reserved.)

7                    (Whereupon, at 6:07 p.m., the proceeding

8                    was concluded.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 265

1                  CERTIFICATE OF DEPOSITION OFFICER

2

3              I, NATALIE RIVAS, the officer before whom the

4     foregoing proceedings were taken, do hereby certify that

5     any witness(es) in the foregoing proceedings, prior to

6     testifying, were duly sworn; that the proceedings were

7     recorded by me and thereafter reduced to typewriting by

8     a qualified transcriptionist; that said digital audio

9     recording of said proceedings are a true and accurate

10    record to the best of my knowledge, skills, and ability;

11    that I am neither counsel for, related to, nor employed

12    by any of the parties to the action in which this was

13    taken; and, further, that I am not a relative or

14    employee of any counsel or attorney employed by the

15    parties hereto, nor financially or otherwise interested

16    in the outcome of this action.

17

18

19

20

21          NATALIE RIVAS

22          Notary Public in and for the

23          State of California

24

25    [X] Review of the transcript was requested.

                                        Page 266

1          CERTIFICATE OF TRANSCRIBER

2

3          I, AUDREY FRANKLIN, do hereby certify that

4   this transcript was prepared from the digital audio

5   recording of the foregoing proceeding, that said

6   transcript is a true and accurate record of the

7   proceedings to the best of my knowledge, skills, and

8   ability; that I am neither counsel for, related to, nor

9   employed by any of the parties to the action in which

10  this was taken; and, further, that I am not a relative

11  or employee of any counsel or attorney employed by the

12  parties hereto, nor financially or otherwise interested

13  in the outcome of this action.

14

15

16          *Audrey Franklin*

17  _____

18          AUDREY FRANKLIN

19

20

21

22

23

24

25

                                          Page 267

1           I declare under penalty of perjury

2     under the laws that the foregoing is

3     true and correct.

4

5           Executed on _____ , 20___,

6     at _____, _____.

7

8

9

10

11         _____

12                  COLIN THOMSON

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 268

1   In Re: Kast Media, Inc.

2   Colin Thomson (#6834033)

3

4                     E R R A T A   S H E E T

5   PAGE_____ LINE_____ CHANGE_____

6   _____

7   REASON_____

8   PAGE_____ LINE_____ CHANGE_____

9   _____

10  REASON_____

11  PAGE_____ LINE_____ CHANGE_____

12  _____

13  REASON_____

14  PAGE_____ LINE_____ CHANGE_____

15  _____

16  REASON_____

17  PAGE_____ LINE_____ CHANGE_____

18  _____

19  REASON_____

20  PAGE_____ LINE_____ CHANGE_____

21  _____

22  REASON_____

23

24  _____        _____

25  (Colin Thomson)                        Date

                                    Page 269

[& - 12]

**&**

**&**    2:20 119:15

**0**

**000002**    192:24
**000003**    192:11
**000007**    175:3
**000024**    176:3
**0007**    172:15
**000963**    153:4
**000980**    158:20
158:23 160:10
**03/13/2024**
4:25
**03/15/2024**
4:17
**05/11/2022**
4:13
**05/30/2023**    5:8
5:9,10
**09/29/2023**    5:3

**1**

**1**    1:14,25 4:7
5:14 6:8 36:8,9
36:12 37:5,6,9
37:13 38:12
92:16,18 93:1
119:22 120:8
120:10 123:7
145:17 147:7
164:19 165:4
195:7 211:2,17
218:14 233:4
261:2

**1,042,173**
228:21
**1,150,000**    94:5
116:17
**1,168,410**    221:8
**1,328.32**    102:17
**1,328.32.**
100:25
**1,374,088**
216:11,13
**1,378,009**
215:21,25
216:2,5 222:15
222:16
**1,392,000**    166:6
**1,554,000**
214:16
**1,554,015**
213:24 214:1
217:14,20
**1,591,874**
208:25 211:23
212:3,13
**1,595,561**    227:9
**1.15**    116:21,25
117:17
**1.378**    215:22
**1.392**    166:14,16
**1.4**    145:9
**1.554**    218:2
**1.6**    196:6 197:1
197:11 199:12
**1.7**    167:15
174:25 175:7
175:10,18,23

**1.7.**    175:17
**10**    4:19 41:7,9
115:6 160:18
166:1 181:12
181:15 232:9
245:5,9,16,24
246:3,9,21
257:17
**10,000**    41:23
129:20 130:3
133:15 189:2
**10,300**    218:18
**10,430,000**
222:4
**10,477**    218:21
218:22
**10/26**    259:19
**10/30/2018**
152:18
**10/31**    159:20
**100**    93:24
166:2 183:15
243:3
**100,000**    131:6,7
132:10 224:8
**10396**    1:6
**1040**    203:19
204:21
**1099**    4:21
30:20,23 31:2
31:6 70:4
83:11,13 84:14
108:14 129:16
129:18 146:9
147:12 185:6

**186:3 214:3**
251:14 252:1
253:2,7,16
258:18 259:20
259:24
**10:19**    1:15 6:5
256:7
**10:27**    14:14
**10:29**    16:13
**10:31**    16:16
**11**    4:21 116:13
117:7 181:12
184:23,24
228:6
**11,000**    53:25
54:9 206:6
215:9 224:6
**1102**    42:12,15
42:19,23 43:2
43:2,8,19,22
124:22,24
125:25 126:2
192:6 203:22
204:3 207:9,12
**1113**    152:16
**1145**    152:18,21
**11:52**    5:8
**11:53**    5:9
**11th**    49:9 240:2
**12**    4:22 19:24
49:1,2,3 145:9
161:19 190:15
206:7,11,11
228:17

**[12,002 - 2]**

**12,002**   214:19
**12/31/22**
   239:18
**121,000**   206:7
   206:14
**12:15**   86:3
**12:35**   210:11
**12th**   161:13,15
   161:16,22
   162:5 244:22
**13**   4:23 19:24
   50:25 95:10
   117:13 118:15
   118:16 163:18
   192:1 193:3,6
   195:23
**13,790,839**
   218:8
**132**   222:14
**136,513**   228:16
   228:18
**136,537**   75:19
**136,537.32**
   74:22 75:10
**136,537.32.**
   74:9
**138**   4:13
**139,466**   49:19
**13th**   38:22
   64:10 123:14
   123:25 124:1
   240:1
**14**   4:24 37:10
   37:13 38:12
   192:18 225:15

**225:18 256:24**
**14,000**   256:19
   256:22,24
**14,643.07.**
   257:6
**14,925,000**
   222:15
**14,925,338**
   213:3,4,5
**143,231**   223:12
**146**   4:15
**1480**   40:22,25
   42:8 124:21
   192:5 203:21
   204:2,24 206:2
   206:4 207:9
**14th**   183:22
**15**   4:25 151:8
   190:21,22
   191:5,9 193:1
   222:14 240:1
   257:17
**15,132,245**
   212:19
**150**   113:12
**150,000**   232:20
**151**   4:16,17
**158,454**   50:25
**158,454.13**
   48:19 49:7
   50:9
**158,454.13.**
   48:15
**15th**   21:11

**16**   5:3 196:10
**16,437.99**   90:20
**16,889,408**
   223:10,11
   224:18
**16.889**   228:14
**161**   96:19
**161,413.50.**
   96:17
**1615**   1:17 2:5
   6:9
**165**   4:18
**166,000**   247:7
**166,019**   161:17
**166,019.71**
   161:14,24
**16th**   240:1
**17**   5:4 202:25
   203:1
**17,040**   111:5,14
**17,575,881**
   223:5
**1700**   2:14
**176**   260:6
**176,000**   258:15
   259:17
**17th**   161:2,4
**18**   5:5 43:21
   98:12 123:25
   147:2 229:7,12
**18,000**   203:9,12
   203:15
**18,015**   219:15
**18,974**   220:5,8
   220:20

**1801**   40:23,25
   42:8,20,23
   125:5,10 192:5
   204:25 206:2,5
   215:2 224:8
**181**   4:20
**182,613.06.**
   114:2
**184**   4:21
**185,482**   220:24
**19**   5:6 229:12
   229:13 237:7,8
   237:10
**190**   4:22
**192**   4:23,24
**193**   4:25
**196**   5:3
**19th**   21:11
**1:00**   210:11
**1:02**   86:6
**1:24**   1:6
**1a**   223:4 228:3
**1st**   123:15
   165:7

|  **2**  |

**2**   4:8 5:18
   30:23 31:6
   37:2 38:20,24
   39:22 48:17
   49:1 59:23
   60:6 64:4 81:6
   83:11 90:24
   91:12,17,20
   92:21 93:5,10
   93:20 108:10

Page 2

**[2 - 2022]**

108:20,21
109:15 116:10
117:1 137:21
139:24 144:16
144:21 145:1
152:19 153:9
165:15 173:4
193:12,13
194:1,23
202:23 203:4,8
203:17 224:21
230:10,14
232:5 233:12
243:23 244:10
259:13
**2,014,647**
224:18,20
230:5
**2,515.62.**   107:1
**2,548,274**
193:20
**2,548,274.08.**
193:13
**2,675**   258:6
**2,675.04.**   258:5
**2,693,664**
207:19
**2,700**   21:14
**2,765**   258:3
**2,931,067**
234:14
**2.1**   148:8
**2.2**   144:16,21
**2.4**   207:21

**2.5**   194:8,13
231:22 233:9
**2.931**   234:12
**20**   5:7 41:7,9
46:1 51:3
66:11 68:7
116:20 118:8
118:16 123:25
124:8 132:12
133:14,22
135:15 218:1
237:3,10,12,15
245:5,10,16,24
246:3,10,21
268:5
**20,000**   66:24
**20,448.19.**
72:22
**20,836.78**   115:8
**20,902.33**
239:25
**200**   225:19
**200,000**   213:9
**200,200**   213:7,9
214:3,8
**2004**   1:11
10:20 11:2,14
12:16 15:2,23
36:14,15 38:1
38:11 92:15
**2007**   128:17
**201**   118:7
**2013**   44:15,16
44:18

**2014**   203:3
**2016**   44:25
192:15
**2017-2022**   5:5
**2018**   21:25
27:1 44:17,18
96:10 124:8
141:25 152:3
152:13 153:9
153:10,10
203:8,14 204:5
204:18 205:4,6
205:9,11
206:16 207:14
207:15 208:17
209:5
**2018-2023**   5:4
**2019**   43:20
152:19 206:19
207:18 208:4,5
208:9,10,14,19
**2020**   33:23
40:16,19 43:21
45:23 46:7
55:18 56:16
57:17 58:11,17
84:16 85:2,9
86:13 95:9
104:21 149:2,8
190:11,12,13
204:15 208:24
209:5 211:25
212:3,4,14
257:20

**2021**   4:21
43:20 60:4
104:11 146:10
147:13,23
159:6 185:6
189:16,18
201:21 203:24
204:15 209:8
212:18,19,22
213:6,11,18
214:8,10,23
215:4,10,17,19
215:22 216:2
216:17 217:24
219:5,12
227:23 254:4
260:20
**2022**   47:5,23
60:4,14 91:15
91:16 98:11
116:11 126:24
127:13,19
128:14,19,23
138:13 139:9
139:13,19,21
140:8,15
142:13,18
143:1,1,7
144:8,11 147:7
158:8,9,16
159:1,6,13
160:3,5 186:15
187:6,9 190:1
223:10,13,17
223:25 224:17

**[2022 - 276.37.]**

226:2,8,20
227:11,13
230:11,15
231:12 232:25
254:4 257:20
257:21 260:23
**2023**  5:6 21:25
52:25 53:13
54:10 55:10
77:13 78:14
79:6,11 98:2
104:21 105:11
105:12 120:15
137:22 138:14
147:3 157:22
160:18,18,19
160:22 161:3,9
161:13,16,19
162:5,22,24
163:3 164:19
165:4,10,11
167:8 168:19
170:17 181:9
183:22 186:24
187:9,22
188:13,15,18
190:3 229:16
230:4 234:25
235:5 236:13
236:17 238:16
239:12 241:4
241:13 242:3
242:23 243:2,8
254:4 258:3

**2024**  1:14 6:8
35:14 38:23
64:10 69:17
70:18 73:2,10
76:12 77:1,13
78:15 80:3
82:7 85:9 89:5
90:21 95:10
97:3,23 102:14
102:15 107:18
111:11 112:6
113:1 116:6
123:7,7,7
124:9 151:8
163:18 190:5
193:4,7 195:23
204:18 254:4
**2025**  182:11,17
**203**  5:4
**203,713**  49:19
**204**  117:5
**2052**  258:8
**2083**  206:16
**209,682.15.**
115:16
**20b**  205:12,19
**20th**  117:2
**21**  5:8 40:16,19
227:15 232:19
238:7,10
256:18 259:18
**213,000**  224:8
**213,278**  223:24
**218,601**  219:22

**22**  5:9 143:10
147:24 187:4
222:17 227:15
227:19 229:4
232:12,20
241:7
**22,653**  240:2
**229**  5:5,6
**23**  5:10 120:20
121:10,15
138:8,9 159:20
227:24 229:4
233:14 238:6
238:16 240:1,2
240:2,3,3,4,20
240:25 241:2
242:9 244:5,8
244:10,22
**233-4100**  2:17
**237**  5:7
**238**  5:8
**23rd**  163:3
**24**  49:3 69:15
89:23 96:24
102:23 114:10
115:6 116:13
117:7,13
121:10,15
123:4,15,15,25
124:1,8 147:7
160:22 233:19
**24,090.90**  82:7
82:16
**24,748**  225:19
225:20

**24,748.26**  79:6
79:21
**24,748.26.**
78:20
**241**  5:9
**241-5**  121:5
**242**  5:10
**24350**  34:8
192:7,12
**248**  195:9
**24th**  256:18
**25**  145:19
**25,000**  227:6
**250**  94:1
162:12 168:12
168:22 169:8
169:14 247:15
**250,000**  117:22
168:18 184:3
**250,442**  195:14
**250,442.79**
162:7 169:10
195:8,25
**250-6017**  2:24
**25801**  2:22
**2653**  70:6
**266,855**  214:22
214:23
**269**  1:25
**26929**  266:20
**27**  247:2
255:23
**274,000**  172:18
**276.37.**  250:25

[278,400 - 4,803,985.44.]

**278,400** 172:10
172:18 173:8
173:12,22
174:4
**28** 215:20,24
216:5 243:2
**28th** 242:3,23
244:23
**29** 178:12
**29,385** 78:13
**29,385.81** 76:18
76:24
**29,385.81.**
76:14
**29th** 35:14
**2:40** 150:6,15
**2:50** 150:18
**2:55** 150:22
**2s** 109:3,4,22

**3**

**3** 4:10 40:9,10
81:6 145:10,14
165:23 167:17
175:2 200:12
230:19,20
260:23
**3,485,000**
223:21
**3,485,350**
223:16
**3/17** 240:13
**3/2/2019**
152:22
**3/30** 240:13

**3/7** 261:2
**30** 8:25 9:4,8
10:21,25 11:4
11:5,14,15,16
11:17,23 12:1
12:6,13,18,25
13:7 14:9,15
15:11,19,25
16:18 67:3,4
123:7 131:9
152:12 153:10
153:10 158:25
159:13 160:3,5
161:9 178:20
178:21 210:6
210:14 218:1
264:5,6,7,9
**30,128** 240:1
**300,000** 147:22
**304** 2:24
**31** 69:17 70:18
73:1,10 76:12
77:1 82:7 89:5
90:20 158:15
178:20,22
**310** 2:8
**31001** 82:10,24
**317,000** 226:2
**317,915** 226:1
**31909** 267:17
**32** 5:18 75:19
176:5,8,16
179:3,11
**323** 32:20

**323-6811** 32:17
**326** 218:3
**326,000** 146:12
146:15 147:13
147:22 189:17
**326,633** 185:10
186:7 214:3,16
220:19
**328,048** 224:13
**33** 176:8,17
179:3
**336,714** 195:18
195:20
**336,714.27**
195:22
**34** 176:8,17
179:4
**34,615.67.**
89:11
**34,800** 172:11
172:19 173:8
173:12 174:3
182:21
**34240** 33:16
**346,000** 226:13
**346,959** 186:16
223:22
**35** 176:19
179:4,5 223:20
**35,000** 97:17
98:4 99:6
**350** 147:7
195:17
**352** 147:13,24

**352,000** 146:25
**352,051** 147:6
**36** 4:7
**363** 165:8
**365,519** 226:15
**37,275** 161:23
**38** 4:9 223:20
**384,000** 219:11
**384,368** 219:11
**394-5900** 2:8
**3:50** 150:25
**3:55** 150:24
**3rd** 121:5
240:4 241:2
260:22

**4**

**4** 4:11,12 45:17
45:18 46:12,14
46:18 47:4
142:12,16,25
143:8 144:15
177:11 224:22
225:1,4 231:9
231:12 239:14
**4,311.07** 115:4
**4,480** 152:12
153:5,8 155:1
157:14
**4,763.07.**
112:19
**4,803,985.44**
82:1
**4,803,985.44.**
81:22

**[4.16. - 70,000]**

**4.16.**  257:8,13
**4.759**  194:22
**4/7**  46:1
**4/7/2020**  46:2
  46:25
**40**  4:10 189:20
**40,800**  228:23
**400**  207:22
  225:4
**400,000**  232:21
**4038**  71:14
  72:18
**409a**  120:16
**42003**  83:14
**430**  2:21
**4421**  35:25
  36:3 185:4
  186:14 203:25
**45**  4:11
**450**  119:2
  207:22
**4562**  225:6
**46**  4:12
**471,855.44**  89:4
**471,855.44.**
  88:1
**471-2163**  32:20
**478,184**  116:22
**49,997.85.**
  116:1
**4:27**  211:5,12
**4:34**  211:15
**4th**  119:3

**5**

**5**  4:13 69:14,15
  138:15,17
  176:6,7 178:25
  249:6
**5,074**  205:3,5
  205:11
**5,190,333**
  234:15 236:9
  236:11
**5,857,107.60**
  94:23 95:1,11
  124:1,9
**5,932,196**
  211:21 212:13
**5.3**  137:20
**5.8**  95:14
  124:15 200:19
**5.857**  96:6
**50**  65:14 66:3
  66:10 67:4,13
  98:3 132:21
  189:22
**50,000**  132:19
  134:19,20
  135:6,6,8,14
**50/50**  164:2
**500**  91:14
  93:22 118:23
**500,000**  73:5
  93:19 119:6
  142:5 145:11
  259:9
**500,536.65**
  73:10

**500,536.65.**
  72:25
**5084**  70:23
**5085**  71:1,2
**52,674**  225:23
  225:25
**526,833**  214:5
  214:10
**539,864.50**
  126:24
**54**  211:2,5
**55**  228:10
**55,767.80.**
  107:15
**568**  211:22
**57,799**  218:24
**5th**  145:1,22

**6**

**6**  4:14 146:22
  146:23 178:25
  201:9,16 227:8
**6.2**  144:14
  225:2
**6/10/89**  31:22
**60**  131:9
  183:13,19
  189:24,25
**600**  2:14
**619**  2:17
**63,000**  161:6
**63,643**  206:16
  206:18
**635,000**  260:12
**63k**  208:18

**64,484**  148:22
  149:3 190:13
**66,307.41**
  100:22
**661**  207:16,21
  208:18
**661,356**  204:25
  207:17,18
**664,000**  220:2
**68**  240:2
**6834033**  1:23
  269:2
**6:07**  265:5,7
**6:30**  209:22
**6th**  240:3,24

**7**

**7**  4:16 45:23
  46:7 89:23
  151:4,5,7,10,15
  151:22 152:5
  178:25 181:9
  190:12,12
  210:4,24 261:1
**7,492,634**  228:4
  228:6
**7,665**  252:23
  253:3
**7,709,559**  228:3
**7.492.**  228:14
**70**  65:12,19,20
  66:3,3,9,10,11
  67:13,13 68:7
  183:15
**70,000**  66:24

**[70/30 - account]**

**70/30**   164:2,2
**700**   188:22
**71**   161:17
**7111**   52:3,12,16
53:12 54:21
63:3,19 177:4
192:4 215:2,7
224:1,9 229:1
**72,489.31.**
76:10
**73,767.65**   112:2
**749,135**   223:6
**75**   131:6
**75,532.20.**
115:7
**75,594**   219:18
**79**   195:14
**79,000**   186:19
228:20
**795**   204:22
**7th**   56:24 57:16

**8**

**8**   4:3,17 96:23
151:1,3,9,10,16
165:10,11,16
165:18 166:17
174:5 179:1
193:20
**8,122,000**
233:23
**8,323.59.**   87:16
**8,391.66.**
115:24
**8,700**   200:13

**8.1**   233:20
**8.122**   234:11
**80**   131:4,4
133:9,15,24
135:16
**80/20**   130:25
132:10
**800**   188:22
**82,206**   215:16
215:17
**826**   211:19
**832**   216:10
**836**   217:18
**846**   218:5,15
**86,649**   215:13
**8719**   31:25
**874**   222:20
**88,278**   205:12
**883**   225:8
**884**   225:22
**885**   227:5
**8th**   240:3,20,21

**9**

**9**   4:18 114:10
164:22 165:1
176:21,24
**9,913**   76:3
**9,913.94.**   75:22
**9/30/2018**
152:17
**9/8**   161:20
**90403**   1:18 2:6
6:9
**91**   196:1

**91406**   52:4
**91423**   185:5
**92**   5:14
**920**   228:2,3
**92101**   2:15
**94,020.10**
113:23
**941**   32:17 90:3
**941s**   90:4,9,16
**944**   90:3
**944s**   90:5,9,16
**980**   160:16
**983,823**   258:11
**9:01**   5:10
**9th**   251:2

**a**

**a.k.a.**   36:17,17
**a.m.**   1:15 5:8,9
6:5 16:13,16
210:4,24
238:17
**ability**   162:17
266:10 267:8
**able**   52:14
81:25 94:1
96:13 153:22
179:22 209:22
218:8,10 233:9
236:6 238:21
243:21,22
**ablovatskiy**
182:20
**absent**   6:12
**absolutely**
127:16 167:23

188:5 231:6
**academy**   36:17
44:19 45:2,10
45:12,12 58:1
58:3,6,8,10,12
58:16,19,23
149:7 191:14
191:16 192:14
204:24
**accept**   104:6
194:6 196:7
**acceptable**
264:12
**access**   23:19,21
24:3,6,13 25:8
26:4,6 28:3,7
28:11,12,20
52:14,21,22
72:14 75:5
77:9 87:10
139:25 142:18
144:20 146:5
157:18 158:1,3
254:1
**accessing**   25:18
**accommodati...**
144:11
**account**   22:24
23:5,8,13,17,18
24:6 25:9,12
25:18 68:14,16
68:17,18,22,23
69:23,24 70:7
70:10,18,23
71:5,6,9,15,19

**[account - addresses]**

71:21,23 72:2
72:5,8,15,18,24
80:14,23 81:11
87:15 91:17,18
94:17 107:13
108:17 114:14
114:16,20,22
114:24,25,25
140:12 141:10
256:20 257:15
258:3 259:15
259:25 260:1,6
260:24
**accountant**
56:19 64:20
149:1 156:22
157:18 213:14
**accountant's**
110:23 111:2
**accountants**
27:17 55:19
56:13,15 72:13
74:15,16,19
75:8 81:13
83:4,7 87:9,25
88:3,8,11,14
89:16,18 90:22
96:21 111:16
112:17 116:8
124:10,12
129:10,15
155:25 156:18
156:19 251:9
253:4 255:7

**accounting**
23:12,14,20,21
23:24 24:2,10
25:9 26:19,20
27:3 28:2 80:9
110:9 111:9,15
111:22 114:7
154:20,24
155:4,7,8,15,16
155:18,20,22
186:9 202:19
251:10,11
253:18,22,25
254:4,5
**accounts**    23:15
23:18 25:13
68:25 69:1,3
72:25 73:1,3
81:22 115:7,16
115:18,21
141:2,7 185:18
193:11 194:25
195:4
**accredited**
176:2 177:16
177:18 178:7
**accrual**    87:4,11
87:19,22 88:1
89:4 230:21
231:7
**accrue**    161:7,8
162:1
**accrued**    160:25
**accrues**    161:5

**accumulated**
74:9,11 75:20
**accurate**    47:6
47:23,24
158:14 160:20
167:6 169:14
175:11 180:19
216:23 230:20
231:6 243:3
266:9 267:6
**accurately**
211:24
**ach**    68:13
**acknowledge**
184:16,18
**acknowledg...**
6:11
**acosta**    24:9
74:18 81:16
156:2,14,21
157:1,20
**acquire**    4:19
163:4
**acquisition**
180:9 181:19
**action**    266:12
266:16 267:9
267:13
**active**    45:24
69:5 70:20
**activities**
192:16
**activity**    58:7
**actor**    70:16

**actual**    51:24
59:25
**actually**    29:16
70:14 73:24
122:25 132:16
139:25 174:21
187:5 224:9
225:2
**ad**    73:25
100:19 136:25
**add**    20:3 96:13
154:21 214:2,9
**added**    73:16
108:3
**adding**    20:20
**addition**    29:12
64:5 133:13
192:8
**additional**
22:11 230:3
231:22
**additionally**
6:12
**address**    23:1,16
23:22 30:7
32:24 33:18
35:2,9 36:4,5
39:8 52:2
119:13 124:22
149:23 185:5
204:2,5 207:8
207:10
**addresses**
118:9

**[adds - amex]**

| | | | |
|---|---|---|---|
| **adds** 94:2 | **advertiser** | 165:4,9 197:19 | 18:17,17,23 |
| **adhered** 244:16 | 250:11 | 197:25 | 20:11 47:13 |
| **adjusted** | **advertisers** | **agree** 6:14 | 118:25 129:25 |
| 165:24 166:8 | 73:20,22 | 12:15 50:24 | 130:1 132:18 |
| **administer** | 132:19 141:11 | 57:18 154:3 | 134:10 136:5 |
| 6:11 | **advertising** | 167:21 244:15 | 168:17 171:17 |
| **administrative** | 66:16,23 67:1 | **agreeable** | 171:18 211:4 |
| 64:21 | 67:6,12,20,21 | 263:13 | 240:14,16 |
| **admissible** | 68:1,6 74:2,3 | **agreed** 52:20 | **ain't** 47:18 |
| 196:22 | 97:5 114:23 | 244:14 | 109:16 |
| **adobe** 29:24 | 131:1,4 183:20 | **agreement** 4:18 | **alex** 144:5 |
| 30:1,2 107:5,6 | 188:4 204:23 | 5:7 54:20 67:2 | 226:11 |
| 219:3 | 215:16,17 | 68:5 76:20,23 | **allow** 135:4 |
| **advance** 11:25 | 221:24 222:12 | 79:5 80:6 | 136:8 |
| 12:3 115:13 | **advise** 157:3 | 143:11 162:25 | **allowance** |
| 132:1,23 133:9 | 210:3 | 164:15 165:12 | 225:17 |
| 133:14,23 | **advisor** 119:9 | 165:23 166:10 | **allowed** 18:8 |
| 134:19,20 | **affectionately** | 166:23 167:10 | 19:3,13,17 |
| 135:17,22 | 246:23 | 167:17 172:13 | 182:2 |
| 140:16,21,23 | **afford** 136:23 | 174:7,23 | **allowing** 224:7 |
| 141:3,13,18,22 | **agencies** 73:25 | 176:14 177:3 | **allows** 200:14 |
| 143:15 144:21 | 74:2,4 97:7 | 177:10 181:6 | **almighty** |
| **advanced** | **agent** 172:12 | 181:23 182:8 | 200:17,22 |
| 133:18 134:23 | 172:12,20,20 | 183:21 193:22 | 201:5,15 |
| 140:11,24 | 174:19 182:21 | 235:19,21,25 | **alternative** |
| **advances** | 202:14,16 | 236:2 237:16 | 131:24 |
| 132:11 227:8 | **agents** 242:16 | 237:17 241:6 | **america** 102:21 |
| **advancing** | 242:22 | 241:14,22 | 148:3 260:10 |
| 115:15 135:18 | **aggregate** | **agreements** | **american** |
| **advantageous** | 123:12 183:15 | 68:4 99:2 | 128:17 |
| 164:6 | **aging** 4:17,25 | 114:2 | **ameritrade** |
| **adventures** | 151:8,22 | **agrees** 165:24 | 80:13,14,18,23 |
| 59:24 60:6 | 158:20 193:3,6 | 175:6 183:18 | 81:11 |
| 61:9 | **ago** 47:5 | **ahead** 14:13 | **amex** 21:19 |
| | 131:14 142:1 | 17:23 18:12,13 | 82:9,24 83:14 |

**[amex - arcadian]**

115:23 250:4
252:6 253:9
255:16
**amortization**
225:10
**amount**  35:11
50:15 51:8
53:24 73:6,13
74:7,21 92:21
96:14 108:17
115:14,14
119:7,10 123:1
131:25 132:2
132:23 133:23
135:17 139:25
142:2 150:20
150:21 152:19
154:22 166:24
166:25 167:11
167:19 168:23
169:17,24
172:24 175:25
193:17,19,20
197:8 198:21
215:8 223:21
258:18
**amounts**  60:20
60:21,22 80:3
93:12 198:2
215:12 239:20
**analina**  24:9
74:18 81:16
156:1,14,21
157:1,17,20

**analogy**  183:6
**analysis**  138:12
**ancillary**
105:24
**angeles**  34:9
124:22 177:4
**announced**
163:3
**annual**  47:4,22
111:22
**answer**  5:16
10:7 16:25
17:22,23 18:13
19:13 20:16
31:13,19 32:2
32:9 33:1,8
34:13 35:4
37:21 38:4,7
39:24 41:22
46:23 47:11
49:13 55:4
57:3,24 58:15
75:4 79:12,23
81:10 85:14
86:18 104:6
112:14 125:15
125:16 129:13
169:1,4 171:25
192:21 205:7
216:1,24
218:13 220:9
244:13
**answered**
18:21 55:3
77:20 86:16,23

89:7 90:14
121:8 217:3,6
224:24 231:15
231:18 239:4
249:18,19
**answering**  17:8
**answers**  10:18
17:2 37:16
46:20 47:8
144:19 179:18
**anybody**  17:13
28:19 81:18
109:17 112:9
157:6 245:9
**anymore**  136:8
136:20
**anyway**  110:6
**apartment**
203:22 207:9
**apartments**
124:21,25
125:6,9,24
**apologies**
125:18 257:11
**appearing**  7:16
**appears**  152:21
161:4 178:1
186:15 214:4
**appendix**
233:12 234:9
**apple**  66:19
**applicable**  6:18
183:20
**application**
56:9

**applied**  153:12
153:13 190:23
**apply**  13:8
55:18 58:6
147:24 175:6
**appreciate**  27:5
261:4
**approach**
157:4
**appropriate**
70:3 82:19
84:11 108:13
180:2
**appropriately**
83:7 253:13
**approval**
145:15
**approved**
132:14,24,25
133:19 135:18
**approximately**
21:14 128:9
**apps**  61:17
**april**  45:23
46:6 56:24
57:16 58:11,17
84:16 85:2,8
86:13 95:9
124:7 190:12
190:12 236:13
240:1 243:1
**arcadian**  2:10
3:3 7:5,19 8:19
22:23 29:13
69:4 130:8,15

**[arcadian - audience]**

131:2,8 132:8
132:19 133:10
133:15,22
151:24 152:10
152:12 153:3
156:24 158:16
160:12,19,24
161:13 184:8
184:19 196:1
199:25 200:7,9
234:22 237:18
238:14 239:12
240:5 241:5
242:13,24
244:22 245:8
247:7,19
252:19
**area** 41:5
**areas** 9:25 11:7
12:10,11 22:8
37:9,12,17
38:6,12 88:7
**argue** 16:18
110:7
**arguing** 11:5
110:5
**argumentative**
81:3 90:6
103:10 170:12
184:5,11
197:14 200:20
200:24 224:24
231:15 236:19
236:23 239:8
255:2

**arm's** 35:17
**arrangement**
52:14 130:24
132:7 163:23
164:5
**arrive** 199:14
**arrived** 89:5
216:22 217:10
**art19** 219:21
**article** 196:9
198:3
**article's** 198:5
**articles** 4:15
138:3 146:20
187:19
**asked** 11:12
17:15 18:20
20:1 32:7 43:7
55:3 86:15,22
89:6 90:13
92:9,13 111:16
121:8 134:4
157:8 196:7
197:19 201:14
210:6 217:3,5
217:6 224:23
231:14 239:3,6
249:19 255:4
**asking** 15:10
20:13 36:19
39:8,9 43:10
43:18 57:18
60:5,19 73:16
75:12 79:19
86:9 90:7

98:19 99:8,21
118:12 121:9
127:1,4,17,21
128:12 136:16
143:8 144:12
157:3,5,8,15
160:2,3,4
191:7 204:8,11
208:19 217:11
217:12 225:16
230:8,8 231:1
232:4 239:10
248:15
**asset** 69:25
71:22 76:9,25
77:13 78:14,21
79:12 80:7
81:12 145:6
173:8,12,22
181:23
**assets** 4:20
69:20 76:11
78:21,22,23,24
78:25 79:2
80:17,18,24
163:5,11
181:19 182:16
**assigned** 6:4
**assistance**
64:21
**associated**
148:19 181:2
182:1,3 221:2
221:11 259:7

**associates** 2:20
**association**
128:17 181:2
232:13,23
**assume** 27:16
29:20 33:25
35:20 42:15,17
59:25 68:11
76:19 90:3
115:20 119:11
132:9 143:17
261:23
**assumes** 197:15
**assuming** 49:7
162:13 169:3
169:14 177:6
**attach** 36:7
182:7
**attached** 88:15
98:23 116:6
145:7 176:24
239:16 249:24
**attachment**
176:21 239:17
249:12
**attendance** 7:2
**attorney** 7:3
17:23 41:19
50:20 88:24
121:24 266:14
267:11
**attribute**
187:13
**audience** 131:5
131:7 247:13

Page 11

**[audio - bankruptcy]**

**audio**  29:25
30:1 59:24
60:6 61:9,20
61:20,21 62:1
62:1 64:25
266:8 267:4
**audit**  154:24
155:5,23
162:10,16,17
168:23 247:12
**auditing**
156:24
**audition**  30:1
**audrey**  267:3
267:18
**august**  1:14 6:8
123:15 147:2
164:19 165:4,7
240:4 241:2
243:14,15
244:19
**authenticated**
47:10 196:13
196:23
**authenticating**
47:15
**authority**
171:20
**authorized**
6:10 34:2 38:4
125:1,10 259:1
**auto**  100:24
101:8,11,14
102:17 218:18
218:20 225:23

**automatically**
191:20 257:14
**autopay**  257:6
**available**  140:2
144:17 146:5
**ave**  177:4
**avenue**  1:17 2:5
6:9 36:1,4 52:3
52:12,17 53:12
54:21 63:3,19
119:3 185:4
186:14 203:25
**average**  41:7
131:5 137:20
**averaging**
189:18
**avoidance**
174:24 175:4
**aware**  62:5
66:21 80:4,4
80:22 149:9

**b**

**b**  2:12,14 4:5
5:1 8:25 9:4,8
11:4,5,14,16,17
11:23 12:1,6
12:13,18,25
13:7 14:9,15
15:11,19,25
16:18 91:7
172:10,17
179:19 252:11
**bachelor's**
44:12

**back**  13:5,11
14:19 16:15,24
25:2 38:1 40:6
48:17 79:8,18
86:5 93:2 96:9
102:3 110:6
122:17 123:1
124:3 131:11
134:6,10,12
144:10 146:2,7
148:16 150:17
151:13 183:12
190:8 205:4,9
209:23 210:11
210:13,19
211:14 230:16
240:9 243:9
246:24 249:6
264:11
**background**
30:6
**backwards**
24:4,5
**bad**  226:10
**badgering**
77:19 78:1,2,6
78:7 88:18
137:10 184:11
248:1
**balance**  4:16
69:16 71:16
76:17 82:16,16
87:4 88:10,15
114:5 123:8,9
140:25 141:1

142:15 143:13
145:16 146:4
151:7,23 152:4
153:21 154:4
157:13 158:19
158:25,25
159:4,12,21,22
159:25 160:25
161:3,4,5,7,8
161:10,24
166:11 195:21
256:23 257:9
**bali**  129:8,14
**ballpark**
167:14 191:8
207:25 249:7
**bank**  21:23
68:12,17,21
70:6,10,23
71:11,13 72:4
72:8,11 102:21
114:18 129:2
139:20,22
140:6,11 141:2
141:10,15
142:11 148:1,3
190:9 191:8
218:21,22
258:12,16
259:25,25
260:6,9,10
**bankruptcy**  1:1
8:20 11:6
30:24 31:1,5
36:24 38:21

**[bankruptcy - benz]**

39:11,21,23
49:10,20 51:1
68:24 69:17
70:21 78:15
85:3,9 86:14
87:8 88:6
89:14 93:9
95:10 99:3
108:23 116:6
163:17 169:11
169:15,18
170:6,10
171:24 173:3,7
173:11 182:15
193:10 194:9
194:10,14,15
194:18,19,21
198:24 199:9
233:6,8 236:17
236:20,24
247:15
**bar** 171:12,15
**based** 52:1
87:14 98:10
99:17,18
132:13 168:23
**basically**
130:21
**basis** 17:22
84:23 180:13
230:22,23
231:7
**bates** 158:22
160:9 175:2
176:3 178:12

178:18 179:10
179:11 192:11
206:24 207:1,4
211:18 216:9
217:17 218:5
218:14 222:19
225:8 228:2
258:8
**batman** 59:23
59:24 60:6,14
61:5,9,25 70:6
**battery** 106:7
**bear** 129:2
179:22 210:19
**bearing** 114:16
114:22,25
**beckley** 2:22
**beginning** 7:3
102:13 105:11
120:15 187:9
213:6 227:9
230:4
**begins** 177:3
178:16
**behalf** 2:2,10
7:5 16:21 21:7
38:16 84:24
89:19 105:8
126:19 132:4
146:17 166:15
166:21 180:3
181:8 185:22
186:1 198:9
250:17

**behest** 241:22
**believe** 10:1
12:4 21:11
23:9 24:12,13
25:25 28:12
37:11 40:15
43:24 44:1,25
50:12 51:13,16
51:19 53:25
58:7 59:14
60:3 61:1
65:14 71:5,15
74:4 75:6 83:1
89:21 91:14
92:19 93:1,24
94:1,11 98:18
98:21 101:3,10
102:18 104:14
107:19,23
116:12 117:10
117:15 119:9
122:3 123:16
123:16,22
124:24 126:1
127:11 141:5
142:5 143:25
144:6 152:7
158:5,14,15
162:9 163:21
165:14 166:17
168:22 169:10
172:23,24
173:19 174:8
174:17,20
175:22 180:5

182:12,12
184:17 188:19
193:17 195:2
195:15 201:8
201:11,11
202:10 203:3
204:6,6,12
211:24 212:18
213:12 217:22
220:22 223:14
234:10 235:8
237:23 240:10
244:18 245:11
252:7 255:15
255:17,19,21
257:16
**believed** 164:13
247:18
**belonging**
80:24
**ben** 143:24
**benefit** 149:5
168:7 169:20
169:21 193:21
193:25 194:16
234:25
**benefited** 172:3
194:3
**benefits** 55:23
199:23 235:3,6
235:8,9
**benefitted**
169:16
**benz** 105:2

[berger - business]

| | | | |
|---|---|---|---|
| **berger** 138:11 | **billboard** 198:5 | **books** 123:11 | 135:10 136:9 |
| **best** 19:10 24:8 | **billboard.com** | 157:19 158:2,3 | 151:24 153:20 |
| 48:1 72:10 | 196:8 | 259:5 | 157:23 158:6 |
| 81:5,10 87:7 | **bills** 84:7,10 | **borne** 187:18 | 168:8,12,18,21 |
| 87:23 89:18 | 113:21 122:9 | **borrower** 4:22 | 184:2,19 |
| 153:14,16 | 153:5 154:5,14 | **bottom** 145:3 | 188:10,14 |
| 157:1 164:13 | 154:14,21 | 158:23 207:2 | 193:24 195:7 |
| 167:23,25 | 157:1,10 | 211:19 217:18 | 195:14,25 |
| 185:9 201:7,8 | 159:23 | 233:22 | 199:25 200:17 |
| 239:6,11 | **binds** 9:15 | **boutique** 253:3 | 238:17 239:15 |
| 241:17 247:18 | **birth** 31:22 | **box** 64:6 | 239:25 240:5 |
| 247:21,24 | **bit** 14:5 30:6 | 179:16 205:19 | 241:12 242:3 |
| 251:8 266:10 | 56:5 60:13 | **boxes** 179:16 | 243:7,24 |
| 267:7 | 87:19 107:14 | 180:3 181:4 | 244:13,23 |
| **better** 122:25 | 131:13 187:14 | **boyd** 143:24 | 245:2,7,15 |
| 124:14 170:3 | 210:7 222:10 | **brand** 150:4 | 246:2,9,15 |
| 200:3 | 224:7 240:14 | **brands** 97:7 | 247:17,24 |
| **beverly** 49:17 | **bitches** 234:3 | **break** 17:8 | 249:11,13 |
| 110:10 111:2,6 | **biweekly** 84:23 | 18:18,19,20 | **brian's** 246:13 |
| 111:10 | 108:20 | 65:7 82:22 | **broad** 245:5,25 |
| **beyond** 29:2 | **bk** 1:6 | 85:24,25 | **broads** 116:22 |
| 145:12 239:20 | **black** 123:3,6 | 107:15 132:18 | 234:2 |
| **big** 146:5 | **block** 177:25 | 150:6,9 210:7 | **brother** 119:25 |
| **bill** 111:23 | 178:1,3 | 210:10,12 | **brothers** 60:7 |
| 112:15,15,16 | **bloomberg** | 211:8 | **brought** 251:3 |
| 112:16 152:6,6 | 138:11 | **breakdown** | **bucks** 73:17 |
| 152:7,16,18,21 | **bluevine** | 107:16 | **building** 42:14 |
| 152:23 153:10 | 139:16 141:21 | **brendan** 196:6 | 52:9 |
| 153:10,11,12 | **bold** 242:6,7 | 196:25 197:3,4 | **bump** 232:22 |
| 154:25 155:2 | **bondit** 139:17 | 197:4,11,18,20 | **bunch** 40:2 |
| 157:14 161:19 | 142:3,3,5,10 | 198:14,19,23 | 118:8 |
| **bill.com** 252:15 | **bonus** 100:19 | 199:7,12 200:2 | **business** 4:11 |
| 252:16 | **booking** 26:6 | **brian** 3:3 7:18 | 23:5,8,15,18 |
| **bill.com.** | **bookkeeping** | 22:23 23:13 | 26:11,13 28:23 |
| 252:22 | 27:3 | 82:3 132:22 | 33:4,7,9,14,17 |

**[business - car]**

34:2 40:21
41:2 42:2,3
45:9 46:6
51:21 52:11
58:10,16,21,22
63:18 64:1,2
70:3 72:22,24
82:12,19 83:2
83:4,6,7,14,15
83:16 84:2,11
84:24 86:11
107:13 108:13
124:22 125:1,5
126:6,15,18
128:9,20 129:3
129:11 130:15
136:8,21,22
137:24 140:5
142:21,23
149:7 179:20
180:7 181:1
186:10,11,23
188:13 191:13
191:16 192:14
204:21,23
205:15,21
208:10 209:3
220:12,21,23
222:14 231:12
246:19 250:8
251:7,8,15,21
251:25 252:6,7
253:9,15,19,23
254:6,12,13,14
254:16

**buying** 194:7

**c**

**c** 2:1 3:1 5:12
6:1 8:17 33:22
40:13 59:13,14
95:13 104:14
104:16,19
176:2 177:3,16
177:19 179:24
202:13 204:21
204:22 205:19
208:4,5,6
252:12
**ca** 1:18 2:6,15
**calabretta** 24:9
74:18 81:15
156:1,4,12,13
239:7
**calculation**
140:1 200:15
235:17
**california** 1:2
6:9,11 8:20
30:13 33:24
34:2,9,10 35:2
35:3 36:1,4
45:22 46:17
48:4 49:18
51:18,20,25
52:4 54:22
56:22 57:14
89:24 95:19
96:4 119:13
121:4 124:22
147:8 170:22

171:12 177:5
185:5 204:18
211:22 212:1
266:23
**california's**
171:6
**call** 12:20 16:6
16:8 29:14
46:12 71:6
95:19 154:14
156:11 251:13
**called** 8:8 23:13
23:15 24:10
28:11 44:19
60:12 62:6,24
62:25 69:16
126:12 149:14
233:4
**calling** 96:5
**calls** 13:20
49:12 50:1,5
57:1,22 58:24
58:25 83:18
85:4,11 95:22
95:24 185:12
198:11 200:25
245:17 246:4
**canoga** 34:8
35:2 147:8
192:13
**capable** 179:21
180:8
**capacity** 14:18
145:8 179:24
188:4

**capchase** 139:4
139:6 140:19
142:12,16,25
143:19,21,25
144:4,7,9,11,20
144:22 145:6
166:11,14,18
166:20,24
167:9,16,18,22
168:7,20
169:16,21,23
171:22 172:3,6
175:5,15,17,18
175:23,25
224:22,25
227:14,18,23
231:11 235:2,5
236:15 258:23
260:20,22,23
**capchase's**
178:14
**capital** 115:8
115:11 131:20
131:21,22,23
132:7 134:1,21
135:14 136:10
136:17,25
140:21 231:22
253:10 254:25
258:9,21
260:11,14
**captured**
253:11
**car** 205:2,3,5,8
205:10

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[card - chase]**

**card** 70:2 82:10
82:12,13,14,15
82:18,24 83:14
83:16 84:2,3,7
84:10 115:23
146:17 189:6,6
190:9 211:9
251:5 252:6,24
253:17,25
254:23 255:8
255:14,18
256:19 257:6
258:3 262:21
**cards** 62:14,23
82:6 108:11
185:23,24
251:14 253:8
253:13 254:3
254:22 255:9
257:14
**care** 43:12
119:15 253:22
262:24,25
**careful** 33:6
**cartier** 252:23
253:3
**cary** 119:8,9
**case** 1:5 25:24
36:22 69:18
133:21 137:7
156:23 160:9
185:10 188:5
211:22 212:5
226:20

**cash** 68:10,11
115:9 122:8
142:18 145:16
230:23
**cashflow**
115:10,19,22
**cashflows**
116:5
**catching**
238:13
**categorized**
89:25
**category** 87:21
**cause** 60:24
96:21 188:19
212:15 232:6
245:3,23 246:3
**caused** 139:9
245:12,16
246:9
**cbs** 195:10
**cease** 33:20
**ceased** 46:16
57:16 190:11
190:12
**cell** 16:7,8
113:15,16,18
113:19,21
**cent** 168:20
238:19
**center** 121:5
**central** 1:2
**cents** 50:25
75:19 122:18
137:21,21

161:17 193:21
195:14 200:12
240:1,2
**ceo** 3:3 30:18
31:3,10 44:2
59:4 63:6 76:6
77:17 81:1
89:3 90:4
155:14,17,19
158:6 181:9
197:17,21
241:20
**certain** 4:19
12:24 15:12
98:9 108:17
114:5 115:13
130:7,11 132:1
139:7 155:1
156:25 157:1
157:10 163:5
163:12 166:25
167:11 177:23
251:24
**certificate** 4:10
95:25 266:1
267:1
**certified** 6:14
**certify** 266:4
267:3
**cetera** 182:25
182:25 219:21
**cfo** 24:11 28:3
28:3,11,15,15
28:16,16 63:13
63:14,15 81:17

143:23,23
156:2,2,15,15
232:13,24
**cgl** 202:9
226:18
**change** 10:19
115:20,20
169:14 211:9
247:16 269:5,8
269:11,14,17
269:20
**changed** 45:15
215:11
**character**
62:24 100:11
**charge** 82:23
83:2 252:23
253:3,23,24
258:2
**charged** 83:8
251:14
**charges** 218:21
218:22 225:23
250:6,13,24
251:1,18,19,22
252:5 253:19
253:19 254:6,6
**charging** 251:1
**charles** 119:11
**chart** 230:20
231:9 232:16
232:19
**chase** 69:21
253:10 255:1
255:18 256:19

Page 16

**[chase - cohen]**

| | | | |
|---|---|---|---|
| 256:22 257:6 | **civil** 9:1 12:1 | **closed** 69:5 | 85:11,19,22,25 |
| **chatty** 116:22 | 14:16 17:19 | 70:21 | 86:15,22 88:17 |
| 234:2 | 78:10 | **cloud** 29:24 | 88:23 89:6 |
| **cheap** 106:15 | **claim** 49:18,19 | 63:20,21,24 | 90:6,13 92:10 |
| **cheat** 19:18,23 | **claimed** 230:10 | 64:3 107:6 | 92:15,22 |
| **check** 68:12 | 231:3 251:7 | **coach** 19:3 | 103:10 106:16 |
| 79:17 94:2 | **claims** 49:21 | **cogs** 231:10 | 108:22 109:6,8 |
| 157:14 161:19 | **clara** 91:9,11 | **cohen** 1:16 2:3 | 109:10,13,19 |
| 180:2,3 252:21 | 91:14 93:5,22 | 2:4 6:8 7:8,8 | 109:23,25 |
| **checked** 179:16 | 118:23 119:1,6 | 9:3,7,19 10:17 | 110:3,11,14,17 |
| 181:4 191:20 | 259:7,10,12,13 | 11:1,9,12,20,22 | 110:24 116:19 |
| **checking** 69:21 | **clarify** 37:18 | 12:4,15 13:15 | 116:23 117:4,7 |
| 69:24 70:23 | **clarity** 48:7 | 13:18,23 14:1 | 118:6,11,15,17 |
| 71:13,19 72:2 | 50:11,14 | 14:4,20,23 | 121:8 124:3 |
| 72:22,24 | **classified** 83:6 | 15:1,5,9,14,17 | 125:14 127:4 |
| **chief** 63:8,11 | 84:12,13 113:2 | 15:21,25 16:5 | 129:25 134:5,8 |
| 63:14 | 254:14,15 | 19:1,5,10,14,20 | 134:9,12,16,22 |
| **chino** 121:4 | **classify** 186:10 | 19:22 20:3,9 | 135:1,24 136:2 |
| **choice** 262:3 | **cle** 78:8 | 20:15,19 22:17 | 137:9,13,16 |
| **chose** 139:8 | **clean** 190:7 | 31:11,18 32:2 | 145:3 150:11 |
| 186:25 199:1,1 | **clear** 12:12 | 32:4,8,12,25 | 151:5 164:20 |
| **christine** 34:5,7 | 13:22 14:6 | 34:11,18 35:4 | 164:23 169:1 |
| 203:21 257:19 | 39:9,15 166:13 | 37:4,7,16,21,24 | 170:12,24 |
| 258:15,19 | 167:4 182:23 | 38:4 39:1,4,7 | 171:4,8,13,17 |
| 259:17,24 | 195:7 204:16 | 39:12,15,24 | 172:15 173:4 |
| **chrysler** 106:24 | 216:14 234:25 | 41:12,16,17,20 | 176:5,10,18,20 |
| **chuck** 91:4 | 235:2 | 46:20 47:8,15 | 176:25 177:7,9 |
| 93:4,25 117:22 | **client** 17:23 | 49:2,4,11,25 | 177:14,20,25 |
| 119:11 | 41:19,19 | 50:5,20 51:2 | 178:3,6,10,13 |
| **chunk** 146:5 | 169:17 248:18 | 55:3 57:1,7,21 | 178:18,24 |
| **citi** 255:13,13 | **clients** 126:21 | 58:24 62:16 | 179:3,6,9,12 |
| 258:3 | 169:10,21 | 77:18,24,25 | 181:12,14 |
| **citing** 138:11 | 183:20 199:4 | 78:6 79:14 | 184:5,10,22 |
| **city** 30:8 | **close** 68:25 | 80:16,19 81:3 | 185:12 189:13 |
| | 165:6,8 208:3 | 83:18,22 85:4 | 195:9,12 |

**[cohen - compensation]**

| | | | |
|---|---|---|---|
| 196:12,18,21 | **colin**  1:12 6:6 | 193:15 201:22 | **companies** |
| 197:14 198:11 | 7:12 8:7,17 | 209:23 213:14 | 59:18 138:5 |
| 198:16 200:20 | 12:14 13:3,9 | 217:15 220:6,8 | 144:23,24 |
| 200:24 202:23 | 23:2 32:11,12 | 223:7 | 182:1 202:8 |
| 203:5,11 | 32:12 119:14 | **comes**  62:14,21 | **company**  4:14 |
| 205:16,20,23 | 128:8 186:14 | 62:22 75:19 | 30:24 32:13 |
| 206:20,23 | 239:15 242:4 | 82:1 95:5 | 33:22 44:4,18 |
| 207:3 209:10 | 246:16,17 | 173:2 186:12 | 44:19 48:7 |
| 209:21,25 | 265:4 268:12 | **comfortable** | 50:12 60:24 |
| 210:5,9,13,20 | 269:2,25 | 17:8 37:14 | 69:13 70:1 |
| 212:8 217:3,5 | **colin's**  167:24 | **coming**  40:6 | 71:23 77:12 |
| 221:20 222:18 | 251:13 | 107:14 126:25 | 78:13 79:7 |
| 222:24 224:23 | **colinpthomson** | 134:20 135:7,8 | 82:18 84:9 |
| 229:9 230:12 | 32:23 33:5,9 | 135:13 137:25 | 91:2 95:6,7 |
| 231:14 232:17 | **collect**  67:6 | 138:22 178:21 | 102:5 125:20 |
| 233:13 236:19 | 71:7 132:3 | **comment** | 127:23 131:16 |
| 236:23 237:1 | 141:8 170:3 | 110:24,25 | 131:16 133:19 |
| 238:10 239:3,8 | **collected**  71:9 | **commercial** | 139:10 142:20 |
| 240:16 243:9 | **collecting** | 42:8 125:2 | 146:20 149:18 |
| 243:11,13 | 71:10 141:17 | 202:1 | 155:15 165:21 |
| 244:3,6,9,11 | **collective** | **commissions** | 165:24 166:7 |
| 245:17 246:4 | 202:22 | 226:1,2 | 175:6,7 179:16 |
| 248:1,6,19,21 | **collectively** | **commit**  145:11 | 180:14,20,21 |
| 248:25 249:18 | 37:5,6 | **common** | 180:25 181:3 |
| 255:2,22 256:4 | **collects**  67:20 | 119:17,23 | 183:17,18 |
| 256:23 257:2,4 | **college**  44:9,14 | 120:11,20 | 191:21 200:18 |
| 257:9 261:8,10 | **combination** | 165:16,19 | 200:23 201:9 |
| 261:16,25 | 221:25 | 166:1 182:21 | 219:1 223:13 |
| 262:14,17,18 | **come**  13:5,10 | **communicate** | 223:15 229:1 |
| 262:21,24 | 14:19 21:7 | 230:1 | 232:8 233:4 |
| 263:4,8,10,23 | 50:13 62:16 | **communication** | 251:3 254:23 |
| 264:2,5,8,10,20 | 68:23 75:10 | 22:14,16 | **company's** |
| 264:25 265:2 | 96:14,18 139:1 | **communicati...** | 165:25 187:1 |
| **coincidence** | 143:9 145:19 | 20:21,24,25 | **compensation** |
| 197:10,13 | 174:1 178:7,9 | 26:7 29:5 | 22:4 31:6 |

**[compensation - conversion]**

| | | | |
|---|---|---|---|
| 147:16 165:20 | conditioned | consulting | 156:15,15,17 |
| 165:20 185:6 | 241:13,21 | 88:14 219:11 | 162:11 163:10 |
| 185:11 186:4 | **conduct** 33:4,6 | 219:12 226:13 | 167:22 174:20 |
| 186:11,16,19 | 33:8,13,17 | **cont'd** 3:1 5:1 | 182:13 199:19 |
| 186:25 189:7 | 36:15 37:25 | **contact** 69:8 | 233:2,3 235:14 |
| 189:11 203:24 | 38:11 | 143:18 144:4 | 235:15,16 |
| 213:8 214:4,12 | **conducted** | **contacts** 143:20 | 237:20,22 |
| 223:12 228:17 | 14:15 | **contain** 218:17 | **contracted** |
| 228:20 258:17 | **conference** | **contained** | 28:11 30:25 |
| **compensation's** | 128:3,17,23 | 112:24 219:13 | 60:1 63:15 |
| 228:16 | **conferences** | 220:25 223:8 | 143:23 156:21 |
| **complaint** | 126:22 254:20 | **content** 69:12 | **contractor** |
| 171:15 | **conferred** | 100:19 | 30:18,20 31:2 |
| **complete** 17:2 | 37:23 | **continue** 30:5 | 31:10 45:8 |
| **complex** 42:1 | **confers** 14:7 | 52:21 53:17 | 84:22,23 |
| 42:19 43:8 | **confidential** | 71:20 72:3 | **contractors** |
| **composition** | 147:2 | 98:14 101:19 | 64:14 113:5 |
| 44:10,13 | **consent** 170:22 | 232:8 244:16 | 156:20 223:17 |
| **computer** 7:23 | 170:25 171:6 | 244:24,25 | 252:18 |
| 18:25 19:7,8 | 171:19 | **continued** 77:9 | **contracts** 5:14 |
| 22:12 63:18 | **considered** | 130:15 | 92:4,4 183:11 |
| 75:22 219:1 | 51:21 | **continues** | **contractual** |
| **computers** | **considers** | 26:20 84:19 | 162:23 |
| 27:10 75:23 | 180:11 | 161:7,8 162:1 | **contributed** |
| 218:24 219:2,5 | **consistent** | **continuing** | 127:25 129:18 |
| **concerning** | 213:20 | 65:4 126:12 | 229:23 |
| 261:5 | **consistently** | **contract** 54:11 | **conversation** |
| **concluded** | 27:2 29:9 | 61:3,5,8 64:12 | 238:13 243:19 |
| 265:8 | **constitute** 6:22 | 64:13 70:10 | **conversations** |
| **concludes** | 60:17 | 94:10 97:25 | 20:13,17,19 |
| 265:4 | **constituted** | 98:8,16,24,24 | **conversion** |
| **conclusion** 50:6 | 112:2 | 130:8,11,16,20 | 4:10 40:12,13 |
| 50:13 57:2,22 | **consult** 88:6,8 | 130:21,22,25 | 56:4,4 94:8 |
| 58:25 185:13 | **consultation** | 131:3,11 153:2 | 95:13,18,19,22 |
| 200:25 | 109:7 | 154:15 156:2 | 95:25,25 96:5 |

**[conversion - correct]**

| | | | |
|---|---|---|---|
| 96:7 124:8 | 158:7,17 160:6 | 95:20 96:4 | 103:9,25 |
| 190:20 | 161:14,17 | 216:16 | 105:21 111:24 |
| **convert** 92:2 | 162:5,7,20,21 | **correct** 10:14 | 111:25 112:17 |
| 93:11 | 162:22 168:8 | 21:21,23 22:1 | 113:24 115:4,5 |
| **converted** | 168:12,18 | 22:5,15,16,24 | 116:18 117:14 |
| 33:22 40:18 | 184:3,8,20 | 25:9,14 27:6 | 121:7,17 |
| 44:20 45:2 | 188:10,14 | 27:10,22 29:15 | 122:19 123:1 |
| 56:6 58:13,13 | 193:25 196:1 | 31:3,7,23 32:1 | 124:1,9 125:25 |
| 93:8 192:15 | 199:25 200:18 | 33:10 34:3 | 129:3,16 130:9 |
| **convertible** | 234:18 237:18 | 35:18,19 36:18 | 130:12,17,22 |
| 91:1,21 92:4 | 237:22 238:2 | 36:22,25 37:1 | 131:2 132:22 |
| 93:7 116:15 | 238:24 240:6 | 39:22,23 40:16 | 133:11,17 |
| 117:1 | 241:12 243:25 | 40:19 42:12,16 | 134:2,21 135:7 |
| **converts** 91:24 | 245:8,15 246:2 | 44:10 45:13,14 | 135:16,23 |
| **cool** 59:24 | **cornette's** | 45:23 46:1,7,9 | 138:9 141:4 |
| **cooperate** | 132:9 168:21 | 46:11,17 48:4 | 143:1,10,19 |
| 256:15 | 221:18,18 | 53:20 54:18 | 144:17 148:16 |
| **cooperative** | **corp** 33:23 | 55:2,10,16 | 148:21 151:25 |
| 256:12 | 40:13 59:13,13 | 56:25 58:17 | 152:1,13 |
| **coordinated** | 59:14 95:13 | 59:5,11 63:3 | 157:25 158:17 |
| 202:17 | **corporate** 1:11 | 64:7 65:8,13 | 159:3,4,13 |
| **copies** 250:5 | 9:2,11 10:22 | 66:4,5 67:10 | 161:10,11,14 |
| **copy** 178:20 | 11:7,18 12:2 | 67:18,22 68:2 | 161:17,24,25 |
| 182:5,6 261:9 | 12:25 13:4 | 68:13 69:6,7 | 162:2,5,6,8,14 |
| 262:10,19 | 14:8 34:15 | 69:18 70:17 | 162:22 163:1 |
| 263:19,19 | 36:5 96:13 | 75:5,11,20 | 163:25 164:3 |
| **cornette** 2:11 | 125:24 258:25 | 78:15 79:7,24 | 165:5,10,17 |
| 7:6 8:19 29:13 | 259:4 | 82:4,5,7,10,25 | 166:15,22 |
| 67:9 69:5 82:3 | **corporation** | 83:5,9,10,11 | 167:5,17 |
| 130:8,16 131:2 | 9:2,15 16:4 | 84:8,19 85:10 | 168:21 169:18 |
| 131:9 132:20 | 32:5 34:1 | 89:5,9,20 | 169:19 174:19 |
| 133:10,16,22 | 44:20 45:15 | 90:21 93:6 | 174:25 175:10 |
| 136:9,18 | 58:3,12,18 | 94:9 95:11,15 | 175:16,23 |
| 153:20 156:24 | 81:2,10,12 | 96:3,7,8 97:3 | 176:4 180:21 |
| 157:10,24 | 90:4 95:15,16 | 97:24 100:22 | 181:6,9,20,23 |

**[correct - credits]**

| | | | |
|---|---|---|---|
| 182:11 183:1 | 238:14 241:6 | **counting**  211:3 | 84:3,7,10 87:4 |
| 184:21 185:17 | 242:13,25 | **county**  34:9 | 87:11,19,22 |
| 185:18,22 | 244:24 249:17 | **couple**  30:12,14 | 89:23 108:11 |
| 186:8,16,20 | 249:23 255:10 | 60:25 161:1 | 139:7,8,12,19 |
| 187:4,22 | 256:20 258:4 | 210:18 250:22 | 139:21 140:11 |
| 188:10,15 | 259:21 260:3 | 252:3 | 140:17,18 |
| 192:17 193:22 | 260:20,24 | **course**  19:5 | 141:4,14,19,23 |
| 194:24 195:3,8 | 261:1,24 268:3 | 25:15 63:13 | 142:22 144:13 |
| 195:14,18,20 | **correctly**  27:16 | 64:2 107:25 | 144:14,17,21 |
| 196:2,9 198:1 | 29:21 45:1 | 112:10 133:12 | 146:17 166:12 |
| 198:9 199:18 | 67:14 69:3 | 174:6 220:13 | 167:9 168:7 |
| 199:23 203:9 | 138:13 139:24 | 236:12 | 175:22 185:23 |
| 203:15,17 | 143:12 227:12 | **court**  1:1 25:2 | 185:24 189:6,6 |
| 204:25 205:9 | 241:25 | 169:15,18 | 190:9 227:14 |
| 206:17 207:19 | **cost**  126:8 | 170:6,10 | 251:5,14 |
| 207:23 208:14 | 212:21 217:1,6 | 247:15 | 252:24 253:8 |
| 208:25 209:5 | 223:6,8 245:9 | **courtroom**  10:9 | 253:13,17,25 |
| 213:7,11,16 | **costs**  221:1,11 | **courtside**  183:1 | 254:3,22,23 |
| 214:5,11 | 226:16 | 199:21 | 255:8,9,14,18 |
| 215:11,23 | **could've**  16:1,1 | **cover**  55:21 | 257:6,14 |
| 216:2,3,11,17 | 85:8 86:21 | **covered**  88:7 | 260:19 |
| 216:22 218:3 | 96:9 111:22,23 | 111:18 | **creditor**  49:9 |
| 218:15 220:3 | 160:6 | **covers**  92:18 | 87:7 185:9 |
| 222:4,15 | **counsel**  3:5 | 93:1 | 198:23 199:9 |
| 223:10,13 | 20:24,25 50:16 | **cpa**  28:8,15,16 | 233:6,8 |
| 224:18,22 | 50:19 92:8 | 28:16 111:12 | **creditors**  2:10 |
| 225:24 227:16 | 165:14 180:17 | 212:25 | 7:5 9:19,21,23 |
| 227:20 228:5,8 | 208:8 238:3 | **create**  150:3 | 50:4 116:11,14 |
| 228:16,21,22 | 252:9 261:6 | **created**  191:21 | 116:14,18 |
| 228:23 229:2 | 266:11,14 | **creative**  29:21 | 117:3,14,16,18 |
| 232:21 233:5 | 267:8,11 | 29:24 | 118:5 122:14 |
| 234:9,13,15,18 | **counsel's**  18:25 | **credit**  49:21 | 122:19,23,24 |
| 234:20 235:3,6 | **count**  21:18 | 70:2 71:4,7 | 123:2 170:3 |
| 235:9,21 236:9 | **counted**  253:5 | 82:6,12,13,14 | **credits**  213:24 |
| 237:3,19,22 | | 82:15,18 84:2 | 213:25 214:17 |

[criteria - deferred]

criteria  99:12
crossover
  215:1,5 224:2
  224:3,7
cummings
  234:2
curbanof  35:13
curious  195:17
current  78:22
  78:24 157:18
  158:16 239:15
  250:3
currently  30:8
  48:8 63:10
  64:13 66:6
  68:7 84:20
  85:8 113:7
  202:7
customer  87:4
  87:11,19,22
customers  73:8
  73:9,15,18
  74:1
cut  66:10 67:7
  125:14
cute  62:15
cuts  196:8

**d**

d  4:1 5:12,12
  6:1 62:6
dad  49:17
dah  183:17,17
  183:17,17,17
damage  246:3
  246:10,22

damages
  245:22
date  1:14 31:22
  45:25 46:2,25
  46:25 57:20
  64:15 73:13
  101:25 110:7
  112:7 123:13
  128:9 152:16
  152:18,19,21
  159:11,17
  163:17,20
  164:18 166:8
  174:10 201:20
  204:13 236:12
  243:2 264:15
  269:25
dated  40:16
  159:8 165:10
  165:11 181:9
  193:3 229:16
dates  142:7
  159:22 239:18
dave  226:9
day  18:16
  46:15 85:21
  94:3 141:12
  193:9 210:25
  264:2
days  165:8
  183:19 196:1
  264:5,6,7,8,9
  264:10,14
deal  54:14
  59:15 69:9,10

69:11 77:2,2
78:12 79:1,3,6
98:7 141:12
157:24 163:6,8
163:13 164:14
166:18 168:10
168:11,15
169:20,22
170:8,17,17,21
171:22 172:2,6
174:3 181:21
181:22,24
183:4 188:15
193:18 194:1,3
194:6,17,20,24
197:2 199:22
200:1,4,6
228:25 234:23
235:3,5,7,9,10
235:11,13,20
235:25 236:7
236:15,15
238:17 241:11
245:3,12,23
247:20,22,23
247:25 248:2,8
249:8,14,16,22
250:1 258:23
dealing  138:5
  261:11
deals  60:17
dealt  16:2
debits  257:13
debt  48:21
  91:23,24

103:21,24
131:24 135:19
139:6 167:4
170:1 195:21
224:14,25
225:2 231:23
debtor  1:6 2:2
  7:9 15:2,4,7,23
  36:16,19,21
  39:6 69:1
debtor's  18:13
  36:14 92:19
debts  104:3
  185:20,21
december
  152:24 157:21
  158:15,25
  159:13 160:3,5
  227:23
decided  54:13
  144:22
decision  143:14
  146:1 163:12
  199:15,16,18
  241:9
declare  268:1
decrease  138:9
  188:21
deduct  257:14
deductions
  218:8,14
deemed  83:9
deferred  89:11
  116:1

Page 22

**[define - directly]**

**define** 90:17
**defined** 116:12
  165:25
**definitely** 106:5
**definition**
  90:11 94:18
**definitive** 61:3
  61:5
**degraded**
  136:22
**degree** 44:9,13
**del** 250:24
  251:2
**delaware** 34:1
  46:14,14 47:6
  48:5,6,10,20
  49:8,9 50:15
  51:12,15 56:23
  95:20 216:10
  216:11,12
**deleted** 23:11
**delta** 82:9,24
  115:23
**depending**
  23:23 56:3
  140:5 141:1
**depends** 106:25
**depicted**
  214:17
**depose** 13:3,5,9
  13:11 14:18,20
  156:23 213:15
**deposit** 70:23
  108:16 141:3

**deposited**
  172:12,20
  174:18,22
**deposition** 1:11
  6:3,6,20 8:21
  8:22 9:8 10:4
  10:25 11:8,14
  11:18,25 12:13
  12:13,16 14:8
  14:14,21 16:25
  18:8 19:11
  20:13 34:15
  36:13,13 81:6
  88:9 110:19
  210:3,23 261:7
  265:4 266:1
**deposits** 68:22
  239:23
**depot** 251:18
  251:19,22
  252:6
**depreciating**
  74:21 75:10
  225:11,14,20
**depreciation**
  74:9,11,24
  75:3,5,9,15,17
  75:20 215:13
  215:14 225:10
  225:13,16,17
**derivative** 97:8
  98:10 99:17
**derived** 73:7
**describe** 40:25
  52:6

**described**
  53:10 84:8
  163:24
**description** 4:6
  5:2,13
**descriptions**
  180:2
**designated**
  8:25 23:16
  253:14,15
**designations**
  190:19
**desk** 62:24
**despite** 55:21
  194:12,20
  222:13 224:21
  224:22 231:11
  231:11 236:14
  236:15,16,21
  242:24
**detail** 4:16,17
  75:25 76:1,2
  79:24 111:8
  112:3,23 151:7
  151:8,22,23
  152:4 153:21
  154:4 157:13
  158:20,20
  159:22 224:11
  224:15 235:18
  246:17 251:6
**detailed** 94:18
  144:9 167:1
  224:11

**details** 4:12
  107:25 145:25
  154:20 202:5
  226:25 227:7
  247:10 249:10
**develop** 98:10
**developing**
  65:5 98:14
**development**
  64:22 97:18
  99:9,11,15,22
**dial** 14:4
**dialogue** 22:11
**dictated** 241:10
**die** 100:4
**diego** 2:15
**difference**
  141:16 186:22
  256:9
**different** 23:17
  27:12 29:6
  43:3 61:25
  94:11 101:16
  104:12,14
  107:6 113:18
  126:9,10
  127:23,23
  187:18
**digital** 266:8
  267:4
**diligence** 164:8
**direct** 108:16
  202:15
**directly** 98:7
  100:17 101:17

**[directly - draft]**

| | | | |
|---|---|---|---|
| 105:1 259:14 | 188:8,20 | 196:13 212:2 | 254:16 260:19 |
| **director** 64:22 | **distributed** | 215:20,24 | **dollar** 122:18 |
| **disclose** 50:8 | 61:17 | 216:4,7,12,20 | 146:4 194:24 |
| 124:20 230:6 | **distributes** | 232:23 233:23 | 200:12 |
| 230:14 | 67:11,17,24 | 236:10 237:24 | **dollars** 60:15 |
| **discount** 175:6 | 163:24 | 248:16,20 | 60:25 66:12,25 |
| 175:8 | **distributing** | 249:10 258:25 | 67:12 68:8 |
| **discover** | 67:5 | 260:13 | 74:6 127:2,12 |
| 255:20 | **distribution** | **document's** | 159:12 188:23 |
| **discrepancies** | 61:14,24 62:8 | 47:10 | 194:1 198:15 |
| 239:2 | 164:9 | **documentary** | 198:20 232:5 |
| **discrepancy** | **distributor** | 99:16 | 245:5,10,16 |
| 212:16 230:24 | 183:7 | **documentation** | 246:3,10,22 |
| 231:3 238:20 | **district** 1:2 | 65:11 | 256:19 |
| 238:22 | **division** 1:3 | **documents** | **domain** 149:16 |
| **discussed** 61:14 | 216:10 | 12:12 21:10 | 149:20 |
| 76:21 230:17 | **divulge** 20:16 | 22:9,11 29:3 | **door** 217:13 |
| **discusses** 15:1 | **divvy** 84:7 | 36:8,15 37:5 | **double** 215:3 |
| **discussion** | **document** | 47:14 52:2 | **doubt** 174:24 |
| 109:14 182:9 | 37:10 38:2,18 | 56:22 57:14 | 175:4 |
| **disposable** | 40:9,12 46:21 | 65:16 96:12 | **dovetail** 12:12 |
| 200:15 | 46:24 47:15,22 | 120:19 148:25 | **download** |
| **disposition** | 48:14,22,23 | 151:19,20 | 137:20,21,21 |
| 104:22,23 | 51:5,7,9 54:4,7 | 169:9 185:2 | 138:13 162:11 |
| 105:15 | 69:16 95:22,24 | 191:23 193:16 | 188:21 |
| **dispute** 53:1 | 145:7 147:6 | 213:21 214:7 | **downloads** |
| 216:6 233:1,2 | 154:17,19 | 216:18 254:24 | 162:15 168:24 |
| 233:3 261:5 | 157:9 159:15 | 261:5 | **downturn** |
| **disputes** 188:10 | 160:8,21,22 | **doing** 18:12 | 186:23 187:11 |
| **disputing** 11:9 | 169:6,11 176:5 | 29:12 58:10,16 | 187:25 188:8 |
| 11:10 | 176:12,13,22 | 67:8 85:8 | **draft** 237:16 |
| **distinction** | 178:25 179:6 | 103:18 123:17 | 238:4 261:21 |
| 42:10 | 191:4,22 192:8 | 142:17 162:16 | 261:23 263:3 |
| **distressed** | 192:11,23 | 209:10,11 | 263:16,22,24 |
| 187:1,2,8 | 195:7,24 | 222:14 226:22 | |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[drafted - employed]**

**drafted** 238:2
**draw** 145:9,11
146:17,18
**drawn** 144:15
**draws** 84:3
145:14
**drew** 188:23
189:16 225:3
**drive** 2:21 29:2
105:17,18
107:6 221:19
**drop** 228:7
**dropped** 62:25
**due** 48:14
131:5,6 152:7
152:12,16,19
152:21,23
164:7 186:25
228:25
**dues** 107:1
**duly** 8:8 266:6
**dustin** 120:23
**dutch** 100:2
**dynamics**
136:22 138:2

**e**

**e** 2:1,1 3:1,1 4:1
4:5 5:1,12,12
5:12,12 6:1,1
33:16 91:7,7,7
91:8 156:14,14
156:14 252:12
269:4,4,4
**e&l** 202:6
226:18

**e&o** 219:23
**earlier** 110:21
110:23 163:24
169:12 183:3
186:23 213:21
227:20 237:21
237:21 244:21
**early** 30:15
52:25,25
102:14 143:1
187:22 188:13
188:18 252:20
**earn** 94:23
257:22
**earned** 131:1
226:1,13
**earnings** 94:16
95:2 124:11
**east** 21:23
68:16,17,21
70:5,23 71:5
71:10,13
114:18 135:21
139:16,20,22
140:10,19
142:11 258:12
258:15
**easy** 74:24,25
75:7,12
**eat** 34:22 47:18
**eaten** 220:19
**economic**
179:23
**economy**
187:12

**ecosystem** 29:4
**edited** 30:3
**editing** 29:25
30:3 113:5
**editors** 64:25
**education**
44:19 45:5
126:12 191:21
**educational**
148:23 149:2
191:11,13
**effective**
164:19 165:4,9
166:8
**eight** 151:22
170:5,9 171:23
224:19
**eighteen** 229:6
**either** 24:4 56:2
66:9 67:3
83:11 91:7
98:13 108:11
122:15 134:6
146:16 153:9
156:17,19
160:21 187:6
201:16 202:19
208:23 253:15
259:1
**el** 202:9
**eleven** 206:13
206:14 223:11
**eli** 69:11
**ellen** 35:25 36:4
185:4 186:14

203:25
**ellin** 69:12
**elyashar** 28:9
110:10,14
111:4,5,5
**elyashar's**
111:10
**email** 4:13 5:3
5:8,9,10 22:14
22:24 23:1,3,6
23:13,16,22
25:12,13,18
29:2 32:24
33:7,18 107:10
107:12 143:2
143:14 144:9
146:8 240:6
243:2,23 246:6
246:12,19,23
247:7 248:11
248:12
**emails** 20:17
22:24 23:10,12
25:11 26:10
138:16,22,25
139:1,11 145:1
187:3 227:19
238:5 248:17
248:23 249:2
**emily** 24:9
56:18 74:18
81:16 156:3,15
**employed**
30:17 156:18
257:19 266:11

Page 25

**[employed - exactly]**

266:14 267:9
267:11
**employee** 3:5
22:4 121:20
143:25 144:6
156:18 233:1
266:14 267:11
**employees** 23:7
64:10,12
127:23 128:14
170:2 217:23
223:17
**employers**
156:20
**employment**
213:23,25
214:17
**empty** 70:22
**enable** 21:6
**ended** 62:9
181:21,24
193:18 210:7
**ends** 177:12
**enjoy** 99:1
**ensuing** 245:22
**enter** 162:25
241:5
**entered** 163:4
164:18 166:23
183:21 199:19
237:17
**entering**
241:10,14,21
**enterprise**
125:2

**entire** 132:13
132:21 133:20
**entirety** 51:4,7
133:23 177:24
**entities** 56:10
61:4 63:17
81:21 91:4
**entity** 4:12
55:22,25 59:25
125:1,5 149:14
**entries** 88:15
157:12
**entry** 114:3
153:4 159:18
**episode** 162:15
168:24
**episodes** 64:24
65:4
**equal** 77:5
93:19
**equipment**
76:10,11 77:5
77:7 78:18
79:1,3,4,11,20
80:2,5
**equity** 91:23,24
93:8,11 94:17
119:1,4,5,16
120:23 121:10
121:16,21
122:1,12,24
200:16 231:22
**equivalent**
172:11,18

**erik** 28:12
63:15 81:17
143:22 156:2
156:14
**erin** 3:5 7:23
**es** 266:5
**escrow** 68:5,10
172:12,12,13
172:19,20
173:2,2 174:7
174:19 177:3
181:6 182:20
236:2,3,5
**esquire** 2:3,12
2:19
**essentially** 45:7
77:4 130:19,25
141:7 154:24
236:13
**estates** 119:12
**estimate** 41:22
41:25 216:12
**et** 182:25,25
219:21
**ett** 89:24
**eurasian**
258:21
**evaluate** 181:2
**evaluating**
179:21 180:8
**evan** 33:16
**evening** 264:22
**event** 15:18
91:25 92:1
94:8 251:3

256:5
**events** 94:11
**eventually**
163:6
**everybody** 24:6
122:21 142:19
155:7 170:9,18
188:6 194:16
194:23
**everybody's**
122:20
**everyone's**
247:20
**evidence** 47:13
78:9 167:4
197:15
**evidenced**
167:17
**evidentiary**
6:19
**exact** 103:3
119:10,19
121:2 142:7
197:8,9 198:2
198:21
**exactly** 26:25
28:10 54:3
62:12 91:8
92:5 104:10
113:10 115:10
115:21 120:10
120:18 122:7
140:4,25
142:14 147:21
147:25 148:9

**[exactly - extensions]**

165:9 167:13
201:20 204:13
215:6 237:25
239:22 251:16
257:23

**examination**
4:2 8:13 11:2
12:6,16 15:2
15:23 20:5
36:15 38:1,11
211:1

**examine** 15:22

**examined** 8:10

**example** 26:17
126:17 132:19
134:14 135:12
152:15

**examples** 73:22
126:11,18,20
127:18 128:4,6
221:8

**exceed** 116:22

**excel** 22:4

**exchange** 91:19
143:3,14

**excited** 63:1

**exclusively**
84:21

**excuse** 37:4

**executed** 268:5

**exhibit** 4:7,8,10
4:11,12,13,14
4:16,17,18,19
4:21,22,23,24
4:25 5:3,4,5,6,7

5:8,9,10 36:7,9
36:12 37:5
38:20,24 39:22
40:9,10 45:17
45:18 46:12,18
48:17 49:1
64:4 92:16
138:15,17
146:19,22,23
151:10,10
164:20,22
165:1 173:4
176:2,21 177:3
177:16,22
181:6,12,15
182:7 184:22
184:24 190:15
192:1,18 193:1
196:10 202:21
202:25 203:1
208:12 229:5,7
229:13 237:3
237:12,15
238:7 240:9
241:7 242:9
243:9 244:5,7

**exhibits** 40:2
151:15

**exist** 33:21
46:16 57:16
137:3 190:11
190:12

**existed** 46:6,10

**existence** 84:16

**existing** 45:9

**exists** 149:12

**expect** 90:1
162:12 223:18
224:14 239:22
239:25 252:8
253:6

**expectation**
144:18

**expected** 17:1
53:4

**expedited**
261:14,21,23
263:22,24

**expense** 70:3
83:4 100:25
101:9,11
102:17 103:6
107:10 113:12
126:15 220:21
220:24 250:8
251:7,8,21
253:1,6

**expenses** 5:5
82:20,20 83:6
83:7,15,17
84:12,24 86:11
100:24 101:14
105:24 107:3
108:13,13
126:3,4 127:14
129:17 146:16
186:1 205:2,2
205:4,6,8,10
208:10 209:3

218:20 219:1
220:16,22,23
221:7 251:15
251:25 252:7
253:15

**expensive**
106:20

**experience**
179:20 180:7
180:14,18
221:18

**experienced**
180:12

**experimented**
29:7 71:18
72:1,5,16

**expired** 130:11
130:20,21
237:22

**explain** 53:15
95:4 152:19
155:22 216:15
216:21 217:21
218:9,10,13
252:24

**explanation**
224:10

**extend** 98:13
98:16

**extended**
140:16

**extension**
167:24

**extensions** 99:2

**[extent - financial]**

extent  12:11
extra  182:5
  210:25

**f**

f.r.b.p.  1:11
face  137:14
facilities
  224:15
facility  71:4,7
  91:23,24
  115:12 135:19
  224:25 225:2
fact  155:23
  231:2 235:23
factor  132:13
factored  136:6
  136:10,14,16
factoring  115:8
  115:11,12
  131:16,23
  132:11,14
  133:19 135:23
  136:24 137:2
  140:20
factors  188:17
facts  197:15
failed  183:22
  183:24 184:1,2
fair  55:15
  123:14 137:16
  154:5 184:9
  201:12,13
fairly  75:7
falling  245:4,24

falsely  10:13
familiar  27:13
  115:9 182:20
  182:22 258:10
family  30:9
  35:22,24
far  114:6 205:4
  205:8 231:6
fargo  21:21
  191:8 256:20
  257:15 258:2
fastpay  139:16
  140:14,15,18
  140:22,23
  141:3,17 227:8
  227:11,13,18
  227:22 260:12
  260:15,17,18
  260:19
father  120:5,6
  120:7 121:7,16
favorable
  194:5
february  40:16
  40:19 97:3,23
  107:18 111:10
  111:20 112:6
  113:1 116:6
  128:16 137:22
  138:10,13
  147:7,24
  152:24
federal  9:1 12:1
  14:15 17:19
  47:13 55:23

78:9,9 90:4
  124:18 191:2
  207:10 211:18
  212:17 214:9
  230:9 231:4
fee  4:18 97:18
  100:18 132:5
  163:9 164:15
  165:23,24
  166:9 176:13
  177:10 181:21
  181:24 235:13
  235:16,18,19
  235:21,25
  244:1 247:17
feel  17:7 37:13
  226:10 247:14
fees  110:9
  165:20 219:11
  219:12,17
  220:2 232:10
  232:12,12,20
  232:23
feet  41:23,23
fell  29:8
felt  144:16
  145:23
fence  164:11
fennemore  2:13
fennemorela...
  2:16
fernando  1:2
fifth  19:18,23
fighting  232:13
  232:23,25

figure  50:25
  153:14,16
figures  197:12
  216:15 238:18
fiji  129:8,14
file  51:14,17
  52:2 145:6
  171:15 190:17
  194:9,14,15,18
  194:19,21
  249:24 259:4
filed  8:20 36:24
  38:22 39:11,21
  47:4,23 48:10
  55:22,25
  171:23 193:10
  204:9 212:18
  236:20,24
files  250:20
filing  31:1,5
  38:21 64:9,15
  70:21 85:2,9
  86:13 95:9
  99:3 163:17
  203:20
film  41:3
final  50:13
  172:9 264:15
finalized
  239:21
finance  148:2
financed
  102:16,19
financial  54:22
  55:2 63:8,12

**Page 28**

**[financial - front]**

63:14 139:10
167:20 179:20
180:7 181:1
187:1 188:20
194:4 232:6
238:15
**financially**
187:8 266:15
267:12
**financing**
231:23
**find** 48:18 87:8
124:17 131:15
164:12 173:21
185:10 188:2,3
190:18 208:5
208:16 222:25
239:17
**finder's** 4:18
163:9 164:15
176:13 177:10
181:21,24
235:12,16,18
235:19,21,24
244:1 247:16
**finding** 205:17
**fine** 10:18 12:5
12:9 13:9
32:10 42:7
43:15 93:1
99:14 136:1
150:8,25
247:14 261:13
263:16 264:4

**finish** 15:5
125:16 168:16
169:1 170:20
210:25
**finished** 61:7
**firm** 24:10
111:9 112:8
**first** 8:8 9:21
53:12 54:9
55:9 123:3,6
138:19,21
142:13,17
143:9 144:1
147:8 152:15
157:12 160:18
177:2 207:4
231:12 238:19
246:6,11 247:1
**five** 41:11
150:11,11
178:20 201:25
209:16 211:8
**fix** 250:7,9
**fixed** 76:9,11
78:21,23,25
79:2 80:17
**flagged** 183:13
**flight** 210:4,23
**floated** 213:22
**floating** 190:19
**floor** 119:3
121:5
**flow** 114:7
141:9

**flowed** 114:24
**fluid** 174:2
**fly** 128:24
**focus** 144:23
**focusing** 99:24
**foley** 182:19
**folks** 26:4
**followed** 86:12
86:21 174:21
**following** 86:10
100:10 118:7
**follows** 8:10
179:16
**footage** 41:8
**ford** 106:23
**foregoing**
266:4,5 267:5
268:2
**forget** 119:10
224:3
**forgetting**
226:10
**form** 4:21 18:9
18:11 22:20
47:17 49:11
74:1 117:5
118:7 135:2
174:15 185:6
186:3,4 207:10
208:16 211:22
225:6,13
**formal** 10:5
130:16
**formation**
46:25 95:15,16

**formed** 45:4
**former** 148:20
**formerly** 36:16
**forth** 234:4,9
240:6 257:24
**forward** 31:1
54:14 144:24
236:12 262:15
**foul** 100:5
**found** 44:24
**founded** 44:4
**four** 31:25 32:7
49:4 91:4
93:14,19
116:10 145:12
145:12,13
152:25 180:25
181:4 200:19
201:17 263:25
264:6
**franklin** 267:3
267:18
**free** 17:7
100:19 242:16
242:22 247:14
**frequently** 26:2
**friend** 35:8
**friendship**
250:21
**front** 10:9,20
38:2 56:9
94:10,24
107:16 108:25
110:6 163:16
207:15 224:16

Page 29

**[front - going]**

231:21 247:9
249:24 255:12
**frozen** 143:5
**fuel** 105:23
106:3
**fulfill** 243:21
**full** 8:15 123:1
132:23 133:18
135:17 160:23
161:3
**funding** 131:18
131:19,21,22
132:7 135:15
136:11,17,25
140:21 230:3
**funds** 134:1,21
141:9
**funny** 85:16
**furniture** 76:14
76:17,24 77:11
78:14 79:4,19
80:2
**further** 130:19
266:13 267:10

**g**

**g** 6:1 28:18
101:4,20,22
102:1,6,8
103:5,6,9,13
104:8,8 148:14
148:17 165:18
185:24 189:1
**gary** 2:12 7:4
7:16 12:23
13:13

**gas** 106:1,3,5,5
**general** 25:23
106:23 142:21
202:1,6
**generally** 25:21
130:23 182:13
243:20
**generate** 66:14
66:23 67:12
154:18
**generated** 68:1
154:25 258:25
**generating**
66:6,9
**generous**
201:12,14
**getting** 16:24
107:21 122:20
132:11 144:24
200:15 263:15
263:19,21
**gift** 201:24
**give** 15:22 17:2
21:7 26:17
30:7 32:5 43:1
81:14 98:17
109:21 126:11
126:17 127:18
128:2,4 133:25
136:5 155:6
159:24 167:14
176:16 177:21
182:6 221:8
222:18 253:17
253:24 262:21

263:24
**given** 9:17,24
10:2 68:7
109:3 129:19
144:13 159:25
186:15 211:22
**giving** 135:12
**gmail.com** 33:5
33:9,14
**gmail.com.**
32:23 33:12,16
**go** 10:3 14:13
17:23 18:12,13
18:17,17,23
20:11 32:16
47:12 48:17,22
48:23 49:1
68:15 69:20
79:8 88:10
91:17 92:3
93:2 100:2
102:3 109:2
111:7 112:3
114:15 117:13
118:25 126:12
126:15 128:23
129:25 130:1
131:11 132:18
134:10,13
136:5 145:1,8
146:2 158:22
158:22 159:6
160:9 163:5
168:17 171:17
171:17 173:3

173:14 177:10
183:11 186:9
191:1 193:12
203:19 204:20
206:19 208:23
209:8 211:4
215:10 216:9
222:17 227:5
233:12 236:2,3
236:17 240:9
240:16 243:9
243:23,25
245:8 246:25
246:25 247:17
249:6 250:5
251:5 253:18
259:14
**god** 34:21
200:17,22
201:4,15
**goes** 25:21
161:1 166:3
174:23 179:3
227:25 235:18
**going** 10:3 14:8
14:14,17,19,20
16:12,15,17
17:11 18:16,17
20:15 22:21
24:4,5 31:11
34:11,22 38:1
38:8 41:12
46:12,21 47:9
47:18 49:23
50:3 54:4

**Page 30**

**[going - handle]**

| | | | |
|---|---|---|---|
| 57:12 60:21 | **good** 6:2 17:18 | **government's** | **growth** 142:20 |
| 77:18 81:20,25 | 18:6 34:20 | 49:23 50:3 | 142:23 145:19 |
| 85:17,18,21,22 | 39:17 41:15 | **governs** 16:18 | **grudolph** 2:16 |
| 86:2,5 88:7,21 | 47:16 51:11 | **grade** 19:18,23 | **guarantee** |
| 90:10,10,17 | 57:5,13 77:23 | **granat's** 119:8 | 234:4,5,7,17,21 |
| 93:16 94:1 | 78:4 106:8 | **grand** 118:3,3 | 234:23 |
| 96:9,11 98:17 | 127:8 128:18 | 118:23 168:13 | **guarantees** |
| 99:13 110:6 | 128:18 134:24 | 195:17 260:6 | 233:16,20 |
| 122:12 131:15 | 135:25 148:13 | **gratis** 52:19 | 236:9,16 |
| 134:16 135:3 | 150:5,6,23 | 54:18 | **guardrails** |
| 137:9 140:12 | 156:11,11 | **great** 129:6 | 145:10,16,21 |
| 144:1 146:6 | 164:12 170:8 | 150:23 170:5 | **guess** 41:13 |
| 149:22 150:14 | 196:16 198:25 | 170:17,21 | 43:16 56:17 |
| 150:17 151:1 | 199:4 200:6 | 171:22 246:17 | 75:21 122:1 |
| 155:13,16,17 | 209:18 248:24 | **greater** 131:5 | 139:3 140:6 |
| 156:5 168:11 | 264:25 | 132:9 145:16 | 198:7 202:24 |
| 169:6,7,10 | **goods** 212:21 | 145:19 | |
| 174:9 177:13 | 212:21 217:1,6 | **greenlight** | **h** |
| 187:15 188:6 | 223:6,9 | 98:13 | **h** 4:5 5:1 8:17 |
| 196:12 198:7 | **google** 23:5,7 | **greenlighting** | 91:7 202:13 |
| 200:6,7 203:7 | 23:15,18 25:20 | 98:15 | 269:4 |
| 207:13 209:22 | 29:1,2,3,3 | **gross** 91:20 | **half** 73:17 74:5 |
| 210:21,25 | 63:21 107:6,12 | 100:21 183:16 | 91:16 98:5 |
| 211:8,11,14 | **google's** 29:2 | 204:25 207:23 | 123:3,6 127:2 |
| 214:15,15 | **gotfryd** 144:2,2 | 208:18,24 | 127:12 194:1 |
| 227:15 236:5 | 144:3 178:15 | 211:21,24 | 194:23 200:12 |
| 238:22 239:12 | **gotfryd's** 144:1 | 212:13,19 | 228:10,10,12 |
| 246:15,16,21 | **gotten** 251:24 | 213:3,4 222:14 | 228:15 232:5 |
| 247:12 249:9 | 256:12 258:11 | 223:3,4 227:25 | **halfway** 166:5 |
| 250:5 251:13 | **governed** 14:8 | **ground** 10:4 | **hand** 8:5 |
| 261:18,25 | **government** | 16:24 | 129:23 178:22 |
| 263:2,4,5,24,25 | 47:14 55:23 | **group** 23:16,20 | 214:7 |
| **gold** 252:6 | 124:18 191:2 | 24:7 183:1 | **handed** 36:12 |
| 259:6,10 | 207:11 230:9 | **groups** 25:16 | 178:8,11 |
| | 231:4 | 25:19 | **handle** 70:8,14 |
| | | | 71:19 |

**[handled - how's]**

| handled | hazel | high | home |
|---|---|---|---|
| **handled** 55:19 | **hazel** 226:9 | **high** 145:18 | **home** 147:10 |
| 56:13,15 | **hbo** 59:16,16 | 232:12 | 148:2,4,6,7,15 |
| 250:17 | 59:19,22,25 | **highest** 142:15 | 148:18,20 |
| **handy** 25:19 | 60:7,8,17 | 187:5 | 204:5 207:8 |
| 40:3 229:5 | 61:12,15,16,18 | **highlight** 257:4 | 251:18,19,22 |
| **hang** 125:14 | 62:1 | **hills** 49:18 | 252:6 |
| **hannah** 107:20 | **he'll** 12:5,9 | 110:10 111:3,6 | **honest** 17:2 |
| **happen** 139:18 | **head** 24:16 | 111:10 121:4 | 179:18 220:10 |
| 207:21 | 28:13 32:13,21 | **hiring** 219:15 | **hope** 243:21 |
| **happened** 61:4 | 42:5 48:13 | 219:15 | **hoping** 236:5 |
| 100:6,7 149:21 | 56:12 69:12 | **hiscox** 202:10 | **host** 8:1 107:20 |
| **happens** 93:9 | 87:6 90:11,18 | 202:17 219:25 | **hosted** 251:3 |
| **happy** 14:10,10 | 100:14 114:13 | 226:19 | **hostile** 137:11 |
| 250:7 | 226:8 240:7 | **hit** 55:17 | **hosting** 107:10 |
| **hapworth** | 250:20 252:3 | 191:17 | 107:12 219:18 |
| 119:2 | **headline** 196:8 | **hmm** 13:25 | 219:20 |
| **harassing** | **headquarters** | 15:8 21:15 | **hosts** 64:25 |
| 85:19 248:2 | 41:1 | 49:5 53:21 | 65:2 |
| **hard** 129:22 | **heads** 220:15 | 78:19 99:10 | **hotel** 250:25 |
| 187:21,25 | **healthy** 244:1 | 109:9 113:17 | 251:2 |
| 188:6,12,13,18 | **hear** 18:11 | 127:15 158:13 | **hour** 211:2,5 |
| 188:23 189:3 | 129:22 209:13 | 160:11 161:1 | 264:2 |
| 225:8 256:14 | **hearing** 8:3 | 164:24 206:9 | **hours** 13:10,12 |
| **hardware** 27:9 | **hearsay** 47:10 | 217:25 221:10 | 14:10,11,18 |
| **harper** 2:21 | 47:12,14 | 240:12 245:13 | 47:19 85:23 |
| **harris** 229:24 | 196:13,15,22 | 250:10 | 189:11,17 |
| **hawaii** 129:8 | **held** 63:17 | **hold** 31:16 | 209:16 210:1 |
| 129:14 | 68:10 242:1 | 34:18 115:13 | 210:22 255:23 |
| **hayvenhurst** | **help** 50:17 | 118:6 119:5 | **house** 27:17 |
| 52:2,3,12,16 | 116:8 189:3 | **holder** 121:17 | 56:20 62:14,23 |
| 53:12 54:21 | **hereto** 266:15 | **holders** 119:1,4 | 129:15 147:17 |
| 63:3,19 177:4 | 267:12 | 121:10,11 | 183:8 |
| 192:4 215:2,7 | **hey** 238:17 | 122:12 | **how's** 122:11 |
| 224:1,9 229:2 | 239:15 244:13 | **holds** 119:9 | 156:10 |

**[howard - instruction]**

**howard** 28:9
111:4 214:12
**howie** 76:23
77:12 78:12
79:1,3,7 229:1
**huebner** 91:5,8
93:4,25 117:22
**huh** 133:5
146:13
**hundred** 60:25
74:11 118:2,3
133:20 162:11
162:14
**hypothetical**
135:12

**i**

**idea** 52:9
149:17,20,24
150:1,2 174:9
**identification**
36:10 38:25
40:11 45:19
46:19 138:18
146:24 151:11
165:2 181:16
184:25 190:16
192:2,19 193:2
196:11 203:2
229:8,14
237:13 238:8
241:8 242:10
**identify** 7:2
**impact** 245:5
245:25

**impaulsive**
195:17,22
**implied** 130:22
**improper** 34:23
47:19 135:3
211:3
**improved**
194:4
**inactive** 45:21
45:25 46:2,16
69:23
**inc.'s** 39:23
178:16
**include** 126:20
223:21
**included** 107:4
110:4 132:21
156:1 218:3
228:20 253:2,7
258:18
**includes** 169:23
**including** 63:21
122:22,22
133:24 170:2
175:8
**income** 31:9
66:6,8,14
67:25 70:4
82:21 83:9
84:13,13 96:17
96:19 108:14
113:23 114:1
115:7 129:12
129:16,18
147:12,23

200:15 203:20
207:14,15,18
207:23 208:24
208:25 209:7
211:18,23,25
212:13,17
213:5 214:10
215:20,24
216:4,13,16
217:13 218:3
220:17,20
222:16 223:3
223:10,11,22
224:17,19
227:25 228:4,6
251:8,13 252:1
253:2,5,11,16
259:22,23,23
260:2,3,5
**incorporating**
46:15
**incorporation**
46:25
**increase** 207:23
**incur** 84:24
**indefinite**
179:24
**indented** 87:19
**indicated** 27:5
**indirectly**
104:2
**individual**
14:18 15:23
34:16 125:20
202:16 203:20

251:25 259:7
**individuals** 4:9
23:17 24:15
**industry** 138:7
187:15,20,25
188:4,7 191:11
**inflammatory**
110:12,13
**info** 25:21
**informal** 10:5
**information**
47:3 87:10
88:4 92:19,20
92:24 109:17
109:20 111:17
**informs** 175:21
**initial** 9:18
238:3
**initially** 61:18
**inquiry** 11:7
12:11,11,18
22:8 37:9,13
37:17 38:6
**inside** 109:8
**installed** 27:9
**instance** 29:23
126:11 132:10
155:1
**instruct** 20:15
41:12,18
141:11
**instructed** 5:16
32:8
**instruction**
41:17

Page 33

**[insurance - january]**

insurance
105:22 106:9,9
202:2,7,8,18
219:22 226:15
226:16,17,21
227:2
intellectual
97:9
intend   162:18
162:19 210:23
244:23
intended   6:17
176:11
intends   244:16
244:25
intent   163:4
intentions
182:15
interactive
195:10
interchangea...
55:21 182:24
interest   114:10
114:16,22,25
115:4 167:25
201:7,8 224:13
224:13 247:19
247:21,24
interested
29:11 249:14
266:15 267:12
interests   18:13
167:23 179:25
201:19

internal   29:5
154:19
interrupt   24:19
211:7
interrupted
60:5
interrupting
37:4
interview
149:14
intimate   19:7
introduce   7:15
intuit   27:11
inventory
136:25
invest   91:12
142:20 201:9
201:15
invested   91:1
118:4
investigate
78:16 79:9,25
100:6
investigator
181:5
investment
91:20 94:13,15
117:22 119:2
179:22,23
180:7,24,25
181:3 227:6
259:10,12,13
investments
122:17 123:1

investor   5:6,14
90:24 176:2
177:17,18
178:7,16
179:14,19
180:13 181:5
229:16 231:20
233:10 237:9
investors   91:2
91:3,12,19
93:19 170:3
230:1,6,10,15
231:5 232:5
234:12
invoicing
183:19
involved
180:24 260:20
iofi   35:13
ip   98:11 149:19
irrelevant
106:16 246:4
ishwar   143:18
145:2,22 187:3
227:19
issue   11:11
15:9 50:18
254:23
issued   166:7
172:11,19
175:5
issues   150:7
261:5
it'd   239:6

item   76:2 92:18
111:8 124:11
128:1 212:24
212:25 213:8
214:25 216:21
219:14 222:10
223:9 225:21
226:14 228:3
228:17 233:22
236:10
itemizations
209:2
items   100:15
159:12 216:16
iw   211:23

**j**

j   252:12
jacobs   119:15
janicek   252:2,5
252:11
january   69:17
70:18 73:1,10
76:12,25 77:13
78:15 80:3
82:7 89:5
90:20 91:15
97:3,22 107:17
111:10,20
112:6 113:1
116:6 123:7
138:14 139:18
140:15 152:24
160:18,18,22
260:22

Page 34

**[jensen - kast]**

| | | | |
|---|---|---|---|
| **jensen** 121:19 | 110:6 | 39:23 40:18,18 | 95:10 96:1 |
| 121:20 226:9 | **july** 21:11 | 40:22 42:19,23 | 99:1,7 101:11 |
| 229:24 239:6 | 187:6 240:3,24 | 43:9,13,14,22 | 101:14,19,22 |
| 239:24 243:7 | 243:8,13,15 | 44:3,21,22,24 | 102:16 103:5 |
| **jim** 2:10 7:6 | 244:19 251:2 | 45:2,6,21 46:1 | 103:14,16,23 |
| 8:19 29:13 | **jumps** 207:18 | 46:5,15,16 | 103:24 104:1,4 |
| 82:3 130:8,16 | **june** 30:15 | 48:10 49:7 | 104:7,8,18 |
| 132:8,20,22 | 123:7 145:12 | 50:16 51:11,14 | 105:7,19,23 |
| 133:10,16,22 | 145:12 187:6 | 51:17,24 52:11 | 106:1,4,5,9,18 |
| 136:9 153:20 | 240:3,19,21 | 52:16,21 54:1 | 107:17 108:8 |
| 156:24 157:24 | 243:8,8,13,15 | 54:8,22 55:1 | 111:13 112:5 |
| 158:7,17 168:8 | 244:19,19 | 55:15,18 56:2 | 112:25 113:13 |
| 168:12,18,21 | **jury** 10:10 | 56:3,3,24 | 113:18,21 |
| 184:3,8,20 | **justice** 128:17 | 57:16,19 58:4 | 114:14 116:11 |
| 188:10,14 | **k** | 58:9,13,14,18 | 117:14,23 |
| 193:24 196:1 | | 58:19 59:4,7 | 118:4 119:4,5 |
| 199:25 200:18 | **k** 23:2 252:12 | 59:11,13,15 | 119:16 120:9 |
| 221:18,18 | **kast** 1:5,12 2:2 | 60:16 63:2,6,7 | 120:11,20,24 |
| 237:18 238:21 | 4:20,22 5:6 6:7 | 63:8,11,22 | 121:20,21 |
| 240:6 241:12 | 8:22 9:11 11:8 | 64:2,6,10,14 | 122:2,5,9,11,16 |
| 243:25 244:14 | 12:16 13:4,6 | 65:12 66:9,14 | 122:25 123:3,6 |
| 245:8,15 246:2 | 13:12 14:20 | 67:3,13,24 | 123:8,15 124:1 |
| 246:9 247:17 | 16:21 21:8,25 | 68:7,9,18 | 124:9,14,18,23 |
| 247:24 249:11 | 22:14,24 23:1 | 69:16,25 71:16 | 125:10,24 |
| 249:13 | 23:2,3,7,8 | 73:9,18 75:9 | 126:1,3,7,18,23 |
| **jim's** 135:10 | 25:16 26:10,12 | 75:18 76:4,11 | 127:1,11,20,24 |
| **jive** 238:18 | 26:18,23 27:2 | 76:25 77:13 | 128:10,20 |
| **job** 1:23 18:12 | 27:17,22 28:6 | 79:12 80:1,13 | 129:9,13 130:5 |
| **jobs** 149:14 | 28:25 29:13,14 | 80:21,24 81:5 | 130:7,14 131:1 |
| 191:9 | 29:21 30:19,21 | 82:17,24 83:14 | 131:22 135:7,9 |
| **jog** 42:6 | 31:17 33:4,7,9 | 83:24 84:4,6 | 135:19 139:12 |
| **jointly** 203:20 | 33:13,17,20,24 | 84:15 85:2 | 139:19 140:16 |
| **judge** 10:10 | 34:1 35:25 | 86:10 87:23 | 141:17 142:4 |
| 11:6 12:20,23 | 36:3,16,17,18 | 88:15 89:3,19 | 142:12,17,25 |
| 16:19 38:2 | 36:19,21 38:16 | 91:13 93:4 | 143:8,9,23 |
| | 38:22 39:3,22 | | |

Page 35

**[kast - kicking]**

| | | | |
|---|---|---|---|
| 144:20 145:6,8 | 189:3,17 | 234:23 235:3,6 | 157:18 167:23 |
| 145:23,24 | 190:11,12,13 | 235:8,9,18,23 | 172:3,22,25 |
| 146:9,14 147:9 | 190:18,21,22 | 236:6,17,20,24 | 173:1 181:19 |
| 148:16,19 | 191:1,12 192:4 | 237:9,18,22 | 182:15 183:3 |
| 149:2,3 150:2 | 192:6,11,12,15 | 238:1,23 | 194:4 195:21 |
| 151:8 152:12 | 192:16,24 | 239:18,24 | 199:16 221:13 |
| 153:4,22 154:5 | 193:6,9,19,19 | 240:5,19,24 | 221:19,24 |
| 155:2,25 | 193:21,23 | 241:2,17 | 238:3 239:21 |
| 156:17,18 | 194:3,9,14,15 | 242:13,16,21 | 255:7 259:14 |
| 157:6,15,20 | 194:17,19,21 | 242:23 243:4,6 | **kast000003** |
| 158:6,7,16,20 | 195:3 196:7 | 243:17,20,24 | 4:24 |
| 158:23 159:11 | 197:4,21 198:8 | 244:14,15,16 | **kast000004** |
| 159:23 160:5 | 198:16,19 | 244:18,25 | 4:23 |
| 160:10,12,19 | 199:13,14,23 | 247:5 250:16 | **kastmedia** |
| 160:24 161:16 | 199:24 201:15 | 250:17 252:19 | 23:12 |
| 162:4,7 163:2 | 201:19,25 | 252:24 253:4 | **kastmedia.com** |
| 163:5,11,18,20 | 203:8,14 205:3 | 254:5 257:19 | 23:14,20,21 |
| 164:6,10,14 | 205:7,15 207:9 | 258:8,24 | 25:9 26:1 |
| 165:13,24 | 208:13 211:19 | 259:11 260:5 | **kastmedia.co...** |
| 166:7,15,21 | 211:25 212:12 | 269:1 | 23:2 25:21 |
| 167:5,8,16,20 | 212:19,22 | **kast's** 22:12 | 26:3,5 |
| 168:1,6,18,19 | 213:7,10,15,17 | 25:13 27:9,17 | **kasts** 247:19 |
| 169:22,24 | 213:18 214:22 | 28:4,7,20 | **keep** 19:2,6,8 |
| 170:1,8,17 | 215:16,19,22 | 30:18 31:3,10 | 39:15 40:3 |
| 172:3 173:9,12 | 216:2,9 219:5 | 39:2,5,9 45:11 | 64:3 81:20 |
| 175:2,9 176:3 | 219:12 220:15 | 48:18,19 49:9 | 83:17,21 |
| 177:3,16,17 | 221:15,17 | 50:9,20,25 | 144:12 155:6 |
| 178:16 180:3 | 222:15 223:17 | 51:8,21 63:18 | 182:24 200:5 |
| 181:8 183:7,7 | 223:24 224:18 | 69:17 92:7 | 214:14 229:4 |
| 183:10,23,24 | 225:10,14,20 | 94:22 97:15 | 251:11 |
| 184:1,7,8,13,18 | 226:17 229:16 | 98:4,18,21,22 | **kept** 103:12,17 |
| 185:22 186:3 | 229:20,23 | 101:5,6 104:2 | **kick** 164:12 |
| 186:19 187:2,7 | 230:2,3,5 | 122:11 132:12 | 183:6 |
| 187:21 188:1 | 231:21 232:25 | 135:15 140:12 | **kicking** 183:5 |
| 188:18,24 | 233:19 234:5,7 | 141:2,15 150:3 | |

**[kill - labeling]**

| | | | |
|---|---|---|---|
| **kill** 247:4 | 77:20,22 78:16 | 157:3 158:18 | 240:15 241:16 |
| **kind** 28:24 | 79:8,17 80:8 | 159:5,10,14 | 241:19,23 |
| 41:20 67:8 | 80:12,15,25 | 160:7 162:20 | 242:14 243:3 |
| 79:18 104:12 | 81:1,4,8,9 | 164:11,12 | 243:20,21 |
| 146:6 149:23 | 83:23 86:20 | 166:1,20 | 246:8,17,18 |
| 152:6 163:8 | 87:6,9,13,14,21 | 170:24 172:9 | 247:8 249:5 |
| 182:24 220:9 | 88:3,21 89:13 | 173:2,23,24 | 250:3,12 251:1 |
| 254:16 | 89:15,25 90:4 | 174:6 180:16 | 251:16,17,18 |
| **kinds** 112:25 | 90:9,12,16 | 182:5 183:6 | 251:25 253:23 |
| 226:24 | 92:5 95:7,12 | 185:14 187:19 | 258:11,14 |
| **kit** 69:11 | 96:6,11,16,19 | 189:19 190:25 | 259:2,5 260:17 |
| **knew** 11:7 | 96:20 97:25 | 191:6,19 | 262:22 |
| 175:18 208:17 | 98:6,17,22 | 192:21 196:4 | **knowing** 88:6 |
| **knouse** 120:23 | 100:7,14,19 | 197:17,25 | **knowledge** |
| **know** 13:13 | 103:19 107:5 | 199:6 200:11 | 157:6,23 167:2 |
| 18:19 20:23 | 111:7,20,24 | 202:5 205:14 | 179:19 180:6 |
| 21:17 23:17,24 | 113:2,5 114:12 | 207:6,8,12 | 181:1 266:10 |
| 25:22 27:1,24 | 115:2,15,18,21 | 208:15 212:9 | 267:7 |
| 28:13 29:6,8 | 115:25 116:3,4 | 212:12,15,23 | **known** 36:16 |
| 30:2 32:21 | 116:15 117:21 | 213:21 214:6 | **knows** 19:14,20 |
| 34:14 38:1,15 | 118:1,22 | 214:12,18,21 | 19:22 155:16 |
| 40:6 42:10,10 | 119:12 124:16 | 214:24 215:1,6 | **krimzee** 24:14 |
| 43:17 45:7,17 | 125:3 126:23 | 215:15,18 | 81:16 156:3,13 |
| 46:11 47:24,25 | 127:1,5,7 | 218:1,4,18,23 | **l** |
| 48:12,12 49:14 | 134:19 136:21 | 219:6,13 | **l** 8:17 156:14 |
| 49:22 53:8,14 | 137:14,22 | 220:25 221:1,4 | 252:11 259:6 |
| 56:8,10,17 | 139:9 141:16 | 221:4,6 222:12 | 259:10 |
| 57:3,10,25 | 141:20,25 | 222:22 223:8 | **la** 126:13 |
| 59:3 60:23,25 | 142:8,21 146:6 | 223:19,23 | **label** 206:24 |
| 61:16 62:14,16 | 148:17,23 | 224:4 225:21 | 259:23 |
| 62:22,22 66:11 | 149:3,5,11 | 226:14,20 | **labeled** 222:10 |
| 71:21 74:14,23 | 153:1,19 154:2 | 227:3 229:12 | 259:24 |
| 75:2,15,24 | 154:13 155:1,7 | 231:25 232:1 | **labeling** 181:21 |
| 76:5,7,13,15,16 | 155:15,17,19 | 236:4 238:25 | 181:24 |
| 77:10,14,16,17 | 155:23 156:8,9 | 239:1,13,21 | |

Page 37

**[lady's - list]**

| | | | |
|---|---|---|---|
| **lady's** 156:12 | **lawyers** 112:5 | 220:23 250:8 | **limited** 4:14 |
| **laid** 235:18 | 112:10 126:11 | 251:6,7,21 | 146:19 |
| **landline** 113:14 | **lax** 210:24 | 252:7 | **line** 5:17 71:4 |
| **landlord** 79:4 | **lays** 235:14 | **lending** 102:5 | 76:2 100:15 |
| 125:4,8 | **lc** 128:15 | **length** 35:17 | 111:8 124:11 |
| **landlord's** 42:3 | **lease** 52:23 | **leslie** 1:16 2:3,4 | 128:1 139:7,8 |
| **lane** 229:24 | 53:5,6,17,20 | 2:7 6:8 7:8 | 139:19,21 |
| **language** 13:8 | 54:8,11,12,17 | 13:2 50:22 | 140:11,16,18 |
| **langworthy** | 54:25 55:6 | 264:17 | 141:3,14,18,22 |
| 24:11,12 | 76:21 77:4,6,8 | **leslie's** 112:8 | 142:5,8,21 |
| **large** 52:8,9,10 | 104:25,25 | 264:24 | 143:5 144:12 |
| 228:25 258:24 | 105:1,13 | **lesliecohenla...** | 144:13,17,21 |
| **larger** 111:18 | 205:12,20 | 2:7 | 159:12 166:11 |
| 214:25 216:24 | 215:1,2 | **letter** 163:4 | 167:9 168:7 |
| **largest** 49:9 | **leased** 192:4 | **level** 25:17 | 175:2,22 |
| 51:3 116:20 | **leasing** 205:15 | **lewis** 3:5 7:23 | 212:23,25 |
| 117:2 118:8 | **leaving** 161:23 | **lexington** 119:3 | 213:8 214:25 |
| **larry** 91:9 93:5 | **left** 53:4,6,16 | **liabilities** 81:22 | 215:20,24 |
| 93:23 118:2,3 | 86:8 140:1 | 90:1 | 216:4,16,21 |
| 121:3 | 211:2 256:10 | **liability** 4:14 | 219:14 222:9 |
| **las** 126:13 | **legal** 50:6,16,19 | 48:7 50:11 | 223:9 225:21 |
| 129:8,14 130:4 | 57:1,22 58:24 | 53:5 82:17 | 226:14 227:14 |
| **last's** 168:21 | 98:17,19 112:1 | 146:20 202:1,6 | 228:3,6,17 |
| **late** 30:15 | 112:1,13 122:4 | **libor** 252:2,5 | 233:22 236:10 |
| **laughing** 88:24 | 126:12 157:4 | 252:11 | 238:15 269:5,8 |
| **law** 1:16 2:4 | 185:12 198:11 | **libsyn** 219:20 | 269:11,14,17 |
| 6:8 112:8 | 200:25 220:2 | **lien** 145:6,7,7 | 269:20 |
| 119:25 120:5,6 | 232:9,11,20 | **liens** 49:20 | **lines** 89:22 |
| 121:7,16 | 247:3 | **likely** 19:22 | 139:12 260:19 |
| **laws** 6:19 268:2 | **legitimate** 46:6 | **lila** 226:10 | **linkedin** 219:16 |
| **lawsuits** 232:13 | 56:23 57:19 | **limit** 162:9,12 | **lion's** 74:5 |
| 232:24,25 | 83:3,4,15,16 | 162:14 168:22 | **liquid** 174:2,12 |
| **lawyer** 17:18 | 126:6,15,18 | **limitations** | **list** 51:2 76:25 |
| 20:14 49:20 | 128:9 129:3 | 210:3 | 81:19 116:20 |
| 50:17 149:1 | 136:3 220:21 | | 117:18,19 |

**[list - looking]**

118:8,11,19
119:1 155:10
155:12 156:9
163:16 173:8
173:12 174:12
195:2 251:11
254:7
**listed** 36:3
48:20 49:15
69:25 71:22
74:17 78:14
79:12 80:7,23
81:11 82:16
116:5,18 117:2
117:23 118:4
121:16 173:22
174:15 195:1
198:23 199:9
207:9 214:8
215:13 218:14
233:25 238:19
238:20 253:8
254:24
**listen** 61:12
**listeners**
100:18 246:17
**listing** 77:11
117:14,15
118:4
**little** 14:4 30:6
56:5 60:13
62:13 87:19
107:14 131:13
222:10 224:7
240:14

**live** 10:9 30:8
34:8 35:9
42:22 43:19
204:14
**lived** 30:10
34:10 35:3,3
43:8,13,13,22
185:8 204:11
**liveone** 4:19
149:18,23
163:3,11,19,21
181:25 182:3
182:25 249:17
**liveone's**
165:14
**livid** 238:21
**living** 35:13,15
35:20,22 43:2
43:2 203:25
**llc** 2:10 3:3 7:5
33:20,22,24,24
36:17 40:13,18
45:3,4,10,12,21
46:1,5,16
49:17 56:2,24
57:16,20 58:4
58:9,14,19,20
95:20 96:2
149:3 190:12
190:13,18,21
190:22 191:2
191:12 192:14
203:8,14 205:3
205:8 208:24
213:16,17,18

213:22
**llc's** 207:10
**llp** 2:13 182:20
**loan** 190:14,23
227:5
**loans** 89:22
132:21 136:24
**located** 6:8
63:19
**location** 1:16
41:6 42:12
52:6,7 54:18
64:6 128:8
**locations**
215:11
**lockbox** 71:6
**lockdown**
175:10 182:16
**locked** 182:10
182:16
**lockup** 174:8
182:8
**lodged** 17:25
**logan** 195:16
195:18,20,22
**long** 18:16
30:10 32:10
85:21 104:8
105:7 136:7
157:20 224:3
232:2 261:18
262:25,25
263:5,17,23,25
**longer** 69:5
105:19 210:7

**look** 19:18 37:9
47:3 54:4
57:15 65:15
73:11 74:23
75:24 79:24
87:3 92:4,15
100:24 102:20
106:12,14
107:4 112:23
124:17 129:5
131:25 138:2,3
138:15 141:2
146:2 148:10
153:1,21,24
154:4,7 157:8
158:19 160:8
160:17 177:22
177:24 191:1
195:2 208:16
208:19 209:20
211:17 212:17
214:14 220:14
224:11 225:5
227:24 238:5
240:10 247:11
248:9,13 249:4
256:18
**looked** 19:25
173:21 174:16
203:23 232:3
244:20
**looking** 13:15
18:24 20:7
47:1 113:4
125:17 131:14

**[looking - march]**

141:15,15
144:9,10
158:21 161:18
162:24 176:7
176:10 179:7
207:7 217:17
228:1 230:2,3
231:9,19
233:10 243:24
247:3 257:10
**looks** 40:12
87:18 95:3
97:2 152:2
166:10 203:14
205:5 229:18
229:19 237:16
240:14
**loose** 130:22
**los** 34:9 124:21
177:4
**lose** 215:19
**losing** 124:15
231:13
**loss** 204:20
206:18 230:11
**losses** 96:7,9,13
209:3 230:15
**lost** 65:21,24,25
66:15 95:1,10
95:14 99:17
100:1,3 124:1
124:9 128:24
200:19 201:9
201:16 215:22
216:2,11

222:15 224:18
224:21 230:5
**lot** 14:12 25:22
30:3 40:6
100:4 127:20
127:22 138:4,5
139:9 187:18
189:19 196:14
252:17 256:12
**lots** 254:11
**loud** 14:1
**louis** 30:9,10
35:21,22
105:17 254:11
254:16,20
**love** 248:2
**loved** 247:23
**low** 66:12
**lower** 13:24
15:17 66:12
**lunch** 210:12
**lying** 137:7
**lyrical** 91:4
93:4 94:4
116:17,25
117:2,17 121:4

| m |
|---|

**m** 5:12 8:17
62:6 156:14
**macs** 219:9,10
**madam** 25:2
**made** 74:5 77:2
78:12 146:1,25
153:15 160:22
161:23 162:4

163:12 164:14
166:11,19,21
169:22 211:3
238:3 243:7
244:21 248:10
253:12,21
**maenlee** 24:14
81:16 156:3,13
**main** 41:5
62:23 71:8,13
71:15 72:18
74:1
**maintain** 23:3
63:23 106:15
106:20
**maintained**
130:21
**maintains** 64:2
**maintenance**
105:23 106:13
214:19,20
**major** 188:19
**majority** 63:7
119:17
**make** 31:11
49:8 53:17
67:16 80:1
94:2 96:24
104:8,18 105:7
122:15 132:6
143:11,13,16
145:17 150:11
166:13 174:21
178:24 181:18
185:15 199:16

202:21 215:19
235:1 240:19
240:24 241:2
243:6,17
244:16,20,24
244:25 250:5
251:11 261:11
**makes** 62:20
76:2 105:19
**making** 53:3
124:19,19
145:17 180:24
199:15,23
210:16 244:19
252:5
**management**
26:11,13,16
28:23,24
**managers**
126:22
**mandel** 76:24
77:12 78:13
79:1,3,7 229:1
**manner** 6:20
19:4 84:8
110:12
**march** 5:6
38:22 64:10
85:9 95:10
123:14,25,25
124:8,8 151:8
152:19 161:2,4
161:9 163:18
190:11 193:3,6
195:23 229:16

**Page 40**

**[march - media]**

| | | | |
|---|---|---|---|
| 238:16 240:1 | 119:25 121:7 | 262:3 264:2 | 76:11,25 77:13 |
| 258:3 261:1 | 121:16 201:18 | **meaning** | 79:12 80:1,13 |
| **margaret** 35:7 | **max** 59:16 | 233:24 234:1 | 80:21,24 81:5 |
| **maria** 226:9 | 61:15,18 62:2 | **means** 6:21 | 82:17,25 83:24 |
| **marina** 250:24 | 144:14 174:23 | 89:4 165:16,18 | 84:6,16 87:23 |
| 251:2 | 174:25 175:17 | **meant** 39:5 | 89:3,19 91:4 |
| **marked** 36:9 | **maximum** | 176:16 246:8 | 91:13 93:4 |
| 38:24 40:10 | 139:24 175:4,9 | **media** 1:5,12 | 94:4 96:1 |
| 45:18 46:18 | 175:12 | 2:2 4:20,22 6:7 | 101:11 112:6 |
| 138:17 146:23 | **mazza** 3:7 6:25 | 8:22 9:11 | 116:11,17,25 |
| 151:10 161:12 | **mb** 1:6 | 12:17 13:4,6 | 117:2,14,17,23 |
| 165:1 181:15 | **meal** 220:18,22 | 13:12 14:20 | 118:4 119:4 |
| 184:24 190:15 | **meals** 220:5,5,8 | 16:22 21:8,25 | 120:9,12,20,24 |
| 192:1,18 193:1 | 220:11 | 22:14,24 23:1 | 121:5,21 122:9 |
| 196:10 203:1 | **mean** 10:6,22 | 23:3,7,8 26:10 | 124:23 125:25 |
| 229:7,13 | 18:7 19:7 | 26:18,23 29:15 | 126:18 128:10 |
| 237:12 238:7 | 25:19 26:15 | 30:21 31:17 | 130:7,14 131:1 |
| 241:7 242:9 | 27:23 29:6 | 33:7,9,13,17,20 | 131:22 139:12 |
| **market** 138:2 | 35:10 39:1 | 33:24 34:1 | 140:16 142:4 |
| **marketing** | 42:2 45:14 | 36:16,17,19,21 | 142:12,17 |
| 221:7,9,12,13 | 49:23 50:20 | 38:16,22 39:22 | 144:20,25 |
| **married** 34:5 | 51:2 58:21 | 39:23 40:18,19 | 145:7,8 146:14 |
| 203:20 | 59:25 68:11 | 40:22 44:3,24 | 147:9 148:16 |
| **mary** 35:25 | 84:1 87:11,12 | 45:3,21 46:1,5 | 148:19 149:2,3 |
| 36:3 185:4 | 87:17,20 88:2 | 46:15,16 48:10 | 151:8 155:2,25 |
| 186:14 203:25 | 91:22 95:18 | 56:24 57:16,20 | 156:17,18 |
| **match** 99:12 | 99:19 102:4 | 58:4,9,13,14,19 | 157:6 158:6,16 |
| **materials** 39:2 | 103:19 108:6 | 58:20 59:5,7 | 163:5,11,18 |
| **math** 60:19 | 116:19 140:8 | 59:11,13,15 | 164:6 166:15 |
| 206:12 207:25 | 155:5 187:14 | 60:16 63:2,6,8 | 166:21 167:5,8 |
| **matter** 16:19 | 198:16 207:25 | 63:11,22 64:10 | 173:9,13 177:4 |
| **matters** 179:20 | 208:16 220:14 | 64:14 65:12 | 177:16,17 |
| 180:8 181:2 | 220:15 222:9 | 66:9 68:7,18 | 178:16 180:3 |
| **matthew** 35:21 | 229:18 243:11 | 69:16,25 71:16 | 181:8 186:19 |
| 35:23 119:23 | 243:13 251:23 | 74:1 75:10 | 187:2,7,21 |

**[media - minus]**

188:1,18,24
189:17 190:11
190:12,13,18
190:21,22
191:2,12
192:15 193:6
193:10 194:9
197:4,21
199:14,23
201:16,19,25
203:8,14
204:23 205:3,8
207:10 208:13
211:25 212:12
212:22 213:10
213:16,17,18
214:22 215:16
215:22 216:2
223:24 236:17
239:24 241:17
250:16 253:4
258:24 259:11
269:1
**media's** 88:15
198:9
**meet** 14:7
184:18
**meeting** 9:19
9:20,23 126:20
126:21,21
145:10 171:8
**megaphone**
219:21
**member** 25:17

**members**
229:20,22
**memo** 5:6
229:16,19,19
230:15,18
231:20 233:10
237:9
**memorize**
32:22
**memory** 24:8
181:11 242:2
247:11 249:9
260:13
**mentioned** 28:2
131:14 162:16
183:3
**mercedes** 101:4
101:16,19,22
102:1,5 103:5
103:6,9,13
104:12,13,16
105:2 106:15
106:20 148:14
218:19
**merch** 250:16
250:17
**merchandise**
250:15
**merits** 179:21
180:9
**met** 37:22
184:12 208:21
**metric** 162:11
**metrics** 140:5

**mg** 233:16,25
**miami** 126:14
128:16
**mic** 62:25
**michael** 24:9
81:15 121:19
121:20 156:1
156:13 238:18
239:7,11,15
**microphone**
7:23
**microsoft** 29:4
107:8
**mid** 143:1,2
**middle** 91:16
**might've**
103:25 188:23
189:25 215:3
**mike** 74:17
226:9 229:24
238:17 239:6
239:10,24
243:6,19
**mill** 258:9
260:11,13
**million** 73:17
74:6 90:25
91:12,17,20
92:21 93:5,10
93:20 96:6
116:11,21
117:1,1,17
119:14 124:15
127:2,12
139:25 142:12

142:16,25
143:8 144:14
144:15,21
145:9,17 146:4
148:8 166:14
174:25 175:8
175:10 194:1,8
194:13,22,24
196:6 197:1,12
198:15,20
200:19 201:9
201:16 215:22
224:21,22
225:1,3,4
230:10,14
231:12,22
232:5 233:9,20
234:11,13
245:5,10,16,25
246:3,10,21
259:13 260:23
261:1,2
**millionth** 166:2
**mine** 24:21
214:8
**minimum**
233:16,20
234:4,7,17,21
234:22 236:9
236:16
**minus** 88:1
113:23 115:8
115:16,18
132:4 193:13
224:20

**[minute - name]**

| | | | |
|---|---|---|---|
| **minute** 210:6 | **model** 61:14,24 | **monica** 1:18 | 124:20 143:16 |
| **minutes** 19:25 | **mom** 49:17 | 2:6 6:9 | 163:13 |
| 42:6 150:11 | **moment** 16:7 | **monies** 114:15 | **moved** 204:13 |
| 197:19,25 | 24:23 131:14 | 172:6 | 227:18 235:17 |
| 209:17 210:14 | 159:25 160:1 | **montana** 1:17 | 252:21 |
| 210:18 211:2,6 | 168:12 209:14 | 2:5 6:9 | **movement** |
| 255:24 256:3 | 225:5 | **month** 43:1 | 128:22 |
| 256:10 257:17 | **monetization** | 53:25 54:9 | **moving** 144:24 |
| **miscasts** 79:14 | 164:9 | 66:12,25 68:8 | 236:12 |
| **miscellaneous** | **monetizer** | 97:1 108:16 | **multi** 25:17,17 |
| 147:23 218:3 | 183:8 | 111:16 112:15 | **multiple** |
| 220:19 223:22 | **money** 30:24 | 112:16 145:9 | 204:17 229:20 |
| **mispresent** | 54:24 55:5,8,9 | 145:12,13,18 | 229:22 251:1 |
| 210:22 | 67:21 68:5,6 | 187:6 206:6,11 | **murcin** 226:9 |
| **mispronounce** | 68:14,22 73:8 | 224:6 | **music** 44:9,13 |
| 144:1 | 73:9,19 103:8 | **monthly** 53:18 | 44:19 45:4 |
| **mispronounced** | 103:13,22 | 100:18 112:15 | 191:21 |
| 110:21 | 114:21,21 | 239:23 | **must've** 219:7 |
| **misrepresent...** | 124:19,19 | **months** 24:11 | **mutual** 241:22 |
| 210:17 | 131:8 133:9 | 30:12,14 53:4 | **n** |
| **missed** 10:24 | 134:1 135:14 | 53:6,16,20 | **n** 2:1 3:1 4:1 |
| **missouri** 30:9 | 136:6,18 | 54:1,5,7,16 | 5:12 6:1 8:17 |
| 30:11 | 141:17 144:10 | 97:1,2 98:12 | 8:17 33:16 |
| **mm** 13:25 15:8 | 148:16,19 | 100:21 111:19 | 62:20 91:7 |
| 21:15 49:5 | 154:14 160:6 | 111:23 152:25 | 156:14 252:12 |
| 53:21 78:19 | 163:19,21 | 159:3 161:2 | **name** 6:3 7:11 |
| 99:10 109:9 | 167:9,11 168:4 | 170:5,9 171:23 | 8:15,18 28:10 |
| 113:17 127:15 | 169:25 183:10 | 206:7 | 42:1,2,3 45:16 |
| 158:13 160:11 | 185:18 193:8 | **morning** 6:2 | 87:14 91:6 |
| 161:1 164:24 | 197:5 215:19 | 209:24 | 101:5,7,8,10 |
| 206:9 217:25 | 215:19 230:2 | **motion** 263:3 | 104:16,17 |
| 221:10 240:12 | 231:13,24 | **motions** 263:16 | 105:4,6 110:10 |
| 245:13 250:10 | 234:6 235:24 | **motors** 106:23 | 110:15,18,18 |
| **mobile** 32:17 | 242:25 246:16 | **move** 30:13 | 110:21,23 |
| 32:18 | 246:18 258:24 | 54:14 71:8 | 111:2 125:11 |

Page 43

**[name - new]**

125:12,19
131:15,16
144:2 150:4
156:4,12
172:11,19
182:1,19,22
192:14 200:17
200:22 201:4
201:14 204:24
213:15 260:1
**name's** 24:12
**names** 81:14
118:9 143:17
155:6
**nashville**
126:14
**natalie** 1:22 6:3
266:3,21
**nature** 53:1
83:9 174:12
180:23 187:15
**nda** 241:25
**nec** 4:21 185:6
214:8
**necessarily**
30:7 60:15
107:22
**necessary**
12:22 227:1
**necessitated**
127:19,24
**need** 10:19
14:12 18:18
29:18 32:5
137:11 141:9

155:3,8,12
157:15 171:1
221:5 238:21
247:11,12
256:11 263:4,5
264:9
**needed** 53:9,15
54:1,8 142:18
142:25,25
175:24 232:7
256:13
**needs** 52:15,15
83:15 231:21
**negative** 94:24
123:8 215:21
215:25 216:5
216:13 222:16
**negotiated**
13:19
**negotiations**
241:11
**neighborhood**
66:24
**neil** 121:23,23
121:24 229:24
**neither** 266:11
267:8
**net** 96:17,19
113:23 115:6
131:9,9 183:13
200:15 206:15
206:16,18
208:13,17,18
208:20 209:7

**netflix** 59:16,19
59:21 60:8,11
60:17 61:19,23
61:24 62:3,4
**netflix's** 61:24
**never** 10:2
27:14 36:3
149:13 174:21
181:19 191:19
237:17 240:5
**new** 2:19,20 3:5
4:3 7:4,4,17,22
8:1,14,18 9:6,8
9:9,22 10:17
10:25 11:3,11
11:16,21,24
12:10,23 13:17
13:21,25 14:3
14:6,25 15:4,8
15:12,16,20,24
16:3,9,11,17,20
18:5 19:2,6,12
19:16,24 20:6
20:10,18,21,22
22:19,22 24:21
24:23 25:1,6
31:15,21 32:3
32:6,10,14,15
33:3 34:14,17
34:20 35:1,6
36:7,11 37:6,8
37:20,22,25
38:10 39:1,3,6
39:10,14,17,19
40:1 41:15,18

41:21 47:2,12
47:20 49:3,6
49:16 50:2,7
50:21,23 51:4
51:6 55:7 57:5
57:9,11,23
59:1 62:6,19
65:5 68:25
77:23 78:2,7
78:11 79:16
80:16,17,20
83:20 85:13,21
86:1,7,17,24
89:1,8 90:7,8
90:15 92:8,12
92:18,24 93:3
106:17,19
108:23 109:1
109:12,15,21
109:24 110:2,5
110:8,13,16,20
110:25 111:1
116:21,24
117:6,9,12
118:10,14,16
118:20 119:3,3
121:5,5,9,14
124:5,6 125:17
125:22 126:14
127:8,10
128:15,16
129:22,24
130:2 134:7,11
134:13,18,24
135:2,5,25

**[new - number]**

| | | | |
|---|---|---|---|
| 136:4 137:9,12 | 212:11 215:2 | **nineteen** 237:4 | 92:4,23 117:1 |
| 137:15,18,19 | 217:4,7 221:22 | **ninety** 119:20 | 239:20 |
| 145:4,5 150:5 | 222:19,21 | **non** 4:9 47:14 | **noteholders** |
| 150:10,13,19 | 223:2 229:4,10 | 129:11 | 116:16 |
| 150:23,25 | 229:11 230:13 | **nondisclosure** | **notes** 19:1,11 |
| 151:3,6,12 | 231:16 232:18 | 241:5,14,22 | 20:4 93:7 |
| 165:3 169:2 | 233:14,15 | **nonemployee** | **notice** 4:7 13:6 |
| 170:13,22 | 237:2,6,9,14 | 185:6,10 186:4 | 36:13 191:24 |
| 171:2,5,10,15 | 238:12 239:5,9 | 186:15,19 | **noticed** 68:4 |
| 171:19,21 | 240:18 243:10 | 203:24 228:20 | **noticing** 7:3 |
| 172:16,21 | 243:12,15,16 | **nonindividuals** | **notified** 236:4 |
| 173:5,6 176:7 | 244:10,12 | 38:21 | **noting** 38:5 |
| 176:9,11,12,15 | 245:19 248:5,7 | **nonrenewed** | 230:22 |
| 176:19,24 | 248:22,24 | 61:3 | **november** |
| 177:1,8,12,15 | 249:1,20,21 | **nonspeaking** | 152:24 153:9 |
| 177:21 178:1,5 | 252:11,14,23 | 17:18 18:6 | 183:22 |
| 178:9,12,14,19 | 255:4,6,25 | 34:21 39:17 | **number** 32:18 |
| 179:2,5,8,11,13 | 256:2,5,16,17 | 41:15 47:16 | 32:20 48:24 |
| 181:13,17 | 257:3,5,10,11 | 57:5,7,13 | 51:10 68:19 |
| 184:6 185:1 | 257:12 261:3 | 77:23 78:4 | 92:18 94:25 |
| 189:15 195:10 | 261:13,19,21 | 127:8 134:24 | 103:3 119:19 |
| 195:13 196:16 | 262:2,6,8,12,25 | 135:25 196:16 | 121:2 126:25 |
| 196:19,24 | 263:2,15 264:1 | 248:24 | 127:5,6,7 |
| 197:16 198:13 | 264:14,19 | **nonstop** 20:8 | 138:15 152:16 |
| 198:17,18 | 265:1 | **nope** 135:25 | 152:21 158:22 |
| 200:21 201:1 | **newlawoffice...** | **normal** 248:3 | 160:10 164:21 |
| 203:3,6,13 | 2:23 | **normally** 94:12 | 174:13 176:3 |
| 205:19,22 | **news** 234:3 | 261:12 | 178:12 180:10 |
| 206:1,20,22 | **nice** 156:11 | **north** 258:9 | 180:11 183:9 |
| 207:1,5 208:8 | **night** 129:20 | 260:11,13 | 184:22 186:12 |
| 208:11 209:11 | 130:3 189:2 | **notary** 6:10 | 193:15 203:22 |
| 209:15,18,19 | 264:18 | 266:22 | 205:12 207:1 |
| 209:23 210:1,8 | **nine** 14:6 | **notch** 137:10 | 208:21 216:9 |
| 210:10,16,21 | 119:20 264:2 | **note** 9:3 10:19 | 217:14 218:5 |
| 211:10,16 | | 90:24 91:1,21 | 218:15 222:19 |

Page 45

**[number - okay]**

225:7,15,18
228:2 233:13
237:15 258:8
**numbered**
217:18
**numbers**  32:16
32:22 46:13
108:7,25 116:5
211:24 214:9
**numerous**
37:23 229:20
**nuys**  52:3,17
53:12 54:21
63:3,19 64:7

**o**

**o**  5:12 6:1 8:17
8:17,17 202:13
252:11
**o&o**  29:15,20
30:4 65:22
164:3 250:21
**o&os**  97:13,16
163:25
**o'dell**  226:10
**oaks**  36:1,4
185:5 186:14
203:25 204:14
**oath**  10:7,7,13
11:13 15:10
25:7 137:6
**oaths**  6:11
**object**  18:8,11
22:19,20 34:11
46:21 47:17
49:11 50:5

135:2 196:12
**objection**  6:12
17:24 18:7
31:12,18 32:25
41:16 47:9
49:25 57:1,6,8
57:13,21 58:24
58:25 77:24,25
78:4,6,8 79:14
81:3 83:18,22
85:4,11,19
86:15,22 88:17
89:6 90:6,13
103:10 106:16
127:9 134:25
135:24 136:1,2
136:3 170:12
184:5,10,10
185:12 196:17
196:18,21
197:14 198:11
200:20,24
217:5 224:23
231:14 236:19
236:23 239:3,8
245:17 246:4
248:1 255:2
**objections**  8:4
17:18 34:21,23
39:18 47:16,19
135:3 211:3
248:25
**obligate**  12:2
**obligations**
11:17,25 12:25

15:13 184:13
184:19 234:7
243:22
**obtain**  44:12
163:11 201:18
**obviously**
70:22 142:9
173:25 187:14
219:3
**oc**  234:3
**occurred**
138:10
**october**  153:10
259:18
**oddly**  222:10
**offer**  90:10
194:6 248:9
**offered**  168:9,9
194:5 200:6
**offers**  199:1,4
**office**  1:16 6:8
7:22,24 13:16
20:25 28:23
47:6 51:24
52:13 64:6
76:14,17 77:9
77:11 79:19
80:2 220:24
264:21
**officer**  6:2,3
7:7,10,13,20,25
8:3,11 25:3,4
59:9,12 63:9
63:12,14
129:22 151:1

213:10 223:13
223:14 229:6
237:4,11 252:9
252:13 261:8
261:15 262:4
262:16 266:1,3
**officers**  59:7
213:8 223:12
228:17
**offices**  52:11
**official**  117:4
118:7
**officially**  98:15
**officiated**  1:21
**oh**  25:19 46:2
49:5,15 62:25
78:23 94:24
104:7 105:16
109:4,7 135:1
138:24 143:2
148:12 151:14
161:5 165:6
175:12 206:24
212:9 223:1,4
226:11,11
231:18 237:8
244:3 246:15
246:25 249:12
258:22
**okay**  8:18 9:7
9:23 10:4,6
11:21 12:21
14:3,6,25
15:20 17:5,9
17:15,16,25

**[okay - order]**

| | | | |
|---|---|---|---|
| 18:6,9,10,16,21 | 162:24 166:13 | **old** 68:25 215:1 | 114:14,24,25 |
| 19:2,19 20:11 | 167:16 169:11 | **omitted** 173:23 | 140:12 259:14 |
| 21:6,19,19 | 171:10 172:2 | 173:24 | 260:24 |
| 22:7,12 23:3 | 172:10 173:16 | **once** 173:1,2 | **operation** 45:7 |
| 24:8 25:1,7,16 | 173:21 174:18 | 199:22 | 63:2 |
| 26:10,21 28:19 | 175:17 176:9 | **one's** 237:8 | **operations** |
| 30:5 32:10,14 | 176:25 177:14 | **ones** 21:9 25:10 | 45:11 52:1 |
| 35:12 37:7 | 178:10 179:6,9 | 26:8 29:8,10 | 69:10 95:6 |
| 38:8 40:4,6 | 179:12,14 | 186:10,11 | 149:19 250:15 |
| 43:15 45:21 | 180:6 183:10 | 202:11 | **opinion** 98:18 |
| 49:1 50:24 | 184:2 185:4 | **ongoing** 55:6 | 198:12 |
| 59:4 60:5 | 186:2,6,13 | **onion** 250:21 | **opinions** 98:19 |
| 68:14 70:5 | 187:7 190:1 | **online** 26:22 | **opportunist** |
| 77:18 82:22 | 191:7,11 | 27:6,14 | 65:18 66:15 |
| 86:8 88:12 | 193:20 194:7 | **open** 68:25 | 99:19 100:8,9 |
| 89:11 92:24 | 198:6 203:7 | 144:13 153:12 | 107:20 |
| 95:1 98:4 | 204:16 205:20 | 158:25 | **opportunistic** |
| 100:13 104:12 | 207:8,13,21 | **opened** 69:2 | 100:10 |
| 106:6 107:1 | 208:23 209:15 | 217:13 | **opportunity** |
| 109:4 110:17 | 209:18 210:9 | **operate** 41:2 | 93:11 |
| 117:20 118:17 | 211:6 212:9 | 55:14 58:22 | **opposed** 27:8 |
| 121:12 123:14 | 217:13 218:7 | 125:1,5,10 | 60:22 68:12 |
| 125:23 126:3 | 223:1 225:9 | 141:6 213:18 | 103:18 122:9 |
| 129:13 132:17 | 230:19 231:19 | **operated** 35:25 | 141:18 |
| 134:13 135:1 | 234:15 235:20 | 42:23 43:14 | **opted** 98:15 |
| 135:20 137:15 | 236:14,25 | 65:3,9 95:21 | **option** 98:8,8 |
| 137:18 138:15 | 240:16,17 | 222:2 | 98:14 122:20 |
| 138:22 139:6 | 242:15 247:9 | **operateds** | 122:21 164:13 |
| 142:23 143:7 | 248:5 250:13 | 97:14 | **options** 119:10 |
| 150:1,10 151:6 | 252:5 254:25 | **operating** | 120:25 121:22 |
| 151:15 152:11 | 255:16 257:11 | 42:20 43:9 | 122:3,8,13 |
| 155:18 158:15 | 259:9 261:3 | 58:16 68:16,17 | **order** 21:3 |
| 158:24,24 | 262:2,3,9,11,13 | 68:18 71:8,15 | 30:24 49:15 |
| 160:2,5,8 | 263:11 264:10 | 72:18 91:18 | 91:8 141:9 |
| 161:22 162:19 | 265:1,2 | 95:8 113:23 | |

**[organization - paid]**

| | | | |
|---|---|---|---|
| **organization** | 197:4 198:14 | 102:1 110:22 | 89:23 96:23 |
| 4:15 28:7 | 198:19 246:16 | 119:17 120:8 | 114:9,10 115:6 |
| 146:20 | **owed** 48:20 | 128:13,13 | 116:13 117:7 |
| **organizations** | 73:8,9,13,18 | 179:25 221:25 | 117:13 118:15 |
| 31:17 | 77:3,6 82:2,7 | 259:22,23 | 121:9,15 |
| **original** 263:19 | 102:23,24 | **owned** 27:11 | 138:19,21 |
| **originally** | 114:5 117:1,17 | 65:3,9 97:10 | 145:1,10 147:2 |
| 62:23 | 131:8,25 | 97:14 121:22 | 147:4,5 160:14 |
| **originated** | 132:21 133:9 | 122:3 222:1 | 165:15,22,23 |
| 98:23 | 133:14,16,20 | **ownership** 66:3 | 167:17 173:18 |
| **orleans** 126:14 | 133:21,23 | 201:19 | 175:2 177:2,10 |
| **outcome** | 141:18 154:22 | **owns** 65:12 | 177:20 178:4 |
| 266:16 267:13 | 154:25 158:7 | 69:12 119:22 | 178:15 179:9 |
| **outlined** 232:7 | 160:6,24 | 120:25 | 179:10,11 |
| **outside** 24:10 | 161:24 162:20 | **oxford** 73:25 | 186:13,18 |
| 28:6,20 80:5 | 162:21 166:12 | | 193:12 195:7 |
| **outsourced** | 166:24 167:5 | **p** | 203:19 211:17 |
| 28:2 63:14 | 167:11 168:3 | **p** 2:1,1 3:1,1 | 217:17 225:22 |
| **outstanding** | 168:12,18 | 4:17,25 6:1 | 227:5 230:19 |
| 183:19 261:5 | 169:18,24 | 35:13 128:15 | 230:20 231:8,8 |
| **overall** 129:18 | 170:4 172:6 | 151:8,22 | 232:9 233:13 |
| **overlap** 42:24 | 175:18,25 | 158:12,14,18 | 233:14,19 |
| 42:24 43:10,16 | 185:20,21 | 158:20 160:17 | 239:14 243:23 |
| 43:17,19 | 193:17,19 | 193:3,6 | 244:10 249:6 |
| **overseeing** | 195:3,20,25 | **p&l** 114:8 | 269:5,8,11,14 |
| 64:22 | 197:12,18,20 | 230:7,8 | 269:17,20 |
| **overstated** | 198:1 199:13 | **p.m.** 5:10 86:3 | **pages** 1:25 |
| 50:12,15 | 238:24 247:7 | 86:6 150:15,18 | 21:14 118:8,16 |
| **owe** 103:22 | 247:15 | 211:12,15 | 159:6 176:16 |
| 114:21 132:19 | **owes** 49:7 93:4 | 265:5,7 | 177:10 178:6,9 |
| 162:10 163:18 | 152:12 153:23 | **pacific** 14:14 | 178:21 |
| 163:20 167:8 | 161:16 162:7 | 150:6 | **paid** 30:18,22 |
| 168:23 169:9 | **owing** 242:24 | **page** 4:2,6 5:2 | 31:10 68:9 |
| 183:10 193:8 | **own** 65:24 80:2 | 5:13,17 21:17 | 69:4 72:11,17 |
| 194:23 195:16 | 80:5 84:3 | 37:2 49:1,2,3 | 84:23 93:12 |
| | | 69:14,15 80:10 | |

Page 48

**[paid - paying]**

98:6 101:9,12
101:14 104:7
107:21 108:10
108:19 113:21
126:1,7,19,24
127:12,20
128:10 129:14
130:5 136:7,15
142:19 146:9
146:16 147:22
153:9 154:5,9
154:15 155:2
155:24 156:25
157:10,14
158:6 159:23
159:24 161:3
166:14 183:17
185:18,21,22
186:1 196:6
197:11 198:8
199:12 203:14
215:3 222:3,5
227:11 239:2
239:20 240:5
240:14 247:6
256:19
**palatable**  146:3
**palos**  119:12
**panama**  65:23
65:24 66:1,15
99:17 100:1,3
128:24,25
**pandemic**
55:17,24
190:10 191:17

**paper**  63:23
64:1 221:4
**paperwork**
190:17
**par**  166:2
**paradise**  65:21
**paragraph**
166:4 242:19
**pardon**  43:25
95:23 221:16
**parent**  69:13
149:18
**parentheses**
151:24
**park**  2:21 34:9
35:2 147:8
**part**  12:4,18,19
23:24 24:7
52:20 63:15
68:24 69:17
76:19 77:2
79:1,3,6,11
80:5 81:6,6
112:11 117:1
135:15,16
141:12 143:23
156:15 169:4
169:23 177:19
177:22 214:16
224:5 228:25
241:10 249:16
249:22,22
259:10
**partial**  176:13

**participants**
7:14
**particular**
25:13
**particularly**
138:10
**parties**  6:13
37:22 238:1
244:15 245:6
245:25 266:12
266:15 267:9
267:12
**partner**  139:6
164:9 222:2
**partners**  119:2
132:14 135:19
141:18 142:24
154:18 168:3,8
170:2,8,18
172:5 193:9
194:2,8,13
199:14 221:25
241:21 247:25
**partnership**
150:2,3 164:12
**party**  171:6
241:23
**pass**  70:13
**past**  30:22 71:4
74:20 202:11
**paths**  200:14
**patience**  261:4
**paul**  195:16,18
195:20,22

**pay**  43:22
53:20 54:16
67:7 70:1,12
70:13 77:8
82:18,25 84:7
84:10 101:19
101:22 103:21
103:21,24
104:2 105:23
106:2,4,5,9
108:8,9 122:8
122:12 126:4
127:24 129:9
132:4 135:22
136:9,12,13,17
141:11,12
144:10 146:14
147:9 154:15
165:24 172:5
183:18,22,23
183:24 184:1,2
196:7,25 219:3
219:19 239:18
239:21 240:3
252:19
**payable**  81:22
89:22 90:24
115:16,18,21
193:11 194:25
195:4,21
**paying**  55:14
67:3 72:16
84:3,21 86:10
97:15 100:18
102:17 106:18

Page 49

**[paying - personal]**

122:9 125:25
127:2 142:23
153:6,9,15,17
153:22,22
156:25 160:12
160:19 162:21
167:4 168:6,6
194:12 205:3,8
213:6 214:22
224:9
**payment** 54:9
55:6 70:9,14
72:20 101:20
101:23 104:9
104:19 105:7
105:19 146:25
147:6,9,14,16
147:24 153:2,5
153:11,12
160:22,23
161:2,9,12,19
161:23 162:4
166:20,21
172:9 183:12
184:13,19
215:10 238:19
240:19,24
241:2 243:22
244:14,21
252:16 256:24
257:8
**payments**
53:18 70:2
71:7,9,10 84:4
84:21 103:6

108:11 143:11
143:13 145:18
153:15 154:21
189:1,2,6
222:11 238:14
239:2 240:8
241:13,21
242:1 243:6,17
244:16,19,20
244:24 245:1
252:17 253:9
253:12
**payouts** 71:24
72:3,6,11,16
209:4 222:7,8
**paypal** 71:21
71:21,23 72:21
**payroll** 22:3
71:16,19 90:1
90:3 107:25
108:2,10
109:17,19
156:19 257:24
**pays** 67:13
108:8 220:16
**pc** 1:16
**pc1** 165:16,19
**pcs** 219:9
**peak** 223:19
**penalty** 10:12
169:9 268:1
**pender** 24:10
56:18 74:18
81:16 156:3,16

**pending** 221:20
255:3
**penny** 200:1
**people** 24:2
25:8,17 27:16
41:6,9 45:8
63:16 74:17,18
81:19 82:3
89:18 100:10
107:24 116:10
119:5 121:6
128:24 132:25
149:13 182:2
190:21,22
191:5 202:20
226:5 239:11
**percent** 65:13
65:14,19,20
66:3,10 67:4
67:13 98:3
119:20 120:8
131:4,6 132:12
133:9,14,15,21
133:22 135:15
135:16 145:14
145:20 183:15
183:16 207:22
207:23 228:10
243:3
**percentage**
60:16,18,22
65:25 97:23
133:25
**percentages**
97:16

**performing**
122:4
**period** 26:23
42:13,18,22,24
43:7,16,19
45:13 52:22
72:4 77:10
96:25 98:9
104:18 108:22
108:23 111:19
112:13 121:25
123:21,24
124:7,15 139:7
175:10 179:24
189:14 197:7,9
197:18,20
198:1 215:5
224:4
**periods** 257:18
**perjury** 10:13
169:9 268:1
**permission**
125:4
**permitted** 6:17
**person** 7:20
8:25 48:1
69:10 72:10
81:5,10 87:23
125:12 128:13
155:9 157:1
241:17 251:9
**personal** 34:18
42:11 69:21,22
69:24 82:12,14
82:15,18,20

Page 50

**[personal - podcastone]**

83:9,16 84:7
84:10,12
108:11,13,17
113:19 129:7
129:17 186:1
186:11 189:5,6
220:16 252:1
253:1,5,6,8,12
253:13,16,17
253:19,24,25
254:3,6,12,14
254:15,22
255:5,8,9,14,16
255:20
**personally**
12:14 13:10
36:25 42:13,19
43:13 167:24
185:21 188:23
201:23
**petition**  4:8
38:21 39:9,23
48:18,18,19
50:9 51:1,8
55:22 64:4,5,9
64:15 68:24
69:15,18 78:15
87:3 88:6,16
89:14 92:19
101:24 116:7
117:7 118:7
123:9,13,24
131:15 163:20
173:3,7,11
195:2 199:10

**ph**  35:13,13
**phone**  11:6
12:24 13:19
32:16,22
113:13,14,15
113:16,18,19
113:21 171:3,6
171:11,16
**phrasing**  167:7
**physical**  64:6
**piano**  44:22
**piece**  25:19
98:10
**pit**  89:24
**place**  40:21
42:8 51:21
58:8 62:8
76:21 130:16
215:4 244:15
**placed**  57:13
83:11
**plan**  62:7 93:9
93:13,15,18
122:11 182:15
200:5,8,14
201:11,12,12
201:14 210:24
211:3,5 239:16
244:15
**planned**  247:4
**planning**
231:24
**platform**  25:20
27:12 29:25
62:4,6,17,18

72:20
**platforms**
28:24 29:7
61:13
**play**  100:5
**please**  7:1,15
8:5,15 13:24
14:21 15:5,17
16:7 19:9 24:7
34:19 49:1
64:19 69:15
91:6 114:10
115:6 125:16
137:10 138:16
160:10 193:12
206:19 209:9
211:19 218:6
225:6 227:25
229:5 230:19
233:12 238:6
239:14,16,20
248:3 252:10
256:18 262:8
**plenty**  110:7
129:1
**plus**  197:12
230:10
**pocket**  168:21
**pocketed**  103:8
**podcast**  5:7
60:12 61:12,12
61:17,23,23
65:10 100:18
128:22 133:10
135:23 136:5

138:7 141:17
142:24 154:25
168:3 170:8
172:5 180:14
180:20,21
187:11,24
188:4 194:8,13
221:25 226:22
237:16,17
241:20 247:25
**podcaster**
133:24 183:14
197:12
**podcaster's**
183:15,18
**podcasters**
114:21 136:7
193:18 196:7
198:25 222:11
233:20 234:5,8
254:18
**podcasting**
68:22 154:18
168:7 170:18
186:23 192:16
193:9 194:2
199:13
**podcastone**
65:12 66:4
67:3,3,5,11,13
67:17,20,24
68:4,6,22 69:8
69:9 97:15,23
98:1,25 149:18
149:23 150:4,7

**[podcastone - prepayment]**

162:25 163:6
163:13,14,18
163:21,24
164:5 165:13
166:14,18,19
166:25 167:4
168:10,20
169:16,21,22
171:23 172:3,6
175:7 181:20
181:25 182:3
182:10,25
183:5,10,22
184:7,12
188:15 193:18
193:22,25
194:6,7,12,17
194:20,24
196:6,25
197:11 198:7,8
199:21,22
200:7 235:1,3
235:5,7 236:15
241:10,15,23
242:5,7 243:25
245:9 246:18
247:17,20,22
249:8,14,17,23
**podcastone's**
168:14 180:16
197:2 200:1,8
**podcasts** 25:22
41:3 65:3
66:18,19,23
67:1,12,18,21

74:3 97:12,18
114:15 162:13
164:3 183:8
209:4 221:12
221:13,13,15
221:17,19,24
222:2
**point** 54:13
56:16 59:15
64:9 71:18
72:1 84:22
85:2,9 86:13
106:8 130:7,11
136:22 137:21
145:18 146:1
167:20 196:2
232:22 258:23
**pointed** 194:5
**pointing** 231:2
**points** 156:25
**policies** 202:2
202:18 226:18
226:18
**portion** 47:22
108:20,21
176:16
**portions**
177:23
**position** 119:16
120:23 121:21
122:1 170:3,5
194:4 200:3
232:6
**positions** 31:16
64:18

**positive** 28:13
123:8
**possession** 69:1
92:7
**possibility**
149:17
**possible** 80:8
122:17
**possibly** 209:25
247:4
**post** 64:6
**potential** 230:6
230:10
**potentially**
141:25 215:6
245:4,24
**pounding**
62:15,24
**ppc** 191:4
**ppp** 4:22 55:17
55:18,22 56:5
56:8,11,15,24
57:20 58:2,6,7
148:23,24
190:13,23
**practice** 71:20
72:3 263:16
**pre** 108:23
124:8
**precede** 153:5
**precisely** 153:3
**predated** 95:15
**predates** 96:7
98:24

**preexisted** 99:3
**prefer** 176:22
**preferable**
220:10
**prejudicial**
110:15,16
**preliminary**
20:1
**premiere** 30:2
**premium**
100:12,13,14
**preparation**
11:24 88:8
**prepare** 12:2
13:17 20:12
21:1,3,4 89:16
90:22 92:19
96:21 112:18
116:9 124:10
148:25 191:4
191:24 193:16
212:10 216:18
218:12
**prepared** 11:18
11:20 12:8
13:16 16:21
28:9 38:12
124:12 165:12
165:14 216:20
229:17,20
230:22 237:24
267:4
**prepayment**
166:8

Page 52

**[present - programming]**

**present** 3:2
27:3 55:10,12
64:16
**preserved**
23:10 25:14
**president** 7:18
59:10,10 69:11
**pressure** 54:23
55:1 167:20
**pretty** 59:24
63:20,24,25
123:17 128:18
150:5 164:7
208:3 228:7
238:21
**prevent** 194:17
**previous**
157:19 159:6
192:14 233:25
238:18 240:9
**price** 145:14
148:9 165:16
165:18,18
166:17 174:2,9
174:13 200:8
250:3
**priced** 94:13,15
174:5
**primarily** 69:9
**primary** 62:8
69:8 142:24
144:4
**principal** 40:21
51:21

**printed** 264:20
**printers** 221:4
**printify.com**
250:13
**prior** 31:5
79:15 92:13
139:12,18,21
140:8,15
142:10 144:18
167:10 192:15
266:5
**priorities** 99:19
99:21
**privilege** 17:23
41:20
**pro** 93:12
**probably** 27:1
41:7 43:20
50:3 56:6 60:1
60:3,14 64:17
72:13 73:24
98:23 101:24
102:15,20
104:11,20
105:9 120:15
120:16 131:18
137:23 146:3
154:11 157:17
173:25 180:5
191:6,10
201:21 218:1
218:16 221:1
222:10,11
223:18 226:5
227:23 230:17

238:3 246:6
248:12 250:22
251:23 252:20
253:1 260:15
**problem**
171:13
**procedural**
6:18
**procedure** 9:1
12:1 14:16
17:20 78:10
**proceeding** 6:5
6:16,24 265:7
267:5
**proceedings**
266:4,5,6,9
267:7
**proceeds**
147:12,15
**process** 10:5
84:9 85:6,7
86:9,12,20
146:7 164:8
199:15 251:16
252:17 253:20
**processing**
70:14 72:20
**processor**
252:16
**produce** 29:22
37:18 128:25
206:23 248:19
248:21
**produced** 6:15
12:12 22:9

**professional**
60:12 92:13
128:24 159:15
160:9
**producers**
64:25 65:1
**producing**
64:23 221:12
**production**
36:14 45:8
59:17,21 60:8
61:1 62:1 70:6
70:8 98:13,15
109:11 127:23
221:7,9
**productions**
61:2 202:20
226:22,23
227:1,3
**productive**
77:22
**professional**
63:5 220:2
232:10,12
**profit** 100:21
123:22 148:4
204:20 206:16
206:16,18
208:13 213:3,4
222:15
**profitable**
123:15,19
**programmatic**
87:16
**programming**
29:15,20

Page 53

**[programs - question]**

| programs | provided 21:9 | purposes | q |
|---|---|---|---|
| 29:22 | 21:11 52:19 | 251:14 261:23 | |

**programs**
29:22
**prohibited**
88:13,19
**project** 26:15
**projects** 65:1
**promise** 22:21
47:17 78:8
**promised**
154:15
**promptly** 166:7
**pronounce**
28:10
**proper** 17:18
**properties**
192:13
**property** 35:12
97:10 192:7
205:15,21
**proposal** 256:4
**propose** 256:8
**proposed** 93:15
93:18 180:9
**proposes**
145:22
**proprietorship**
58:23
**protect** 18:12
41:19 115:14
179:25
**protection**
170:6,10
**provide** 109:17
229:9,18 237:1

**provided** 21:9
21:11 52:19
54:22 80:5
139:7 144:14
157:9 159:9
163:9 174:6
191:22,23
192:8,23 212:5
230:7 254:24
257:25
**provider**
131:23 140:18
142:8,10
**providers**
219:20
**provisions**
174:8
**przemek** 144:3
178:15
**public** 25:23
180:25 181:3
266:22
**publications**
137:24 187:19
**pull** 226:21
227:3
**pumping**
224:22 231:11
**purchase** 74:2
105:13,14
148:1,9 181:23
261:9
**purpose** 36:5
46:6 128:10
229:25

**purposes**
251:14 261:23
**pursuant** 8:25
11:3 14:15
172:13 175:5
191:23 235:24
**put** 17:18 18:6
34:20 39:17
41:15 47:16
55:9 57:5
61:15,16 62:4
65:4 77:23
78:4 83:15
89:14 91:14,15
92:20 127:8
134:24 135:25
142:12 147:13
147:16 148:16
148:18 149:2
168:20 170:1
180:14 187:21
187:25 188:12
188:13,18,23
189:3 194:9
196:16 214:12
242:6 248:24
260:5
**puts** 242:6
260:23
**putting** 20:2
34:23 62:9
64:24

**q**

**q1** 102:15,23
120:20 138:8,9
232:12,19,22
**q4** 232:19
**qualifications**
44:2,6
**qualified** 266:8
**qualifier**
169:12
**qualifies** 92:5
179:18
**quarter** 53:13
54:9 55:9
119:14 142:13
142:18 160:18
231:12 232:10
**quarters**
143:10
**question** 10:7
16:25 17:1,6
17:22,24 18:20
20:16 22:20
25:2 33:13,17
34:12 38:5,7
42:21 43:3
45:24 47:21
48:2,9,9 49:12
49:25 50:5
57:4,12 58:5,5
58:15 61:19
65:18,25 75:4
77:21 79:10,13
79:20,22 81:11
84:5,15 85:7

**Page 54**

**[question - recall]**

| | | | |
|---|---|---|---|
| 86:9 87:24 | 232:15,17 | **ran** 45:9,11 | **real** 150:12 |
| 88:5 99:4,5 | 235:4 236:14 | 104:25 170:9 | **really** 32:22 |
| 103:11,12 | 241:18 244:13 | **ranch** 34:8 | 45:6 168:2 |
| 110:12 111:15 | 249:19 251:6,9 | 147:8 192:7,13 | 191:19 199:4 |
| 112:12 114:19 | 255:3 256:13 | **range** 66:13 | 235:2,10 238:9 |
| 114:20 116:25 | **questionnaire** | 119:21 142:16 | 256:10,14 |
| 118:2,13 | 176:3 177:17 | 189:25 | 263:25 |
| 121:13 123:5 | **questions** 5:16 | **rata** 93:12 | **reason** 11:4 |
| 124:2,4 129:13 | 17:3,9,15 | **rather** 39:2 | 17:5 38:15 |
| 132:15,17 | 18:14 20:1 | 144:9 174:1 | 56:23 57:19 |
| 133:2,3,7,8 | 25:24 34:19 | **reach** 25:24 | 85:1 86:12 |
| 134:3,17 | 89:19 134:16 | **reached** 52:24 | 88:12 191:20 |
| 135:11 140:14 | 177:23 178:21 | 53:2 54:2 | 216:6 230:24 |
| 141:21 147:8 | 196:19 248:3 | **read** 25:1 38:8 | 232:11 269:7 |
| 155:4,21 156:8 | 250:6 | 51:4,7 65:24 | 269:10,13,16 |
| 157:2,16 | **quick** 60:19 | 124:3 134:6,10 | 269:19,22 |
| 168:16,25 | 150:12 | 134:12 230:16 | **reasonable** |
| 169:13 170:15 | **quickbooks** | 242:15 246:6 | 52:22 |
| 170:16,20 | 26:18,19,22,24 | 261:25 262:3 | **reasons** 142:24 |
| 173:10 175:20 | 27:2,6,11,13,15 | 264:9,15 | **recall** 26:8,25 |
| 175:21 184:4,7 | 27:18,21 28:4 | **reading** 14:23 | 33:11,15 41:10 |
| 184:12 187:23 | 28:7,21 72:14 | 36:17 44:19 | 54:3,3 56:12 |
| 187:24 189:4,5 | 75:1,3 107:8 | 45:2,10,12,12 | 72:7,9 94:7 |
| 190:10 194:11 | 111:18 | 58:1,3,6,8,10 | 101:18 103:3 |
| 194:12 195:19 | **quite** 141:24 | 58:12,16,19,22 | 107:22 112:11 |
| 197:23,24 | 142:1 187:14 | 149:7 191:14 | 113:22 120:18 |
| 198:8 199:3,5 | 210:7 | 191:16 192:13 | 121:2 130:4 |
| 201:3,4 204:1 | **r** | 204:24 261:22 | 138:13,22 |
| 204:2 205:7 | | 261:23 | 139:18,24 |
| 214:16 216:1 | **r** 2:1 3:1 5:12 | **reads** 17:12 | 140:4 142:7 |
| 216:19,20 | 6:1 91:7 | **ready** 145:8 | 146:9 153:2 |
| 217:19,20 | 252:11 269:4,4 | 151:13 171:25 | 157:11 163:15 |
| 220:7 221:20 | **raise** 8:5 230:2 | 192:21 196:4,5 | 172:8 197:8,9 |
| 221:21,23,24 | 231:20,22 | 203:5 222:22 | 198:21 201:20 |
| 230:12,14 | 232:4 233:9 | 256:5,6 | 202:5 241:25 |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[recall - reimburse]**

252:20
**receipt** 263:9
263:10 264:11
264:15
**receipts** 60:12
61:7 204:25
211:21 212:19
223:4
**receivable**
72:25 73:1,3
115:7 134:20
135:7,8,13
141:8 227:6
**receivables**
73:11,12
115:13 132:1,2
132:3,13,24
133:18 135:18
136:14 137:2
140:22 141:1
183:19,21
**receive** 56:24
58:1,6 166:25
183:15 200:1,3
200:9 235:24
**received** 31:6
55:22 167:1
236:1 238:19
261:6
**receiving**
190:13
**recently** 120:13
148:4,7
**recipient**
179:15,18

180:6,11,23,25
**recipient's**
179:17
**recognize**
38:18 138:16
138:20 151:15
151:18 185:2
238:6
**recollection**
175:22,24
198:4
**reconcile**
253:19
**reconciled**
123:21 255:8
**reconciling**
254:5
**record** 6:4,5,13
7:2 8:16 9:4
14:21 16:7,10
16:13,14,16
17:19 18:7
20:2,3 25:4
34:21,24 37:19
39:16,18 41:3
41:16 47:17
57:13 77:24
78:5 86:3,4,6
88:23 109:16
110:2 127:9
136:1 150:15
150:16,18,21
167:3 171:1
182:23 195:6
196:17 209:21

210:17,18
211:12,13,15
216:14 234:24
235:1 246:7
248:25 265:5
266:10 267:6
**record's** 204:16
**recorded** 6:20
6:24 170:25
171:9 266:7
**recording** 6:15
52:15 170:23
171:2,5,10,16
266:9 267:5
**records** 21:4,6
21:19,21,23
22:3 63:18,23
64:1 125:24
129:2 140:6
141:16 157:19
244:18 250:4
**red** 168:20
**reduced** 266:7
**refer** 176:22
246:23
**reference** 156:6
156:9
**referenced**
243:19 244:14
244:17,24
245:1 249:25
**references**
166:18
**referencing**
137:23 169:23

185:23 212:2
**referred** 29:15
**referring** 39:22
117:4 118:6,12
**reflect** 88:23
**reflecting**
259:21
**reflects** 211:24
**refresh** 181:11
198:3 260:13
**refreshed**
247:11
**refreshes**
175:21
**refreshing**
175:25
**refused** 109:16
188:14
**regardless**
58:21 96:5
103:4 174:13
261:22 263:21
**regards** 6:7
164:8
**region** 245:4,24
**regular** 61:17
64:2 100:9
140:12 248:3
**regularly** 26:9
70:1 74:2
84:10 154:18
**reimburse**
103:5,14,15,20
103:23

Page 56

**[reimbursed - represents]**

| | | | |
|---|---|---|---|
| **reimbursed** | 124:10 | 250:11,22,23 | **repay**  143:8 |
| 84:25 86:11 | **relief**  53:19 | 253:20 254:7 | **repayment** |
| **reimbursing** | 54:2,8,22 | 254:10 257:23 | 143:6 |
| 104:1,4 | 56:11 57:20 | 258:10 260:7 | **repeat**  110:11 |
| **reiterate**  18:18 | 58:2 | **renamed**  58:4 | 129:25 130:1 |
| **related**  40:13 | **reliving**  170:1 | 58:14,19 61:16 | **repeated**  25:4 |
| 120:2 128:20 | **remainder**  53:6 | **renaming**  58:8 | **rephrase**  17:7 |
| 129:11 202:20 | 54:24 77:3,3,6 | **rendered** | 133:7 |
| 220:12 260:15 | 77:8 91:15 | 112:14 | **report**  47:4,22 |
| 266:11 267:8 | 183:16 | **renegotiated** | 73:11,12 74:23 |
| **relation**  35:14 | **remained**  54:1 | 234:12 236:8 | 74:25,25 75:3 |
| 120:4 260:17 | 54:8 | 236:11 | 75:5,13,16,17 |
| **relationship** | **remaining** | **renegotiating** | 76:7 154:23 |
| 192:6,12 | 53:20 54:16 | 236:16 | 159:7,10,11 |
| 242:12,16,21 | 238:20 | **renewal**  98:7 | 224:12 239:17 |
| 242:24 243:4 | **remember** | **rent**  42:18,19 | **reported**  191:9 |
| **relative**  54:21 | 25:10 42:5 | 43:23 52:16 | 238:23 |
| 65:18 79:20 | 72:9 104:10 | 53:11,14,24 | **reporter**  25:2 |
| 86:10 106:22 | 106:11,14 | 54:9 55:9,13 | **reports**  27:24 |
| 106:23 112:12 | 110:21,22 | 55:14 125:25 | 75:9 |
| 266:13 267:10 | 112:8 113:10 | 126:1 205:12 | **repossess**  102:6 |
| **relatively**  142:2 | 119:19 122:6 | 205:20 206:4 | **represent**  8:19 |
| **release**  114:2,6 | 125:11,11,19 | 214:23,25 | 29:11 98:4 |
| 172:9 193:13 | 129:21 140:24 | 215:3,3,7,8,10 | 148:22 |
| **releases**  114:4 | 142:14 143:12 | 216:24 224:8 | **representative** |
| **releasing** | 145:25 147:21 | **rented**  35:10 | 1:12 9:2,11 |
| 193:19 | 147:25 148:9 | 42:14 224:1 | 10:23 11:8,18 |
| **relevance** | 167:13 183:5 | **renting**  76:22 | 12:2,17,25 |
| 31:11 88:17 | 197:19,22,24 | 223:25 | 13:4 15:7 16:4 |
| 184:11 | 198:2 202:11 | **rents**  214:22 | 89:2 125:8 |
| **relevant**  106:17 | 204:13 205:24 | 217:9 223:24 | 202:15 |
| 154:12,16 | 226:25 227:7 | 224:6 228:23 | **representing** |
| **relied**  89:16 | 227:12 232:10 | **rep**  14:8 | 7:8 29:10 |
| 90:22 96:21 | 237:25 240:7 | **repairs**  214:19 | **represents** |
| 112:17 116:8 | 243:18 249:7 | 214:19 | 179:15 |

**[request - right]**

| | | | |
|---|---|---|---|
| **request**  154:19 | **restaurant** | 183:16 187:6 | 58:23 62:15 |
| **requested**  25:5 | 44:23 | 188:20 216:10 | 65:7,15 67:9 |
| 92:17 109:10 | **restock**  221:5 | 222:12 230:20 | 68:21 69:14,15 |
| 109:23 266:25 | **restricted** | 230:21 231:10 | 69:20 70:13 |
| **required**  17:19 | 165:25 | 239:17 | 71:2,13 73:15 |
| 68:25 127:24 | **result**  179:25 | **review**  21:6 | 74:8,8,13 75:7 |
| 202:7 227:2 | 186:3 194:17 | 262:23 263:6 | 75:17,22 76:4 |
| **requirement** | 233:10 235:25 | 263:21 264:11 | 76:9 78:18 |
| 146:4 | **resulting**  149:3 | 266:25 | 79:10 80:1,10 |
| **requiring** | **results**  73:25 | **reviewed**  21:3 | 81:20 82:6 |
| 143:6 | **retained**  94:16 | 40:7 45:17,20 | 83:8 84:6,20 |
| **reserve**  82:10 | 95:1 124:11 | 207:6 229:12 | 87:3 90:19,24 |
| 82:24 115:8,14 | 183:17 | **rewards**  252:6 | 93:2,15 96:10 |
| 115:23 | **return**  48:11 | **rey**  250:25 | 96:23 99:20,24 |
| **reserved**  265:6 | 110:1,4 203:20 | 251:2 | 100:8,24 |
| **residence**  42:11 | 206:19 207:15 | **ride**  122:16 | 102:22 103:17 |
| **residences** | 208:5,9,24 | **right**  8:5 10:2 | 103:17 104:2 |
| 204:17 | 209:5,8 212:18 | 10:16 12:24 | 106:7,13 |
| **residential** | 213:15 214:9 | 13:13 14:13 | 107:10 109:2 |
| 42:16 | 214:13 216:17 | 15:22,24 16:5 | 111:14 112:1,5 |
| **resolution** | 218:12 222:17 | 16:9,17,24 | 112:19 114:9 |
| 259:3,4 | 227:24 | 17:17 18:3,23 | 114:18 115:3 |
| **resolved**  233:5 | **returns**  5:4 | 20:2,6 21:13 | 116:13,22 |
| **resort**  129:8 | 21:25 28:9 | 21:19 24:23,24 | 118:21,25 |
| 130:4 | 51:14,17 60:24 | 27:23 31:22 | 119:25 122:11 |
| **respect**  61:19 | 96:14 124:17 | 33:12,20 34:7 | 122:24 123:11 |
| 79:19 105:22 | 190:8 203:8 | 35:17,20 36:12 | 123:23 124:20 |
| 129:7 140:14 | 212:10 229:4 | 37:2,12,20 | 124:25 127:17 |
| 182:15 | **revenue**  60:16 | 38:20 39:12 | 129:5 130:7 |
| **respectfully** | 60:23,23 67:6 | 42:1,6 43:18 | 131:13 132:6 |
| 13:23 | 68:9 97:6,8,9 | 46:5 48:17 | 132:20 134:13 |
| **responsive** | 99:2 100:12,13 | 50:8,17,24 | 148:5,8,20,20 |
| 154:19 | 100:17 114:23 | 51:3,11 52:3 | 149:4 150:13 |
| **restate**  17:7 | 131:1,4 137:20 | 54:23 55:13 | 150:23 151:13 |
| | 138:12 183:14 | 56:3,4 58:1,18 | 151:15 152:2 |

**[right - sales]**

158:5,5,12
160:6 162:15
163:23 165:8
165:12,15,20
171:2,17,17,24
172:22 174:4
175:19 176:1,1
176:9,15
177:21 178:13
182:19,23
183:5 184:3
185:2 188:1,17
189:10 191:9
191:10,12
193:10 194:20
194:22 195:6
195:15,16,17
195:24 196:25
198:4,14 203:7
203:11,19
204:9 206:15
206:19 207:13
207:16 208:1,3
208:8,23,24
209:8,20
210:14,16
211:17 213:5
213:23 214:2
214:14 217:19
218:5,19
220:18,20,21
220:24 222:3
222:13,17
224:17 225:1
225:18,22

227:21,24
228:4,11,13,15
228:19 231:8
231:13,17,19
232:14 233:17
233:21,24
234:1,6,11,24
235:12,14
236:22 239:14
240:19 242:3
244:1,4 245:2
245:21 246:19
247:7,17 249:6
249:14,25
250:1,25 254:3
254:11,19
255:13 256:2
256:16 258:8
259:20 262:2,4
264:16,23
265:3
**rights** 97:17
155:5
**rigorous** 164:7
**risk** 179:21,23
181:2
**risks** 180:9,24
**rivas** 1:22 6:3
266:3,21
**road** 34:8
73:25 147:8
250:25
**rob** 69:12
**robert** 259:6,9

**rod** 119:23
120:6 201:18
**rodenting** 78:3
**role** 31:2
**rolled** 56:5
**rolling** 10:18
62:5,6
**room** 35:10
**rooms** 41:4,5,8
**rose** 119:15
**rough** 249:7
**roughly** 55:9
73:17 74:5
95:14 152:25
**round** 94:13,15
**rudolph** 2:12
7:5,16,16
13:18 16:6
24:18,22,25
262:9,11,20,23
263:7,9,13,18
264:3,12,16,23
**rule** 1:11 8:25
10:21,25 11:2
11:3,14,15,16
11:17,23 12:1
12:6 14:8,15
15:2,11,13,18
16:18 36:14,15
38:1
**rules** 6:19 9:1
10:4 12:1
14:16 16:25
17:19 47:13
78:9,9

**run** 73:12
74:25 75:2,8
75:12,15,17,18
76:7 83:24
84:4 123:12
129:11 159:10
159:11 180:20
246:19
**running** 125:12
125:20 134:15
180:14,21
221:2
**runs** 106:6

**s**

**s** 2:1 3:1 4:5 5:1
5:12,12 6:1
8:17 28:18,18
59:13 202:13
269:4
**saas** 144:23
**sacker** 121:23
121:23,24
229:24
**safe** 92:3 119:7
**salaries** 213:23
213:25 214:17
217:14,20,22
223:16
**salary** 89:11
116:1
**sale** 103:8,13
247:4
**sales** 26:2,4
183:8 204:25
223:4 226:3,4

Page 59

**[sales - sell]**

| | | | |
|---|---|---|---|
| 226:6,12 | 247:1 256:10 | **scripted** 97:19 | 152:2 153:7 |
| **salesteam** 26:3 | 258:5 260:11 | 98:10 99:18 | 156:11 158:11 |
| **san** 1:2 2:15 | **scanned** 51:9 | **sdi** 89:24 | 161:5 164:15 |
| **santa** 1:18 2:6 | **schaefer** 35:7 | **search** 4:11,22 | 166:3,4 172:13 |
| 6:9 | **schaub** 196:6 | **season** 59:23 | 174:15 175:3 |
| **sarah** 234:2 | 197:1,3,5,11,18 | 60:6 61:6,7 | 176:15 178:22 |
| **satisfactory** | 197:20 198:1,7 | 111:21 | 182:6 183:12 |
| 144:19 | 198:14,19,23 | **seasons** 99:18 | 193:13 206:24 |
| **saturday** 247:2 | 199:7,8,12 | **second** 91:16 | 206:25 207:3 |
| **save** 30:24 55:8 | 200:2 235:9,10 | 128:16 142:17 | 208:6,21 209:2 |
| **saved** 54:24 | 235:13,15,17 | 147:1,4 186:13 | 209:3,3,3,4,5,6 |
| 55:5 | 235:20,25 | 211:8 242:19 | 209:6,7 211:19 |
| **saving** 55:14 | 236:16 | **secretary** 45:22 | 213:3,6,24 |
| **savings** 234:15 | **schaub's** | 46:14 47:6 | 224:19 225:8 |
| 236:11 | 199:17,18 | 59:11 | 238:9,15,16 |
| **saw** 57:14 | **schedule** 153:7 | **section** 178:17 | 239:16 242:8 |
| 123:23 188:21 | 169:7 204:21 | **secure** 258:23 | 242:17 243:4 |
| 227:19 | 204:22 205:19 | **secured** 116:14 | 244:25 249:10 |
| **saying** 152:11 | 208:4,5,6 | 121:10 122:24 | 256:23,24 |
| 154:25 155:6 | 211:23 239:18 | **security** 119:1 | 257:6 264:23 |
| 169:11 225:15 | 239:22 240:15 | 119:4 121:10 | **seeing** 10:23 |
| 238:17 248:2 | 244:17,21 | 121:16 122:1 | 177:20 |
| **says** 11:2 16:3 | 245:1 | 122:12 | **seeking** 143:1 |
| 37:17,22 46:2 | **schedules** | **see** 10:20 11:4 | 170:6 203:4 |
| 46:24 47:4 | 89:17 90:23 | 12:6,7 20:6 | **seen** 22:14,16 |
| 48:14 55:22 | 92:20 96:22 | 24:19 48:15,24 | 22:18 23:12 |
| 85:16 97:4 | 112:18 116:9 | 48:24 49:5 | 29:14 37:10 |
| 100:23 113:25 | 124:11,13 | 51:9 59:23 | 56:22 187:3 |
| 147:2 151:6,7 | **scheduling** | 60:18 73:6 | 253:10 |
| 159:23 164:19 | 26:7 | 74:9,12 76:8 | **segment** 150:19 |
| 182:8 184:23 | **scold** 77:21 | 81:23 96:1 | **segue** 150:5 |
| 191:1 203:12 | 110:22 | 100:13 112:23 | **self** 47:15 |
| 208:6 212:20 | **screen** 18:25 | 113:4 117:19 | **sell** 27:12 |
| 233:23 236:10 | 19:7,8,25 20:4 | 119:1 121:3 | 102:12 149:22 |
| 236:11 246:15 | 20:7 | 138:4 141:3 | |

**[selling - shows]**

| | | | |
|---|---|---|---|
| **selling** 67:5 | **series** 65:5 | **seven** 13:10,12 | 87:4 88:10,15 |
| 188:4 212:22 | 97:19 99:8,11 | 14:9,10,18 | 123:8,9 247:9 |
| **sells** 66:22 68:6 | 99:14,18 101:4 | 47:19 85:23 | **sherman** 36:1,4 |
| **send** 141:8 | 104:15,16,19 | 164:10 197:12 | 185:5 186:14 |
| 261:16 262:14 | 138:22 | 210:1,22 219:7 | 203:25 204:14 |
| 264:21,24 | **servers** 22:13 | 256:1 | **short** 35:11 |
| **sending** 144:8 | 27:9 | **seventy** 66:2 | **should've** |
| 186:3 | **service** 144:23 | **several** 53:16 | 92:13 |
| **sent** 22:23 | 258:22 | 234:8 | **show** 54:11,13 |
| 25:12 128:3,16 | **services** 110:9 | **share** 65:13,19 | 92:16 96:12 |
| 128:20 151:19 | 112:1,2,13 | 67:4,25,25 | 120:19 123:22 |
| 151:20 157:14 | 122:5 148:23 | 74:5 93:12 | 125:24 128:25 |
| 185:7 238:18 | 149:2 154:20 | 165:16,16,18 | 132:8,9,20 |
| 264:18 | 191:11,13 | 165:18,19 | 135:10,13 |
| **sentence** 4:23 | **serving** 31:2 | 166:3 174:6 | 137:13 140:6 |
| 4:24 15:6 | **session** 10:7 | 183:15,18 | 160:25 163:13 |
| 242:19 | 17:1 | 222:24 | 173:7,11 177:2 |
| **sentences** | **set** 70:7,9,11 | **shareholders** | 182:8 183:14 |
| 242:20 | 149:16 234:9 | 168:1 | 193:5 221:7,9 |
| **separate** 70:2 | 240:6 257:14 | **shares** 165:25 | 230:5 232:22 |
| 70:10 71:19 | 257:24 262:20 | 166:6,6,16 | 244:18 250:7 |
| 72:2,24 83:17 | **setting** 10:6 | 172:10,11,18 | 257:2 259:17 |
| 83:21 84:2 | 19:7 149:20 | 172:19 173:8 | 260:12 |
| 100:15 176:22 | 238:13 | 173:12,22 | **showing** 46:15 |
| **separated** | **settled** 167:16 | 174:3,13,15,18 | 195:12 206:15 |
| 82:19 123:11 | 167:18 | 174:24,25 | **shown** 20:4 |
| **separately** | **settlement** | 175:5,7,12 | **shows** 30:4 |
| 84:25 | 52:20,24 53:2 | 179:22,23 | 45:21,24,25 |
| **september** 98:2 | 53:7,9,15 54:2 | 180:10 182:10 | 66:6,8 67:4,6 |
| 152:12 153:9 | 54:13,14,15,20 | 182:21 183:1 | 68:1 127:24 |
| 165:10,11 | 55:12 76:20,23 | 201:24 | 131:5 135:10 |
| 167:8 168:19 | 77:2 79:5,11 | **shechter** | 154:17 158:12 |
| 170:17 181:9 | 80:6 166:10,23 | 182:19 | 159:22 160:22 |
| 182:11,17 | 167:10,22 | **sheet** 69:16 | 163:12,15 |
| | | 76:17 82:16 | 204:2 213:8,17 |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[shows - sounds]**

215:20,24
216:4,7,12
232:19 250:18
250:19,21
**shuman**  91:9
93:5,23 118:2
118:3 121:4
**shut**  70:19
**sic**  115:12
191:4
**side**  164:11
183:4 253:14
256:25
**sight**  36:17
44:19 45:2,10
45:11,12 58:1
58:3,6,8,10,12
58:15,19,22
149:7 191:14
191:16 192:13
204:24
**sightreadinga...**
33:12,14
**sign**  263:21
264:15,17
**signature**  40:14
177:25 178:1,3
237:20 264:24
265:6 266:20
267:17
**signatures**
177:14
**signed**  55:11
98:1,11 114:4
163:7 169:11

178:15 181:8
263:19,19
**significant**
31:14 33:11,15
53:3 74:7
167:19 169:24
169:24 198:22
228:7
**significantly**
140:2 250:2
**silverman**
234:2
**similar**  72:21
140:20 194:6
215:12
**simply**  19:11
**singh**  143:7,18
145:2 187:3
**single**  21:1
155:13,14
168:20 200:1
216:15,21
**sinister**  100:10
**sir**  8:15,18 9:12
36:12 37:9
38:12,18 40:9
47:21 76:6
157:7 159:9,15
169:7 170:11
173:3 175:3
229:16
**sit**  89:2 90:19
94:7 111:24
165:5 186:6
216:15 254:19

**sitting**  22:7
210:14
**situation**  61:11
138:5 145:21
145:23 187:1
188:20
**six**  54:5 112:16
164:10 200:19
201:10,17
209:17 219:7
255:23
**skills**  266:10
267:7
**skymiles**  82:10
82:24 115:23
**slack**  29:4
**small**  45:6
141:24 142:2
**smaller**  186:25
**smith**  107:20
**snacks**  221:5
**snapshot**
159:24 160:4
**snyder**  119:15
**social**  31:25
32:5,7
**software**  22:13
26:19,20 27:3
27:8 28:24
80:9 107:5
144:23 218:24
219:4,4
**softwares**
26:11,13 29:21

**sold**  35:12 67:1
102:9,10,23
103:4 137:1
148:4,6,6,15,18
212:21 217:1,6
223:6
**sole**  58:23
**solicited**  149:13
**solution**  131:24
**somebody**
64:20 103:21
128:3 137:6
149:1 201:15
**sophisticated**
176:2 177:17
177:18 178:16
179:14,19
180:13 181:5,5
**sorry**  60:2,5
62:25 65:24
71:1 125:17
129:24 150:24
161:12 164:20
175:13 182:14
205:16 211:7
225:19 237:6
237:11 244:6,9
244:9 252:9
**sort**  29:7 64:21
131:24 149:19
**sought**  57:20
**sound**  62:20,23
182:20
**sounds**  27:20
182:22 258:10

Page 62

[sounds - statements]

264:25
sources  31:9
97:5 185:17
southern
204:17
space  52:13,16
52:19 53:4
144:25 192:4
span  111:16
speak  38:13,15
182:17 197:2
235:10 249:9
262:12
speaking  34:23
47:19 135:3
243:20 260:22
speaks  38:2
special  225:16
226:21 227:4
specific  30:7
73:13 111:8,17
128:6,12,13,20
202:16 226:22
230:17 260:7
specifically
17:21 42:25
109:16 151:20
154:8
specified  77:10
specifies
152:16
specify  231:25
spectrum  245:6
245:25

speculate  85:15
85:17 86:19
87:13 88:21
96:11 201:6
speculating
187:15
speculation
49:12 50:1
58:25 83:19
85:5,12,17
100:4 245:18
246:5
spell  8:15 91:6
202:12 252:10
spend  257:17
spent  63:5,7
111:14 164:10
split  68:9 98:22
108:12 131:1
132:10 183:14
256:8
splits  164:3
spoke  93:17
spoken  93:14
sponsor  72:2
222:7,8,12
sponsors
183:20 222:3,5
sponsorship
71:24 72:5,11
72:16
spot  88:1,1
89:4,4
spotify  66:20

spreadsheet
22:4 108:1,5
109:3 251:12
spreadsheets
29:3
square  41:8,23
41:23
st  30:9,10 35:21
35:22 105:17
254:11,16,20
stacy  69:11
staff  20:14
25:25 26:1
stake  200:18,23
stakeholders
168:2,5 170:2
172:4 193:23
194:3 199:24
247:20
stamp  158:22
217:17
stamped  175:2
192:11 211:18
stand  110:24
110:25
standing  51:11
standpoint
55:2 58:21
stands  233:16
stapled  176:13
start  14:9
116:13 151:13
152:3,3 187:7
203:7 210:6
213:6

started  18:23
20:11 27:1
43:2 44:18,21
45:6,6 188:9
188:12 190:11
192:16 210:19
256:7
starting  24:4,5
156:6
starts  95:12
176:5,6 222:19
startup  45:5
state  8:15
14:21 30:8
34:2 45:22
46:14,17 48:4
48:5,6,20 49:8
49:9 50:15
51:12,14,17,20
146:21 170:23
171:7,12
216:11 266:23
state's  47:6
statement
55:15 115:10
115:19,22
116:5 154:6
160:20 184:9
218:14 227:8
statements
190:9 230:20
251:6 253:18
253:25 254:2
255:8 258:12
258:16

**[states - sums]**

| | | | |
|---|---|---|---|
| **states** 1:1 | 166:17 173:22 | **studio** 26:5,6,7 | **subscribing** |
| 174:20 182:13 | 174:2,5,9,12 | 41:1 52:7,14 | 100:18 |
| **status** 179:14 | 182:21,24 | 77:9 78:18 | **subscription** |
| 180:1 | 183:1 200:8 | 79:1,2,20 80:2 | 100:14 |
| **stay** 54:17 | 249:16,23 | 219:2,7 221:2 | **subscriptions** |
| 209:22 | 250:2,3 | 221:6 251:23 | 66:16 107:1 |
| **staying** 30:9 | **stocks** 80:21 | 252:3 | **subsequent** |
| **stenographic** | **stole** 246:18 | **studioone** | 145:14 |
| 6:21 | **stop** 61:2 77:18 | 149:10,11,14 | **subsidiaries** |
| **stephen** 2:19,20 | 123:13 | 150:4 | 242:6,8 |
| 7:4,17 8:18 | **stopped** 43:2 | **studiooneip.c...** | **substance** |
| 24:18 128:15 | 160:19 | 149:15,22 | 243:18 |
| 128:16 263:13 | **stops** 160:12 | **studios** 52:11 | **substantial** |
| 264:17 | **stories** 64:23 | **stuff** 9:4 100:19 | 245:4,23 |
| **sterling** 34:8 | 100:9 | 106:1 190:8 | **success** 165:23 |
| 147:7 192:7,13 | **story** 100:2,6 | 209:4 219:23 | 165:24 166:8 |
| **steve** 2:23 16:6 | **stranger** 62:21 | 221:6 227:4 | **sue** 171:11 |
| 16:6 | **streak** 100:11 | **subcategory** | **sufficient** 181:1 |
| **stick** 122:25 | **stream** 61:22 | 87:18 | **suggests** 57:10 |
| 246:23 | **streaming** | **subcontractors** | **sui** 89:24 |
| **stipulation** 4:7 | 61:12 | 112:19,21,25 | **suite** 2:14 |
| 6:22 9:5 10:20 | **street** 2:14 | 113:3,8 | 40:22 129:20 |
| 10:24 11:2,14 | 40:22,25 42:9 | **subject** 40:4 | 130:3 204:24 |
| 11:22 12:5,7 | 121:5 124:21 | 145:10,15 | 206:2,4 |
| 12:19 13:9,16 | 192:5 203:21 | 174:7 235:20 | **suites** 189:2 |
| 14:24 15:1,18 | 204:3,24 206:2 | 235:21 238:15 | **summaries** |
| 36:14 37:3 | 206:4 207:9 | **submit** 109:4 | 257:24 |
| 92:16 162:23 | **striking** 193:25 | **subpoena** | **summary** 4:25 |
| 261:12 264:17 | **stripe** 72:19 | 125:13,23 | 193:3,11 |
| **stitch** 250:7,9 | **struck** 229:1 | 198:6 | 194:25 195:5 |
| **stock** 119:17,23 | **structure** 58:22 | **subpoenas** | 211:18 |
| 120:11,17,20 | 140:20 163:9 | 254:23 | **summer** 188:15 |
| 120:25 121:22 | 234:23 | **subscribe** | 241:4,13 |
| 122:3,8 165:16 | **struggle** 139:10 | 66:17 | **sums** 258:24 |
| 165:19 166:1 | | | |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

[sunset - teacher]

**sunset** 124:21 124:25 125:5,9 125:23
**sunsight** 125:9
**super** 115:9
**supplement** 208:9
**supportingcast** 49:19
**supposed** 37:18 153:21,24 155:24 200:9
**sure** 17:10 26:3 28:10 29:24 54:6 56:17 67:16 80:1 86:1 91:8 94:2 96:24 102:21 109:15 122:15 124:5 126:20 131:23 132:6 143:17 164:9 166:13 174:21 178:24 181:18 185:15 189:21 189:23 190:25 191:6 222:13 224:3 229:15 235:1 236:2 253:4,21 257:3 262:1
**surprised** 254:17
**suspend** 261:7

**swear** 8:4 34:21
**sworn** 6:13 8:8 9:14,17,24,25 10:3 21:7 169:8 192:8 266:6
**synced** 262:6
**system** 22:13 23:4
**systems** 63:19

**t**

**t** 4:5 5:1,12,12 8:17 62:6 233:4 269:4,4
**table** 62:15
**take** 6:4,10 8:21 16:19 18:18,19 37:9 53:11 54:20 63:22 65:15 66:22 85:24,25 87:3 93:12 105:19 122:17 123:10 132:20 133:8,13,15 136:24 137:10 138:15 148:14 148:15 158:19 160:8 163:12 168:14 173:17 177:22 186:25 189:16 194:23 199:1,2 209:20 210:12,23

211:8,17 214:7 214:14 227:10 227:24 238:5 248:13 249:16 256:9,9,18 263:17
**taken** 6:7 11:3 58:8 70:4 82:20 83:3 84:13 108:14 126:7 127:18 129:12 139:20 220:17 250:1 252:1 253:2,16 258:17 259:22 259:23 266:4 266:13 267:10
**takes** 261:22 262:25 263:1
**talent** 70:9,12 70:15 114:2,5 126:21
**talk** 11:15 14:12 22:12 40:5 55:17 92:10 104:6 121:6 126:3 168:11 189:10 198:7 200:7 239:16
**talked** 18:2 108:12 122:13 146:17 192:5 219:24 232:11

**talking** 11:24 14:1 21:10 96:25 137:2 143:2 152:14 200:5 205:17 207:22 257:18
**talks** 166:5
**tax** 5:4 21:25 47:3 48:7,10 48:14 49:20 50:11,15,18 51:14,17 60:24 96:14 109:15 109:25,25 110:2,4 111:20 124:17 190:8 203:8,20 207:10 208:14 209:8 211:18 212:10,13,17 213:15 214:9 214:13 216:6 216:17,18 218:12 230:15
**taxable** 215:20 215:24 216:4 216:12 222:16 224:19
**taxes** 49:8 90:3 90:4 230:22
**td** 80:13,13,18 80:23 81:11
**teach** 47:13
**teacher** 44:22

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[team - thing]**

| | | | |
|---|---|---|---|
| **team** 23:24 | 107:10 112:5 | 256:9 | **testimony** 9:14 |
| 24:2 26:6 | 112:15 114:2 | **term** 29:16 | 9:17,24,25 |
| 28:11 29:5 | 114:10 115:3 | 95:4 145:9,12 | 10:3 21:7 |
| 155:4,7,8,16,16 | 115:11,24 | 145:13 162:23 | 24:17 25:7,11 |
| 155:18,20,22 | 116:1 123:10 | **terminated** | 45:1 67:17 |
| 183:8 186:9 | 126:6 128:15 | 157:25 | 79:15 82:23 |
| 202:19 226:3,4 | 128:19 131:21 | **termination** | 86:25 87:1,2 |
| 226:6,12 | 138:25 139:4 | 114:1 193:12 | 134:22 157:11 |
| 229:20,23 | 140:15 146:14 | **terms** 54:15,19 | 170:7,11,14,16 |
| 247:3 251:4,10 | 148:10 153:11 | 55:20 60:16,18 | 172:2 192:9 |
| 251:11 253:18 | 153:22 154:4,7 | 67:2 124:18 | 256:12 |
| 253:22,25 | 155:19 157:9 | 130:20 139:19 | **thank** 7:7,10,13 |
| 254:5,5 | 157:13 166:9 | 140:11,16 | 7:25 8:3,11 |
| **technology** | 173:17 182:2 | 141:22 145:22 | 14:2 15:6 |
| 6:25 | 186:7 197:22 | 153:2 172:13 | 80:19 161:8 |
| **telephone** | 198:6 202:4 | 182:24 183:12 | 164:23 205:23 |
| 113:12 | 208:9,12,19 | 242:4 249:7 | 207:4 248:6 |
| **tell** 8:9 10:8 | 213:13 217:1,8 | 263:18 | 252:13 261:7 |
| 11:16 13:2,2 | 217:9 218:2,16 | **tesla** 101:17 | 261:10 262:17 |
| 14:13 17:14 | 228:19 238:22 | 105:4,4,7,15,16 | **that'd** 206:7 |
| 18:24 19:13 | 248:14 254:9 | 105:18,20 | 207:22 |
| 20:11,25 23:1 | 254:21,22,25 | 106:6 189:2 | **theirs** 50:3 92:1 |
| 24:5 26:11 | 255:9 260:18 | 218:19 | **theory** 44:10,13 |
| 44:16 50:10 | **telling** 77:19 | **testified** 8:10 | **thereabout** |
| 54:7 60:20,21 | 197:25 231:4 | 186:22 220:15 | 207:25 |
| 64:18 69:21 | 234:12 239:25 | **testify** 9:1 | **thereabouts** |
| 70:6,24 71:14 | 242:4 244:23 | 11:13,19,20 | 54:10 |
| 71:16,22,24 | 245:2 | 15:10 16:21 | **thing** 12:18 |
| 72:19,22 73:1 | **tells** 17:21 | 22:17 37:14 | 16:1 21:1 |
| 73:13,15 74:13 | 100:9 108:1 | 235:23 | 72:21 79:18 |
| 75:9,18 77:21 | 174:3 195:24 | **testifying** 9:5 | 114:7 138:10 |
| 78:20 81:25 | **ten** 15:14 64:17 | 10:9,13,22 | 138:20 149:12 |
| 87:4 90:20 | 156:7 181:13 | 15:3 32:4 | 170:25 186:2 |
| 94:16 99:14 | 181:14 210:6,6 | 37:14 266:6 | 213:22 230:17 |
| 100:5,16,25 | 226:5 256:6,9 | | 262:5 264:15 |

[things - time]

**things**   22:13
25:23 27:24
29:22 62:21
105:23 107:5,6
107:8 113:6
126:12,22
127:25 221:5
236:21 251:24
**think**   9:4 10:19
12:5,8,9,22
21:13,15,17
24:14,15 26:2
28:14,19,22
29:16,16 33:25
39:5 52:25
55:19 60:3,13
61:10,15 62:9
69:22 70:20
71:18 81:15,19
98:6,12 99:23
99:24 101:24
102:13,20
104:5,17,20
105:3,6 111:12
112:7 114:17
115:2 117:24
118:18,19,24
120:10,16
122:20 124:14
128:2 137:23
139:16 141:24
142:14,15
146:2 148:3
153:7,8 154:11
154:13,16

157:21 160:20
167:6 173:25
175:11,24
176:3 183:13
186:5,5 188:2
188:22 189:1
190:17 191:5,5
191:7,9,10
195:9 197:10
205:18 206:14
208:4 209:13
214:24 215:12
216:23 219:6
219:10 222:9,9
225:3 226:11
226:11 227:21
227:22 230:7
231:21 239:6
240:23 241:1,3
241:9,24,24,25
244:3 246:11
246:11 247:24
250:22 251:21
256:11 258:22
260:10
**thinking**
191:18
**third**   147:5
153:4 186:2,18
241:23
**thirty**   178:19
178:19,20
206:18 256:2
264:8,10,14

**this'll**   78:8
**thomson**   1:12
6:6 7:12,12 8:7
8:17 12:14,17
13:3,9 14:11
14:13 15:2,4,6
16:22 32:11,13
34:5,7 40:4
41:24 47:7
50:9 55:15
57:15 76:18
78:4,12 81:7
83:21 85:18
86:8 88:5
93:10 109:18
111:3 118:5
119:15,24
120:6,21 128:8
133:21 138:16
151:13 154:16
161:3 164:16
170:7 180:4,15
186:14 194:10
197:11 200:10
200:23 201:18
203:21 207:11
208:13 211:17
215:14 237:15
238:6 245:7,20
246:16,17
247:22 249:2
250:8 252:25
257:19 258:4
258:15,19
259:18,24

261:3 262:15
262:23 263:20
265:4 268:12
269:2,25
**thomson's**   19:9
**thought**   146:7
186:2 191:19
203:23 237:6
246:13 264:13
**thousand**   41:11
41:11,11 60:25
66:12 68:8
162:11,14
188:22
**thousandth**
166:2
**three**   41:8 66:8
66:18,23 67:4
67:6,11,18,21
68:1 105:24
157:12 163:25
164:3 180:23
185:17 236:21
243:17 256:2
263:5,6,7,9,10
263:20 264:3
**thursday**   1:14
6:7
**tight**   232:6
**time**   1:15 7:1
9:21 14:14
16:13,16 17:5
17:17,17 18:19
18:20 23:25
26:23 30:16

Page 67

**[time - totaling]**

| | | | |
|---|---|---|---|
| 34:23 35:11 | 189:14 190:19 | 16:22 17:5,12 | 230:10 237:21 |
| 40:22 42:11,13 | 190:23 197:7,9 | 17:17 21:2,3,5 | 243:7 247:14 |
| 42:18,22 43:8 | 197:19,21 | 22:8,21 24:4,5 | 249:13 255:7 |
| 43:11,19 44:22 | 198:1 203:24 | 25:14 34:23 | **tomorrow** |
| 45:13 52:22 | 209:10,11 | 38:13 39:6 | 209:23 210:24 |
| 55:4,24 56:7 | 211:12,15 | 40:3,5 47:13 | **tone**   137:11 |
| 56:19 62:7 | 215:5 223:15 | 47:19 78:10 | 248:4 |
| 63:5,7,15 69:2 | 226:12,18 | 84:19 85:17 | **took**   10:8 54:23 |
| 69:23 72:4,14 | 232:2,7 243:20 | 88:7 89:2 | 55:1 129:15 |
| 77:10 84:15 | 243:22 247:6 | 90:19 92:14 | 135:23 138:7 |
| 85:16 86:3,6 | 247:18 255:22 | 94:7 98:20 | 147:12 167:19 |
| 86:13 95:7,9 | 257:18 261:17 | 111:24 135:4 | 210:10 223:22 |
| 96:24 98:9 | 261:22 262:20 | 156:18 157:7 | **tools**   76:9,11 |
| 102:16 104:18 | 263:20 | 165:5 170:7 | **top**   24:16 28:13 |
| 107:20,21,23 | **timeframe** | 186:6 192:6,9 | 32:21 42:5 |
| 111:13,16,19 | 30:16 56:5 | 216:15 220:15 | 48:12 49:2 |
| 112:9,10,11,13 | **timeline**   122:6 | 236:1 239:16 | 56:12 87:6 |
| 113:11 120:14 | **times**   15:14 | 256:15 261:4 | 90:11,17 97:4 |
| 121:25 123:21 | 19:24 25:22 | **today's**   20:12 | 100:14 114:12 |
| 123:24 124:7 | 37:23 127:25 | 165:7 261:9 | 147:2 152:14 |
| 124:15 125:12 | 155:12 156:7 | 265:4 | 226:8 230:20 |
| 125:21 135:24 | 187:21,25 | **together**   34:8 | 240:7 250:20 |
| 136:2 138:3,4 | 188:6,12,13,18 | 120:8 214:2,10 | **total**   21:17 |
| 139:11 142:10 | 188:23 189:3 | 229:21 | 78:22,23,25 |
| 143:23 145:17 | 202:20 206:13 | **told**   15:14 16:1 | 80:17 93:5 |
| 146:7 150:6,15 | 206:14 251:24 | 18:17 39:10 | 114:1 127:14 |
| 150:18,21 | **tires**   164:12 | 93:22 114:24 | 154:22 195:22 |
| 155:13,14 | 183:5,6 | 116:17 124:18 | 207:13,15,18 |
| 156:8,9,15 | **title**   63:17 | 131:17 138:11 | 211:23 213:5 |
| 157:25 159:3 | **titled**   101:5,9 | 138:12 144:22 | 214:4 223:10 |
| 159:25 160:1 | 105:5 | 156:7 157:10 | 223:11 224:17 |
| 160:15,16,16 | **titling**   105:22 | 157:13 169:15 | 228:4,6 |
| 160:17 173:17 | **today**   8:21 9:11 | 169:17 186:2 | **totaling**   73:10 |
| 175:23 179:24 | 9:15 13:3,10 | 202:24 203:23 | 80:3 |
| 185:8 188:8 | 14:11,19,22 | 216:10 230:9 | |

[totals - uc]

| | | | |
|---|---|---|---|
| **totals** 93:20 | **transcriptionist** | **trust** 35:13,15 | **twice** 176:20 |
| 108:24 115:4 | 266:8 | **truth** 8:9,9,10 | **two** 13:11 |
| 233:22 | **transfer** 68:12 | 10:8 | 14:19 36:8 |
| **toward** 91:15 | 258:15 259:25 | **truthful** 17:2 | 41:5,11 43:17 |
| **towards** 99:16 | **transfers** | 179:17 | 43:21 63:16 |
| 99:18 102:13 | 146:16 | **try** 144:2 | 83:17,21 96:25 |
| 120:15 147:13 | **transition** | **trying** 18:12 | 97:2 99:23 |
| 147:16 | 145:13 | 63:25 232:4 | 100:2,21 |
| **tower** 124:21 | **transitioned** | 241:4 | 101:17 107:24 |
| 124:25 125:6,9 | 30:25 85:6 | **tudum** 62:6,11 | 108:16 111:16 |
| 125:23 | 227:13,22 | 62:13,15,21,25 | 111:19,23 |
| **town** 119:13 | **travel** 126:3,4,6 | 62:25 | 112:15 143:10 |
| **trade** 77:4 | 126:24 127:3 | **tune** 184:3 | 145:19 153:5 |
| 80:21 | 127:13,14,22 | 194:8 215:17 | 174:8,9 175:10 |
| **trademark** | 127:24 128:13 | 225:20 | 180:11 186:5 |
| 29:18 | 128:13,21 | **turn** 37:2 64:4 | 197:19,25 |
| **traditional** | 129:3,11 | 69:14 89:23 | 200:14,15 |
| 140:20 | **treasurer** 59:11 | 96:23 100:10 | 214:7 220:14 |
| **tragically** | **tricky** 174:1 | 114:9 115:6 | 232:13,23,25 |
| 100:4 | **trigger** 94:12 | 118:25 121:3 | 238:1 239:11 |
| **transaction** | **triggers** 94:8 | 138:7 147:1 | 242:19 |
| 35:18 148:19 | **trip** 129:21 | 165:15 171:11 | **type** 19:17 27:7 |
| 161:18 224:12 | 130:4 | 176:1 186:13 | 27:15 29:12 |
| 253:14 256:21 | **trips** 126:18 | 186:18 218:5 | 162:25 |
| 256:22 | 127:18,20 | 225:5,22 | **typed** 17:12 |
| **transactions** | 129:7,14 | 230:19 231:8 | **types** 27:12,13 |
| 84:11,11 112:4 | 185:24 189:5 | 232:9 233:19 | 202:1 |
| 186:10 254:10 | 254:11 | 239:14 | **typewriting** |
| 260:8 | **trouble** 205:17 | **turned** 202:24 | 266:7 |
| **transcriber** | **truck** 205:2,3,5 | 250:4 | |
| 267:1 | 205:8,10 | **twelve** 49:4 | **u** |
| **transcript** 6:15 | 218:18 225:23 | 206:13,14 | **u** 5:12,12 62:6 |
| 17:12 261:9,11 | **true** 266:9 | **twenty** 49:4 | 62:6 91:7,7,8 |
| 262:7,15 | 267:6 268:3 | 224:19 238:5 | **uc** 131:18,19 |
| 266:25 267:4,6 | | 256:1 | 132:24 133:4,6 |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[uh - van]**

**uh** 146:13

**unauthenticat...**
46:22

**uncertain**
242:4

**under** 6:18
10:7,13 11:13
11:17 12:1
15:10,11,13
25:7 47:3 67:2
78:21,23,24,25
79:2 80:17
82:6 89:25
93:9,13,15
114:1 122:11
137:6 150:4
152:18 169:9
179:18 200:5,8
205:12 227:8
268:1,2

**undersigned**
179:15

**undersigned's**
180:1

**understand**
6:14 8:22,24
9:10,14 10:10
10:12,14 17:3
17:6,14 19:5
19:15,21 20:9
22:7,10 29:12
30:5 45:1
49:20 59:2
67:14,17 69:3
82:23 84:5

95:4 96:24
99:5 108:15
114:6 122:16
124:4 132:7
134:1,5,7
143:17 164:10
167:3 169:12
181:18 231:7

**understanding**
11:13 12:8
65:11 129:10
130:14,19,22
130:23 131:3
185:16

**understands**
15:11 180:23

**understood**
17:11,14 39:20
171:13 263:18

**underwriting**
145:15

**unfreeze** 145:8

**unique** 61:14

**unit** 42:8,12,14
42:15,15,20,23
42:23 43:8,22
124:22 125:5
125:10 192:6

**united** 1:1
115:8,11
131:20,21,21
131:23 132:7
134:1,21
135:14 136:10
136:17,25

140:21

**unpaid** 49:8

**unprepared**
37:14

**unravel** 245:3
245:23

**unraveled**
245:12

**unsecured**
49:18,21 50:4
116:14,18
117:3 122:18
122:22,23
123:2

**update** 238:15

**updated** 80:9
80:11 213:21

**upfront** 132:2
166:6 172:10
172:18

**upper** 162:9,12
168:22

**upwards**
127:12 194:13

**usage** 53:3,10

**use** 23:5 26:18
26:23 27:21
29:22,24,25
30:3 46:21
55:20 72:4
77:7 147:15
149:19 263:3
263:16

**used** 24:10 26:1
26:6,12 27:2

27:14,15,17
28:25 29:1,1,2
29:3,4,9 44:21
71:5 92:19,20
92:23 147:13
147:23 148:1
192:14 219:2
219:10

**uses** 6:17
142:21

**using** 26:8
33:14,18 71:19
72:2 113:1
157:12 182:24
239:19

**usually** 49:21

**v**

**v** 33:16

**vacation** 100:3

**vague** 135:24
136:2

**valley** 1:2

**valuation**
120:13,14
173:25

**value** 77:5
120:11,17,18
120:20 150:3
166:2 174:24
174:25 175:9
182:10 236:1,7
250:2

**valued** 76:18

**van** 52:3,17
53:12 54:21

**[van - want]**

| | | | |
|---|---|---|---|
| 63:3,19 64:6 | **vehicle** 101:1,2 | 150:14,17,22 | **voluntary** 4:8 |
| **vanguard** 2:10 | 101:3,6,8 | 150:24 209:12 | 38:20 55:21 |
| 3:3 7:5,19 8:19 | **vehicles** 104:7 | 209:14,16 | 118:7 |
| 22:23 29:13 | 105:25 106:10 | 211:7,11,14 | **volunteering** |
| 69:4 130:8,15 | **vendor** 4:16 | 255:23 256:1 | 27:6 |
| 131:2,8 132:20 | 114:10 115:3 | 262:5,9,13,18 | |
| 133:10,16,22 | 151:7,23 152:4 | 263:11 265:3 | **w** |
| 151:24 152:10 | 152:8,9 153:21 | **videos** 17:13 | **w** 28:18 30:23 |
| 152:12 153:3 | 154:3,4,7,23 | **videotaped** | 31:6 83:11 |
| 156:24 158:16 | 155:23 157:12 | 1:11 | 108:10,20,21 |
| 160:13,19,24 | 158:19 159:21 | **view** 19:9 | 109:3,4,15,22 |
| 161:13 184:8 | 159:21 | **vigilante** 65:8,9 | 202:23 203:4,8 |
| 184:19 196:1 | **vendors** 82:2 | 65:13 66:15 | 203:17 |
| 199:25 200:7,9 | 154:13 252:17 | 97:21 99:6,13 | **waffle** 169:7 |
| 234:22 237:19 | **verdes** 119:12 | **vincent** 3:7 | **wages** 31:6 |
| 238:14 240:5 | **verifying** 32:11 | 6:25 | 107:14,15 |
| 242:13,24 | **veritext** 6:4 | **vine** 40:22,25 | 203:17 213:23 |
| 244:22 245:8 | **veritone** 73:25 | 42:9 124:21,21 | 213:25 214:17 |
| 247:7,19 | **versus** 231:4 | 124:25 125:6,9 | 217:14,21,22 |
| 252:19 | 232:10 251:8 | 125:23 192:5 | 223:16 |
| **vanguard's** | 251:14 253:19 | 203:21 204:3 | **wagon** 101:20 |
| 132:8 | 254:6 | 204:24 206:2,4 | 101:22 102:1,6 |
| **varies** 66:11,13 | **viall** 250:20 | 207:9 | 102:8 103:5,6 |
| **variety** 27:12 | **vice** 59:10 | **virginia** 210:2 | 103:9,13 104:8 |
| 126:9,9 190:18 | **video** 6:25 | **virtue** 99:2 | 104:9 148:14 |
| **various** 25:22 | 24:19 30:1,1 | **vis** 168:20,20 | 148:18 185:24 |
| 138:3 155:25 | 61:20,21 62:3 | 239:12,12 | 189:1 |
| 187:19 193:17 | 62:4,8 137:13 | **vista** 91:9,11,14 | **wait** 22:17 |
| 219:19 221:4 | 150:20 210:18 | 93:5,22 118:23 | 43:10 116:19 |
| **vary** 23:23 | 262:6,10,19 | 119:2 259:8,10 | 124:3 |
| 140:4,25 | **videoconfere...** | 259:12,13 | **waive** 262:3 |
| **vegas** 126:14 | 2:12 3:4,6 | **vista's** 119:6 | **walked** 210:17 |
| 129:8,14 130:4 | **videographer** | **voice** 13:24 | **want** 9:3 12:20 |
| 189:3 | 3:7 16:10,12 | 15:17 70:16 | 12:21,23 13:7 |
| | 16:15 86:2,5 | 137:14 | 13:14 14:9,22 |
| | | | 20:23 24:18 |

**Page 71**

**[want - witness's]**

| | | | |
|---|---|---|---|
| 37:18 55:20 | **warner's** 70:12 | **wells** 21:21 | **withdraw** |
| 60:21 67:16 | **warnermedia** | 72:22 191:8 | 139:8 |
| 73:22 87:13 | 60:1,11 | 256:20 257:14 | **withdrawals** |
| 92:10,12 95:20 | **warrants** | 258:2 | 257:13 |
| 96:24 110:11 | 179:15 | **went** 30:23 | **witness** 6:13,14 |
| 121:12 122:15 | **watch** 61:23 | 77:12 128:3,8 | 8:4,8 9:20 13:1 |
| 132:6 139:3 | **watches** 17:13 | 137:20 164:7 | 18:2 19:3,15 |
| 143:16 145:24 | **way** 43:7 83:24 | 188:7 232:20 | 19:21 31:14,20 |
| 154:13 155:7 | 87:7 98:8 | 240:8 259:25 | 33:2 35:5 38:8 |
| 155:10 166:13 | 123:12 141:6 | **wes** 226:9,10 | 39:25 41:13,14 |
| 167:3 168:14 | 153:14,16 | **west** 21:23 | 46:20,24 47:8 |
| 169:4,8 173:14 | 169:17 178:10 | 68:16,17,21 | 49:5,14 50:22 |
| 173:17 178:24 | 178:19 185:9 | 70:6,23 71:5 | 55:5 57:4 |
| 181:18 182:1,6 | 213:13 235:12 | 71:10,13 | 62:17 77:19 |
| 185:15 195:1 | 239:21 242:1 | 114:18 135:21 | 78:1 85:20,24 |
| 196:20 198:10 | **we've** 27:14 | 139:16,20,22 | 88:24 108:24 |
| 200:18,23 | 56:22 92:9 | 140:10,19 | 109:7,9 117:10 |
| 201:15 206:11 | 96:12 112:9 | 142:11 210:2 | 118:18 121:12 |
| 209:23 210:11 | 123:21 150:20 | 258:12,15 | 125:19 127:7 |
| 235:1 243:10 | 179:12 182:9 | **what'd** 195:16 | 137:11,17 |
| 249:4 251:5 | 187:2 192:5 | **wheaton** 44:9 | 150:8,12 151:4 |
| 254:22,25 | 256:11,14 | 44:13 | 164:22,24 |
| 261:8,11,13,17 | **website** 191:3 | **whitney** 234:2 | 172:17 176:8 |
| 261:21,22 | **weeds** 95:21 | **why's** 80:7 | 184:23 189:14 |
| 262:19 263:17 | **week** 13:5,11 | **wife** 257:18 | 196:14 203:12 |
| **wanted** 15:25 | 14:19 47:5 | 259:1 | 205:18,24 |
| 53:19 70:8,9 | 128:16 189:17 | **william** 24:11 | 212:9 221:21 |
| 154:23 156:23 | **weeks** 13:11 | 119:2 | 223:1 237:5,8 |
| 243:24,24 | 108:16 162:1 | **wire** 68:13 | 238:11 240:13 |
| 247:16 | 263:5,6,7,9,10 | 258:14 259:9 | 240:17 244:2,5 |
| **warehouse** | 263:20,25 | 259:17 260:23 | 244:8 248:20 |
| 52:7 | 264:3,6 | **wissig** 28:12,17 | 257:1 261:20 |
| **warner** 60:7 | **welcome** 57:15 | 28:18 63:15 | 264:7,9 266:5 |
| 61:14 70:7,8 | 177:24 234:3 | 81:17 143:22 | **witness's** 79:15 |
| 227:1 | 240:10 247:10 | 156:2,14 | |

**[wolverining - yeah]**

**wolverining**
78:3
**women** 100:2
**wonder** 176:10
**wonderful**
249:7
**words** 25:18
61:22 103:14
193:8 245:20
246:1 253:9
**work** 29:12
30:25 44:16
50:17 59:17,21
60:8 64:13
85:18 113:5,6
**worked** 24:12
41:6,9 44:23
63:13 74:19
112:9 115:12
121:24 122:7
131:22 142:8,9
143:20 219:20
224:15 252:17
256:14 258:22
**working** 45:5,7
48:3,6 50:11
50:14 63:5
64:21 65:2,6
99:16,17
107:17 111:13
112:7 133:1,4
133:6 142:19
142:20 143:18
189:11 190:22
190:23 191:5

227:13,14
242:1,5,7
**works** 24:25
98:8 115:10,22
**worries** 261:15
262:16
**worse** 138:8
**worth** 73:5
76:24 78:13
166:6,16 173:8
173:12,22
175:4,12
220:21 230:22
246:3,10,22
**would've** 9:21
26:4,25 28:8
29:25 36:3
44:25 52:25
56:6,18,18,23
57:19 60:3,13
63:16,17 69:22
72:13 73:15,16
73:24 74:7
76:19 83:12,12
88:13,19 97:9
97:17 98:11
104:1,4,20
107:3,12,21,24
108:3 112:11
113:10 114:4
115:19,20
126:19,23,23
127:1,18,19
128:10 129:12
129:17,18

139:16,17,19
142:10 162:13
204:12 214:4
214:10 219:23
220:18,19,23
221:1,11 226:8
226:12 239:1
246:9,9 250:15
251:23,25
252:20,21
253:1,4,13,14
253:16 258:11
258:14,17
**write** 156:5
185:16 247:1
**writers** 64:24
65:1
**writes** 243:4
**writing** 65:25
113:6
**written** 6:22
130:20 138:4
187:19
**wrong** 244:2,6
**wrote** 246:21
246:22
**wv** 2:22
**wynn's** 129:8
129:20 130:4
189:2
**wyoming**
146:21

| **x** |
| --- |
| **x** 4:1,5 5:1 |
| 202:13 233:4 |
| 266:25 |
| **x1t** 233:4 |

| **y** |
| --- |
| **y'all** 22:21 |
| 251:1 |
| **yeah** 15:12 |

18:1,4 22:10
23:11 24:22
25:19 27:7
28:8 29:19,19
29:24 30:16
33:2 35:24
38:11 39:3,10
41:14 42:4,13
43:5 45:4,14
46:11 48:23
50:21,22 51:13
55:5,11,16
59:17 61:6,10
61:21 62:22
64:20 65:5,17
72:9 78:23,23
84:18 89:10
96:2 97:14,25
98:1 100:23
102:15 103:12
103:12 105:18
106:1,4 107:9
107:9,23 108:3
108:6 109:12
109:15,24
113:15 116:12

Page 73

**[yeah - zoom]**

| | | | |
|---|---|---|---|
| 116:21 117:9 | 217:20 221:23 | 220:20 223:18 | 258:7 260:21 |
| 118:10,18 | 225:2 226:10 | 223:22 224:2,5 | 260:25 261:2 |
| 119:21 120:10 | 227:12,17,21 | 227:11,22 | **york**   119:3,3 |
| 121:3 122:21 | 227:21,21 | 228:7 230:15 | 121:5,6 252:23 |
| 124:5 126:5 | 228:14,15 | **years**   29:9 | **youtube**   62:10 |
| 128:19 130:23 | 230:3 232:16 | 43:21 68:19 | **yu**   35:21,23 |
| 133:3 137:4,8 | 232:22 234:7 | 156:1 159:4 | 119:23 121:7 |
| 138:2,19,24 | 234:10 235:22 | 164:10 174:10 | 121:16 201:18 |
| 139:5,14 140:8 | 236:21 237:5,8 | 183:9 200:19 | **yu's**   119:25 |
| 140:9,18,22 | 237:9 238:11 | 201:10,17,25 | |
| 144:3,3,6 | 240:16 241:9 | 252:4 | **z** |
| 146:22 148:6 | 244:9,10 | **yell**   255:3 | **zavlaris**   144:5 |
| 150:12 151:14 | 246:14 248:14 | **yep**   15:16 16:3 | **zero**   41:23 |
| 156:6 158:4 | 249:5 251:10 | 16:11 18:22 | 71:16,24 159:1 |
| 159:10 162:15 | 251:23 255:4 | 21:22,24 22:2 | 159:4,12 161:4 |
| 162:18 165:8 | 255:11,15,17 | 22:6 28:1 40:8 | 161:10 |
| 166:4 168:17 | 255:21 258:1 | 40:17 52:5 | **zeroed**   227:10 |
| 169:6 171:4 | 258:20 259:12 | 59:20 71:12 | **ziprecruiter** |
| 172:1,17,24 | 259:16 260:15 | 73:23 94:6 | 219:16 |
| 175:14,16 | 261:20,25 | 102:11 117:6 | **zoom**   7:14 8:2 |
| 176:8,15 | 263:4,8,15 | 165:23 172:16 | |
| 180:17 182:12 | 264:1,7 | 173:5,15 178:5 | |
| 183:7 184:14 | **year**   33:23 43:1 | 180:22 181:10 | |
| 184:15 188:7 | 43:17,17 44:12 | 190:2,4,6 | |
| 189:14,21,23 | 48:10 60:14 | 192:22 204:4 | |
| 191:4,6,10,18 | 102:13 105:9 | 205:1,22 | |
| 195:1,4,17 | 112:16 128:23 | 207:20,24 | |
| 196:5,14 | 129:19 145:19 | 208:2 209:1,1 | |
| 197:24 198:2 | 165:4,9 174:8 | 211:10,20 | |
| 199:6 202:3 | 175:10 203:4 | 214:1 220:1 | |
| 203:12 204:10 | 204:9 206:8 | 222:23 228:6 | |
| 205:10 207:12 | 208:14 211:25 | 228:24 229:3 | |
| 209:14 210:5,5 | 212:4,14 | 229:15 234:14 | |
| 213:4,20 215:5 | 216:13,17,25 | 234:16 238:16 | |
| 215:12 216:4 | 217:24 220:3 | 240:22 243:12 | |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127