Leslie A. Cohen, Esq. (SBN: 93698)
    leslie@lesliecohenlaw.com
J'aime K. Williams, Esq. (SBN 261148)
    jaime@lesliecohenlaw.com
LESLIE COHEN LAW, PC
1615-A Montana Avenue
Santa Monica, CA 90403
Telephone:  (310) 394-5900
Facsimile:  (310) 394-9280

Attorneys for Debtor in Possession

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## SAN FERNANDO VALLEY DIVISION

|  |  |
|---|---|
| *In re*<br><br>Kast Media Inc.<br><br>　　　　　　　　Debtor and<br>　　　　　　　　Debtor in Possession | Case No. 1:24-bk-10396-MB<br><br>Chapter 11<br><br>**MOTION OBJECTING TO CLAIM NO. 5 OF ARCADIAN VANGUARD LLC; DECLARATION OF J'AIME WILLIAMS KERPER; DECLARATION OF COLIN THOMSON**<br><br>Hearing Information:<br>Date: December 17, 2024<br>Time: 1:30 p.m.<br>Courtroom:  303 and Via Zoomgov<br><br>Video/audio web address:<br>https://cacb.zoomgov.com/j/1604944937<br>ZoomGov meeting number: 160 494 4937 Password: 322344 Telephone conference lines: 1 (669) 254 5252 or 1 (646) 828 7666 |

1  TO THE HONORABLE MARTIN BARASH, UNITED STATES BANKRUPTCY JUDGE;

2  THE OFFICE OF THE U.S. TRUSTEE; CLAIMANT; AND PARTIES IN INTEREST:

3        Kast Media, Inc. ("**Debtor**" or "**Movant**"), debtor and debtor in possession in the

4  above-captioned chapter 11 bankruptcy case, files this Motion ("**Motion**") objecting to the

5  amended Proof of Claim No. 5 (the "**Claim**") of Arcadian Vanguard LLC ("**Arcadian**" or

6  "**Claimant**").  **Claimants receiving this Motion should locate their names and claims**

7  **in the Motion**, **and read the entire Motion, as claimants' rights may be altered or**

8  **affected by this Motion**.  Please note that the Claim may be subject to other/multiple

9  objections, and Debtor reserves all rights to file further future objections.  *This Motion*

10  *objecting to claims seeks to alter Claimant's rights by modifying the claim based upon the*

11  *grounds set forth in this Motion, and which appears below*.

12  

**I.**      **INTRODUCTION**

13        The Claim should be disallowed in its entirety because 1) Arcadian lacks standing

14  to assert the claim, 2) the Claim is barred by virtue of Arcadian's breach of the underlying

15  agreement, 3) Claimant fails to substantiate that any amount is due.

16        This Motion is made per the U.S. Bankruptcy Code ("**Code**"), 11 U.S.C. § 101 *et*

17  *seq.*, including § 105, § 502 ;[1] Federal Rules of Bankruptcy Procedure (FRBP) 3007 and

18  3012; and Local Bankruptcy Rule (LBR) 3007-1.

19  **II.**      **ALPHABETICAL INDEX OF CLAIMANTS, GROUNDS OF OBJECTION AND**

20  

**CROSS-REFERENCES**

21        Below is a list of creditor(s) whose claims are subject to this Motion. E.g. FRBP

22  3007(e)(2).  A copy of the Claim is attached to the Declaration of J'aime Williams Kerper

23  ("**Kerper Decl.**") as **Exhibit A**. Additionally, the below table provides the brief grounds for

24  objections, and cross-reference to pages, *infra*, of this Motion describing the objecting

25  grounds in greater detail. E.g. FRBP 3007(e)(3).  Claimants should note that a claim may

26  be subject to more than one basis for objection.

27  _____

28  [1] Unless otherwise noted, all statutory and section references refer to the U.S. Bankruptcy Code.

2

| Claimant | Claimant Address | Claim No.(s) and Date Filed | Amount and Classification | Basis(es) |
|---|---|---|---|---|
| Arcadian Vanguard LLC | c/o Gary Rudolph Fennemore LLP 600 B Street Suite 1700 San Diego, CA 92101 | Claim No. 5 Filed May 6, 2024 | $250,442.79 unsecured | Lack of standing; violation of underlying agreement; Claim not supported by any evidence; amounts asserted are unsubstantiated. |

### III.    STATEMENT OF FACTS

#### A.    Prepetition

The Debtor is a dynamic podcast production company which creates award-winning content. Specializing in podcasts with potential for second-window opportunities in film and television, the Debtor has several projects currently in film & TV development. See attached Declaration of Colin Thomson ("**Thomson Decl.**").

Prior to its bankruptcy filing, the Debtor's operations were dramatically affected by downturns in the advertising industry, decreases in revenue and financial stress caused by structured deals with minimum guarantees due on shows that generated insufficient revenue to cover these amounts.  See Thomson Decl. This financial stress was exacerbated by pre-petition state court litigation. See Thomson Decl.

#### B.    Bankruptcy Case

The Debtor filed a voluntary petition for relief in the United States Bankruptcy Court for the Central District of California (the "**Bankruptcy Court**") under chapter 11 of title 11 of the United States Bankruptcy Code ("**Bankruptcy Code**" or "**Code**"[2]) on March 13, 2024 (the "**Petition Date**").   The Debtor commenced this subchapter V chapter 11 case in good faith, with the intention to establish a plan of reorganization. Debtor continues to

---

[2] 11 U.S.C. 101 *et seq.*  Unless otherwise noted, all statutory references herein shall refer to the Code.

1    manage its estate as debtor-in-possession pursuant to Sections 1107 and 1108 of the

2    Bankruptcy Code.  To date, no Committee, Examiner or Trustee has been appointed in

3    Debtor's case other than the subchapter V Trustee.

4         On June 11, 2024, the Debtor filed its *Chapter 11 Plan of Reorganization for*

5    *Subchapter V Debtor* ("**Plan**") [Docket No. 71].

6         **C.    The Claim**

7         On May 6, 2024, Arcadian filed Proof of Claim No. 5, in the unsecured amount of

8    $250,442.79.  A copy of this Claim is attached to the Kerper Decl. as ***Exhibit A***.

9         The only documentation attached to the Claim is a 1-page narrative which

10   describes a Podcast Agreement entered into between the Debtor and Jim Cornett

11   ("**Cornette**") in 2018.  The Claim does not include any evidence to demonstrate or explain

12   Arcadian's standing to bring the Claim on behalf of Cornette.  The attachments make

13   unsubstantiated accusations regarding the Debtor, Colin Thomson, and alleged fraud

14   without any evidence or support.

15        **D.    The Cornette Agreement**

16        In 2018, the Debtor and Cornette entered into a Podcast Agreement ("**Podcast**

17   **Agreement**").  A copy of the Podcast Agreement is attached as ***Exhibit B*** to the Thomson

18   Decl.  Arcadian is not a party to the Podcast Agreement.  See Exhibit B.

19        The Podcast Agreement provides that the Debtor will be the exclusive advertising

20   representative for Cornette's podcasts "The Jim Cornette Experience" and "Jim Cornette

21   Drive-Thru" (the "**Podcasts**").  Despite this contractually mandated exclusivity, the Debtor

22   is informed and believes that Arcadian's counsel, Steve New ("**New**"), has been

23   purchasing advertising through Cornette for the Podcasts for many years rather than

24   buying ad space through the Debtor, as required by the Podcast Agreement.  This breach

25   of the Podcast Agreement came to light due to a May 2024 article in The Register-Herald,

26   where New discusses the fact that he sponsored the Podcasts in return for Cornette

27   promoting his legal services.  A copy of this article, with relevant portions highlighted, is

28   attached to the Kerper Decl. as ***Exhibit C***.  New's purchase of ad space directly from

Cornette appears to be a breach of the Podcast Agreement Section 1b, and the Debtor should be entitled to at least 20% (or 25% depending on audience size) of whatever money Mr. New spent advertising directly with Cornette.

The Podcast Agreement also provides for the Debtor and Cornette to share ad revenue according to the following formula:

> Kast Media shall pay Podcaster eighty percent (80%) of the Net Ad Revenue (defined below) collected during such **month if the average audience size for individual episodes equals or is more than one-hundred thousand (100,000)**, and seventy-five percent (75%) of the Net Ad Revenue (defined below) collected during such month if the average audience size for individual episodes is less than one-hundred thousand (100,000).

> See Exhibit B, Section 2 (emphasis added).

Notably, the Claim does not provide any evidence from the hosting platforms to demonstrate the Podcasts' audience size; therefore, the correct percentage of payout allegedly owed to Cornette under the Podcast Agreement is indiscernible.

The Podcast Agreement also includes a confidentiality provision, which provides:

> All knowledge and information related to this Agreement that is not available to the public is confidential, whether acquired before, during, or after the Term of this Agreement. Such confidential information shall not be used, disclosed, or made available to others, directly or indirectly, for any purpose without the prior, written approval of Kast Media.
> …
> Any breach of this Section would cause irreparable harm, and Kast Media is entitled to injunctive relief in such situation.

> See Exhibit B, section 7.

Despite this confidentiality provision, Cornette published a multi-hour series on YouTube about the Debtor[3], in which he reveals confidential details of the Podcast Agreement in violation of its terms.  See Thomson Decl. The YouTube series and

---

[3] The series is available at:
https://www.youtube.com/playlist?list=PLAYwRejbLOEOccWhdXYxyeMnqbSPv5Lli

1  Cornett's actions in publishing it is a clear violation of the Podcast Agreement, and its

2  confidentiality provision, which survives the term of the agreement.

3                              **IV.    DISCUSSION**

4        Except in certain instances, inapplicable here, where claims listed on the debtor's

5  schedules are "deemed filed," a creditor must file a proof of claim in order to receive

6  distributions in a bankruptcy case. Fed.R.Bankr.P. 3002(a).  If filed, a claim may be

7  allowed unless a party in interest objects, in which event the court, after notice and a

8  hearing, is required to determine the amount of the claim as of the date of the filing of the

9  petition. Bankruptcy Code § 502(a)-(b).

10       "If the objector produces evidence sufficient to negate the validity of the claim, the

11  ultimate burden of persuasion remains on the claimant to demonstrate by a

12  preponderance of the evidence that the claim deserves to share in the distribution of the

13  debtor's assets."  In re Pugh, 157 B.R. 898, 901 (B.A.P. 9th Cir. 1993).  An objection need

14  only "show facts tending to defeat the claim by probative force equal to that of the

15  allegations of the proofs of claim themselves." Lundell v. Anchor Constr. Specialists, Inc.

16  (In re Lundell), 223 F.3d 1035, 1040 (9th Cir. 2000). The burden of persuasion is always

17  on the claimant to establish his entitlement to the claim.  In re Holm, 931 F.2d 620, 623

18  (9th Cir. 1991).

19       Further, a lack of supporting documentation at a minimum means that the proof of

20  claim no longer constitutes *prima facie* evidence for the validity of a claim. See Heath v.

21  Am. Express Travel Related Servs. Co. (In re Heath), 331 B.R. 424 (B.A.P. 9th Cir. 2005).

22       Here, the Claim should be disallowed for several reasons.

23       First, as the Podcast Agreement is between the Debtor and Cornette.  Arcadian is

24  not a party to the Podcast Agreement upon which its Claim is purportedly based, and it

25  accordingly lacks standing to assert the Claim.  Further, there is no evidence attached to

26  the Claim to demonstrate that Arcadian has standing.

27

28

1    Second, Claimant should be barred from any recovery under the Podcast

2 Agreement, due to Cornette's violation of both the exclusivity and confidentiality terms of

3 the agreement.

4    Third, other than the self-serving, 1-page narrative attached to the Claim, the Claim

5 is devoid of any evidence to substantiate the amount claimed, or the allegations of fraud

6 against the Debtor.  As noted above, even if Cornette were entitled to any ad sharing

7 revenue despite his breach of the Podcast Agreement, the Claim fails to provide any

8 evidence of his Podcasts' audience size, such that the ad sharing percentage cannot be

9 calculated in any event.

10    Accordingly, the Debtor submits the Claim should be disallowed in its entirety, and

11 reserves all rights to seek damages arising from Cornette's violations of the Podcast

12 Agreement.

13                    I.    **NOTE TO CLAIMANTS REGARDING EXHIBITS**

14    **The claim listed herein (Claim No. 5) was filed by the Claimant, and is the**

15 **subject of this Motion.**

16    Per LBR 3007-1, the supplemental evidence supporting this Motion includes the

17 attached Declaration, any exhibits thereto, including the exhibits providing a true and

18 correct copy of the filed Claim subject to this Motion.  Additionally, the Debtor is

19 concurrently filing and serving herewith a Notice of Motion Objecting to Claim, setting forth

20 the required notice/disclosures, and hearing information.

21                    II.    **RESERVATION OF RIGHTS**

22    The Movant respectfully reserves all rights to add, amend and/or supplement this

23 Motion or any other objection, especially as new allegations are brought forth by Claimant

24 or any other party.  Movant reserves the right to object to the Claim on any and all other

25 available grounds, against any entity.  Movant also reserves the right to seek offsets

26 against the Claim based on affirmative claims by the Debtor.

27

28

### III.    CONCLUSION

Based on the foregoing, Movant respectfully requests that the Court enter an order disallowing Claim #5 in its entirety, and providing for any other relief the Court deems just and proper under the circumstances.

Respectfully submitted,

DATED:  November 15, 2024            LESLIE COHEN LAW, PC


                                     _/s/ Leslie A. Cohen_____
                                     Leslie A. Cohen
                                     Attorneys for Debtor in Possession

**DECLARATION OF J'AIME WILLIAMS KERPER**

I, J'aime Williams Kerper, hereby declare as follows:

1.      I am over 18 years of age. I am a member, in good standing, of the Bar of the State of California, and I am admitted to practice before, among other courts, the United States District Court for the Central District of California.  I am Junior Partner at Leslie Cohen Law, PC (the "**Firm**") attorneys for the Debtor in Possession in the above-captioned bankruptcy case.  Unless otherwise stated, I have personal knowledge or information of the facts set forth herein and, if called as a witness, could and would testify competently thereto.

2.      All capitalized works in this declaration shall have the same meaning as defined in the foregoing Motion.

3.      A true and correct copy of the Claim, as obtained from the claims register in this chapter 11 case, is attached hereto as ***Exhibit A***.

4.      A true and correct copy of the May 2024 article in The Register-Herald, titled "Yeet! Steve New is All In on law career and pro wrestling" is attached as ***Exhibit C***.  I obtained the article from The Register-Herald website at https://www.register-herald.com/sports/yeet-steve-new-is-all-in-on-law-career-and-pro-wrestling/article_3c39a4f4-163f-11ef-986c-1bb1fbfe3261.html.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 15th day of November 2024 at Boise, Idaho.

J'aime Williams Kerper

**DECLARATION OF COLIN THOMSON**

I, Colin Thomson, hereby declare as follows:

1.      I am over 18 years of age. I am the CEO of Kast Media, Inc., the Debtor and Debtor-in-Possession ("**Debtor**") in the above-captioned bankruptcy case.  Unless otherwise stated, I have personal knowledge or information of the facts set forth herein and, if called as a witness, could and would testify competently thereto.  Where statements are made upon information and belief, I believe them to be true and correct.

2.      I make this Declaration in support of the foregoing Motion ("**Motion**"). Where terms are capitalized herein, they shall have the same meaning as defined in the Motion.

3.      The Debtor is a dynamic podcast production company which creates award-winning content. Specializing in podcasts with potential for second-window opportunities in film and television, the Debtor has several projects currently in film & TV development.

4.      Prior to its bankruptcy filing, the Debtor's operations were dramatically affected by downturns in the advertising industry, decreases in revenue and financial stress caused by structured deals with minimum guarantees due on shows that generated insufficient revenue to cover these amounts.  This financial stress was exacerbated by pre-petition state court litigation.

5.      Attached as *Exhibit B* of the Podcast Agreement between the Debtor and Cornette.

6.      Despite the confidentiality provision in the Podcast Agreement, I am informed and believe that Cornette published a multi-hour series on YouTube about the Debtor, in which he reveals confidential details of the Podcast Agreement.  This information and belief is based on the following YouTube link:

https://www.youtube.com/playlist?list=PLAYwRejbLOEOccWhdXYxyeMnqbSPv5Lli

///

1    I declare under penalty of perjury under the laws of the United States of America

2    that the foregoing is true and correct.

3    Executed on this 15th day of November 2024 at St. Louis, Missouri.

Colin Thomson

# **<u>EXHIBIT A</u>**

**Fill in this information to identify the case:**

Debtor 1    Kast Media Inc.

Debtor 2
(Spouse, if filing)

United States Bankruptcy Court for the:    Central District of California

Case number    24-bk-10396-MB

## Official Form 410

# Proof of Claim

04/22

**Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.**

**Filers must leave out or redact** information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309)** that you received.

| Part 1: | Identify the Claim |
| --- | --- |

**1. Who is the current creditor?**

Arcadian Vanguard LLC
Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor _____

**2. Has this claim been acquired from someone else?**

☑ No
☐ Yes. From whom? _____

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

**Where should notices to the creditor be sent?**

c/o Gary B. Rudolph/Fennemore LLP
Name

600 B Street, Suite 1700
Number    Street

San Diego, CA  92101  CA        92101
City            State        ZIP Code

Contact phone (619) 595-3225

Contact email grudolph@fennemorelaw.com

**Where should payments to the creditor be sent?** (if different)

c/o Brian Last
Name

8 Beacon Hill Drive
Number    Street

Chester            NJ        07930-3000
City            State        ZIP Code

Contact phone (347) 994-8585

Contact email brianlast30@gmail.com

Uniform claim identifier for electronic payments in chapter 13 (if you use one):

__ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __

**4. Does this claim amend one already filed?**

☑ No
☐ Yes. Claim number on court claims registry (if known) _____    Filed on _____
                                                                MM / DD / YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**

☑ No
☐ Yes. Who made the earlier filing? _____

**Part 2:    Give Information About the Claim as of the Date the Case Was Filed**

| | |
|---|---|
| 6. **Do you have any number you use to identify the debtor?** | ☑ No<br>☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ____ ____ ____ ____ |

| | |
|---|---|
| 7. **How much is the claim?** | $_____250,442.79_. **Does this amount include interest or other charges?**<br>☑ No<br>☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A). |

| | |
|---|---|
| 8. **What is the basis of the claim?** | Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.<br><br>Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).<br><br>Limit disclosing information that is entitled to privacy, such as health care information.<br><br>Agreement: debtor to provide advertising services; see attachment |

| | |
|---|---|
| 9. **Is all or part of the claim secured?** | ☑ No<br>☐ Yes. The claim is secured by a lien on property.<br><br>**Nature of property:**<br>☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*<br>☐ Motor vehicle<br>☐ Other. Describe: _____<br><br>**Basis for perfection:** _____<br>Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)<br><br>**Value of property:** $_____<br>**Amount of the claim that is secured:** $_____<br><br>**Amount of the claim that is unsecured:** $_____ (The sum of the secured and unsecured amounts should match the amount in line 7.)<br><br>**Amount necessary to cure any default as of the date of the petition:** $_____<br><br>**Annual Interest Rate** (when case was filed)_____%<br>☐ Fixed<br>☐ Variable |

| | |
|---|---|
| 10. **Is this claim based on a lease?** | ☑ No<br>☐ Yes. **Amount necessary to cure any default as of the date of the petition.** $_____ |

| | |
|---|---|
| 11. **Is this claim subject to a right of setoff?** | ☑ No<br>☐ Yes. Identify the property: _____ |

**12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

☑ No

☐ Yes. Check one:

|  | Amount entitled to priority |
|---|---|
| ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $_____ |
| ☐ Up to $3,350* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $_____ |
| ☐ Wages, salaries, or commissions (up to $15,150*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $_____ |
| ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $_____ |
| ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $_____ |
| ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(__) that applies. | $_____ |

\* Amounts are subject to adjustment on 4/01/25 and every 3 years after that for cases begun on or after the date of adjustment.

---

## Part 3:  Sign Below

The person completing this proof of claim must sign and date it. FRBP 9011(b).

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

Check the appropriate box:

☐ I am the creditor.

☑ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this Proof of Claim serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this Proof of Claim and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date  05/01/2024
                  MM / DD / YYYY

Signature

**Print the name of the person who is completing and signing this claim:**

| Name | Brian Last | | |
|---|---|---|---|
| | First name | Middle name | Last name |

Title  President and CEO of Arcadian Vanguard LLC

Company _____
Identify the corporate servicer as the company if the authorized agent is a servicer.

| Address | 8 Beacon Hill Drive | | |
|---|---|---|---|
| | Number      Street | | |
| | Chester | NJ | 07930-3000 |
| | City | State | ZIP Code |

Contact phone _____  Email _____

**Attachment to Proof of Claim for Creditors:**
**Arcadian Vanguard LLC and Jim Cornette (collectively "Creditor")**
**Debtor: Kast Media, Inc. ("Debtor")**
**Case No. 24-bk-10396-MB**
**U.S. Bankruptcy Court for the Central  District of California, San Fernando Valley**

The Debtor's filed schedules list Arcadian Vanguard LLC/Jim Cornette as an undisputed, liquidated and non-contingent unsecured creditor in the amount of $250,442.79 related to "podcast content[1]" from 2023.  See ECF #13, p. 20, para. 3.3.  For purposes of this proof of claim, Arcadian Vanguard accepts this amount, but acknowledges that the final amount (after an accounting and after examining the Debtor and its principals and after 2004 examination(s)) could be different.   Arcadian Vanguard reserves the right to amend the amount and basis of its claim.

The only written agreement governing the relationship between Arcadian Vanguard and the Debtor was a Podcast Agreement entered into in 2018, for a one-year period with an option to extend the term for a year,  between the Debtor and Jim Cornette.  Mr. Cornette is a professional wrestling living legend and believed by many to be the world's leading expert on all matters having in any way to do with the sport of professional wrestling.  Mr. Cornette hosts two podcasts, "The Jim Cornette Experience" and "Jim Cornette's Drive-Thru" (hereinafter collectively "Podcasts").  Arcadian Vanguard produces the Podcasts, and Brian Last is the co-host on the Podcasts.  There was a First Amendment to that Podcast Agreement dated September 12, 2019.  Subsequent to that there has been no written agreement in place and the parties have been proceeding on an oral contract since that date.

Among other things, Mr. Cornette and Arcadian Vanguard were operating under an implied contract whereby the Debtor obtained advertisers to be featured on the Podcasts, and the advertising revenue was to be split with 80% (Eighty Percent) to be paid to Mr. Cornette and Arcadian Vanguard, and 20% (Twenty Percent) to be retained by Debtor.  The Debtor paid the expenses of the hosting platform in exchange for Arcadian Vanguard's agreement that  the Debtor would retain 20% of all programmatic advertising that Arcadian Vanguard was entitled to receive related to its podcasts.  The Debtor set it up so that it would receive all advertising income from podcast advertisers, and then pay to Arcadian Vanguard its 80% from those receipts.   This agreement was terminable at will and expired on its own terms no later than 2021.

The Debtor was also required to provide accounting back-up to Arcadian Vanguard substantiating the advertising revenue supporting the payment, but failed to do so.

Beginning in late 2022, the Debtor its principal, Mr. Colin Thomson, failed to timely pay all amounts due to Mr. Cornette and Arcadian.  The last payment either Mr. Cornette or Arcadian has received from the Debtor was on May 17, 2023.

Arcadian Vanguard is informed and believes that the Debtor and/or Mr. Thomson received the advertising revenue, and kept it for their own uses.

In addition to general unsecured claim for $250,442.79, Creditor also asserts that it may have additional claims sounding in fraud, including claims for punitive damages, in an amount not yet known.   Creditor will amend this proof of claim when the amount of their additional damages as described above is ascertained.

---

[1] Not a defined term.

48655270.1

# **EXHIBIT B**

# PODCAST AGREEMENT

## KAST MEDIA LLC

This agreement for services, including all exhibits attached to it (the "Agreement"), is between Kast Media LLC ("Kast Media"), a California limited liability company, and Jim Cornette (the "Podcaster") for the services described in Exhibit A (the "Podcaster Content"). Each of Kast Media and the Podcaster may be referred to as a Party, or, collectively, as Parties. Any references to the Podcaster include any of its affiliates, whether existing currently or in the future.

In consideration for the mutual covenants in this Agreement, Kast Media and the Podcaster agree as follows:

1.    **Content.**

    a.    <u>Podcaster Content</u>. Podcaster agrees to produce digital media content, as described in part in Exhibit A. For the avoidance of doubt, the description provided in Exhibit A shall be interpreted as broadly as possible, and include directly and indirectly related services and content.

    b.    <u>Representation by Kast Media</u>. With respect to the services provided by Kast Media under this Agreement, and except as provided below, the Podcaster Content shall be exclusively represented by Kast Media. Kast Media's representation of the Podcaster Content shall not be exclusive with respect to: (i) the engagement of third parties that seek to develop business and deals for the Podcaster Content (including, for example, Podcaster's engagement and appearance at an event, or Podcaster's engagement of commentary on television), provided such engagement does not need to pre-exist this Agreement; and (ii) Podcaster's own distribution of the Podcaster Content.

2.    **Compensation.**

    a.    <u>Percentage of Net Ad Revenue</u>. Except as provided for the Existing Podcasts (as defined and described below), for each calendar month of the Term, Kast Media shall pay Podcaster eighty percent (80%) of the Net Ad Revenue (defined below) collected during such month if the average audience size for individual episodes equals or is more than one-hundred thousand (100,000), and seventy-five percent (75%) of the Net Ad Revenue (defined below) collected during such month if the average audience size for individual episodes is less than one-hundred thousand (100,000). "Net Ad Revenue" shall mean the total revenues received by Kast Media (including any of its affiliates, agents, or third parties engaged by Kast Media) directly connected to the Podcaster Content, less any sales commissions, and less production costs not covered by Kast Media. For the avoidance of doubt, Net Ad Revenue shall be revenue calculated on a net, not gross, basis as received by Kast Media.

        i.    <u>Cornette Podcasts</u>. The Parties have agreed that for the podcasts ["The Jim Cornette Experience" and "Jim Cornette Drive-Thru"] (the "Existing Podcasts"), Kast Media

1

shall pay Podcaster eighty percent (80%) of the Net Ad Revenue collected during each calendar month.

b. <u>Compensation</u>. Kast Media shall pay Podcaster the amounts due under this Agreement for a given month within thirty (30) days following the end of a month in which Kast Media has received advertising revenue that would be included in Net Ad Revenue.

**3.    Production.**

a. <u>Production</u>. The Podcaster will produce the Podcaster Content described in Exhibit A in the formats specified by Kast Media. The Podcaster shall have final cut approval rights cut for all Podcaster Content, and no edits or alterations shall be made to the Podcast Content without Podcaster's consent.

b. <u>Distribution</u>. Kast Media will distribute the Podcaster Content across digital outlets including, without limitation, Facebook, Twitter, Instagram, YouTube and any other digital distribution channels owned or managed by Kast Media, whether currently or in the future. For the avoidance of doubt, this Section 3(b) shall not prevent or prohibit the Podcaster from distributing the Podcaster Content or engaging in any activities that do not conflict with Podcaster's obligations under this Agreement.

c. <u>Expenses</u>. Kast Media will be responsible for the direct costs of production that it incurs in connection with the Podcaster Content, which shall include post-editing, recording, and associated costs, as determined by Kast Media. Podcaster will be responsible for indirect expenses, such as regular overhead, administrative expenses, financing, travel, supplies, equipment, and materials paid for by the Podcaster or its hosts.

**4.    Term.**

a. <u>Initial Term</u>. This Agreement is for a term of one (1) year (the "Initial Term").

b. <u>Option</u>. The Parties agree to (2) consecutive option(s) to extend the term of this Agreement for an additional period of one (1) year (the "Option Term"). The Option Term will be exercised automatically, unless a Party gives the other Party thirty (30) days' written notice prior to the end of the Initial Term. References to "Term" in this agreement shall include both the Initial Term and any Option Term.

c. <u>Termination</u>. Either Party may terminate this Agreement at any time, with or without cause, by giving the other Party thirty (30) day's written notice. Either Party may terminate this Agreement immediately upon notice to the other Party if it (i) suspects fraudulent, dishonest, negligent, or similar activity related to the Podcaster Content and this Agreement, (ii) the other Party breaches any provision, in part or in whole, of Section 7 of this Agreement, or (iii) the other Party violates any laws.

**5.    Nature of Term.**

2

a. <u>Renewal & Extension</u>. Ninety (90) days prior to the expiration of the Term, Kast Media may, at its discretion, give Podcaster written notice that it desires to renew or extend the Agreement. Following the receipt of such notice by Podcaster, Kast Media and Podcaster shall, for sixty (60) consecutive days, exclusively negotiate renewal or extension of this Agreement.

    i. <u>Right of First Refusal</u>. If Kast Media and Podcaster cannot reach an agreement, for the remainder of the Term, and the twelve (12) months following the expiration of the Term, Podcaster must provide Kast Media with notice of, any offer related to the Podcaster Content (the "Competitor Offer"), including all material terms of the offer. Kast Media shall have a right to purchase Podcaster's services on identical terms to the Competitor Offer within five (5) business days of notice of the Competitor Offer. Podcaster shall not accept any Competitor Offer prior the expiration of such notice period.

b. <u>Non-Compete</u>. Except as provided below, during the Term of this Agreement, Podcaster will not enter into, attempt to enter into, or negotiate any other agreement with respect to the Podcaster Content, or any services related to such Podcaster Content, if the other party to such agreement is a competitor to Kast Media with respect to the services Kast Media provides under this Agreement. For the avoidance of doubt, the scope of Podcaster Content shall be interpreted based on commercially reasonable standards. For the further avoidance of doubt, this Section 5(b) shall not apply to any third-party agreements already entered into by Podcaster with respect to the Podcaster Content.

c. <u>Responsibility</u>. Podcaster is responsible for statements Podcasters makes, re-posts, endorses, or otherwise distributes. Podcaster may be held personally liable for such statements, and is responsible for complying with defamation, libel, copyright, trademark, and any other applicable laws and regulations that may apply to Podcaster's words and actions in any jurisdiction.

6. **Intellectual Property & Promotion.** For purposes of this Section, "IP" shall include, but not be limited to, any and all copyrights, trademarks, patents, and similar proprietary rights in any applicable jurisdiction, whether reduced to practice or not.

a. <u>Podcaster IP</u>. Podcaster shall own IP distributed by Podcaster on Podcaster's digital media platforms (the "Podcaster IP").

b. <u>Kast Media IP</u>. Kast Media shall not own the underlying IP of the Podcaster IP, provided that Kast Media shall have an irrevocable license to use Podcaster IP, unless such license would infringe on third-party agreements Podcaster has. All IP created in part or in whole by Kast Media in connection with the Podcaster Content shall be made on a work-for-hire basis (the "Kast Media IP"). All rights to the Kast Media IP shall be owned by Kast Media. Podcaster grants Kast Media a perpetual license to use any Podcaster IP, in part or in whole, that underlies any Kast Media IP.

*Kast Media LLC – CONFIDENTIAL*

c. <u>Podcaster Representation</u>. Podcaster represents and warrants that it has all right and title to any and all IP, goods, and services provided under this Agreement, and that nothing in any other agreement or intellectual property rights of any third parties conflict with any rights or provisions under this Agreement.

d. <u>Likeness</u>. Kast Media may use the Podcaster's name, likeness, statements, voice, biographical information, and any other information that may identify Podcaster for Kast Media's marketing purposes worldwide, in any media form, during the Term of this Agreement, provided that Kast Media obtains the Podcaster's prior written consent. The Podcaster's consent to the use of certain information may be relied on by Kast Media for future use of that information during the Term of this Agreement. Kast Media shall not enter into any sponsorships or marketing agreements for the Podcaster Content without Podcaster's prior, written approval.

e. <u>Promotion & Cross-Promotion</u>. The Podcaster agrees to promote the Podcaster Content through Podcaster's other digital distribution platforms. Podcaster acknowledges and agrees that Kast Media shall pursue cross-promotional opportunities with third parties, including, but not limited to, mutual sponsorships, mutual guest appearances, and interviews. Kast Media shall present such opportunities for Podcaster's prior approval.

**7. Confidentiality.**

a. <u>Confidential</u>. All knowledge and information related to this Agreement that is not available to the public is confidential, whether acquired before, during, or after the Term of this Agreement. Such confidential information shall not be used, disclosed, or made available to others, directly or indirectly, for any purpose without the prior, written approval of Kast Media. If Podcaster is required by law to disclose such information, it shall give Kast Media fifteen (15) days' prior written notice of such disclosure. Confidential information shall cease to be confidential if: (i) it is disclosed by Kast Media, (ii) becomes public knowledge through no act or failure to act of the Podcaster, or (iii) lawfully is made public by a third party.

b. <u>Materials</u>. Upon Kast Media's request, Podcaster shall return or destroy all documents or materials that a reasonable person would believe should be deleted related to this Agreement that were provided to Podcaster by Kast Media.

c. <u>Injunctive Relief</u>. Any breach of this Section would cause irreparable harm, and Kast Media is entitled to injunctive relief in such situation.

**8. Miscellaneous**

a. <u>Independent Contractor</u>. Podcaster is an independent contractor. This Agreement creates no employment relationship, joint venture, right to profits, or similar relationship between the Podcaster and Kast Media. Podcaster will not receive the benefits that Kast Media provides to employees. Podcaster understands that Kast Media will not withhold any income, Social Security, or other taxes from its compensation.

*Kast Media LLC – CONFIDENTIAL*

b. <u>Audit</u>. Podcaster shall have the right, once per calendar year, to audit Kast Media's books and records, at Podcaster's own expense, for the Term and the year immediately following the Term. Such audit right shall apply to the two (2) year period prior to the date of the audit. Podcaster shall provide thirty (30) days written notice of the audit. The audit shall be done during business hours and must be completed within four (4) months from when the audit began. If the audit indicates an underpayment in excess of five percent (5%) of the amounts paid under this Agreement, Kast Media shall pay the reasonable costs of the audit. Any information gathered during an audit by Podcaster must be held strictly confidential.

c. <u>Indemnification & Exculpation</u>. Podcaster shall indemnify, defend and hold harmless Kast Media for all costs and expenses (including legal fees) related to any suit, claim, proceeding, or adjudicative matter brought against Kast Media based on a claim arising out of the good and services related to this Agreement, as well as any goods or services directly or indirectly resulting from this Agreement (including, but not limited to, any claims of libel, defamation, or intellectual property infringement). Podcaster shall notify Kast Media immediately of any such suit, claim, or proceeding, and give Kast Media authority, information, and assistance (at Podcaster's expense) for the defense of such suit, claim, or proceeding, and Podcaster shall pay all damages and costs awarded in any such suit, claim, or proceeding.

d. <u>Notice</u>. Notices pursuant to this Agreement may be made by letter, email, fax, or any other commercially reasonable method. A notice shall be considered effective when received.

e. <u>Consent</u>. Any and all consent that is required from Podcaster under this Agreement shall not be reasonably withheld.

f. <u>Governing Law</u>. This Agreement shall be governed by the laws of California, without regard to conflict of laws.

g. <u>Arbitration</u>. Any dispute related to this Agreement shall be resolved through arbitration, the manner of which is to be selected at the sole discretion of Kast Media.

h. <u>Amendment</u>. This Agreement may be amended only by written consent of Kast Media and the Podcaster.

i. <u>Assignment</u>. Either Party shall not assign or transfer any of its rights or obligations, in part or in whole, under this Agreement without the prior written consent of the other Party. This Agreement will be binding on any and all successors.

j. <u>Counterparts</u>. This Agreement may be executed in counterparts.

*Kast Media LLC – CONFIDENTIAL*

k.  <u>Severability</u>. If any term of this Agreement, in part or in whole, is held unenforceable in any jurisdiction, such unenforceability shall not affect any other term of this Agreement in any other jurisdiction.

l.  <u>Entire Understanding</u>. This Agreement constitutes the entire understanding and agreement between Podcaster and Kast Media related to the matters contained in it. This Agreement supersedes all prior understandings and agreements, whether written or oral with respect to such matters.

m.  <u>Survival</u>. Sections 5, 6 and 7 shall survive the Term of this Agreement.

[Remainder of Page Left Intentionally Blank]

*Kast Media LLC – CONFIDENTIAL*

THIS AGREEMENT IS HEREBY ENTERED INTO AS OF ___10/09/2018_____ BY
AND BETWEEN:


**KAST MEDIA LLC**                              **Jim Cornette**


By: _Colin Thomson_____                By: _____

Name: Colin Thomson                      Name:   Jim Cornette

Title: CEO

*Kast Media LLC – CONFIDENTIAL*

**EXHIBIT A**

**DESCRIPTION OF PODCASTER CONTENT**

| | Description |
|---|---|
| **Services / Content** | Interviews, intros, outros, core content, of multi-platform podcast show |
| **Development** | Ongoing improvement and development of podcast show according to mutually agreed upon strategy |
| **Distribution** | All podcast platforms, and applicable visual platforms. Good faith promotion of podcast content on influencer's existing platforms for growth of podcast |
| **Format** | Audio and visual/audio media formats |
| **Frequency** | Weekly, but subject to change according to strategy decisions |

8

*Kast Media LLC – CONFIDENTIAL*

# EXHIBIT C

https://www.register-herald.com/sports/yeet-steve-new-is-all-in-on-law-career-and-pro-wrestling/article_3c39a4f4-163f-11ef-986c-1bb1fbfe3261.html

# Yeet! Steve New is All In on law career and pro wrestling

By Gary Fauber The Register-Herald

May 19, 2024



Beckley attorney Steve New stands among some of his wrestling memorabilia in his office building in Beckley. A lawyer for nearly 30 years and pro wrestling fan for even longer, New has been able to combine the two and represent some of the industry's top players.

Gary Fauber/The Register-Herald

   

Growing up along Gilbert Creek, life for Steve New and his friends was not unlike that of most other kids. They rode their bikes, built treehouses, played Army. Nothing out of the ordinary for a kid on a carefree summer day.

But there was one friend who, every Saturday, at 2:30 p.m., without fail, would always go home. With no explanation.

There came a day when New could fight the curiosity no longer.

"I followed him to his parents' house and I'm like, 'Why do you disappear at 2:30 in the afternoon? No matter what we're doing, where we are, you're home at 2:30 in the afternoon,'" he recalled.

He soon saw on the television something he might have never been exposed to before, but something that would go on to have a lasting impact on his life.

It was International Championship Wrestling, a Kentucky-based organization owned by Angelo Poffo — the father of legend "Macho Man" Randy Savage and "Leaping" Lanny Poffo (later to be known as "The Genius" in the World Wrestling Federation).

"The first match I ever saw — at that time he was called the 'One Man Gang' Ronnie Garvin, who was the Southeastern Champion and was taking on a guy who was tag team partners with Rip Rogers and the Convertible Blondes, a guy by the name of Ricky Starr," New said.

"And from watching that first match with my friend, man, I was hooked."

There was no containing New's newfound passion. He watched every weekend, and not just ICW. There was Georgia Championship Wrestling, Mid-Atlantic Championship Wrestling, World Wide Wrestling — so many avenues for New to further cultivate his growing love for professional wrestling.

It became certainly far more than a hobby (although he does have quite the collection of wrestling memorabilia), but he had different plans in regards to his career path. New made the decision at the age of 14 that he wanted to be a lawyer.

He worked hard to make that happen and is now a top lawyer in the state of West Virginia. He recently celebrated the 20th anniversary of the date he opened his Beckley practice. He takes pride in his work, especially in helping those who can't help themselves.

But, much like his passion for wrestling could not be confined, neither could the reach of his professional expertise. As fate would have it, his legal acumen has been sought in some high-profile cases in the pro wrestling industry.

The next time you see Jey Uso wearing a "Yeet!" shirt or hear the word reverberating through a WWE arena, make sure to throw out a thank you to Stephen P. New.

111

It all started on that Mingo County Saturday afternoon in August 1981. It didn't take long for New to become immersed not only in the weekly ICW shows, but whatever else he could find on TV. Less than a year later, his mom took him to his first house show at the Logan Fieldhouse.

The feature bout was The Great Kabuki bringing his blend of wrestling and martial arts — and his infamous and dreaded green mist — against the charismatic "American Dream" Dusty Rhodes — the man who would become New's favorite wrestler.

"Man, that was a great card," he said with a smile. "It had Michael Hayes, Bad Bad Leroy Brown, Super Destroyer, Big John Studd, Superstar, Tommy 'Wildfire' Rich. The first live wrestling match I ever watched was Kevin Sullivan versus Brad Armstrong. From then on it's just been a passion. I love the sport of professional wrestling."

He watched all that he could, and he was a loyal reader of the magazines featuring the work of iconic pro wrestling writer/photographer Bill Apter. And he was all about the babyfaces of his time.

"I loved 'Wildfire' Tommy Rich. I loved the Rock 'n' Roll Express. Those were a lot of my favorites," New said. "The Road Warriors when they were good guys. And whenever a bad guy team turned to be a good guy, all of a sudden somebody I'd hated, I loved. Hated Roddy Piper as a bad guy, loved Roddy Piper as a good guy when he turned on Magnificent Muraco. Hated him again when he went to the WWF and the Cyndi Lauper stuff. I just always liked the good guys. Ronnie Garvin, obviously somebody near and dear to my heart because of the first match that I ever saw. I loved Ronnie Garvin and I was so glad that he got a world title run in the mid-80s. So the typical cast of characters — Magnum T.A., all of those guys and teams that were your good guys."

But influence didn't come just from the likes of Ronnie Garvin, Dusty Rhodes and Tommy Rich. Perhaps the biggest influence was closer to home — not to be found in a TV set every Saturday, but in the flesh, five days a week.

Her name was Ms. Wolford. She was New's eighth grade Civics teacher, and she recommended that he become a lawyer.

"It fit nicely with what I was good at in school," he said.

So, at 14, New already had his career goals in mind. When the time came to execute, he made sure all the pieces were in place.

He joined the National Guard at the age of 17 to make sure he was set up to attend college. He did just that and went on to earn a political science degree from Marshall University. He then took a year off school after he was commissioned as a second lieutenant in the Army and went through training at Fort Knox.

That, really, was a defining moment for New.

"It was the best thing that I ever did was take a year off school, because when I went back to law school in Morgantown in August of '95, I was completely refreshed, I was in a great frame of mind," he said. "Law school was the best three years of my life, beyond the shadow of a doubt. My closest and best friends, colleagues, just people I had gone to school with at Marshall. Man, law school at Morgantown, '95 to '98, was really good."

New returned to southern West Virginia and clerked for the three circuit judges in Raleigh County — H.L. Kirkpatrick, Robert Burnside and John Hutchison.

"(I) could not have had three better men to work for coming straight out of law school," he said. "They took such good care of me and mentored me and tried to set me on a path that would lead to success, and I credit those three gentlemen so much for any success that I have ever had."

New eventually went back to his hometown of Gilbert and joined the firm of Pam Lambert. He gained plenty of valuable experience there en route to starting his own practice in Beckley in May 2004, and he has been there ever since.

"I've seen a fair amount of success," he said. "I have been abundantly blessed in my law practice, I really have. … I'm in my 26th year of practice and 20 years on my own, and I love it. Not a lot of people can say that they get up every day and they're doing that thing in life that just makes them happy, and I can. I'm abundantly blessed and have been abundantly blessed."

During his 20 years in Beckley, New has made it his mission to serve the community. His firm has supplied bicycle helmets to thousands of children, has contributed to several college scholarship funds and has donated to local charities and community food banks.

As for his practice, New said he does "a little bit of everything."

"We do a lot of injury cases, death cases," he said. "Here in the last few years, I have found my firm doing a lot of sexual assault, sexual harassment and civil rights litigation, focused primarily with corrections and jails and things like that, more so than the law enforcement piece of civil rights litigation."

There is one fight that New wages with the same intensity and fervor as Dusty Rhodes battling a hated rival. Wrestler CM Punk used to refer to himself as "the voice of the voiceless." When it comes to the opioid crisis in West Virginia, New could easily take on the persona of "the defender of the defenseless."

"I would be remiss if I didn't say that for the past five years I have represented thousands of babies who were born addicted to opioids," New said. "What the pharmaceutical industry did to Appalachia is criminal. I think people should be in jail. I'm not in charge of everything, but I really take great joy from representing those innocent victims of the opioid crisis. The only innocent victims of the opioid crisis are the babies. The babies didn't choose to do anything. They didn't choose to take a single drug. Whatever was prescribed to their mom, that's what they ingested in utero.

"Babies are completely innocent, so it's been a long, hard fight, but boy do I love that litigation."

111

Two areas of New's life, each carrying their own deep meaning. Each as important to him as the other, for different reasons.

However, he probably never thought the two would come together. But they did, and it opened a door to something he might never have envisioned.

Twenty years ago, New was at a wrestling legends fan festival in Charlotte, North Carolina, when he met another West Virginian, Logan native Gary Damron. Through their connection as fellow wrestling fans and West Virginia brethren — Gilbert and Logan

are less than 30 miles apart — they formed more than just a friendship.

Two years after they met, Damron founded All Star Wrestling based in Boone County. New began sponsoring ASW events and still does, most notably the upcoming Bash in Beckley IV on June 1.

That's how the two worlds came together. Wrestlers took notice of the Stephen P. New Law Offices name and, while maybe not at a rapid pace, they began contacting him.

"Any work that I had helped a wrestler would have just been very hit and miss," he said. "It wasn't like anybody had me on retainer. If David Flair came through here, or Al Snow or D-Lo Brown or somebody, and they were wrestling a local event that I had sponsored, they might call me the week after or something and be like, hey, man, you're a lawyer, let me ask you a question about this or that. So for a long, long period of time it was just hit and miss."

That changed when Brian Last came calling. Perhaps more popularly known as "The Great" Brian Last, he created the 6:05 Superpodcast, but would later team up with wrestling legend Jim Cornette as co-host of the Jim Cornette Experience and Jim Cornette's Drive-Thru podcasts.

New was among those Last approached for sponsorship, and his life immediately changed.

"Brian Last asked me when he became Cornette's co-host, 'Hey, I really think that I am in on the ground floor of what's going to be a very successful podcast. Would you like to sponsor?' Sure," New said, reflecting the ease of the decision with one word.

"So just through that sponsorship, Cornette inevitably called me his lawyer and I started doing a good bit of work for Cornette. We secured the Midnight Express trademark, and when we did that, that led to some other people. We got Rock 'n' Roll their trademark, and some other work. A colleague of mine, Dusty Gwinn that I do work with, was able to

do that. Then it just sort of took off, because Cornette's on the podcast week after week giving out my phone number and my website and I've got guys out of the blue calling me or sending a message through the website. That's kind of how all of that started. I represent Cornette to this day."

New represented Cornette and Last in a case in California last month.

Cornette has a reputation for being matter-of-fact and unapologetic. New can confirm it.

"What you see is what you get," New said. "He really does not care what anybody thinks of him. He lives in a house in Louisville that he grew up in and he could not care less what anyone's opinion of him is. He knows who he is. If you like him, great. If you don't like him, that's fine, too. But it's an honor (to represent him).

"Make no mistake about it, there's a reason why Jim Cornette is interviewed on shows like 'Dark Side of the Ring'. I think Jim has a photographic memory. His recall of events going back to the turn of the 20th century in the sport of professional wrestling is uncanny. He has a genius-level IQ, No. 1. No. 2, he has a photographic memory. Then because, like Paul Heyman, he got involved in pro wrestling at a very young age, 14, 15 years old, and he's photographing, he gets smartened up, so to speak, in the Memphis territory, making the photographs, Jimmy's had this blessed life. His mother would haul him off to Memphis and Louisville — I was lucky to get my mom to take me to Oceana and Logan and Williamson to see wrestling, let alone haul me hours to watch pro wresting and photograph it and what have you. I'm honored to represent Jim Cornette, I really am."

It didn't stop with the Louisville Slugger. In fact, New took a little more satisfaction from WrestleMania this year than usual.

111

Last fall, World Wrestling Entertainment star Jey Uso began using the slang word "yeet." It drew a huge response from the crowds and didn't take long to show up on WWE merchandise.

There was one problem.

The word was already trademarked — "by some guy in West Virginia" as one Twitter (X) user put it.

His name is Kasey Huffman, a pro wrestler from Madison better known by his ring name, Huffmanly. He built himself into one of West Virginia's top indie stars, but his career was slowed last June when he suffered a serious knee injury. He made his return May 11 for ASW in his hometown, and will be on the card at The Bash in Beckley.

While he was away, "Yeet!" WWE-style was gaining steam, so he did something about it.

"Kasey Facebook messages me, and he goes, 'Man, Jey Uso's out there using 'Yeet!'" New said. "I said, 'Let's not get ahead of ourselves.' I said it could be a rap thing, it could be whatever. Let's watch how this unfolds."

New said he always recommends trademark protection.

"I always tell all the guys, particularly the ones who it looks like might have a nice trajectory — you never know when you're going to go from All Star Wrestling to something big — so I always tell the guys and the gals, 'Protect your trademarks. It's going to cost you a little bit of money but it's worth it in the end,'" he said. "He approached me, and me and Dusty applied for the 'Yeet' trademark — and a couple of things related, but 'Yeet' for use in professional wrestling."

After some research, it was confirmed that Huffman did indeed own the trademark.

"Whether the trademark went through (or) didn't go through was being examined at the U.S. Patent and Trademark Office or whatever. Casey clearly had first use, and first use in patent and trademark cases wins," New said. "So he clearly had the common law trademark and he had first use, which meant he was going to win any dispute with WWE. I sent WWE a cease and desist (order) on a Monday afternoon. That night on Raw, 'Yeet' is blurred out, and I knew we had them. Lawyers for WWE reached out the next day and they were like, 'We want to try to work something out for your client.' I can't divulge all of the details, obviously. But I thought it was very favorable for my client.

"Once again, one of those surreal moments. The lawyers from D.C. and Connecticut were on the phone talking about, 'Paul has to approve this.' Well, Paul (Levesque) is HHH. He's in the background talking to the in-house lawyer at WWE legal, and I'm like, 'Man, how does this stuff happen?' That's a situation where a guy just thinking ahead to protect himself worked out to his favor."

In April, New was at WrestleMania 40 in Philadelphia. When Jey Uso wrestled his brother Jimmy on night one, chants of "Yeet!" flowed freely and legally. And New could only smile, perhaps chuckle.

"Tell you what I said — 'You're welcome,'" he said. "Every chance I got, I said, 'You're welcome.' 'You're welcome.' 'WWE Universe, you're welcome.' 'Pat McAfee, you're welcome.'"

lll

When it comes to his law career and pro wrestling fandom, New is certainly all in. Which is also a bit ironic, considering one of his latest clients.

CM Punk's debut in All Elite Wrestling in 2021 was one of the biggest moments in recent wrestling history. He was making his return to the sport after his split with WWE seven years before.

He was one of wrestling's most popular performers, and also among the most polarizing. And his run with AEW was not without its controversy, first with the All Out pay-per-view in September 2022, after which a backstage fight resulted in the suspension of not only Punk but also Matt and Nick Jackson and Kenny Omega, as well as the firing of Ace Steel.

Punk returned for the first episode of AEW Collision on June 17 of last year, more than 10 months later. However, another backstage altercation at the All In pay-per-view in London on Aug. 28 involving Punk and Jack Perry led to both being suspended. Punk ultimately was fired with cause on Sept. 2.

Representing Punk and Ace Steel through it all was none other than Steve New. Non-disclosure agreements prevent the details of the case being discussed.

"Along with representing Cornette, representing CM Punk and Ace Steel, that's the honor of my lifetime," New said. "They are two legit and solid human beings. Not just people within the pro wrestling industry; they are solid human beings. They never try to give me a smoke screen or try to tell me what's not going on. It's an honor to represent those guys."

Punk made a huge return to the WWE at Survivor Series in November.

Less than two weeks before the All Out incident, Punk was in Charleston for an episode of AEW Dynamite where he delivered his famous shoot promo on "Hangman" Adam Page. New was at ringside for that moment.

This was before the two began working together.

"I've told Punk this several times. I had to go work in New Orleans the next day (after Dynamite), so I stayed in Charleston. On my plane were all of the AEW wrestlers connecting through D.C., and I saw Punk at a Starbucks when we all got off of the plane.

He headed straight for a Starbucks. I almost walked up to him and handed him a (business) card and said, 'I've got a feeling you're going to need this,'" New said, laughing.

"And it wasn't long after that that he and I got put in touch with each other. The rest is history."

111

When New says he is blessed, he means it. One of the great passions of his life unexpectedly meshed with another, and he's thankful for every second.

"Sometimes I have to say, pinch me," he said. "I was backstage at WrestleMania last (month). I'm watching it all go on before Cody's (Rhodes) match on Sunday night and I'm like, how does a boy from Gilbert Creek end up at WrestleMania watching it all unfold? Right there in front of me is (WWE booker) 'Freebird' Michael Hayes, who in 1982 I watched tag with Bad Bad Leroy Brown against the Super Destroyer and Big John Studd. Fast forward 42 years later and there I am shaking the man's hand."

New describes it not only in a way that a wrestling fan can relate, but also as a bit of a reflection of his career.

"It's going on 43 years that I've been a wrestling fan. I just love it. It's one of those things where, in fandom, that thing's always been there for me. That's the way I feel about pro wrestling. Some of the best times of my life have been at an event, at a pro wrestling event of some kind, or watching something on television or what have you.

"It's classic good guy versus bad guy, and the good guy doesn't aways win but he's going to try to come back and eventually best the bad guy. That's why I love pro wrestling."

Trending Video

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:

1615-A Montana Avenue, Santa Monica, CA 90403

A true and correct copy of the foregoing document entitled (*specify*):

**MOTION OBJECTING TO CLAIM NO. 5 OF ARCADIAN VANGUARD LLC; DECLARATION OF J'AIME WILLIAMS KERPER; DECLARATION OF COLIN THOMSON** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1. <u>TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)</u>**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) ___11/15/24___ , I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

Peter M Bransten    pbransten@glaserweil.com, dsanchez@glaserweil.com
Kathleen A Cashman-Kramer    kcashman-kramer@fennemorelaw.com, theresam@psdslaw.com
Russell Clementson    russell.clementson@usdoj.gov
Leslie A Cohen    leslie@lesliecohenlaw.com, jaime@lesliecohenlaw.com;clare@lesliecohenlaw.com
Asha Dhillon    asha.dhillon@turnerdhillon.com
Moriah Douglas Flahaut (TR)    df@echoparklegal.com, C194@ecfcbis.com
Thomas M Geher    tmg@jmbm.com, bt@jmbm.com;tmg@ecf.courtdrive.com
Samuel R Maizel    samuel.maizel@dentons.com,
alicia.aguilar@dentons.com;docket.general.lit.LOS@dentons.com;tania.moyron@dentons.com;kathryn.howard@dentons.com;joan.mack@dentons.com;derry.kalve@dentons.com
Matthew J Matern    mmatern@maternlawgroup.com,
lolarra@maternlawgroup.com;ereyes@maternlawgroup.com;rsuh@maternlawgroup.com;jboxer@maternlawgroup.com
Gary B Rudolph    grudolph@fennemorelaw.com,
bkstaff@sullivanhill.com;vidovich@ecf.inforuptcy.com;rudolph@ecf.courtdrive.com;kcashman-kramer@fennemorelaw.com;ejames@fennemorelaw.com;james@ecf.courtdrive.com
United States Trustee (SV)    ustpregion16.wh.ecf@usdoj.gov    ☐ Service information continued on attached page

**2. <u>SERVED BY UNITED STATES MAIL</u>**:
On (*date*) ___11/15/24___ , I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.

☒ Service information continued on attached page

**3. <u>SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL</u>** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| 11/15/24 | Clare Hendricks | /s/ Clare Hendricks |
|---|---|---|
| Date | Printed Name | Signature |

---

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                             **F 9013-3.1.PROOF.SERVICE**

**<u>Service List Continued</u>**

| |
|---|
| United States Trustee<br>915 Wilshire Blvd, Suite 1850<br>Los Angeles, CA 90017 |
| Arcadian Vanguard LLC<br>c/o Gary Rudolph<br>Fennemore LLP<br>600 B Street<br>Suite 1700<br>San Diego, CA 92101 |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.